**US TAX COURT
RECEIVED**

**OCT 4 2019
9:01 PM**



**US TAX COURT
eFILED**

**OCT 4 2019**

ALEXANDRU J. BITTNER & SHERRY BITTNER,

Petitioners,

ELECTRONICALLY FILED

v.

Docket No.   19894-17

COMMISSIONER OF INTERNAL REVENUE,

Respondent

# PETITIONERS' REPORT

**SERVED Oct 04 2019**



Government
Exhibit
B

## UNITED STATES TAX COURT

| | | |
|---|---|---|
| ALEXANDRU J. & SHERRY BITTNER, | ) | |
| | ) | |
| Petitioners, | ) | |
| | ) | |
| v. | ) | Docket No. 19894-17 |
| | ) | |
| COMMISSIONER OF INTERNAL REVENUE | ) | |
| | ) | |
| Respondent. | ) | |

### Expert Report of Scott D. Michel

**I.     Introduction**

    **A.     Background and Qualifications**

I am in private practice at the law firm of Caplin & Drysdale, Chartered, in Washington, D.C.  I joined the firm in October 1981 and have practiced at the firm since that date.  For the past 38 years my practice has been almost exclusively in the area of tax controversy, and during my entire period as a practicing attorney I have focused particularly on cases involving taxpayers who have failed to disclose foreign assets to the Internal Revenue Service.  These cases have involved the failure to disclose foreign bank accounts, ownership in foreign corporations, certain relationships with foreign trusts, and to report the income, if any, therefrom.  During the course of my practice I have advised over 1,500 companies and individuals with offshore tax noncompliance through voluntary disclosures, civil examinations, and criminal tax investigations.

In my practice I have become generally familiar with the civil and criminal penalty provisions of the Internal Revenue Code (the "Code") as well as its procedural and administrative provisions.  I am also generally familiar with court decisions that impact the tax controversy area and particularly the area of unreported foreign assets and income.  I am well

aware of the regulations and relevant form instructions regarding the reporting of foreign bank accounts.  I do not consider myself a technical expert on the law regarding the taxation of foreign corporations or foreign trusts, or any income they may produce, but I am familiar with the U.S. information return filing obligations related to such entities and, in conjunction with my colleagues at Caplin & Drysdale, have advised numerous taxpayers on the process of coming into compliance as to such issues.

One of the primary focuses of my practice has been in advising taxpayers regarding voluntary disclosures to the Internal Revenue Service, especially as regards the reporting of foreign assets, income, and entities.  I am familiar with the relevant provisions of the Internal Revenue Manual and with various IRS disclosure programs that have been implemented over the years, especially in the area of foreign accounts and assets.  Advising clients with regard to these IRS programs has, I would estimate, represented over half of my practice in the last decade.  I have also participated over the last ten years in meetings with senior officials at the IRS to provide practitioner feedback on the various disclosure programs as they have been implemented and operated.

I have spoken frequently at conferences in the U.S. and abroad and written extensively on issues relating to criminal and civil tax controversy, especially on issues regarding addressing issues of non-compliance in reporting foreign accounts or assets.  Attached as Exhibit A is a list of my publications on these subjects.

I am a member and Regent of the American College of Tax Counsel, a past Vice-Chair of the American Bar Association Section of Taxation, and a former Chair of that Section's Committees on Civil and Criminal Tax Penalties and Standards of Tax Practice.  I also am an Adjunct Professor at the University of Miami Graduate Tax Program.

Caplin & Drysdale, Chartered has been compensated for my time a rate of $ 913.50, which represents a 10% discount off of my normal hourly rate, and at the firm's standard billing rates for colleagues who have assisted me in the preparation of this report.

**B.    Assignment**

I have been engaged by the law firm of Clark Hall PLC in San Antonio, Texas, to provide an expert report on certain issues in connection with the above-captioned case. Specifically, I have been asked to opine on the advice rendered by Mr. Jeff Beckley, a Certified Public Accountant and the Managing Principal of Beckley CPA, in connection with the taxpayer's desire to correct his past U.S. tax filing non-compliance. I have also been asked to opine on the IRS's overall approach to the controversies regarding the taxpayers, as set forth below.

For reasons I shall explain, my opinion is that the advice Mr. Beckley rendered in connection with the filing of delinquent tax and information returns, and the preparation of the returns themselves, was unreasonable, negligent, and erroneous. Additionally, my opinion is that the IRS has conducted an unnecessarily aggressive examination of Mr. and Mrs. Bittner's returns as compared to its treatment of similarly-situated taxpayers and violated certain longstanding principles governing IRS conduct in the course of an examination of a taxpayer.

**C.    Materials Considered in Connection with This Matter**

In connection with the preparation of this Report, I have reviewed certain administrative filings and pleadings relating to Mr. and Mrs. Bittner ("the taxpayers").[1]  Particularly pertinent materials include: i) the Petition and Answer filed in this Tax Court proceeding; ii) the taxpayer's "Protest of FBAR Penalties" filed July 5, 2017, with the Internal Revenue Service; iii) Petitioners' Motion for Partial Summary Judgment filed in this Tax Court proceeding on

---

[1]    If this report uses the term "taxpayer" in the singular, it is a reference to Mr. Bittner.

September 5, 2019 and Respondent's Response filed September 27, 2019; iv) Respondent's

Motion in Limine filed September 13, 2019; v) the Joint First Stipulation of Facts filed

September 17, 2019; and vi) Respondent's Response to First Request for Admissions, filed

September 20, 2019.

I have also reviewed certain IRS materials regarding various voluntary disclosure

programs, and certain provisions of the Internal Revenue Code, the Internal Revenue Manual,

and Circular 230.

## II.    Facts

In support of my expert opinion, I have accepted as true the following facts:

- Alexandru Bittner was born and raised in Romania.  In late 1982, he immigrated to the United States, where he met his wife Sherry.  While he resided in the United States, the taxpayer, who had an advanced degree in mechanical engineering, was employed as a plumber.  The taxpayers became naturalized U.S. citizens in 1987. Approximately four years later, in 1991, they moved back to Romania, where they lived for twenty years.  The taxpayer acquired valuable interests in the fishing business and other businesses and became successful in Romania during this period.

