UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>        Plaintiff,<br><br>v.<br><br>ALEXANDRU BITTNER,<br>        Defendant. | )<br>)<br>)   Case No. 4:19-cv-00415<br>)<br>)<br>)<br>) |

## EXPERT REPORT OF SCOTT D. MICHEL

I.   **Introduction**

    A.   **Background and Qualifications**

I am in private practice at the law firm of Caplin & Drysdale, Chartered, in Washington, D.C. I joined the firm in October 1981 and have practiced at the firm since that date. For the past 38 years my practice has been almost exclusively in the area of tax controversy, and during my entire career as a practicing attorney I have focused particularly on cases involving taxpayers who have failed to disclose foreign assets to the Internal Revenue Service (the "IRS"), with an emphasis on the failure to disclose foreign financial accounts. During the course of my practice I have advised over 1,500 individuals and companies with offshore tax noncompliance issues, in the context of voluntary disclosures, civil examinations, and criminal tax investigations, often involving previously unreported foreign financial accounts.

In my practice I have become generally familiar with the civil and criminal penalty provisions of the Internal Revenue Code (the "Code") as well as its procedural and administrative provisions. I am also generally familiar with court decisions that impact the tax controversy area and particularly the area of unreported foreign assets and

Government Exhibit

A

income.  I am well aware of the regulations and relevant form instructions regarding the reporting of foreign bank accounts.

I am also familiar with the relevant provisions of the Internal Revenue Manual (the "I.R.M.") and with various IRS disclosure programs that have been implemented over the years, especially in the area of foreign accounts and assets.  I estimate that advising clients with respect to the reporting and disclosure of foreign accounts or assets — in the course of an IRS audit or criminal investigation or through one of these IRS programs — has represented well over half of my practice in the last decade.  Over the last ten years I have also participated in meetings with senior officials at the IRS and the Department of Justice to provide practitioner feedback on the various disclosure programs as they have been implemented and operated.

I have spoken frequently at conferences in the U.S. and abroad and written extensively on issues relating to criminal and civil tax controversy, especially on issues regarding noncompliance in reporting foreign accounts or assets.  I am a member and Regent of the American College of Tax Counsel, a past Vice-Chair of the American Bar Association Section of Taxation, and a former Chair of that Section's Committees on Civil and Criminal Tax Penalties and Standards of Tax Practice.  I am also an Adjunct Professor at the University of Miami Graduate Tax Program.  A complete *curriculum vitae* is attached as Exhibit A.

Caplin & Drysdale, Chartered has been compensated for my time a rate of $913.50, which represents a 10% discount off of my normal hourly rate, and at the firm's standard billing rates for colleagues who have assisted me in the preparation of this

report.  I have neither testified as an expert at trial nor by deposition within the preceding four years.

### B.    Assignment

I have been engaged by the law firm of Clark Hill PLC in San Antonio, Texas, to provide an expert report on certain issues in connection with the above-captioned case. I have been asked to opine on the penalties imposed upon Mr. Bittner (the "taxpayer") under 31 U.S.C. § 5321(a)(5)(B), commonly referred to as a "non-willful FBAR penalty," specifically on the questions i) whether the IRS has complied with its published procedures in administering this penalty, and ii) whether the IRS has treated the taxpayer consistently with similar matters that I have participated in or observed in my law practice.

For reasons I shall explain, my opinion is that the IRS has imposed an excessive penalty on Mr. Bittner when compared to its treatment of similarly-situated taxpayers, and it has violated its internal policies in this case.

### C.    Materials Considered in Connection with This Matter

In connection with the preparation of this Report, I have reviewed certain administrative filings and pleadings relating to Mr. Bittner.  Particularly pertinent materials include: i) the Complaint, Answer, and Amended Answer filed with the Court; ii) the taxpayer's "Protest of FBAR Penalties" filed July 5, 2017, with the Internal Revenue Service; iii) IRS Form 886-A, *Explanation of Items*; iv) the "Bittner Appeals Case Memorandum FBAR Penalty"; and v) Letters from taxpayer's counsel to the IRS Appeals Office, dated September 11, 2017 and October 9, 2017.

I have also reviewed certain IRS materials regarding various voluntary disclosure programs, and certain provisions of the Code and the I.R.M.

## II.   Facts

As a threshold matter, it is important to note that in this case the IRS imposed a "non-willful" FBAR penalty on the taxpayer and, as a result of that determination, I accept for purposes of this report that the taxpayer did, in fact, act in a non-willful manner. In addition, I have accepted the following facts as true:

- The taxpayer was born and raised in Romania. In late 1982, he immigrated to the United States, where he met his wife Sherry. While he resided in the United States, the taxpayer, who has an advanced degree in mechanical engineering, was employed as a plumber. The taxpayer and his wife became naturalized U.S. citizens in 1987. Approximately four years later, in 1991, they moved back to Romania, where they lived for twenty years. The taxpayer acquired valuable interests in the fishing industry and other businesses and became successful in Romania during this period.

- While he lived in Romania, the taxpayer was unaware that because he was a naturalized U.S. citizen, he was required to file U.S. tax returns reporting the income he earned in Romania and to file information returns such as Forms 5471 and FBARs.

- It was not until 2012, after the taxpayer moved back to the U.S., that he first learned that he was supposed to file U.S. income tax returns for the years he lived in Romania reporting his worldwide income. He was extremely concerned about this and rushed to find someone to take care of his tax compliance. He located a local CPA in Plano, Texas, Jeffrey Beckley, who advertised on his website that he had expertise in taxation of foreign source income.

- The taxpayer expressed to Mr. Beckley a wish to file returns for every year that he was in Romania to come into full compliance with the IRS. Mr. Beckley was apparently told by the IRS that only six years were necessary, but Mr. Beckley did not act consistent with this information. Instead, Mr. Beckley prepared 22 years of joint U.S. income tax returns for the 1990 through 2011 tax years, all of the years the taxpayers had lived in Romania.

- On each return, Mr. Beckley calculated a taxable income figure but offset that with an equal amount, reflecting and disclosing that the U.S.-Romanian Tax Treaty exempted any tax. He also attached a separate explanation that Mr. Bittner's income was not subject to U.S. tax under the treaty. The

4

taxpayer and his wife signed those returns and Mr. Beckley filed them in May 2012.

