Exhibit 4

Alexandru Bittner / SSN 0102
Sherry Bittner / SSN -6797

Statement of Reasonable Cause Per Treas. Regs. § 1.6038-2(k)(3)

I was born in Romania in 1957. I attended high school in Romania and served one mandatory year in the Romanian Army. Following my military service, I obtained a Master's degree in mechanical engineering, specializing in chemistry.

Because I did not like the communist regime, and because I am of Jewish origin and my sister had already immigrated to Israel (in 1977), I felt heavily discriminated against so I decided to leave Romania. I received support for a visa as well as financial support from the Hebrew Immigrant Aid Society ("HIAS") and I legally arrived in the USA in December of 1982. In 1987, I became a naturalized United States citizen. I met my wife, Sherry, in 1984. Sherry was a legal Chinese immigrant to the United States who, independently, obtained her naturalization as well. Sherry received no formal higher education and may have obtained only a high school diploma. Sherry speaks very little English. We were married in 1985 and had a daughter in 1987.

In 1989, I worked as a plumber for the Los Angeles School District. After the December 1989 revolution and the fall of communism in Romania, I returned to Romania in January of 1990. Over the years, I became a successful businessman in Romania and invested in numerous and diverse businesses including real estate, telecommunications, tourism, and aquaculture. In the mid-2000s, my business interests suffered and I sustained a number of substantial losses.

While living in Romania, I complied with all Romanian tax laws and hired Romanian accountants to keep records and assist with tax compliance. I was not aware during that time that I had to file United States tax returns simply because I had become a naturalized US citizen. Nor did my accountants inform me of that fact. I reasonably believed that I had no US tax obligations for income from Romania when I was living in Romania and paid taxes to Romania.

Up to about 2000, I had some US source income from an S corporation. I was issued a K-1 and I filed returns reporting that income and paying any tax which I understood was my only obligation under US tax laws. During my 22 years of living in Romania, I was registered with the US embassy in Romania. During all that time, the US embassy never contacted me about any tax returns due. I had no reason to believe that the taxing jurisdiction of the United States differed from other foreign countries that tax earnings only in the jurisdiction where the income was generated.

Based on the English grammar that I learned in school, when you balance the conflicting paragraphs from the US-Romania tax treaty: A "art4-3 a contracting state MAY tax its citizens" and B "art 7-1 business profits : Industrial or commercial profits of

1459498.3/SPSA/26881/0101/021414


GOVERNMENT EXHIBIT 39

DOJ 000276

a RESIDENT of one of one of the Contracting states SHALL BE EXEMPT from tax by the other Contracting state" the latter prevails.

My wife and I returned to the United States from Romania in late 2011. After returning to the United States, I learned that I should have filed US tax returns while I was living in Romania because I am a naturalized citizen. I engaged a CPA to prepare my tax returns. I mistakenly believed that I needed to file tax returns for all the years that I was absent from the United States. Additionally, after reading the United States-Romania Tax Treaty, I believed that, because I was exclusively a Romanian resident during those years, only Romania could tax my income. I discussed this with my CPA and he agreed with this conclusion. The CPA and I prepared and filed 22 years of tax returns in May of 2012. Because I had a mistaken understanding of the United States – Romania Tax treaty, which on its face appears to limit taxation to the country of residency, and because of the CPA's advice, I mistakenly understood that the filing of the back returns was simply a formality. As a result, in preparing those returns I estimated my income from each year based on my recollection which amounts I believed were approximately correct. I did not consult any financial records (which they were all in Romania), nor did I claim any business deductions, losses or expenses on those returns. Following the accountant's advice, I excluded the entire amount of the reported income, expressly relying on the United States-Romania tax treaty.

I never understood, until I returned to the United States, that I was required to file US tax returns for the Romanian income. Nor did I understand that the CPA's and my interpretation of the United States-Romania tax treaty was incorrect (i.e., it did not exclude my Romanian income from U.S. taxation). Indeed, the treaty's "savings clause", which allows the United States to tax its citizens' income despite the treaty, is an obscure provision.

I was also completely unaware that I had to file Forms 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations with my US tax returns. My CPA was aware that I had interests and stock ownership in several Romanian companies. However, he failed to advise me that I had to complete any additional forms concerning my ownership of these foreign companies.