- While he lived in Romania, the taxpayer was unaware that because he was a naturalized U.S. citizen he was required to file U.S. tax returns reporting the income he earned in Romania, nor was he aware of any requirement to file information returns such as Forms 5471 or FBARs.

- After moving back to the U.S. in 2012, the taxpayer first learned that he was supposed to file U.S. income tax returns for the years he lived in Romania reporting his worldwide income.  He was extremely concerned about this and rushed to find someone to take care of his tax compliance.  He located a local CPA in Plano, Texas, Jeffrey Beckley, who advertised on his website that he had expertise in taxation of foreign source income.

- Notwithstanding apparently contrary comments that he received in a call with the IRS, Mr. Beckley advised the taxpayer that the Romanian-U.S. tax treaty ("the treaty") exempted all of the taxpayers' Romanian income from U.S. taxation, and that since his income was not taxable by the U.S., his filing of the returns was pro-forma and that they did not need to be exact.

- The taxpayer expressed a wish to file returns for every year that he was in Romania to get in full compliance with the IRS.  Even though he was apparently told by the

4

IRS that only six years were necessary, Mr. Beckley did not advise otherwise, and thus prepared 22 years of joint U.S. income tax returns for 1990 through 2011, all of the years the taxpayers had lived in Romania. The returns reflected estimated gross income or receipts provided by the taxpayer.  The taxpayer generally did not claim full basis in assets sold because cost records were difficult to obtain for historical transactions from many years in the past, and he did not fully understand the concept or how transactions should be reported (and Mr. Beckley did not advise him on this subject).  He relied on Mr. Beckley's advice that irrespective of this cost basis issue he did not owe any tax.  The taxpayer also reported some non-taxable transfers to nominees as taxable sales because Mr. Beckley did not tell him those should not have been reported.

- On each return, Mr. Beckley calculated a taxable income figure but offset that with an equal amount reflecting and disclosing that the treaty exempted any tax.  He also attached a separate explanation that Mr. Bittner's income was not subject to U.S. tax under the treaty.  The taxpayers signed those returns and Mr. Beckley filed them in May 2012.

- Had the taxpayers sought preclearance into the 2012 IRS Offshore Voluntary Disclosure Program in early 2012, as they were not under examination and otherwise appear to have met the "timeliness" requirements of the Program, they likely would have been accepted.

- Beginning in August, 2012, the IRS sent the taxpayers a series of notices of assessed tax.  The notices ignored the claims of exclusion by treaty as "mathematical errors" and calculated and assessed tax, penalties, and interest totaling over $6 million.

- The taxpayers engaged tax counsel who timely sent letters requesting that the assessments based on supposed "mathematical errors" be abated as required by IRC §6113(b)(2)(A).  The IRS ignored the letters and did not reverse the assessments. However, separate from the other events discussed in this Report, after the IRS commenced collection activity and the taxpayers pursued their Collection Due Process rights, in October 2014 these assessments were abated in full.

- On counsel's advice in 2012, the taxpayers also requested pre-clearance into the Offshore Voluntary Disclosure Program ("OVDP"), but the IRS rejected this request as untimely, apparently because the tax returns filed voluntarily by the taxpayers had come under examination.

- Notwithstanding the rejection from OVDP, after extensive work conducted by the taxpayers' U.S. and Romanian advisors and employees, on or about September 12, 2013, the taxpayers submitted proposed amended joint U.S. income tax returns and FBARs for their tax years 2006 through 2011, which included a reasonable cause statement. These returns were assigned for audit to IRS Revenue Agent Anh Reach, and the examination of the Forms 5471 was assigned to Revenue Agent to Revenue Agent Holly Bishop.  Both agents then issued extensive document requests.  In

response, the taxpayers provided written responses and electronically produced thousands of pages of documents (over 1 gigabyte of data). The taxpayers objected to portions of these request on the ground that responding to the requests would have entailed thousands of hours of work at substantial cost, but the taxpayers offered to provide specific documents on request.

■ Beginning in January 2014, Ms. Bishop prepared and sent 163 identical letters to the taxpayer for 38 entities, for every Form 5471 they filed. Each letter was captioned "Failure to File Form 5471" despite that they had filed those Forms with the amended returns. Each letter stated that the taxpayer "had not filed a Form 5471" or that the form filed was substantially incomplete. The notice further said that "if you fail to file the information return within 90 days" additional penalties of $10,000 per return may be imposed. The notices invited the filing of a statement of reasonable cause, and in response to these notices, the taxpayer sent Ms. Bishop a reasonable cause statement on or about February 20, 2014.

■ On May 2, 2014, Ms. Bishop issued a second series of notices stating that 132 of the 163 filed Forms 5471 filed were "substantially incomplete." Taxpayers' counsel discussed on a conference call the notices with Ms. Bishop and IRS Area Counsel Dan Price, among others, seeking to learn specifics as to why the IRS believed the forms were incomplete. The IRS failed to respond to some of these inquiries and refused to identify specific errors, saying only, after being pressed, that taxpayers' counsel should review the Schedules M for intercompany transactions.

■ Taxpayers' counsel then reviewed the Forms 5471 and found certain errors, which had been the result of good faith misunderstandings largely on the part of the taxpayer's Romanian assistant. The errors did not result in material changes to the forms that were filed, and the review by taxpayers' counsel also established that some of the Forms that had been filed need not have been filed. The revised forms were filed on June 30, 2014, and approximately two weeks later, Agent Bishop informed taxpayers' counsel that she would start her review. No further response from Agent Bishop ever came, even after the taxpayer sent Agent Bishop a Supplemental Statement of Reasonable Cause on or about August 6, 2014.