■ Mr. Beckley also provided incorrect and incomplete advice to the taxpayer on the scope of the reporting requirement for his FBARs, and eventually prepared and filed FBARs for sixteen years containing a number of errors, including the fact that the taxpayer could have checked a box on the FBARs (for the years 2007-2011) indicating a financial interest in twenty-five or more accounts, and that further account information was not required to be reported.

■ Had the taxpayer sought preclearance into the IRS Offshore Voluntary Disclosure Program in early 2012, he almost certainly would have been accepted, as he was not under examination and otherwise appears to have met the "timeliness" requirements of the Program.

■ After the taxpayer received income tax assessment notices from the IRS regarding the delinquent returns filed by Mr. Beckley, the taxpayer engaged tax counsel.

■ Following the engagement of new tax counsel in 2012, the taxpayer requested pre-clearance into the Offshore Voluntary Disclosure Program, but the IRS rejected this request as untimely, apparently, and solely, because the tax returns filed voluntarily by the taxpayer on Mr. Beckley's advice had come under examination.

■ Notwithstanding the rejection from OVDP, after extensive work conducted by the taxpayer's U.S. and Romanian advisors and employees, on or about September 12, 2013, the taxpayer and his wife submitted proposed amended joint U.S. income tax returns and FBARs for their tax years 2006 through 2011, which included a reasonable cause statement.  These returns were assigned for audit to IRS Revenue Agent Anh Reach, and a separate examination of the Forms 5471 was assigned to Revenue Agent Holly Bishop.  Both agents then issued extensive document requests.

■ In response, the taxpayer provided written responses and electronically produced thousands of pages of documents (over 1 gigabyte of data).  The taxpayer also objected to portions of these request on the ground that responding further would have entailed thousands of hours of work at substantial cost, but the taxpayer offered to provide specific documents if asked.  The IRS did not seek to compel an additional production by summons.

■ On or about June 30, 2014, taxpayer's counsel informally requested to Agent Reach that the taxpayer be treated as having entered the then recently announced IRS Streamlined Offshore Program which, because the taxpayer qualified as a non-domestic taxpayer under the rules of that

Program, would have resulted in no penalties being imposed.  Agent Reach
denied this request because the taxpayer's voluntarily-filed returns were
under audit, and her notes reflect that she told taxpayer's counsel that she
did not want to permit the taxpayer to enter what she incorrectly described
as "OVDP" because she was "deep in the examination process…"

- On August 7, 2014, the taxpayer sought assistance from the Taxpayer
  Advocate regarding his request to enter the Streamlined Offshore Program.
  On September 24, 2014, on advice from Taxpayer Advocate, the taxpayer
  filed with Ms. Reach a formal written request and the required Certification
  Statement of reasonable cause, seeking to have the taxpayer treated under
  the Streamlined Compliance Procedures for U.S. Taxpayers Residing
  Outside the United States.  Agent Reach never responded to that formal
  request.

- Nothing further in any matter relating to the taxpayer was forthcoming from
  the IRS until April of 2015, when Agent Reach called taxpayer's counsel
  and stated that IRS Counsel wanted to schedule a meeting to see if the
  case could be resolved.  The meeting was held on April 14, 2015, with IRS
  Counsel and Agent Reach in attendance with taxpayer's counsel.  The
  meeting did not result in an agreed disposition of the case, and subsequent
  to this meeting, Agent Reach proposed the assessment of non-willful FBAR
  penalties totaling approximately $3 million.

- Believing that the taxpayer was treated unfairly, taxpayer's counsel sought a
  meeting with more senior IRS personnel.  This meeting was held on May 2,
  2017, in Washington, D.C., between taxpayer's representatives and Nina
  Olson, the Taxpayer Advocate, Doug O'Donnell, Commissioner LB&I, and a
  number of other representatives of the IRS and the Taxpayer Advocate.
  Unsatisfied with the result of this meeting, the taxpayer declined to provide
  requested statute of limitations extensions concerning the FBAR penalty.  In
  response, on June 6, 2017, the IRS sent letter 3709 proposing assessment
  of FBAR penalties.  Two days later, it issued letter 3708, stating that it had
  already assessed the FBAR penalties and demanding payment thereof.
  That letter provided the taxpayer with the opportunity to request post-
  assessment IRS Appeals review of the assessments, and a protest was
  filed.  The matter was not resolved at IRS Appeals.

- On June 6, 2019, the United States Department of Justice commenced this
  action against the taxpayer for the collection of approximately $3 million of
  non-willful FBAR penalties.

## III.   Preliminary Matters

Some background concerning the IRS's historic approach to the reporting of

foreign assets and accounts is important context for the opinion expressed herein.

## A. Voluntary Disclosure Practice Generally

The U.S. tax system is based on voluntary compliance, *i.e.*, the expectation that taxpayers will voluntarily self-report their incomes and self-assess the amount of tax properly due under the law, and that they will properly report their foreign financial accounts, as required by law.  To encourage compliance and deter tax violators, the IRS and the DOJ have a variety of enforcement mechanisms, including the power to audit and examine tax returns and assess (civilly) tax and penalties and to bring criminal enforcement actions against those who knowingly and willfully violate the law.

But for almost as long as there has been an income tax, the IRS has maintained a policy of not recommending criminal prosecution against taxpayers who voluntarily disclose prior tax non-compliance.  The rationale behind the voluntary disclosure policy is to encourage compliance and generate revenue and data for the IRS that otherwise would not have been collected.  Because the IRS has limited resources and cannot possibly detect and examine the substantial number of non-compliant taxpayers, allowing a taxpayer to come forward voluntarily reduces the IRS's administrative costs, brings the taxpayer back into the system, and promotes future compliance.  Moreover, when tax professionals, who are the "gate-keepers" for taxpayers seeking to rectify prior non-compliance, see that the IRS treats those who seek to come forward to correct prior errors on their tax returns in a reasonable and fair manner, such professionals will encourage other clients to do so.