In September of 2012, I contacted Mr. Farley Katz of the law firm of Strasburger & Price to assist me in resolving my outstanding tax issues. Mr. Katz contacted the IRS concerning a way to resolve my outstanding tax issues. After several communications with the IRS, Mr. Katz advised me that we should prepare amended returns to file with the IRS. On January 9, 2013, Mr. Katz hired Lynn Booker, a CPA with Booker, Arceneaux, Laskowski & Myers, LLP in San Antonio, to assist me in preparing my amended returns 1040X for prior years. During the course of preparing these returns, Mr. Booker informed me of the necessity of filing Forms 5471 with my returns. This was the first time I had ever heard of Form 5471. Prior to engaging Mr. Booker, I was unaware of the existence of this form, let alone the requirement of filing this form with my tax returns.

As all of the books and records for my Romanian companies are still in Bucharest, Romania, I introduced Mr. Booker to my administrative assistant Mr. Jenia Strungaru. Mr. Strungaru is in Bucharest and speaks fluent English. Mr. Booker and Mr. Strungaru emailed each other and spoke on the phone frequently (despite the eight hour time zone difference) to gather the information necessary to complete the Forms 5471. I had interests in over 40 Romanian companies during 2006 through 2011 and had voluminous documents in connection with my ownership of these companies.

Mr. Strungaru and my head accountant in Romania spent thousands of hours gathering the information necessary to complete approximately 140 Forms 5471. Mr. Strungaru and my head accountant spent approximately 2,000 hours and 1,500 hours respectively on the project. Additionally, 10 other accountants in other locations in Romania spent about 1,000 hours on this project. Finally, I had other 5-10 persons spend approximately 4,500-5,000 hours to gather additional information.

The preparation of the Forms 5471 was a massive undertaking. First, it took some time for my Romanian professionals to learn and understand the Form 5471 and the various schedules. Mr. Booker spent many hours assisting Mr. Strungaru and the accountants in learning how to complete the required schedules. Additionally, my people had to spend significant numbers of hours gathering records and information throughout various locations in Romania and from several archives. My accountant also had to obtain documents from the Romanian courts and other local fiscal authorities. Once my accountant gathered the information, they spent hundreds of hours translating the documents from Romanian into English. Also, my professionals had to spend a lot of time learning the American method of accounting as it is different from the Romanian accounting method. After my professionals completed translating all the documents and necessary information, they spent hundreds of hours inputting the data into the correct format and filling out the Forms 5471 and accompanying schedules to the best of their knowledge and ability.

After the Romanian professionals completed the 140 Forms 5471, Mr. Strungaru sent the Forms 5471 to Mr. Booker. Mr. Booker reviewed and revised the Forms 5471 to comply with the Form 5471 Instructions. Mr. Booker spent about 400 hours between January and October in assisting my Romanian professionals and reviewing and revising the Forms 5471.

In the course of preparing the amended returns and the Forms 5471, I spent many hours emailing and talking on the phone with both Mr. Katz and Mr. Booker. I also met in person with Mr. Katz and Mr. Booker on several occasions in their offices in San Antonio. I was constantly providing information and additional details concerning the items reported on the return. Also, I routinely reviewed drafts of the returns as Mr. Booker prepared them. On September 5, 2013, I participated in a phone call with Mr. Katz and Mr. Booker in which we finalized the returns and Mr. Booker prepared the returns for my signature. On September 10, 2013, I signed the returns and sent them to Mr. Katz. Mr. Katz then submitted the returns to the IRS on September 12, 3013.

1459498.3/SPSA/26661/0101/021414

Throughout the entire time I lived exclusively in Romania, I was simply unaware, as many other United States citizens in similar circumstances, that I had any United States filing obligations with respect to Romanian income, including filing Forms 5471. Although I dealt routinely with foreign accountants, I was never informed that I had any United States tax obligations. Upon returning to the United States and discovering the facts, I immediately attempted to correct my mistakes and acted in good faith to comply with my tax obligations. I was not aware of the obligation to file Forms 5471 until I had contacted Mr. Katz and Mr. Booker. Upon learning of this obligation, I had my professionals in Romania begin gathering the necessary information. They spent thousands of hours compiling the necessary data and completing the Forms 5471.

Under these circumstances, I did not act negligently and I had reasonable cause for not filing the Forms 5471 timely. The IRS should not apply any penalties.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

_[signature]_ 02/15/2014
Alexandru Bittner