■ On or about June 30, 2014, taxpayers' counsel informally requested to Agent Reach that the taxpayers be treated as having entered the recently announced IRS Streamlined Offshore Program which, because the taxpayers qualified as non-domestic taxpayers under the rules of that Program, would result in no penalties being imposed. Agent Reach denied this request because the taxpayers' voluntarily-filed returns were under audit, and her notes reflect that she told taxpayers' counsel that she did not want to permit the taxpayers to enter what she incorrectly described as "OVDP" because she was "deep in the examination process…"

■ On August 7, 2014, the taxpayers sought assistance from the Taxpayer Advocate regarding their request to enter the Streamlined Program. On September 24, 2014,

on advice from Taxpayer Advocate, they filed with Ms. Reach a formal written request and the required Certification Statement of reasonable cause, seeking to have the taxpayers treated under the Streamlined Compliance Procedures for U.S. Taxpayers Residing Outside the United States.[2]  Agent Bishop never responded to that formal request.

■ Documents obtained under FOIA reflect that in November 2014 Agent Reach twice advised the Taxpayer Advocate Service that she was not examining the years preceding 2006 and did not intend to do so.  She implemented this decision by requesting through her management to remove the pre-2006 years from the examination inventory, and her management approved.

■ Nothing further in any matter relating to the taxpayers was forthcoming from the IRS until April of 2015, when Agent Reach called taxpayers' counsel and stated that IRS Counsel Price wanted to schedule a meeting to see if the case could be resolved.  The meeting was held on April 14, 2015, with Mr. Price and Agent Reach in attendance with taxpayers' counsel.  Ms. Reach stated that she had not examined any of the material the taxpayers had produced in response to the IRS's document requests issued a year earlier.

■ At this meeting, Mr. Price and Ms. Reach made a three part proposal:

  o The taxpayers would pay a miscellaneous penalty of 5 percent of the value of their foreign accounts and assets, which Mr. Price estimated would be at least $1.4 million (and perhaps more).

  o The taxpayers would undergo an examination of certain "large and unexplained" items on the 2006 to 2011 amended returns prepared and filed by taxpayers' counsel, although Agent Reach had already prepared Form 4549 computations showing approximately $500,000 in tax, interest and penalties for such amounts absent further substantiation.

  o The IRS's determination of whether those items had been substantiated would be final and the taxpayers would give up all appeal rights and judicial review.

---

[2]      The Streamlined Filing Compliance Procedures are available to taxpayers who certify that their failure to report foreign financial assets and pay all tax due in respect of those assets did not result from willful conduct.  The Streamlined Procedures are designed to provide taxpayers with the ability to file amended or delinquent returns and resolve outstanding tax and penalty balances, and the Procedures set forth the terms for resolving such matters.  The Streamlined Procedures are available to taxpayers who reside in the United States or taxpayers who reside abroad.  Taxpayers who resided in the U.S. were subject to a 5 percent penalty on foreign assets that should have been, but were not, disclosed on an FBAR or Form 8938, whereas taxpayers who resided abroad did not have to pay any penalty (they paid only tax and interest).  *See Streamlined Filing Compliance Procedures,* available at https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures; and *U.S. Taxpayers Residing Outside the United States*, available at https://www.irs.gov/individuals/international-taxpayers/u-s-taxpayers-residing-outside-the-united-states.

■ Taxpayers' counsel were also told in this meeting that in the event that the taxpayers did not agree to this settlement proposal, Agent Reach would open the years 2002-2004 for examination (notwithstanding her prior representations to both the taxpayers and the Taxpayer Advocate Service that she had no intention to do so, and her implementation of this decision with the approval of her management).

■ Mr. Price further told taxpayers' counsel that if they did not sign extensions of the statute for all years 2002-2004 and 2006-2011 within three days, the IRS would immediately issue a notice of deficiency for the 2002 through 2004 years, years which had never been examined.  The taxpayers were provided a draft notice of deficiency for 2002-2004 asserting tax, penalties and interest exceeding $5.2 million.

■ The taxpayers declined Mr. Price's proposal and made a counter offer to resolve the case.  The counter-offer was rejected, and apparently, Mr. Price and Agent Reach had pre-determined before the meeting that they would not consider any counter proposal from taxpayers' counsel.  Nonetheless, facing the threat that the notice of deficiency for the years 2002-2004 would be issued immediately, taxpayers signed and returned extensions for all the years within the demanded three days.

■ Agent Reach then expanded the examination into 2002-2004, resulting in over $9.6 million in proposed assessments of income tax and over $5.2 million in delinquency and accuracy-related penalties, the issues that are before the Tax Court in the pending proceeding.  In addition, Agent Reach's examination resulted in the proposed assessment of non-willful FBAR penalties totaling about $3 million.  She also proposed the assessment of Form 5471 penalties totaling about $6 million, notwithstanding the IRS's prior failure to respond in any way to the taxpayers' reasonable cause submissions.

■ On May 2, 2017, taxpayers' representatives met in Washington, D.C. with Nina Olson, the Taxpayer Advocate, Doug O'Donnell, Commissioner LB&I, and a number of other representatives of the IRS and the Taxpayer Advocate.  At this meeting the IRS informed taxpayers' counsel that Mr. Price had been removed from the matter and requested additional extensions of the statutes of limitations for tax and FBARs.

■ Following the meeting, Agent Reach supplied taxpayer counsel with a proposed exam plan.  Her plan asserted that "the taxpayers and their representatives have not been forthcoming in providing the documents that we have requested through IDRs."  Based on the entire course of conduct by the IRS during the course of the matter, because taxpayers' counsel was not satisfied that the Agents would handle the taxpayers fairly, they declined to provide the additional statute extensions.

■ Eight days after the meeting in Washington, on May 10, 2017, the IRS sent the taxpayers notices that it had assessed $1,640,000 of penalties with respect to their Forms 5471 under IRC Sec. 6038(a)(1) and $4,250,000 of continuation penalties under IRC Sec. 6038(a)(2).  On June 6, 2017, the IRS sent letter 3709 proposing

8

assessment of FBAR penalties.  Two days later, it issued letter 3708, stating that it had already assessed the FBAR penalties and demanding payment thereof.  That letter provided that the taxpayers can request post-assessment appeals review of the assessments, and a protest has been filed.