To be a valid voluntary disclosure:  (a) the disclosure must be "truthful, timely, complete;" (b) the income at issue must be from legal sources; and (c) the taxpayer must fully cooperate with the IRS and make "good faith arrangements with the IRS to

pay in full, the tax, interest, and any penalties determined by the IRS."[1]  Full cooperation
of the taxpayer requires the disclosure to "be complete and reveal all essential facts
regarding the violation."  In addition, the taxpayer must "cooperate with the [IRS] in
determining the proper amount of taxes owed."[2]

### B. Background on the U.S. Government's Offshore Compliance Efforts

A summary of the IRS's most recent offshore enforcement efforts will help
illuminate the conduct of the IRS in imposing the FBAR penalties in this case and the
punitive nature of the IRS's actions in this taxpayer's case compared to the more lenient
treatment afforded tens of thousands of similarly-situated taxpayers, many of whom,
unlike the taxpayer in this case, engaged in willful non-compliance.

The taxpayer's case involves offshore disclosure issues similar to those
addressed in a series of IRS disclosure programs.[3]  Historically, U.S. persons have
under-complied as to the reporting of offshore assets, as is evidenced by the low
compliance rate with FBAR filing obligations.  For example, the Treasury Department

---

[1]     *See* Internal Revenue Manual (herein after, "I.R.M.") § 9.5.11.9(2) and (3) (Dec.
2, 2009).  On November 20, 2018, the IRS issued a memorandum addressing the
process for IRS evaluation of all voluntary disclosures—that is, disclosures involving
either domestic or offshore issues—following the closing of the Offshore Voluntary
Disclosure Program on September 28, 2018.  *See* IRS Memorandum, Control Number
LB&I-09-1118-014 (Nov. 20, 2018).  The memorandum updates the voluntary disclosure
practice embodied in section 9.5.11.0 of the I.R.M.  Because the procedures in the
memorandum apply only to voluntary disclosures received after September 28, 2018,
citations and references to section 9.5.11.9 of the I.R.M. throughout this Report are
intended to be to the I.R.M. as in effect during the end of 2011 and beginning of 2012.

[2]     I.R.M. § 9.5.11.9.6(6).

[3]     U.S. citizens and permanent resident aliens (*i.e.*, "green card" holders) are
subject to U.S. income tax and information reporting requirements regardless of the fact
that they live outside the United States.

processed in excess of 1,000,000 FBARs for the first time in 2015,[4] but it is estimated that over 7 million U.S. citizens resided overseas at that approximate time.[5]

The catalyst for the significant level of enforcement activity in the offshore area beginning approximately ten years ago was the IRS's and DOJ's enforcement efforts against UBS,[6] and the related enforcement efforts into offshore compliance that followed.  In that matter, UBS provided the names of American account holders in connection with a deferred prosecution agreement[7] and the settlement of a "John Doe" summons matter,[8] representing the first major crack in foreign (particularly Swiss) bank secrecy in history.  This and related enforcement actions led the IRS to implement a series of special voluntary disclosure programs aimed at offshore activity, and to address related issues, including issues concerning Americans living abroad and those with footprints in both the United States and other countries who were faced with navigating two or more tax and reporting systems.

---

[4]     *See* https://www.irs.gov/newsroom/foreign-account-filings-top-1-million-taxpayers-need-to-know-their-filing-requirements.  It is noteworthy that many of the filed FBARs came from U.S. resident taxpayers, which makes the level of non-compliance among non-resident taxpayers even more pronounced.

[5]     *See also* A Model for Developing Estimates of U.S. Citizens Abroad:  Final Technical Report, Fors Marsh Group LLC (2013), p. 4, available at https://www.fvap.gov/uploads/FVAP/Reports/OCE_Technical_Report.pdf.  A 2013 presentation by the Bureau of Consular Affairs estimated that 6.8 million U.S. citizens reside overseas.  See, http://travel.state.gov/content/dam/travel/Congressional-Liaison/OCSPresentationCleared.pdf.

[6]     *See, e.g.*, Browning, Lynnley, *Wealthy Americans Under Scrutiny in UBS Case*, New York Times (June 6, 2008) (available at: https://www.nytimes.com/2008/06/06/business/worldbusiness/06tax.html).

[7]     *United States v. UBS AG*, No. 09-60033-CR-COHN (S.D. Fla. 2008).

[8]     *See* IR-2009-75 (Aug. 19, 2009).

9

### C. IRS Offshore Voluntary Disclosure Initiatives

Following the initial February 2009 disclosure of accountholder information from UBS, on March 23, 2009, the IRS announced the Offshore Voluntary Disclosure Program (the "2009 Program").  The 2009 Program did not repeal the IRS's long-standing voluntary disclosure practice, but instead joined the concept of voluntary disclosure and its corresponding criminal protection with a civil penalty settlement regime.[9]  The 2009 Program required that a taxpayer participating in the program, among other things:  (1) file six years of amended or delinquent returns, including all international information reporting returns; (2) file or amend the previous 6 years of FBARs; (3) pay the tax shown on the returns, along with interest and accuracy related penalties; and (4) pay a miscellaneous offshore penalty of 20 percent of the highest aggregate value of the taxpayer's offshore, non-compliant financial assets.  The rules of the 2009 Program (and all subsequent iterations) were promulgated through Frequently Asked Questions and Answers ("FAQs").  Of note, the miscellaneous offshore penalty was intended to be in lieu of penalties for the failure to file FBARs and information returns.  The FAQs also set out procedures under which a taxpayer could file delinquent information returns or FBARs without formally participating in the Program, so long as the relevant asset or account did not produce unreported income for the taxpayer.

The 2009 Program ended on October 15, 2009.  Approximately 15,000 taxpayers participated and paid over $3.4 billion in taxes, interest, and penalties.[10]  Because of

---

[9]      2009 Offshore Voluntary Disclosure Program, Frequently Asked Questions and Answers 1.  Voluntary Disclosure: Questions and Answers, available at https://www.irs.gov/newsroom/voluntary-disclosure-questions-and-answers.