■ On June 6, 2019, the United States commenced an action against the taxpayer for the collection of approximately $3 million of non-willful FBAR penalties.

## III.   Preliminary Matters

### A.  Voluntary Disclosure Practice Generally

The U.S. tax system is based on voluntary compliance, *i.e.*, the expectation that taxpayers will voluntarily self-report their incomes and self-assess the amount of tax properly due under the law.  To encourage compliance and deter tax violators, the IRS and the DOJ have a variety of enforcement mechanisms, including the power to audit and examine tax returns and assess (civilly) tax and penalties and to bring criminal enforcement actions against those who knowingly and willfully violate the law.

But for almost as long as there has been an income tax, the IRS has maintained a policy of not recommending criminal prosecution against taxpayers who voluntarily disclose prior tax non-compliance.  The rationale behind the voluntary disclosure policy is to encourage compliance and generate revenue that otherwise would not have been collected.  Because the IRS has limited resources, allowing a taxpayer to come forward voluntarily reduces its administrative costs, brings the taxpayer back into the system, and promotes future compliance.

To be a valid voluntary disclosure:  (a) the disclosure must be "truthful, timely, complete;" (b) the income at issue must be from legal sources; and (c) the taxpayer must fully cooperate with the IRS and make "good faith arrangements with the IRS to pay in full, the tax, interest, and any penalties determined by the IRS."[3]  Full cooperation of the taxpayer requires the

---

[3]      *See* Internal Revenue Manual (herein after, "I.R.M.") § 9.5.11.9(2) and (3) (Dec. 2, 2009).  On November 20, 2018, the IRS issued a memorandum addressing the process for IRS evaluation of all voluntary disclosures—that is, disclosures involving either domestic or offshore issues—following the closing of the Offshore Voluntary

disclosure to "be complete and reveal all essential facts regarding the violation."  In addition, the taxpayer must "cooperate with the [IRS] in determining the proper amount of taxes owed."[4]

### B.  Background on the U.S. Government's Offshore Compliance Efforts

A summary of the voluntary disclosure process as it existed in or about the end of 2011 and early 2012 is necessary to evaluate both the actions and recommendations of Mr. Jeff Beckley and the conduct of the IRS and IRS Chief Counsel in the examination of the taxpayers.

The Taxpayers' case involves offshore disclosure issues.[5]  Historically, U.S. persons have under-complied as to the reporting of offshore assets, as is evidenced by the low compliance rate with FBAR filing obligations.  For example, the Treasury Department processed approximately 800,000 FBARs in 2012,[6] but various organizations have estimated that between 1 million and 7 million U.S. citizens resided overseas at that time.[7]

The catalyst for the significant level of enforcement activity in the offshore area beginning approximately ten years ago was the IRS's and DOJ's enforcement efforts against UBS,[8] and the related enforcement efforts into offshore compliance that followed.  In that matter,

---

Disclosure Program on September 28, 2018.  *See*, IRS Memorandum, Control Number LB&I-09-1118-014 (Nov. 20, 2018).  The memorandum updates the voluntary disclosure practice embodied in section 9.5.11.0 of the I.R.M. Because the procedures in the memorandum apply only to voluntary disclosures received after September 28, 2018, citations and references to section 9.5.11.9 of the I.R.M. throughout this Report are intended to be to the I.R.M. as in effect during the end of 2011 and beginning of 2012.

[4]        I.R.M. § 9.5.11.9.6(6).

[5]        For the sake of completeness, I note that U.S. citizens and permanent resident aliens (*i.e.*, "green card" holders) are subject to U.S. income tax and information reporting requirements regardless of the fact that they live outside the United States.

[6]        *See* National Taxpayer Advocate, 2013 Annual Report to Congress, volume one, pg. 235.

[7]        *See, e.g.*, A Model for Developing Estimates of U.S. Citizens Abroad: Final Technical Report, Fors Marsh Group LLC (2013), p. 4, available at https://www.fvap.gov/uploads/FVAP/Reports/OCE_Technical_Report.pdf.  A 2013 presentation by the Bureau of Consular Affairs estimated that 6.8 million U.S. citizens reside overseas.  See, http://travel.state.gov/content/dam/travel/Congressional-Liaison/OCSPresentationCleared.pdf.

[8]        *See, e.g.*, Browning, Lynnley, *Wealthy Americans Under Scrutiny in UBS Case*, New York Times (June 6, 2008) (available at: https://www.nytimes.com/2008/06/06/business/worldbusiness/06tax.html).

UBS provided the names of American account holders in connection with a deferred prosecution agreement[9] and a settlement of a "John Doe" summons matter,[10] representing the first major crack in foreign bank secrecy in history.  This and related enforcement actions led the IRS to implement a series of special voluntary disclosure programs aimed at offshore activity, and to address related issues, including issues concerning Americans living abroad and those with footprints in both the United States and other countries who were faced with navigating two or more tax and reporting systems.

### C. IRS Offshore Voluntary Disclosure Initiatives

With the disclosure of accountholder information from UBS, on March 23, 2009, the IRS announced the Offshore Voluntary Disclosure Program (the "2009 Program").  The 2009 Program did not repeal the IRS' long-standing voluntary disclosure practice, but instead joined the concept of voluntary disclosure and its corresponding criminal protection with a civil penalty settlement regime.[11]  The 2009 Program required that a taxpayer participating in the program, among other things:  (1) file six years of amended or delinquent returns, including all international information reporting returns; (2) file or amend the previous 6 years of FBARs; (3) pay the tax shown on the returns, along with interest and accuracy related penalties; and (4) pay a miscellaneous offshore penalty of 20 percent of the highest aggregate value of the taxpayer's offshore, non-compliant financial assets.  The rules of the 2009 Program (and all subsequent iterations) were promulgated through Frequently Asked Questions and Answers ("FAQs").  Of note, the miscellaneous offshore penalty was intended to be in lieu of penalties for the failure to

---

[9]       *United States v. UBS AG*, No. 09-60033-CR-COHN (S.D. Fla. 2008).

[10]      *See* IR-2009-75 (Aug. 19, 2009).