[10]     IRS Reminds Taxpayers that the Aug. 31 Deadline Is Fast Approaching for the Second Special Voluntary Disclosure Initiative of Offshore Accounts, available at

this success, and because of requests from practitioners and individuals to continue the program, the IRS announced a second program on February 8, 2011 (the 2011 Program).  The 2011 Program was similar to the 2009 Program but required eight years of amended or delinquent tax returns, and the miscellaneous offshore penalty was raised from 20 to 25 percent.  Approximately 15,000 taxpayers participated in the 2011 Program and paid $1.6 billion in taxes, interest, and penalties.[11]  The 2011 Program ended on September 9, 2011.

On January 9, 2012, the IRS announced the third iteration of its Offshore Voluntary Disclosure Program (the "2012 Program").  For purposes of this Report, the biggest differences between the 2012 Program and its prior iterations was that the miscellaneous offshore penalty increased from 25 to 27.5 percent, and that unlike the prior two programs, the 2012 Program was open-ended.  Importantly, the 2012 Program contained "opt out" procedures to allow taxpayers who were non-willful to avoid the imposition of the miscellaneous offshore penalty and to seek reduced penalties based on their non-willful conduct and/or reasonable cause.[12]

On June 26, 2012, the IRS announced the Streamlined Filing Compliance Procedures ("2012 SFCP").  The IRS created the 2012 SFCP as a way for U.S. persons

---

https://www.irs.gov/newsroom/irs-reminds-taxpayers-that-the-aug-31-deadline-is-fast-approaching-for-the-second-special-voluntary-disclosure-initiative-of-offshore-accounts.

[11]     IRS Offshore Programs Produce $4.4 Billion To Date for Nation's Taxpayers; Offshore Voluntary Disclosure Program Reopens, available at https://www.irs.gov/newsroom/irs-offshore-programs-produce-4-4-billion-to-date-for-nations-taxpayers-offshore-voluntary-disclosure-program-reopens.

[12]     Id.; Offshore Voluntary Disclosure Program Frequently Asked Questions and Answers 2012, FAQ 51, available at https://www.irs.gov/individuals/international-taxpayers/offshore-voluntary-disclosure-program-frequently-asked-questions-and-answers-2012.

who resided abroad and presented a low compliance risk to return into tax compliance. The 2012 SFCP was only available to taxpayers who had been residents of a foreign country since at least January 1, 2009, and had not filed any U.S. tax returns during that time.  Participants were required to file three years of returns, including informational returns, and six years of FBARs, but they were not required to pay any penalty with respect to the value of their undeclared offshore assets.

In part in response to the widely held view among tax practitioners that the IRS needed to "widen the lanes" for non-willful taxpayers to correct reporting violations involving foreign assets and accounts, on June 18, 2014, the IRS overhauled the 2012 SFCP.  It created a new two-part program — Streamlined Foreign Offshore Procedures ("Streamlined Foreign Program") and Streamlined Domestic Offshore Procedures ("Streamlined Domestic Program").  Those programs remain in effect as of the preparation of this report.

Like the 2012 SFCP, both the Streamlined Foreign and the Streamlined Domestic Programs require taxpayers to file three years of tax returns, pay tax and interest (no penalties on tax), and file six years of FBARs.  The Streamlined Foreign and the Streamlined Domestic Programs, however, also require participating taxpayers to certify in writing and under penalty of perjury that the failure to report all income, pay all tax and submit all required information returns, including FBARs, was due to non-willful conduct.  Consistent with longstanding legal principles in the tax field, the program instructions define non-willful conduct as "conduct that is due to negligence, inadvertence, or mistake or conduct that is the result of a good faith misunderstanding

of the requirements of the law."[13]  Soon after the announcement of the revised

Streamlined procedures, a senior IRS official stated that even "gross negligence" would

not be deemed disqualifying willful conduct.[14]

Non-resident taxpayers are eligible to participate in the Streamlined Foreign

Program, while U.S. residents and non-residents who fail to satisfy the non-resident

requirement could participate in the Streamlined Domestic Program.  A person is a non-

resident if, in any one or more of the most recent three years for which the U.S. tax

return due date (or properly applied for extended due date) has passed, the individual i)

did not have a U.S. abode and ii) was physically outside the United States for at least

330 full days.  The Streamlined Foreign Program is open to taxpayers who have failed

to file U.S. returns, or who have filed incorrect U.S. returns, and it does not impose any

penalty (even including late filing or payment penalties).  The Streamlined Domestic

Program is not open to non-filers, and it requires a taxpayer to pay a 5 percent offshore

penalty on the highest aggregate balance/value of the taxpayer's foreign financial

assets that should have been, but were not, reported on an FBAR or Form 8938 for any

of the years cover by the Streamlined Domestic Program submission.

---

[13]    *See* "Eligibility criteria for the streamlined procedures," available at:
https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (Last visited Jan. 1, 2020).

[14]    84 Tax Notes Int'l 472 (Oct. 31, 2016) ("'Anything that doesn't rise to the level of tax fraud or the willfulness standard for [the foreign bank account report] is fair game for streamlining,' said John McDougal, special trial attorney and division counsel, IRS Small Business/Self-Employed Division. 'As long as you weren't fraudulent or willful in the FBAR sense, even gross negligence is an appropriate basis for filing streamlined.'").

Approximately 9,000 taxpayers participated in the 2012 SFCP, whereas the Streamlined Foreign and Streamlined Domestic Programs have helped over 65,000 taxpayers come into compliance.

**D.     Changes to the FBAR Penalty I.R.M.**

On May 13, 2015, the IRS published a memorandum (the "2015 Memorandum") providing interim guidance for open cases where the IRS was considering imposing an FBAR penalty.  The 2015 Memorandum provided procedures "to ensure consistency and effectiveness in the administration of FBAR penalties" and to ensure that they were "asserted in a fair and consistent manner."[15]  The IRS ultimately incorporated the procedures and policies from the 2015 Memorandum into sections 4.26.16 (Report of Foreign Bank and Financial Accounts (FBAR)) and 4.26.17 (Report of Foreign Bank and Financial Accounts (FBAR) Procedures) of the I.R.M. in November 2015.  This was the first update to section 4.26.16 of the I.R.M. since it was added in July 2008.