[11]      2009 Offshore Voluntary Disclosure Program, Frequently Asked Questions and Answers 1.  Voluntary Disclosure: Questions and Answers, available at https://www.irs.gov/newsroom/voluntary-disclosure-questions-and-answers.

file FBARs and information returns, and the FAQs set out procedures under which a taxpayer could file delinquent information returns or FBARs without formally participating in the Program, so long as the relevant asset or account did not produce unreported income for the taxpayer.

The 2009 Program ended on October 15, 2009. Because of the success of the 2009 Program — approximately 15,000 taxpayers participated and paid over $3.4 billion in taxes, interest, and penalties[12] — and requests from practitioners and individuals to continue the program, the IRS announced a second program on February 8, 2011 (the 2011 Program). The 2011 Program required eight years of amended or delinquent tax returns, and the miscellaneous offshore penalty was raised from 20 to 25 percent. Notwithstanding the increased penalty, another approximately 15,000 taxpayers participated in the 2011 Program and paid approximately $1.6 billion in taxes, interest, and penalties.[13] The 2011 Program ended on September 9, 2011.

On January 9, 2012, the IRS announced the third iteration of its Offshore Voluntary Disclosure Program (the "2012 Program"). For purposes of this Report, the biggest differences between the 2012 Program and its prior iterations was that the miscellaneous offshore penalty increased from 25 to 27.5 percent, and that the 2012 Program was open-ended whereas the prior two programs had set end dates. Importantly, the 2012 Program contained "opt out" procedures to allow taxpayers who were non-willful to avoid the imposition of the miscellaneous offshore

---

[12]    IRS Reminds Taxpayers that the Aug. 31 Deadline Is Fast Approaching for the Second Special Voluntary Disclosure Initiative of Offshore Accounts, available at https://www.irs.gov/newsroom/irs-reminds-taxpayers-that-the-aug-31-deadline-is-fast-approaching-for-the-second-special-voluntary-disclosure-initiative-of-offshore-accounts.

[13]    IRS Offshore Programs Produce $4.4 Billion To Date for Nation's Taxpayers; Offshore Voluntary Disclosure Program Reopens, available at https://www.irs.gov/newsroom/irs-offshore-programs-produce-4-4-billion-to-date-for-nations-taxpayers-offshore-voluntary-disclosure-program-reopens.

penalty and to seek reduced penalties based on their non-willful conduct and/or reasonable cause.[14]

This is not to say that by the end of 2011 or beginning of 2012 all U.S. taxpayers were aware of their U.S. tax filing obligations with respect to offshore activity, or that all tax professionals and taxpayers were aware of the various IRS Offshore Voluntary Disclosure Programs. However, a reasonably prudent tax professional should have been aware of the options available to U.S. taxpayers seeking to come back into compliance. Additional events during this time frame that should have alerted tax professionals to the increased focus on offshore compliance include:

- *The enactment of the Foreign Account Tax Compliance Act of 2010 (colloquially referred to as "FATCA") in March 2010.*[15] This drew significant media attention because it imposed new, heightened obligations on foreign financial institutions to proactively search their existing client database (and also question new clients) in order to identify U.S. accounts. FATCA also imposed a new filing obligation on U.S. taxpayers by requiring them to disclose "specified foreign financial assets" on a newly created Form 8938.

- *The Financial Crimes Enforcement Network issuance of proposed and final regulations amending the Bank Secrecy Act regulations regarding reports of foreign financial accounts in February 2010*[16] *and February 2011,* [17] *respectively.*

- *The IRS issuance of Fact Sheet 2011-13 in December 2011.*[18] The Fact Sheet, which contains topical information issued to the media by IRS Media Relations, provides information pertinent to U.S. citizens or dual citizens residing outside

---

[14]     *Id.;* Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2012, FAQ 51, available at https://www.irs.gov/individuals/international-taxpayers/offshore-voluntary-disclosure-program-frequently-asked-questions-and-answers-2012.

[15]     Hiring Incentives to Restore Employment (HIRE) Act, Pub. L. No. 111-147, Title V, subtitle A, 124 Stat. 97, 97-117 (2010).

[16]     Financial Crimes Enforcement Network; Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts, 75 Fed. Reg. 8844 (proposed Feb. 26, 2010).

[17]     Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts, 76 Fed. Reg. 10,234 (Fed. 24, 2011).

[18]     *Information for U.S. Citizens or Dual Citizens Residing Outside the U.S.*, IRS Fact Sheet, FS-2011-13, December 2011.

the United States, including various filing and reporting obligations, applicable penalties for failing to meet such requirements, and relevant hypothetical situations.  It also noted that generally six years of retrospective filings was appropriate, and that penalties would not be imposed in all cases.  The issuance of this Fact Sheet during the well-publicized ramping up of enforcement in offshore cases was, in my judgment, an effort – and perhaps the first of its kind – to reach out to this class of taxpayers to educate them on their tax reporting requirements and the penalties for their failure to comply with such.

**D. Additional Paths for Disclosure**

Advising clients during the 2011 to 2012 time period in connection with a voluntary disclosure of offshore assets required the exercise of professional judgment.  Tax practitioners were required to make important tactical decisions without a detailed set of rules and regulations to guide them.  The principal available authority was embodied in the IRS' program-related FAQs and occasional pronouncements of IRS officials at seminars and in the tax press.  Prudent practitioners kept track of the FAQs and their revisions, and any other strands of public information provided by the IRS in order to consider the appropriate options given a client's situation.

An additional layer of complexity in advising clients involved balancing the size of the miscellaneous offshore penalty required by participating in the Program with the clients' conduct or knowledge in respect of the noncompliance (i.e., the clients' willfulness).  The Programs were generally designed to provide protection to individuals with criminal exposure.  The various versions of the Programs, however, afforded participants an option to "opt out" of the settlement structure when the penalties inside the Program were greater than those the person would have faced outside the Program.  Those who opted out were still afforded criminal protection, but were also able to present facts to the IRS that could result (and often did) in a lower penalty. Therefore, the options available to a person seeking to disclose offshore asset noncompliance include participating in one of the IRS's programs (or participating and then choosing to opt out),

filing information returns or FBARs pursuant to special FAQ provisions, making what was called a "quiet disclosure" (highly disfavored by the IRS at the time), and even undertaking only to correct the tax compliance issues on a going forward basis.[19]

## V.     Opinion

### A.  The advice Petitioner received from Mr. Beckley in connection with the filing of delinquent tax and information returns was unreasonable, negligent, and erroneous.