The non-willful FBAR penalty is limited by statute to $10,000 per violation.  IRS examiners have discretion in determining the amount of penalty ultimately asserted.  To reduce the variance that results from different examiners' view of the severity of a violation, the IRS developed "mitigation guidelines" to be applied in assessing an FBAR penalty.  These guidelines were found in I.R.M. Exhibit 4.26.16-1 prior to the November 2015 revisions to the I.R.M.[16]  Recognizing "the magnitude of the maximum penalties permitted for each violation, the assertion of multiple penalties and the assertion of

---

[15]     SBSE-04-051500025, Memorandum from Heather C. Maloy, Karen M. Schiller, and Sunita B. Lough, dated May 13, 2015.

[16]     The mitigation guidelines, as they existed prior to the 2015 revisions, are attached at Exhibit B.

separate penalties for multiple violations with respect to a single FBAR form, should be carefully considered and calculated to ensure the amount of the penalty is commensurate to the harm caused by the FBAR violation."[17]  The I.R.M. reflects the IRS's view that the purpose of FBAR penalties is "to promote compliance with the FBAR reporting and recordkeeping requirements."[18]

The procedures from the 2015 Memorandum, which are now embodied in Section 4.26.16.6 of the I.R.M., directed examiners to first determine whether the taxpayer met the mitigation threshold conditions from the I.R.M.  If the mitigation threshold conditions were met, the 2015 Memorandum directed the examiner to calculate the penalty under the existing mitigation guidelines.  If the mitigation guidelines resulted in a non-willful penalty of greater than $10,000 per year, the 2015 Memorandum limited the penalty "for most cases" to $10,000 for each open year, regardless of the number of unreported accounts.  However, the 2015 Memorandum recognized that "for some cases," the facts and circumstances may indicate the need for a lesser or greater penalty.  Therefore, an examiner had the discretion to determine that the facts and circumstances should result in no penalty, a single penalty not to exceed $10,000 for one year only, or a separate penalty for each account and for each year.[19]  The 2015 Memorandum notes that "[i]n no event will the total amount of the

---

[17]     I.R.M. § 4.26.16.6.7(4).  Prior to 2015, the I.R.M. contained the same policy except the last clause read:  "the assertion of multiple penalties and the assertion of separate penalties for multiple violations with respect to a single FBAR form, should be considered in only the most egregious cases."  I.R.M. § 4.26.16.4.7 (July 1, 2008).

[18]     I.R.M. § 4.26.16.6.4(3).

[19]     Whether the IRS could properly assess a non-willful FBAR penalty on a per account, per year basis will be decided by this Court.  The issue is also pending before

penalties exceed 50 percent of the highest aggregate balance of all unreported foreign financial accounts for the years under examination."

Because of the great discretion afforded examiners in determining the amount of the penalty, both before and after the 2015 Memorandum, consistency in exercising this discretion for similarly situated persons is of the utmost importance in achieving the overarching policy embodied in the I.R.M.

IV.  **Opinion**

### A. The Penalties Imposed on Taxpayer are Inconsistent with Penalties Asserted Against Similarly Situated Taxpayers

The penalties assessed here totaled $2.72 million dollars, exclusive of interest and other statutory additions.  This amount of the penalties strongly resemble the penalties assessed in civil and criminal cases where the Government has asserted "willful" FBAR violations.  The assessed penalties here are also in excess of amounts imposed on thousands of other taxpayers who failed to report foreign accounts, many of whom engaged in willful non-compliance.  Prior to the announcement of the 2012 SFCP, non-willful taxpayers residing in foreign countries, such as the taxpayer in this case, could participate in one of the IRS's voluntary disclosure programs and "opt out" or otherwise request a lesser "miscellaneous" penalty.

Non-willful taxpayers who participated in the 2009 Program could receive a lesser penalty than that offered in the program (20 percent of the aggregate account balances in the highest year) if they could prove to the IRS's satisfaction that the program penalty exceeded those that they would face outside of the Program.  Based

---

the Ninth Circuit.  *See United States v. Boyd*, No. 2:18-cv-00803 (C.D. Cal.), *appeal filed*, No. 19-55585 (9th Cir.).

on my and my firm's experience, and my understanding of similar cases handled by colleagues, while there were few such cases, the penalty for these taxpayers (which necessitated a finding of non-willfulness by the IRS) was almost always very low or zero.

Under the terms of the 2011 Program, non-willful taxpayers were required to "opt out" of the settlement structure to receive a lower penalty. Again, based on my and my firm's experience, and my understanding of similar cases handled by colleagues, where the IRS agreed that the failure to file FBARs was non-willful, the penalty imposed upon the taxpayer was either $10,000 (or less) for each of the six years, or a penalty on each account (subject to the $10,000 limitation) for one year. These amounts are far less than the penalties imposed upon the taxpayer here.

As a third category, non-willful taxpayers participating in a voluntary disclosure program whose case had not been resolved when the Streamlined Foreign and Streamlined Domestic Programs were announced in 2014 were able to request "transition relief." If the IRS agreed that the taxpayer's conduct was non-willful, the taxpayer would pay the same penalty required in the Streamlined Foreign or Streamlined Domestic Program (as opposed to the 20, 25, or 27.5 percent penalty in his or her respective program).

Had this taxpayer been properly advised in early 2012 and entered OVDP, once the transition procedures were announced in 2014 the taxpayer most likely would have qualified for a no-penalty disposition. He lived in Romania full-time and, as the Government has concluded, his conduct was non-willful. (Indeed, even a U.S. resident subject to the terms of the Streamlined Domestic Program would have owed at most a 5

percent penalty on his foreign accounts.)  This makes it plain that the penalty being assessed against him here is inconsistent with those of similarly situated taxpayers — *i.e.*, non-resident (or even resident) taxpayers who committed non-willful violations of their FBAR filing requirements.