The advice that the taxpayer, Mr. Bittner, received from a Plano, Texas Certified Public Accountant, Mr. Jeff Beckley, in connection with the filing of delinquent tax and information returns was unreasonable, negligent, and erroneous.

The ethical codes applicable to tax advisors contain standards against which the actions of Mr. Beckley can be evaluated.  For instance, the rules of the Texas State Board of Public Accountancy incorporate by reference[20] the Statements on Standards for Tax Services ("SSTSs")[21] promulgated by the American Institute of Certified Public Accountants ("AICPA"). SSTS No. 7, ¶ 2 provides that a CPA "should use professional judgment to ensure that tax advice provided to a taxpayer reflects competence and appropriately serves the taxpayer's needs." Federal regulations applicable to tax practitioners in 31 C.F.R. Part 10 (referred to as "Circular 230"), contain a similar but more thorough rule regarding competence:

---

[19]     There is no legal or ethical requirement that a taxpayer amend previously filed tax returns or file delinquent returns for which the filing deadline has passed.  *See* Circular 230 § 10.21.  *See also Badaracco v. Comm'r*, 464 U.S. 386, 393 (1984).

[20]     *See* 22 Texas Admin. Code Part 22, Rule 501.62(1)(D), available at https://texreg.sos.state.tx.us/public/readtac$ext.TacPage?sl=R&app=9&p_dir=&p_rloc=&p_tloc=&p_ploc=&pg=1&p_tac=&ti=22&pt=22&ch=501&rl=62 (retrieved Oct. 2, 2019).

[21]     Available at: https://www.aicpa.org/content/dam/aicpa/interestareas/tax/resources/standardsethics/statementsonstandardsfortaxservices/downloadabledocuments/ssts-effective-january-1-2010.pdf (retrieved Oct. 2, 2019).

### § 10.35 Competence.

(a) A practitioner must possess the necessary competence to engage in practice before the Internal Revenue Service. Competent practice requires the appropriate level of knowledge, skill, thoroughness, and preparation necessary for the matter for which the practitioner is engaged.  A practitioner may become competent for the matter for which the practitioner has been engaged through various methods, such as consulting with experts in the relevant area or studying the relevant law.[22]

More specifically, both the SSTSs and Circular 230 contain extensive rules regarding a tax professional's obligations in advising a client regarding previously-committed errors or non-compliance in tax reporting.  *See* SSTS No. 6, *Knowledge of Error: Return Preparation and Administrative Proceedings*, *supra*; 31 C.F.R. §10.21, *Knowledge of client's omission.*

These standards guide the provision of services to taxpayers and are therefore well-known to competent tax advisors.  In particular, the rules applicable to the correction of previous tax errors or omissions are second nature to tax professionals who routinely assist taxpayers in getting back into tax compliance after a period of non-compliance.  In my opinion, however, Mr. Beckley's advice and services provided to Mr. Bittner failed these basic standards.

In specific, I would note:

■ Mr. Beckley apparently was unfamiliar with IRS and DOJ enforcement efforts to combat offshore tax evasion and to bring back into compliance U.S. taxpayers residing abroad, and he was unfamiliar with, and failed to advise the taxpayers about, the IRS Programs in place at the time of the taxpayers' consultation.  Had he advised the taxpayers of such, they in all likelihood could have entered the IRS Offshore Voluntary Disclosure Program announced on January 9, 2012, been accepted, and then could have opted out or availed themselves of the "Transitional Relief" announced for such taxpayers in June 2014.[23]

---

[22]    Technically this provision did not become enforceable until June 12, 2014, *see* §10.35(b), but it is widely regarded by tax professionals to have stated obvious competence requirements that previously existed, including when Mr. Beckley first provided services to the taxpayer in 2012.

[23]    "Transitional Relief" was a type of relief afforded to taxpayers who were already participating in one of the IRS's Offshore Disclosure Programs to enable them to benefit from the more lenient terms announced at the same

- Mr. Beckley was also apparently unaware of the IRS's hostility with regard to disclosures done outside the parameters of the formal programs (sometimes referred to as "quiet disclosures"), which the IRS viewed as efforts by a taxpayer to sneak back into compliance.  Since 2009, IRS officials had warned practitioners against such filings.[24]

- Mr. Beckley also apparently was unaware of Fact Sheet 2011-13, which had been issued well before the taxpayer sought his services.

- He lacked knowledge about basic international tax compliance concepts.  Every international tax professional should at least know that an IRS form exists to disclose a taxpayer's interest in a wholly-owned foreign corporation.

- The taxpayer was desired to file 22 years of corrective returns because he wanted to act in the utmost good faith and transparency.  However, had Mr. Beckley been aware of, and advised the taxpayer about, the IRS's disclosure programs in place, and particularly Fact Sheet 2011-13, which stated that taxpayers should only filed six years of returns and FBARs, Mr. Beckley could likely have persuasively explained this analysis to the taxpayer.  It was common practice for decades to file six years of amended or delinquent returns for corrective behavior like this.

- Mr. Beckley signed the returns as a preparer taking the position that the U.S.-Romania tax treaty exempted the taxpayer's income for U.S. tax.  Mr. Beckley was obligated to exercise due diligence in preparing and filing the returns.[25]  If he believed the tax treaty position was incorrect, he should not have prepared and signed returns that he knew took income tax positions that lacked reasonable basis.  He also failed to disclose on Form 8833 the treaty benefits claimed on the returns (in addition to the failure to file Form 5471s to disclose Petitioner's interest in foreign companies).