I do understand that the IRS's position here is that the taxpayer was not allowed into the Streamlined Foreign or Streamlined Domestic Programs because he was under audit.  I note that undoubtedly, he was under examination solely as a result of the voluntary filings he made while represented by Mr. Beckley.  More broadly, many FBAR penalty cases generated outside these programs are settled out of the public eye, and there are very few docketed cases where the Government seeks to collect monies owed for non-willful FBAR violations, largely, I suspect, because the amounts in most such cases are not worth the cost of litigation (or even the expenditure of government resources to examine and collect).  The amounts at issue in the cases that are a matter of public record, however, pale in comparison to the penalties assessed here.[20]

---

[20]   I am aware of only four cases where the Government sought to collect non-willful FBAR penalties — *United States v. Boyd*, No. 2:18-cv-00803 (C.D. Cal.), *appeal filed*, No. 19-55585 (9th Cir.) (seeking to collect approximately $46k for a single non-willful FBAR violation where the taxpayer had not previously filed FBARs, did not report the income from such accounts on her returns, and opted out of the 2012 Program); *United States v. Patel*, No. 8:19-cv-00792 (C.D. Cal.) (seeking to collect $440k, $10k, $70k, and $10k for four years of non-willful FBAR violations from four family members); *United States v. Tonisson*, No. 3:19-cv-01497 (D. Or.) (seeking to collect approximately $90k for three years of non-willful FBAR violations where the taxpayer had previously filed FBARs that failed to report some of her foreign accounts, did not report the income from such accounts on her returns, and opted out of the 2011 Program); *United States v. Agrawal, No. 18-C-0504 (E.D.Wisc.)* (the court found that the taxpayer did not satisfy the reasonable cause exception for non-willfully failing to file four years of FBARs and the penalties totaled approximately $46k).

**B. The IRS Has Not Followed Its Procedures In Assessing FBAR Penalties Here**

The amount of the penalty assessed here would not be consistent with the case of a taxpayer who the IRS determined met the mitigation criteria set forth in the I.R.M. The IRS apparently decided in this case not to apply the mitigation criteria.  Based on my review of the record, this determination is incorrect.

To qualify for mitigation, the person must meet four criteria:  (1) the person must have no history of criminal tax or BSA convictions for the preceding 10 years and have no history of prior FBAR penalty assessments; (2) no money passing through any of the foreign accounts associated with the person can be from an illegal source or used to further a criminal purpose; (3) the person must have cooperated during the examination; and (4) the IRS must not have determined to impose a fraud penalty against the person for an underpayment of income tax for the year in question due to the failure to report income related to any amount in a foreign account.

Prongs one and four of these criteria are not in dispute.  The IRS examiner in this case concluded that the taxpayer failed to satisfy prongs two and three, relating to illegal source income and a lack of cooperation.[21]  As to the former, the IRS Appeals Officer stated that "there is no evidence that the money in the foreign bank accounts was from an illegal source or was used for a criminal purpose."[22]  As a result, it appears that the IRS examiner made a material error in her review of the case, and the source of

---

[21]   Form 886-A, pg. 18 (DOJ 000601).

[22]   Bittner Appeals Case Memorandum FBAR Penalty, pg. 5 (DOJ 000011).

the relevant funds is not a basis for concluding that the mitigation guidelines were inapplicable.

As to cooperation, the IRS Appeals Officer notes disagreement on whether this factor is satisfied.  My review of the record, however, reflects that this taxpayer cooperated with the examination.  In describing the meaning of the cooperation requirement, the I.R.M. makes clear that a finding of cooperation is warranted where the "IRS did not have to resort to a summons to obtain non-privileged information; the taxpayer responded to reasonable requests for documents, meetings, and interviews; and the taxpayer back-filed correct reports."[23]  While there was disagreement between the IRS and the taxpayer as to the scope and breadth of the agent's document requests, the taxpayer produced voluminous data, offered to produce more, and importantly, the IRS did not have to resort to any compulsory process to obtain additional information.  I have not seen anything that would lead me to believe that the taxpayer does not satisfy this standard for cooperation, and in my opinion, the mitigation rules should have applied to this taxpayer.

Beyond the question whether the mitigation rules should have applied, the IRS Appeals also concluded that "[t]he disagreement [over cooperation] . . . does not impact the calculation of the total penalty because a reduced, Level III-NW penalty under the mitigation guidelines would be the statutory maximum penalty for nonwillful violations." This conclusory statement, however, does not offer factual or legal support for the extreme treatment of this taxpayer.

---

[23]      I.R.M. 4.26.16.6.6.1(2)(e).

As the 2015 Memorandum states, the first step in ascertaining the penalty amount for non-willful violations is to make a *preliminary* penalty calculation based upon the mitigation guidelines that were in the I.R.M. prior to the issuance of the 2015 Memorandum — this is the "Level III-NW" penalty (the $10,000 per violation statutory maximum penalty) referenced in the Appeals Memorandum.  However, the 2015 Memorandum goes on to say that the penalty under the mitigation guidelines will be limited to $10,000, "unless the facts and circumstances of a case warrant a different penalty amount."

The debate in this case of course is whether a different non-willful penalty amount is warranted, but in my opinion, the IRS has, inconsistent with its general treatment of other taxpayers, and incorrectly, determined that this case warrants more punitive treatment than a single $10,000 per year non-willful penalty.  Based on the available public record of penalty cases, and our firm's experience, here, the IRS is treating this taxpayer in a manner consistent with persons who have committed *willful* FBAR violations.

The taxpayer here is like many other persons who became naturalized U.S. citizens in early adulthood and then returned to their home country to live and work. The taxpayer has spent most of his life residing and making a living outside of the United States.  He returned to the United States in late 2011/early 2012, which was arguably the height of U.S. governmental efforts to educate taxpayers on foreign tax compliance obligations and to enforce these laws.

The taxpayer made the unfortunate mistake of selecting the wrong tax advisor — an incompetent one — who failed to advise him properly on his compliance options.  In

my practice over the past decade, I have seen numerous instances of clients who have come to our firm after having received poor advice from other practitioners who had not been familiar with the IRS voluntary disclosure landscape, or who may not have technically qualified for a formal IRS program but who wished to come into compliance. In many, if not most, of these cases, especially where the taxpayers were deemed to have acted non-willfully, IRS management has been willing to treat such taxpayers in a manner similar to the structure of the applicable IRS program or provide relief similar to that which could have been obtained in the Streamlined Program (or through Transition Relief).  In such cases the IRS in our experience generally has not imposed multi-million dollar penalties that any competent advisor could have helped the taxpayer avoid.