---

time in the IRS's Streamlined Program (described earlier.)  *See*, Transition Rules:  Frequently Asked Questions, available at: https://www.irs.gov/individuals/international-taxpayers/transition-rules-frequently-asked-questions-faqs.

[24]    Having said this, I note that no one could reasonably expect a filing comprised of 22 years of income tax returns and FBARs to escape scrutiny, and to the extent the IRS considers these filings to have been an effort at a "quiet disclosure" that judgment, in my view, is simply not reasonable.

[25]    *See, e.g.*, 31 C.F.R. § 10.22(a) (requiring due diligence in filing returns and similar documents, making representations to the IRS, and determining the correctness of representations made by the practitioner to clients); 31 C.F.R. § 10.34(b) (providing standards with respect to positions taken on documents submitted to the IRS).

**B. The manner in which the Internal Revenue Service has treated the taxpayers has not been consistent with that of similarly-situated taxpayers and on various occasions violated applicable IRS rules and procedures.**

1) Treatment of Similarly Situated Taxpayers

There are a number of aspects of the IRS's treatment of the taxpayers that in my opinion are inconsistent with how the IRS has handled a number of other offshore-related cases as to which I have personal knowledge.

First, it is clear from the facts that these taxpayers made a good faith effort to come forward and correct prior tax issues. Indeed, the IRS has not asserted anywhere that these taxpayers acted willfully. In January 2012, the taxpayers sought out professional advice regarding their desire to become fully tax compliant with the U.S. During this period, IRS officials had gone on the public record inviting and encouraging taxpayers with offshore compliance issues to come forward. The fact that the taxpayers obtained their advice from one or more incompetent tax professionals should not be held against them, but it appears from the record of this case that the IRS has simply ignored the taxpayers' good faith efforts to bring themselves into compliance.

In our practice over the past decade, we have seen numerous instances of clients who have come to our firm after having received poor advice from other practitioners who had not been familiar with the IRS voluntary disclosure landscape, or who may not have technically qualified for a formal IRS program but who wished to come into compliance. In many, if not most, of these cases, especially where the taxpayers were deemed to have not acted willfully, IRS management (including, specifically, in one case, Mr. Dan Price), has been willing to treat such taxpayers in a manner similar to the structure of the applicable IRS program or provide

relief similar to that which could have been obtained in the Streamlined Program (or through Transition Relief).

We have seen such measured IRS action in cases where the IRS has rejected a taxpayer's attempt to enter an offshore program as untimely; this is precisely what happened here, after these taxpayers found competent professionals and the IRS apparently concluded that solely as a result of an examination opened in response to the taxpayers' voluntary filings, their preclearance application into OVDP was rejected. We also have seen this where the IRS recommended criminal prosecution against taxpayers who were late coming forward, but in the end were not prosecuted; such taxpayers have received the settlement structure set forth in the applicable IRS program. There have also been instances of the IRS informally applying the criteria for "Transitional Relief" in light of the announcement of the Streamlined Program in cases where the taxpayers may not have precisely met the requirements for such relief. Similarly, the IRS appears to have given Streamlined treatment in some cases to circumstances where a domestic taxpayer may not have qualified because they failed to file one or more returns. In all such cases, IRS agents and management appear to have recognized the efforts by taxpayers to come forward in good faith, and to understand that a system which severely punishes taxpayers who do so will not succeed in promoting the concept of voluntary disclosure.

For whatever reason, the IRS agents and management evaluating these particular taxpayers decided to punish them with millions of dollars of information return penalties, and with nearly $3 million in non-willful FBAR penalties. This extraordinary level of punishment followed the taxpayers' efforts to come forward voluntarily and to reconstruct decades of financial information largely located in Romania, and their compliance with various requests made by the IRS examiner, at substantial cost to them, as best as they could and in good faith. In

my opinion, the IRS's treatment of these taxpayers is on the extreme end of the "punishment"
spectrum compared to numerous other non-willful taxpayers whom our firm has represented and
who attempted in good faith to come forward, and the IRS has treated them far more harshly than
taxpayers who engaged in similar conduct in coming into compliance.  This is particularly
alarming where, as here, the IRS ultimately decided that the failures were due to non-willful
conduct (as opposed to willful or criminal conduct).

    2)  IRS Conduct During the Examination

There are aspects of the IRS's conduct during the examination of these taxpayers that in
my opinion are not consistent with normal IRS practice or stated procedural guidance.  As
background, I note that in Rev. Proc. 64-22 (1964-1 C.B. 689), the IRS issued a statement of
principles regarding tax administration:

> The Service also has the responsibility of applying and administering the
> law in a reasonable, practical manner.  Issues should only be raised by
> examining officers when they have merit, never arbitrarily or for trading
> purposes.  At the same time, the examining officer should never hesitate to
> raise a meritorious issue.  It is also important that care be exercised not to
> raise an issue or to ask a court to adopt a position inconsistent with
> established Service position.
>
> Administration should be both reasonable and vigorous.  It should be
> conducted with as little delay as possible and with great courtesy and
> considerateness.  It should never try to overreach, and should be
> reasonable within the bounds of law and sound administration.  It should,
> however, be vigorous in requiring compliance with law and it should be
> relentless in its attack on unreal tax devices and fraud.

Further, certain positions of the codified Taxpayer Bill of Rights, I.R.C. § 7803(a)(3)
("TBOR") are relevant to this matter.  In explaining these rights, the IRS states:

> Taxpayers have the right to raise objections and provide additional
> documentation in response to formal IRS actions or proposed actions, to
> expect that the IRS will consider their timely objections and documents

> promptly and fairly, and to receive a response if the IRS does not agree
> with their position."[26]

Also, the IRS recognizes the taxpayer's right to pursue collateral remedies:

> Taxpayers have the right to expect the tax system to consider facts and
> circumstances that might affect their underlying liabilities, ability to pay,
> or ability to provide information timely. Taxpayers have the right to
> receive assistance from the Taxpayer Advocate Service if they are
> experiencing financial difficulty or if the IRS has not resolved their tax
> issues properly and timely through its normal channels.[27]

The following aspects of the examination that led to this case in my opinion violate these

precepts:

1) The taxpayers made two reasonable cause submissions in opposition to the proposed
   penalties for the failure to file Forms 5471. In neither case did the IRS agent respond
   to these submissions.