In this case, the Government, on the one hand, has recognized the mitigating circumstances surrounding this taxpayer's shortcomings with respect to his U.S. tax compliance by determining that he acted non-willfully (even under the recent case law equating "willfulness" with "recklessness" in the context of FBAR violations).[24]  Yet, on the other, it has assessed extraordinary non-willful penalties in excess of $2.7 million, in stark contrast to the cases that I and my firm have handled, read about, or heard about. The punishment imposed on this taxpayer is akin – if not more severe than – the penalties assessed on those who the Government views as "willful" violators of the law — that is, those who knew of their FBAR filing obligations but chose not to comply.

---

[24]     *See United States v. Williams*, 489 Fed. App'x 655, 658 (4th Cir. 2012); *United States v. Bohanec*, 2016 WL 7167860 (C.D. Cal. Dec. 8, 2016); *United States v. McBride*, 908 F. Supp. 2d 1186 (D. Utah 2012); *United States v. Bedrosian*, 2017 WL 1361535 (E.D. Pa. Apr. 13, 2017).

· Further, it appears that the IRS Examiner has placed much weight on the fact that the FBARs filed by Mr. Beckley reported only one or two accounts.  IRS Appeals later found that Mr. Beckley's files contained a document provided to him by the taxpayer that listed *all* of his personal accounts in Romania.  However, Mr. Beckley never explained to Mr. Bittner that he had a reportable "financial interest" in any bank account held by a corporation of which he owned more than fifty percent.  Nor did he explain that if he had financial interests, individually or directly through an entity, in twenty-five or more accounts, he was required to report only the total number of such accounts and provide no additional information.  This shows that Mr. Beckley did not understand or communicate to Mr. Bittner the rules regarding the reporting requirements for FBAR.  Moreover, in my experience, the omission of accounts is almost always a factor in determining willfulness v. non-willfulness.  Given the IRS's conclusion here that the taxpayer acted non-willfully, and my opinion that the mitigation criteria should apply in this case, the omission of accounts should not be the basis for the punitive penalty assessments imposed.

I am hard pressed to comprehend what more any taxpayer, including Mr. Bittner, could have done to try to rectify his prior non-compliance other than what occurred in this case.  The penalties sought in this case are so far off the spectrum of what I and other practitioners in my firm have seen, and even so inconsistent with oft-applied principles of sound tax administration, that I can only wonder why this case is such an outlier.  Irrespective of the reasons why, the non-willful penalties sought against Mr. Bittner appear out of line with the norm of foreign account enforcement over the past ten years.

In sum, in my experience, the facts of this case warrant treatment in accordance with IRM provisions concerning "most cases involving multiple nonwillful violations."[25] The facts and circumstances here do not warrant the disparate treatment that it has been afforded.

## V.     Concluding Comments

I fully respect and support the IRS in its efforts to enforce the nation's tax laws and to punish wrongdoers in a manner commensurate with their conduct.  I also consider the private practice of tax law to include an obligation to promote tax compliance within the bounds of the applicable law and other sources of authority.

In my opinion, notwithstanding efforts to maintain consistency in the treatment of taxpayers with offshore issues, the IRS has erred in this case by "throwing the book" at this non-willful taxpayer who in good faith attempted to come into compliance.  The treatment he has received is unlike, and far harsher than, that afforded to other taxpayers participating in a voluntary disclosure program or under audit or investigations where the IRS determines that their failure to comply with FBAR requirements is non-willful.  Such conduct is unfair to this taxpayer and out of line with the result experienced by tens of thousands of other taxpayers.

Scott D. Michel

Date: 1/2/20

---

[25]     I.R.M. § 4.26.16.6.4.1(1) (Last Revised Nov. 6, 2015); *see also* the 2015 Memorandums.

Exhibit A

.

**CURRICULUM VITAE**

**Scott D. Michel**
**Caplin & Drysdale, Chartered**
**One Thomas Circle NW, Suite 1100**
**Washington, DC 20005**
**(202) 862-5030**
smichel@capdale.com

## Education

| | |
|---|---|
| University of Virginia School of Law, *Juris Doctorate* | 1980 |
| Northwestern University, B.S., with Highest Distinction | 1977 |

## Experience

- Honorable Joyce Hens Green, U.S. District Court, District of Columbia — 1980-1981
  - Law Clerk
- Caplin & Drysdale, Washington, DC — 1981-present
  - Associate
  - Member
  - President, 2007-2015

## Bar and Court Admissions

- New York
- District of Colombia
- United States Supreme Court
- United States District Court, District of Maryland
- United States District Court, District of Colombia
- United States Bankruptcy Court, District of Colombia
- United States Tax Court
- District of Colombia Court of Appeals

## Professional Affiliations

- Former Vice-Chair, Committee Operations, ABA Section of Taxation, 2016-2018
- Former Council Director, ABA Section of Taxation
- Former Chair, ABA Section of Taxation, Committees on Civil and Criminal Tax Penalties and Standards of Tax Practice
- Founder and former Co-Chair, ABA Section of Taxation, Annual International Tax Enforcement and Controversy Conference
- Adjunct Professor of Law, University of Miami School of Law Graduate Program in Taxation
- Fellow, American College of Tax Counsel
- Regent, Federal Circuit, American College of Tax Counsel

- Co-Founder and Director, Buildable Hours, Inc.
- Mentor, American Bar Association Rule of Law Initiative
- Member, International Fiscal Association

## Awards & Rankings

- Chambers USA, 2009-Present
- The Legal 500, Recommended 2014-Present; Leading Lawyer, 2010-2013, 2017-Present
- The Legal 500, Top-Tier Firm, Tax - US Taxes - Contentious, 2010, 2015-Present
- Best Lawyers in America, 2006-Present
- Super Lawyers, Top 100 in D.C., 2015; Washington, D.C., 2008-Present
- American Bar Association Rule of Law Initiative (ABA ROLI), International Justice-Sector Education and Training (IJET) Program International Pro Bono Award, 2018
- The American Lawyer's Global Legal Award, Global Dispute of the Year: Investigations, Swiss Tax Settlements, 2015
- The Washingtonian, Top Lawyers, 2011-Present
- The Washington Post, Top Attorneys in D.C., 2014
- Martindale-Hubbell® AV® Preeminent™