2) The IRS agent incorrectly accused the taxpayers of failing to comply with
   Information Document Requests (IDRs), when the taxpayers had engaged in best
   efforts to do so, and had been transparent about the reasons why they were unable to
   provide further information. This judgment by the agent became "a lack of
   cooperation" which the agent then used to deny penalty relief. Similarly, the IRS
   appears to have issued assessments and a notice of deficiency after the examining
   agent admitted that she had not even reviewed the very documents that were
   submitted in response to her IDRs.

3) The IRS appears to have penalized the taxpayers for seeking to enforce their rights in
   the examination by approaching the Taxpayer Advocate Service (TAS). The agent
   specifically accused the taxpayers of obstructing the examination by doing so. This
   retaliatory action by the agent is contrary to a taxpayer's right to approach TAS as
   specifically recognized in the TBOR.

4) In the discussions between the taxpayers' representatives and the agent and Mr. Price,
   the IRS appears to have attempted to impose a settlement on the taxpayers with the
   statement that if the offer were not accepted, the IRS would "open additional years."
   This was after the agent had explicitly represented to taxpayers' counsel and TAS that
   she had no intention of opening additional years and those years had been removed
   from the examination inventory with approval of management. This represents an
   absence of fairness, arguable bad faith, and it specifically is contrary to the Rev. Proc.

---

[26]   https://www.irs.gov/taxpayer-bill-of-rights#heard

[27]   https://www.irs.gov/taxpayer-bill-of-rights#fair

64-22.  It is one thing for the IRS to negotiate its position vigorously; it is another to announce positions and create expectations on the part of a taxpayer and then reverse course dramatically to create additional punishment if the taxpayer decides not to accept an offer that the taxpayer believes is grossly unfair or inappropriate under the circumstances.

## VI.   Concluding Comments

I fully respect and support the IRS in its efforts to enforce the nation's tax laws and to punish wrongdoers in a manner commensurate with their conduct.  I also consider the private practice of tax law to include an obligation to promote tax compliance within the bounds of the applicable law and other sources of authority.  Although taxpayers are not legally required to correct prior tax-non-compliance, Circular 230 further obligates us as tax lawyers to advise non-compliant clients on their options for coming into compliance and the consequences of such options.

In my opinion, notwithstanding efforts to maintain consistency in the treatment of taxpayers with offshore issues, the IRS has erred in this case by "throwing the book" at these non-willful taxpayers who in good faith have attempted to come into compliance.  The taxpayers' position here is magnified by the incompetence of their original professional advisor, and what appear to me to be heavy-handed efforts by certain IRS employees to push these taxpayers into a punitive settlement.  Such conduct is unfair to these taxpayers.  To the extent practitioners take lessons from cases such as this one and, ethically, have to incorporate them into their required advice to non-compliant taxpayers, it is also not constructive for tax administration.

_Scott R Michel_
Scott D. Michel

_10/4/19_
Date

22

<u>EXHIBIT A</u>

## Published Articles

- **U.S. Tax Enforcers React to The Panama Papers**
  *IFC Review*
  September 1, 2016

- **U.S. Offshore Account Enforcement Issues**
  *CCH's Journal of Tax Practice & Procedure*
  September 30, 2014

- **Strategies for Current Filings of Noncompliant Taxpayers as FBAR Deadline Approaches**
  *Practical Tax Strategies*
  May 23, 2014

- **Here Comes FATCA...What To Expect In 2014**
  *IFC Review Monthly e-Journal*
  April 1, 2014

- **The Justice Department and Swiss Banks: Understanding the Special Disclosure Program**
  *Bloomberg BNA*
  September 24, 2013

- **FATCA: A New Era of Financial Transparency**
  *AICPA's Journal of Accountancy*
  January 1, 2013

- **Offshore Tax Evasion: US Initiatives**
  *Practical Law Company*
  April 26, 2012

- **Offshore Tax Enforcement, Voluntary Disclosure, And Undeclared Foreign Accounts**
  *ALI-ABA Estate Planning Course Materials Journal*
  December 1, 2011

- **OVDI Is Over — What's Next for Voluntary Disclosures?**
  *Tax Notes, Special Report*
  October 17, 2011

- **FATCA & Foreign Bank Accounts: Has the U.S. Overreacted?**
  *Tax Analysts*
  May 31, 2011

- **Final Rules & New FBAR Form Issued**
  *International Tax Review*
  May 1, 2011

## EXHIBIT A

- **IRS Seeks Names of U.S. Account Holders at HSBC (India)**
  *Taxmann-The Tax & Corporate laws of India-International Tax*
  April 18, 2011

- **Indictment of Offshore Account Holder Portends a New Round of Aggressive Enforcement**
  *International Taxation*
  February 1, 2011

- **IRS's Voluntary Disclosure Program for Offshore Accounts: A Critical Assessment After One Year**
  *BNA Insights*
  September 21, 2010

- **Undeclared Foreign Accounts—Voluntary Disclosures and FBARs After the IRS Settlement Initiative**
  *Journal of Tax Practice and Procedure*
  December 1, 2009

- **Voluntary Disclosure Key to Addressing Offshore Tax Cheats, Practitioners Say**
  *Tax Analysts*
  December 8, 2008

- **IRS Issues Revised Foreign Account Reporting Form**
  *Tax Analysts*
  October 1, 2008

- **Voluntary Disclosure Becomes A Necessity**
  *International Tax Review*
  May 1, 2008

- **Enhanced IRS Enforcement and the Voluntary Disclosure Policy**
  *International Law Office*
  August 26, 2005

- **Foreign Bank Accounts - Last Chance for Taxpayers?**
  *Caplin & Drysdale*
  July 1, 2004

- **Advising a Client with Secret Offshore Accounts - Current Filing and Reporting Problems**
  *Journal of Taxation*
  September 1, 1999