## Publications

- "Cryptocurrency Criminal Tax Cases Coming Soon," with Victor A. Jaramillo, Zhanna A. Ziering, and Mark E. Matthews, *Caplin & Drysdale Client Alert*, July 23, 2019
- "The New Voluntary Disclosure Practice: A Fair Compromise?," with Zhanna A. Ziering, Dianne C. Mehany, and Mark E. Matthews, *Caplin & Drysdale Client Alert*, December 3, 2018
- "IRS's Offshore Voluntary Disclosure Program Ending: Impact on U.S. Taxpayers," with Zhanna A. Ziering, Benjamin Z. Eisenstat, Dianne C. Mehany, and Mark E. Matthews, *Caplin & Drysdale Client Alert*, March 14, 2018
- "Possible Tax Fallout for Student and Professional Athletes from NCAA-Related Investigations," with Victor A. Jaramillo and Mark D. Allison, *Caplin & Drysdale Client Alert*, November 9, 2017
- "Paradise Papers: U.S. Citizens and Residents Required to Report on Offshore Assets," with Mark D. Allison, J. Clark Armitage, Peter A. Barnes, and Kirsten Burmester, *Caplin & Drysdale Client Alert*, November 6, 2017
- "Treasury Issues Regulations Addressing Use of LLCs to Disguise Beneficial Ownership," with Kirsten Burmester and J. Clark Armitage, *International Law Office*, January 20, 2017
- "Treasury Issues Final Regulations to Address Use of U.S. LLCs to Disguise Beneficial Ownership," with Kirsten Burmester and J. Clark Armitage, *Caplin & Drysdale Client Alert*, December 19, 2016
- "Voluntary Disclosure Window Closing for Bitcoin," with Mark E. Matthews, *International Law Office*, December 16, 2016
- "Voluntary Disclosure Window Closing on Bitcoin Users," with Mark E. Matthews, *Caplin & Drysdale Client Alert*, December 2, 2016

- "U.S. Tax Enforcers React to The Panama Papers," *IFC Review*, September 1, 2016
- "Is the United States Still a Tax Haven? The Government Acts on Tax Compliance and Money Laundering Risks,"*CCH's Journal of Tax Practice & Procedure*, July 25, 2016
- "The Tax Planner's Tightrope: Morality and Politics Now in Play," *International Law Office*, August 14, 2015
- "The Practical Protection of Taxpayers' Fundamental Rights," *International Fiscal Association 2015 Basel Congress*, August 1, 2015
- "The Tax Planner's Tightrope: Morality and Politics Now in Play," *IFC Economic Report*, May 5, 2015
- "U.S. Offshore Account Enforcement Issues," *CCH's Journal of Tax Practice & Procedure*, September 30, 2014
- "Strategies for Current Filings of Noncompliant Taxpayers as FBAR Deadline Approaches," *Practical Tax Strategies*, May 23, 2014
- "Here Comes FATCA…What To Expect In 2014," *IFC Review Monthly e-Journal*, April 1, 2014
- "Here Comes FATCA…What to Expect in 2014," *IFC Review*, January 4, 2014
- "The Justice Department and Swiss Banks: Understanding the Special Disclosure Program," *Bloomberg BNA*, September 24, 2013
- "Here Are the Implications of Singapore's Move to FATCA Compliance," *Singapore Business Review*, July 29, 2013
- "The Crucial Implications of FATCA for U.S. Citizens in Hong Kong," *Hong Kong Business*, July 25, 2013
- "FATCA: A New Era of Financial Transparency," *AICPA's Journal of Accountancy*, January 1, 2013
- "Offshore Tax Evasion: US Initiatives," *Practical Law Company*, April 26, 2012
- "Offshore Tax Enforcement, Voluntary Disclosure, And Undeclared Foreign Accounts," *ALI-ABA Estate Planning Course Materials Journal*, December 1, 2011
- "OVDI Is Over — What's Next for Voluntary Disclosures?," *Tax Notes, Special Report*, October 17, 2011
- "Unreported Gifts of Real Property: Time for a Voluntary Disclosure?," *Tax Notes*, August 1, 2011
- "FATCA & Foreign Bank Accounts: Has the U.S. Overreacted?," *Tax Analysts*, May 31, 2011
- "Final Rules & New FBAR Form Issued," *International Tax Review*, May 1, 2011
- "IRS Seeks Names of U.S. Account Holders at HSBC (India)," *Taxmann-The Tax & Corporate laws of India-International Tax*, April 18, 2011
- "Indictment of Offshore Account Holder Portends a New Round of Aggressive Enforcement," *International Taxation*, February 1, 2011
- "IRS's Voluntary Disclosure Program for Offshore Accounts: A Critical Assessment After One Year," *BNA Insights*, September 21, 2010
- "Undeclared Foreign Accounts—Voluntary Disclosures and FBARs After the IRS Settlement Initiative," *Journal of Tax Practice and Procedure*, December 1, 2009

## Selected Speaking Engagements

- Panelist, Ethics in Tax Practice, 15th Biennial Parker C. Fielder Oil and Gas Tax Conference, The University of Texas School of Law (Austin), November 22, 2019
- Panelist, Compliance Obligations and Planning Issues for U.S. Clients with Foreign Income and Investments, ALI CLE International Trust and Estate Planning, November 15, 2019
- Chair, Protecting Taxpayers Under Constitutional, EU, and International Human Rights Laws in an Era of Increased Regulation and Heightened Enforcement, 19th Annual U.S. and Europe Tax Practice Trends, April 4, 2019
- Moderator, Tax Avoidance v. Tax Evasion, Cambridge Forum on International Tax Disputes, February 28, 2019
- Moderator, The All New Two-Minute Drills, ABA Section of Taxation, 2019 ABA Midyear Meeting, January 18, 2019
- Panelist, Tax Transparency and Compliance, ALI CLE International Trust and Estate Planning, November 1, 2018
- Panelist, Penalties for Failure to Report Foreign Assets: The Difference Between a Huge Problem and an Innocent Oversight, 10th Annual Tax Controversy Forum, NYU School of Professional Studies, June 21, 2018
- Panelist, Are Human Rights Affected By Tax Information Reporting and Disclosures, ABA 2018 Paris Sessions, June 9, 2018
- Speaker, Ethical Consideration with International Clients, STEP Miami 9th Annual Summit, June 1, 2018