IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:19-cv-00415 |
| ALEXANDRU BITTNER, | ) | |
| Defendant. | ) | |
| _____ | ) | |

## UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

**I.     INTRODUCTION AND OVERVIEW.**

The United States brought this suit under to 31 U.S.C. § 3711(g)(4) against  Alexandru Bittner (Bittner) for judgment and to collect unpaid civil penalties ("FBAR Penalties") assessed against him for his non-willful failure to timely report his interest in foreign bank accounts as required by the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311–25, and its implementing regulations.  The penalties assessed against Bittner arise under 31 U.S.C. §§ 5314 and 5321(a)(5) for his non-willful failure to disclose the existence of numerous foreign accounts in which he had an interest during 2007-2011.  Pursuant to Fed.R.Civ.P. 56 and case law thereunder, the United States moves for, and is entitled to, partial summary judgment on the FBAR penalties for the 2007-2010 years on the foreign accounts that Bittner admits to having a financial interest in, was required to timely report but failed to do so.  The United States does not request summary judgment on the FBAR penalty assessment for 2011 year at this time.

**II.     STATEMENT OF THE ISSUES TO BE DECIDED BY THE COURT.**

1.     Whether Bittner is liable for the non-willful FBAR penalties assessed against him under 31 U.S.C. § 5314 for tax years 2007, 2008, 2009 and 2010 for his failure to

report his interest in foreign bank accounts as follows?

| Year | Total Number Mr. Bittner's Admitted Foreign Accounts | Amount of FBAR penalties sought by summary judgment |
|---|---|---|
| 2007 | 51 | $  510,000 |
| 2008 | 43 | $  430,000 |
| 2009 | 42 | $  420,000 |
| 2010 | 41 | $  410,000 |
| Total | | $1,770,000 |

2.    Whether the statutory maximum penalty under 31 U.S. § 5321(a)(5)(A) for a non-

willful violation is $10,000 per each financial account not reported?

3.    Whether the FBAR penalty assessments against Bittner violate the Eighth Amendment of

the United States' Constitution?

## III.    STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    Before moving to the United States, Bittner attended Politehnica University of Bucharest

for mechanical engineering for 5 years.  Politehnica University of Bucharest is a good university

that is well known in Europe.  Bitner obtained a Masters of Science in Engineering.  *Gov. Ex. 68,*

*Bittner Depo. pg. 17 lns. 1-18; pg. 26, lns. 11-20.*

2.    Bittner moved to the United States in December of 1982.  Gov. Ex. 68, *Depo pg. 21 lns.*

*15-24.*  Bittner became a United States' citizen in 1987 or 1988.  *Gov.Ex.68, Depo. pg. 40 lns. 4-7.*

3.    Before moving back to Romania, Bittner took an exam and became a licensed master

plumber in the State of California.  *Gov.Ex.68, Pg. 26 ln. 6 - pg. 27, ln.1*  Bittner was a master

plumber for the City of Los Angeles.  *Gov.Ex.68, pg. 27, lns.6-10.*

4.    In 1990, Bittner moved back to Romania, but did not renounce his United States

citizenship.  *Gov.Ex.68, Depo. pg  45 lns 5-8.*  Bittner lived in Romania from 1990-2011.

*Gov.Ex.68, Depo. pg. 44 lns.5-8.*

5.    In 1999 or 2000, Bittner opened a personal numbered bank account at Royal Bank of

Canada in Switzerland ("RBC Suisse") which was "one of the first main banks" that Bittner opened outside of Romania.  Gov. *Ex. 25., Gov. Ex. 68, Depo. pg. 170, lns. 4-20; and Depo. pg. 171 lns. 3-7.*  In 2004, Bittner had at least a high balance of $2,400,034 in his RBC Suisse account. Bittner transferred $2,400,034 of his funds from his RBC Suisse account to purchase shares in hotels. *Gov. Ex 25 at DOJ 1872, and Gov. Ex. 68, Depo. pg 171 ln. 17 - pg. 172, ln. 14.*

6.    During the 2004- 2011, Bittner had a personal foreign bank account in Liechtenstein. *Gov. Ex. 24*.  Bittner opened the Liechtenstein account. *Gov. Ex. 68, Depo. pg. 163 ln. 17 - pg.165, Ln 6.*  Bittner knew opening and using a numbered account was for the purpose of hiding his name. *Id.*

7.    Sometime after 2003, Bittner bought four apartments in Brussels in the name of Global Re. *Gov.Ex.68, Depo.pg. 104 ln. 23 – pg. 105 ln. 3. See also Gov. Ex. 66.*  Bittner was sophisticated enough to put his apartment assets in the name of an entity.  *Gov.Ex.68, Depo.pg. 105, lns. 18-21.*

8.    During his time in Romania, Bittner choose to use three holding companies, two in London and one in Geneva to hold his assets. *Gov.Ex.68, Depo. pg. 106, lns. 3-10; and pg. 106 ln. 23- pg. 108 ln. 1.*  Bittner sought advice from individuals who ran these holding companies regarding Romanian citizens owning property in Brussels and taxes in Brussels.  *Gov.Ex.68, Depo. pg. 109, lns. 6-17.*  Yet, Bittner did not ask the individuals running the holding companies located in foreign countries about any banking requirements. *Gov.Ex.68, Depo. pg. 109 lns. 18-22.*

9.    During his time Romania, Bittner negotiated deals with the Romanian government to purchase government assets.  *Depo pg. 90 ln. 20 - pg. 91, ln. 15.*  Bittner used lawyers and sought legal advice when negotiating deals with Romanian government. *Gov.Ex.68, Depo. pg. 95 lns. 9-17.* Bittner submitted investment plans to the Romanian government when purchasing assets from it. *Gov. Ex. 68,* Depo *pg. 87 ln. 21 – pg. 88 ln. 3.*

10.  While in Romania, Bittner filed U.S. income tax returns for the 1991, 1997, 1998, 1999, 2000 years. *Gov. Ex. 63 at DOJ 252-253 and Ex. 67.*  Bittner had the 1991 and 1997 through 2000 U.S. tax returns prepared and sent to Romania, before he signed the returns and returned them to the United States.  *Gov. Ex. 39, Gov.Ex.68, Depo. pg. 249 ln. 17 – pg. 250 ln. 7.*

11.  During 1990-2011 in Romania, Bittner generated some **$70,537,310** of income through his foreign businesses and investments:

| Gross real estate sales | $ 11,872,849 | Gov. Ex. 31 at DOJ 2747-2748; |
| Gross sales of shares or interest in companies | $ 15,888,205 | Gov. Ex. 31 at DOJ 2747-2748 |
| Bank income | $ 24,687,656 | Gov. Ex. 31 at DOJ 2747-2748 |
| Other income | $ 16,026,200 | Gov. Ex. 31 at DOJ 2747-2748 |
| Dividend income | $  2,062,400 | Gov. Ex. 31, DOJ 2752-2754 |
| Total income generated | **$70,537,310** | |

*Gov.Ex.68, Depo. Pg. 212 ln., 14  - pg. 213 ln 10.*

12. In 2010, Bittner deposited at least $1,689,778.60 into his RBC Suisse account in Switzerland.  *Gov. Ex. 27 at DOJ 4234.*

13. In 2010, Bittner also transferred approximately $1,000,000 from his personal accounts in Romania at Unicredit and RBC Suisse in Switzerland to the United States:

| Date of Transfer | Amount transferred | Transferred to whom | Evidentiary Cite |
| --- | --- | --- | --- |
| 1/26/2010 | $100,000.00 | Christine Bittner | Gov Ex. 21 at 1714 |
| 3/6/2010 | $  16,476.00 | Christine Bittner | Gov. Ex. 27 at DOJ 4234 |
| 4/29/2010 | $  15,429.04 | Christine Bittner | Gov. Ex. 27 at DOJ 4234 |
| 4/30/2010 | $400,032.00 | Emil Cobar | Gov. Ex. 27 at DOJ 4234 |
| 5/19/2010 | $400,033.00 | Emil Cobar | Gov. Ex. 27 at DOJ 4234 |
| 6/03/2011 | $  14,475.08 | Christine Bittner | Gov. Ex. 27 at DOJ 4234 |
| 8/03/2010 | $  15,425.22 | Christine Bittner | Gov. Ex. 27 at DOJ 4235 |
| 8/9/2010 | $  22,078.24 | Christine Bittner | Gov. Ex. 27 at DOJ 4234 |
| Total | $983,948.58 | | |

14. In less than a month's time, Bittner transferred over $800,000 to his brother-in-aw, Emil Cobar who lived in the United States.  *Gov. Ex. 27 at DOJ 4234; Gov.Ex.68, Depo. pg. 180 lns. 2-10.*

15. In 2011, Bittner transferred in excess of $1,500,000 from his personal account in

4

Romania at Unicredit to the United States as follows:

| Date of Transfer | Amount transferred | Transferred to whom | Evidentiary cite |
|---|---|---|---|
| 1/6/2011 | $     9,300 | Christine Bittner | Gov Ex. 21 at 1700 |
| 1/14/2011 | $     8,700 | Christine Bittner | Gov Ex. 21 at 1700 |
| 1/20/2011 | $     9,000 | Christine Bittner | Gov Ex. 21 at 1700 |
| 1/28/2011 | $     6,000 | Christine Bittner | Gov Ex. 21 at 1700 |
| 5/03/2011 | $     4,500 | Sherry Bittner | Gov Ex. 21 at 1698 |
| 5/24/2011 | $     2,500 | Sherry Bittner | Gov Ex. 21 at 1697 |
| 8/19/2011 | $   500,000 | Sherry Bittner | Gov Ex. 21 at 1695 |
| 9/15/2011 | $   487,000 | Alexandru Bittner | Gov Ex. 21 at 1695 |
| 12/7/2011 | $   100,000 | Alexandru Bittner | Gov Ex. 21 at 1695 |
| 12/30/2011 | $   425,000 | Alexandru Bittner | Gov Ex. 21 at 1695 |
| Total | $1,552,000 | | |

16. At a minimum, Bittner transferred $2,535,948.58 from his personal foreign accounts to the United States during 2010 and 2011. *Gov. Exs. 21, 27 (SOF ¶ ¶ 13 and 15.)*

17. During 2004-2011, Bittner had an ownership interest in at least 38 different companies. Gov. *Ex. 43 and Gov. Ex. 68, Depo. Pg. 257 ln. 17 -pg. 258 ln. 2.*

18. Bittner had foreign bank accounts since at least 1996. *Gov. Ex. 35* Yet, Bittner failed to timely file any FBARs for the 1996-2010 years. *Id.* Instead, around May 21, 2012, Bittner filed late FBAR reports on is 1996-2010 years. *Gov. Ex. 35 and Gov. Ex. 62 at DOJ 2585.*

19. On his late filed 2006 FBARs, Bittner reported a financial interest in some 69 foreign accounts with the following aggregate high balances:

| Personal accounts | $  4,513,120 | Gov. Ex. 65.at DOJ 2688 |
|---|---|---|
| Business accounts | $  5,997,723 | Gov. Ex. 65.at DOJ 2697 |
| Total | $10,510,843 | |

*Gov. Exs. 41, 42 and 65.*

20. The IRS did not assess any FBAR penalties against Bittner for the 2006 year or for the 1996-2005 years. *Gov. Exs. 61 and 62.*

21. During 2005-2011, Bittner was a United States' Citizen. *Gov. Ex. 60, RFA Nos. 1-7.* During each of 2007, 2008, 2009, 2010, and 2011, the foreign financial accounts in which

Bittner had a financial interest in contained more than $10,000 in aggregate in each year.  *Gov. Ex. 60, RFA Nos. 28-32.*

22. On or about September 27, 2013, Bittner filed amended untimely Forms TD F 90-22.1, FBAR reports reporting his financial interest numerous foreign financial accounts:

| Year | Number of Foreign Accounts not timely reported | Evidentiary Cite |
|---|---|---|
| 2006 | 69 | Gov. Ex. 41 |
| 2007 | 61 | Gov. Exs. 1, 42 and Gov. Ex. 60, RFA No.11 |
| 2008 | 51 | Gov. Exs. 2, 42 and Gov. Ex. 60, RFA No.15 |
| 2009 | 54 | Gov. Exs. 3, 42 and Gov. Ex. 60, RFA No.19 |
| 2010 | 53 | Gov. Exs. 4, 42 and Gov. Ex. 60, RFA No.23 |

23. During 2007-2011, the foreign financial accounts Bittner reported having an interest in had high account balances in the aggregate amounts:

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Personal accounts | $ 1,481,281 | $ 1,053,689 | $ 915,757 | $ 2,333,951 | $ 4,817,293 |
| Business accounts | $ 8,646,579 | $ 9,366,513 | $2,138,127 | $13,724,368 | $10,820,112 |
| Total | $10,127,860 | $10,420,152 | $3,053,884 | $16,058,319 | $15,137,405 |

*Gov. Exs. 1-5, 42 and Gov. Ex. 65 at DOJ 2688.*

24. However, Bittner failed to timely file a Form TD F 90-22.1, FBAR report for each of 2007, 2008, 2009 and 2010 regarding any financial accounts in foreign countries that he had an interest in.  *Gov. Ex. 60, RFA Nos. 10, 14, 18 and 22.*

25.  On June 8, 2017, a delegate of the Treasury Secretary assessed a $10,000 penalty per account violation against Bittner under 31 U.S.C. § 5321(a)(5) for the following total penalties:

| Tax Year | FBAR Account Violations | Aggregate Amount of Assessments |
|---|---|---|
| 2007 | 61 | $610,000 |
| 2008 | 51 | $510,000 |
| 2009 | 53 | $530,000 |
| 2010 | 53 | $530,000 |
| 2011 | 54 | $540,000 |
| | | Total:      $2,720,000 |

*Gov. Ex. 61 and Gov. Ex. 62 at pgs. DOJ 2583 - 2584.*

26. The IRS assessment of the non-willful FBAR penalties for 2007, 2008, 2009 and 2010 for the against Bittner **was based the number of accounts** Bittner listed on his amended FBARs and accompanying schedules.  *Gov. Exs. 1-5, 42 and Gov. Ex. 61 and Gov. Ex. 62 at pgs. DOJ 2583 - 2584.*

27. The IRS provided a detail explanation to Bittner regarding the Agency's reasoning for assessing the non-willful FBAR penalties for 2007-2011 in the amount of $10,000 per account violation.  *Gov. Ex. 63.*  The IRS cannot issue a summons for foreign bank records to a foreign jurisdiction.  *Gov. Ex. 64, Ann Reach Depo. pg. 100, lns. 7-12.*

28. Bittner, now admits that he was legally required to timely file Form TD F 90-22.1, FBARs reporting his financial interest in 41 to 51 different foreign financial accounts from 2007 through 2011:

| Year | Total Number Mr. Bittner's Admitted Foreign Accounts | Evidentiary Cite |
|---|---|---|
| 2007 | 51 | Gov. Ex. 60, RFA Nos. 8,9 |
| 2008 | 43 | Gov. Ex. 60, RFA Nos. 12,13 |
| 2009 | 42 | Gov. Ex. 60, RFA Nos. 16, 17 |
| 2010 | 41 | Gov. Ex. 60, RFA Nos. 20, 21 |
| 2011 | 43 | Gov. Ex. 60, RFA Nos. 24,25 |

As noted above, this motion for partial summary judgment addresses only the non-willful FBAR penalties for tax years 2007, 2008, 2009 and 2010 for Bittner's failure to report his interest in foreign bank accounts as follows.

| Year | Total Number Mr. Bittner's Admitted Foreign Accounts | Amount of FBAR penalties sought by summary judgment |
|---|---|---|
| 2007 | 51 | $   510,000 |
| 2008 | 43 | $   430,000 |
| 2009 | 42 | $   420,000 |
| 2010 | 41 | $   410,000 |
| Total | | $1,770,000 |

29. Even after removing, for the sake of argument on this motion, the account balances that Bittner asserts he lacked greater than 50% control over, the total aggregate high balances in the Bittner's foreign accounts was still as follows:

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| Total aggregate balances | $10,127,860 | $10,420,152 | $3,053,884 | $16,058,319 | $15,137,405 |
| Less accounts <50% ownership | $ 1,416,806 | $   569,198 | $   407,678 | $2,433,022 | $ 5,561,174 |
| Total | $ 8,706,972 | $9,848,104.11 | $2,545,530.11 | $14,425,305.42 | $13,286,734.60 |

*Gov. Ex. 50, Gov. 65 at DOJ 2688 and Gov. Ex. 69*

30. Defense counsel, Farley Katz, was Bittner's representative and power of attorney regarding FBAR related matters for the 1990-2011 years. *Gov. Ex. 6 and Gov. Ex. 60, RFA No. 33.*

31. Bittner and his representative signed consents to extend the time to assess civil penalties under by 31 U.S.C. § 5321 for FBAR Violations for the 2007, 2008 and 2009 years.  *Gov. Exs. 10-16, and Gov. Ex. 60, RFA Nos. 37-43.*

32. On June 6, 2019, the United States filed this suit to reduce to judgment the 2007-2011 FBAR penalty assessments against Bittner.  *See ECF #1.*

33. Since at 1994 or 1995, Bittner knew about the federal insurance (FDIC) guaranteeing amounts held in American bank accounts. Gov.Ex.68, Depo. Pg.153, ln. 15 to pg. 154 ln. 14. Bittner knew the coverage amounts of the federal insurance and knew that it applied on a per account basis and that is why he opened many American accounts.  *Gov.Ex.68, Depo. Pg.153, ln. 15 to pg. 154 ln. 14.*

34. Since at least 1997, Bittner knew that federal law required him to declare if he had more than $10,000 in cash when coming into and exiting the United States.  *Gov.Ex.68, Depo. Pg. 261*

*lns. 3-19.*

35.  Bittner is intelligent enough to know about, and the difference between, the Napoleonic and Anglo-Saxon legal codes.  *Gov. Ex. 68, Depo. Pg. 262 lns. 4-13.*

36.  While a U.S. citizen living in Romania from 1990-2011, Bittner did not ask anyone about U.S. federal taxes.  *Gov.Ex.68, Depo. Pg. 211 lns. 13-19.*  Bittner thought it was more important to make money than inquire about his tax obligations as a U.S. citizen.  *Gov.Ex.68, Depo. Pg. 211 ln. 13 – pg. 212 ln. 5.*  Bittner did not want to waste his breath on asking someone in Romania about American tax laws.  *Gov.Ex.68, Depo. Pg. 273 lns. 2-3*

37.  Bittner did not ask anyone at the United States Embassy about his obligations as a United States' Citizen while living in Romania.  *Gov.Ex.68, Depo. Pg. 48, ln 25 -pg. 49 lns. 1-17.*  Bittner did not ask any at the United States Embassy about federal income taxes.  Bittner did not ask anyone at the United States Embassy while in Romania about obligations or reporting foreign bank accounts or even opening bank accounts in foreign countries. *Gov.Ex.68, Depo. Pg. 51 lns. 11-18.*

38.  Bittner did not "feel like" understanding or inquiring about his foreign bank reporting obligations.  *Gov.Ex.68, Depo. Pg. 51 lns. 11-18.*  Bittner ignored is obligations regarding reporting foreign bank accounts and simply did not feel like inquiring about such obligations.  *Id.*

39.  From 1991-2011, Bittner had accountants in Romania.  *Gov. Exs. 38 and 39, and Gov.Ex.68, Depo. Pg. 240 lns. 5-18.*  However, during that entire time he did not ask his accountants about any tax obligations in the United States or about filing federal income tax returns. *Id..*  During 1991-2011, Bittner did not ask his accountants about filing of foreign bank account reports.  *Gov.Ex.68, Depo. Pg. 240 lns. 10-14.*  In fact, Bittner did not even ask his accountants about Romanian Tax law on worldwide income.  Gov. *Ex. 38, Gov.Ex.68, Depo. Pg. 242 lns. 19-23.*

40. Starting in 2006 or 2007, Bittner employed Eugene Strungaru as an accountant to oversee other accountants in Romania and double check their work for Bittner's companies. *Gov.Ex.68, Depo. 209 lns. 1-2; Depo pg. 209 ln. 20 – pg. 210 ln. 6.* Bittner trusted Eugene Strungaru. *Id.* However, Bittner failed to, or even think it was important to, ask Strungaru about U.S. Tax laws or U.S. Tax obligations. *Id.*

41. Bittner had a general knowledge that the United States tax laws are different from the rest of the world. *Gov.Ex.68, Depo. Pg. 243 lns. 7-19.* Bittner obtained his general knowledge about United States and other countries tax laws not from accountants and lawyers, but from talking to people in bars. *Gov.Ex.68, Depo. Pg. 243 ln. 13- pg. 244 ln. 23.*

42. While in Romania, Bittner simply did not care about learning foreign bank reporting laws. *Gov.Ex.68, Depo. Pg. 263 lns. 18-21 and pg. 264 lns. 21-25.*

43. In 2010, Before moving back to the United States, Bittner used the internet research on real estate in California, Chicago and Texas. *Gov.Ex.68, Depo. Pg. 184, ln.13 pg. 186 ln 9.* Bittner also researched the internet to find Jeff Beckley an account in Plano. *Gov.Ex.68, Depo. Pg. 202, lns. 21-22.*

44. Sometime in 2010, before returning to the United States, Bittner obtained and read the tax treaty between the United States and Romania and personally concluded he did not owe American federal income taxes. *Gov.Ex.68, Depo. Pg. 199 ln. 3 – pg. 200 ln. 6.* However, prior to moving back to Romania from the United States, Bittner did not check for any tax treaties between the U.S. and Romania because he did not think it was important. *Gov.Ex.68, Depo. Pg. 201 ln. 15 – pg. 202 ln. 5.*

45. When asked why the FBAR penalty should not apply to him, Bittner stated that he made a mistake and should be punished, but that the punishment should be like a jaywalking ticket

which he would gladly pay.  *Gov.Ex.68 Depo pg. 263 ln. 18 - pg. 264 ln. 16.; and, Pg. 265 lns. 4-10.*

46. Bittner did not meet with Jeff Beckley who prepared his original FBARs for the 1996-2011 years until January 2012.  *Gov.Ex. 51.*

## IV.   ARGUMENT.

### 1.   Bittner is liable for the FBAR penalties assessed against him for the 2007-2010 years.

#### A.  *The 2007-2010 FBAR penalties meet all the statutory requirements.*

The Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311–25, regulates offshore banking and contains recordkeeping and reporting requirements.  Under 31 U.S.C. § 5314, United States citizens are required to report certain transactions and relationships with foreign financial agencies.  Under the statute's implementing regulations, "[e]ach United States person having a financial interest in, or signature authority over, a bank, securities, or other financial account in a foreign country shall report such relationship" to the IRS for each year in which such relationship exists.  31 C.F.R. § 1010.350(a). To fulfill the reporting requirement, a person must file a Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts," commonly known as an "FBAR."  *See id.*  An FBAR is due by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 1010.306(c). For the 2007 through 2010 years at issue, an FBAR was due by June 30 "of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year."  31 C.F.R. § 1010.306(c).

Bittner was a U.S. citizen during the 2007-2011 years at issue.  Thus, Bittner was a United States person as defined in 31 C.F.R. § 1010.350 for the 2007-2011 years.  From 2007 through 2010, Mr. Bittner's foreign bank accounts contained more than $10,000 in aggregate.

Bittner admits that he had a financial interest in foreign financial accounts with high aggregate account balances as follows:

| Year | Total Number Mr. Bittner's Admitted Foreign Accounts | High Aggregate Account balances |
|------|------------------------------------------------------|----------------------------------|
| 2007 | 51 | $ 8,706,972 |
| 2008 | 43 | $ 9,848,104 |
| 2009 | 42 | $ 2,545,530 |
| 2010 | 41 | $14,425,305 |

Consequently, Mr. Bittner was required to timely file FBARs reporting *every* bank, securities, or other financial account in a foreign country in which he had a financial interest, or over which he had signature authority.   Bittner admits that he was required to timely file FBAR reports disclosing 51, 43, 42, and 41 accounts in 2007, 2008, 2009 and 2010, respectively.  However, Bittner failed to timely file FBARs for 2007-2010 reporting any foreign accounts.

31 U.S.C. § 5321(a)(5) provides for the imposition of civil penalties for a non-willful failure to comply with the reporting requirements of Section 5314 – *i.e,* when the person maintaining a foreign account fails to timely file an FBAR reporting that account despite having an obligation to do so.  For violations involving the non-willful failure to report the existence of a foreign account, the maximum amount of the penalty that may be assessed is $10,000 per account.  31 U.S.C. § 5321(a)(5)(B)(i).   Due to Bittner's non-willful failure to timely file FBARs reporting his financial interest in, or signature authority over, the foreign bank accounts he was required to report, Bittner is liable for the FBAR penalties as follows:

| Year | Total Number Mr. Bittner's Admitted Foreign Accounts | Amount of FBAR penalties sought by summary judgment |
|------|------------------------------------------------------|------------------------------------------------------|
| 2007 | 51 | $   510,000 |
| 2008 | 43 | $   430,000 |
| 2009 | 42 | $   420,000 |
| 2010 | 41 | $   410,000 |
| Total |  | $1,770,000 |

**B.     *The failure to timely file 2007-2010 FBARs was not due to reasonable cause.***

The FBAR penalties for 2007 through 2010 apply to Bittner unless his failure to report was due to reasonable cause.  31 U.S.C. § 5321(a)(5)(B)(ii) provides that "[n]o penalty shall be imposed" if "such violation was due to reasonable cause" and "the amount of the transaction or balance in the account at the time of the transaction was properly reported."  31 U.S.C. § 5321(a)(5)(B)(ii).  While 31 U.S.C. § 5321 and its corresponding regulations do not define reasonable cause in the FBAR reporting context, courts have used the standards set forth in 26 U.S.C. §§ 6651(a) and 6664(c)(1), 6677(d) and case law thereunder when construing the reasonable cause standard applicable in the FBAR context.  *See Jarnagin v. United States*, 134 Fed. Cl. 368, 376 (Fed. Cl. 2017); *Moore v. United States*, Case No. C13-2063RAJ, 2015 WL 1510007 at *4 (W.D. Wash. 2015); *United States v. Agrawal*, Case No. 18-C-0504, 2019 WL 6702114, (E.D. Wis., 2019), *United States v. Ott*, Case. No. 18-cv-12174, 2019 WL 3714491, at *2 (E.D. Mich., 2019).  *See also, Thomas v. UBS AG,* 706 F.3d 846, 851 (7th Cir. 2013) (Noting the similarity between 31 U.S.C. 5321(5(B)(ii) and 26 U.S.C. § 6664(c)).  The taxpayer bears the burden of proof on a reasonable cause defense.  *In re Wyly, 552 B.R. 338, 388 (*Bankr. N.D. Tex., 2016)*.  Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States, 568 F.3d 537, 548* (5th Cir.2009) *(citing Montgomery v. C.I.R.,* 127 T.C. 43, 66 (2006)).

Bittner contends that his failure to report the accounts was due to reasonable cause, and claims that he lacked knowledge of bank reporting requirements.  Additionally, he suggests several other supporting facts, such as his Romanian accountants failed to advise him about his U.S. tax obligations, no one at the U.S. Embassy informed him of his tax obligations, he lacked education in accounting, law and taxation, and he speaks English as a second language.  *See ECF #13 at pps. 11-13 and Gov.Exs. 36, 37, 38 and 39.*

However, in the civil law context, a taxpayer is generally charged with the knowledge of the law, such that ignorance of the law may not be a defense since the taxpayer must take reasonable steps to determine the law and apply it. *Niedringhaus v. Commissioner*, 99 T.C. 202, 222, 1992 WL 190129 (1992).  Taxpayers must establish that they exercised "ordinary business care and prudence" with respect to their obligation to file FBARs for the years at issue in order to show reasonable cause under 31 U.S.C. § 5321(a)(5)(B)(ii).  *Jarnagin*, 134 Fed. Cl. at, 377. Failing to seek professional advice and take steps to learn about the requirement to report foreign financial accounts, does not constitute ordinary business care and prudence, even for a taxpayer with limited education and experience. *Ott*, 2019 WL 3714491, at *2, *Jarnagin*, 134 Fed. Cl. at 378-79.

In the present case, Bittner is an educated, sophisticated and successful businessman who has knowledge about several U.S. banking and U.S. Customs' regulations but failed to exercise ordinary business care and prudence in regard to learn about his foreign account reporting requirements.  Since at least 1997, Bittner knew U.S. laws required him to declare more than $10,000 in cash when was coming into and exiting the United States.  Bittner carefully testified in his deposition that during a trip to Las Vegas, he planned to gamble $50,000 but that he had brought only $10,000 of it with him when he came back into the country and he obtained the other $40,000 allegedly from his U.S. brother-in-law from past dealings they had.  Bittner has a masters degree in chemical engineering from a good and well known university in Europe.  In 1990-2011, Bittner was a U.S. citizen living in Romania with numerous foreign investments. Bittner had an ownership interest in 38 different foreign companies.  Bittner had a reportable financial interest in 69, 51, 43, 42, and 41 separate foreign financial accounts in 2006, 2007, 2008, 2009 and 2010, respectively.  The aggregate high balances in the accounts was over

14

$9,000,000 per year.  During 1990-2011 while in Romania, Bittner generated some **$70,537, 310**
of income through his foreign businesses and investments.  While in Romania from 1990-2011,
when Bittner thought legal, tax, information or advice was important he sought it.  During his
time Romania, Bittner used lawyers and sought legal advice when negotiating deals with the
Romanian government to purchase assets.   In 2003, when purchasing four apartments in
Brussels, he sought advice regarding a Romanian citizen owning property in Brussels and paying
taxes in Brussels.   From 1991-2011, Bittner even employed numerous accountants in Romania.

   However, while in Romania Bittner did not ask anyone about U.S. federal taxes.  During
1991-2011, Bittner did not ask his accountants in Romania about U.S. Tax obligations or filing
of foreign bank account reports.  During the 2000-2003 timeframe, when placing his assets or
investments in foreign holding companies in foreign countries, Bittner did not make any
inquiries about banking requirements.  During the 1991-2010 time frame, Bittner did not ask
anyone about foreign bank account reporting requirements.  Bittner did not ask anyone at the
United States Embassy while in Romania about U.S. obligations or reporting foreign bank
accounts or even opening bank accounts in foreign countries.

   Bittner failed to exercise ordinary business care and prudence because he simply did not
care about learning United States' foreign bank reporting laws.  Upon moving back to Romania,
Bittner did not renounce his U.S. citizenship.   Yet, Bittner did not "feel like" understanding or
inquiring about his U.S. foreign bank reporting obligations.  Bittner thought it was more
important to make money than inquire about his U.S. tax obligations.  Bittner did not want to
waste his breath on asking someone in Romania about American tax laws.  Thus, Bittner's
decision during 1991-2010 not to make any inquires of about foreign bank account reporting
regulations is a failure to exercise ordinary business care and prudence.

15

Furthermore, Bittner's apparent excuse that English is his second language falls flat. Speaking the English as a second language and an inexpert understanding of tax reporting requirements are not sufficient to establish reasonable cause under 31 U.S.C. 5321(a)(B)(ii). *Agrawal,* 2019 WL 6702114, at *5**.** Bittner was able to pass an exam in the U.S. to become a master plumber. Bittner knew enough English to review and sign his U.S. tax returns for 1991, 1997, 1998 and 1999 while living in Romania. Bittner had the mental acuity to read and review the U.S.-Romanian tax treaty. Bittner was sophisticated enough to understand and establish numbered foreign accounts and holding companies to hide his assets. That English was not his native language did not stop Bittner from inquiring about U.S. foreign bank account reporting requirements while in Romania, he just did not want to ask and failed to ask.

Bittner's failure to timely file his 2007-2010 FBARs was not due to reasonable cause.

### C. *The assessments against Bittner for the 2007 through 2010 years were timely.*

The IRS' assessments of the FBAR penalties for 2007 - 2010 were timely. Under 31 U.S.C. § 5321(b)(1), the statute of limitations on the assessment of an FBAR penalty is six years from the date of the violation. The date of the violations for statute of limitations calculations is the date the Form TD F 90-22.1 is due, which in this case is June 30 of the subsequent calendar year. The FBAR for the earliest year at issue – the 2007 year – was due on June 30, 2008. Thus, the statute of limitations for assessment for 2007 was June 30, 2014. However, Bittner signed extensions of time to assess Civil Penalties provided by 31 U.S.C. § 5321 for FBAR violations (FBAR penalties) for the 2007 through 2009 years, which extended the statute of limitation for assessment for FBAR penalties to June 30, 2017. The 2010 FBAR was due on June 30, 2011. The IRS had until June 30, 2017, to assess the FBAR penalties for the years 2010. Thus, the IRS had until June 30, 2017 to assess the FBAR penalties for the 2007 through 2010 years, and those

assessments were timely made on June 8, 2017.  Finally, this suit is timely because it was

commenced within two years of the assessment date.  31 U.S.C. § 5321(b)(2).

**2.   The statutory maximum penalty under 31 U.S. § 5321(a)(5)(A) for a non-willful violation is $10,000 per each financial account not reported.**

   Bittner argues that maximum penalty for a non-willful FBAR penalty cannot exceed

$10,000 per year which would limit the penalties against him in this case to no more than

$50,000 for five years of failing to report between 41 and 51 foreign accounts containing

millions of dollars. *See ECF # 13, pgs. 13, 14, ¶ ¶ 53-55*.  Bittner is wrong.  The statutory

maximum penalty under 31 U.S. § 5321(a)(5)(A) for a non-willful violation is $10,000 per each

financial account not reported.  This is the law even if more than one foreign account can be, or

should have been, reported on the same annual disclosure form to the IRS.  Any other

interpretation would allow persons like Bittner to effectively hide millions of dollars in multiple

unreported foreign accounts while gladly paying a *de minimis* annual penalty of only $10,000 –

something Bittner equates to a jaywalking ticket he would gladly pay.[1]

   The United States' position that a non-willful FBAR penalty violation is $10,000 per

account is supported by the BSA, its implementing regulations, statute itself, congressional intent

and case law.  In 1970, Congress enacted the BSA to close "the largest single tax loophole

permitted by American law," the secret foreign bank account. H.R. Rep. 91-975 (1970) *reprinted

in* 1970 U.S.C.C.A.N. 4394, 4398.  Congress found that undisclosed relationships with "secret

foreign financial facilities," particularly those in Switzerland, facilitated a number of unsavory

activities, including income tax evasion, schemes to defraud the United States, and the illegal

---

[1] Gov.Ex.68 *Depo. pg. 263 ln. 18 pg. 264 ln. 16.; and Depo. Pg. 265 lns. 4-10.*

concealment of assets.  *Id.* at 4397-4398.  In an effort to unearth such relationships, the Treasury

Secretary was authorized to assess a penalty "on any person who violates, or causes any violation

of, any provision of [31 U.S.C.] section 5314." 31 U.S.C. § 5321(a)(5)(A).

31 U.S.C. § 5314 authorizes the Secretary of the Treasury to require United States

persons to report certain transactions with foreign financial agencies.  This includes United

States persons who have a financial interest in, or signature authority over, a bank, securities, or

other financial account in a foreign country that exceeds $10,000 in aggregate value must file a

Form TD F 90-22.1, "Report of Foreign Bank and Financial Accounts," commonly known as an

"FBAR," with the IRS reporting the account for each year in which such relationship exists.  31

U.S.C. § 5314; 31 C.F.R. § 1010.350(a); § 1010.306(c).

While Section 5314 does not, by itself, explain exactly how a person who maintains

relationships with foreign financial institutions must comply with the reporting obligation, it

directs that records and reports must "contain . . . (1) the identity and address of participants in a

transaction or relationship, (2) the legal capacity in which a participant is acting, (3) the identity

of the real parties in interest, and (4) a description of the transaction."  31 U.S.C. § 5314(a).

These requirements are met only by providing the information on an account-by-account basis.

The Treasury Secretary was also authorized to prescribe how the reporting requirements

under this section or a regulation under this section were to be met.  31 U.S.C. § 5314(b)(1).  The

Treasury Secretary promulgated 31 C.F.R. § 1010.350(a), which provides that:

> Each United States person having a financial interest in, or signature or other
> authority over, a bank, securities, or other financial account in a foreign country
> shall report such relationship to the Commissioner of Internal Revenue for each
> year in which such relationship exists and shall provide such information as shall
> be specified in a reporting form prescribed under 31 U.S.C. § 5314 to be filed by
> such persons. The form prescribed under section 5314 is the Report of Foreign
> Bank and Financial Accounts (TD-F 90-22.1), or any successor form.

18

By using, "shall," the regulation mandates that covered persons (a) report certain relationships (accounts) they have in foreign countries and (b) with respect to such relationships, provide the information specified on the FBAR form.  In turn, the FBAR form is an annual[2] report that requires that the U.S. person provide, for each account in which they have an interest, identifying information about the U.S. person, the name and address of the foreign institution, the account number, and the maximum balance in the account, as well as the legal capacity in which they hold that interest (ownership, joint ownership, signature authority).[3]  Although the detail of reporting required of persons with an interest in more than 25 foreign accounts differs from those with an interest in less than 25 foreign accounts, the FBAR form still requires annual disclosure of the total number of accounts (if more than 25) and detailed record keeping for each such account.[4]

From 1970 to 2003, the only penalty for failure to comply with the BSA reporting requirements required a showing of willfulness. See 31 U.S.C. § 5321, (Pub. L. 97-258, Sept. 13, 1982, 96 Stat. 999).   However, in 2004, Congress again expressed concern that the number of individuals using offshore bank accounts to engage in abusive tax scams had grown significantly in recent years.[5]  Congress believed that improving compliance with the FBAR reporting requirements was vitally important to sound tax administration, combating terrorism, and

---

[2] The FBAR report is due 6/30 of the year following the calendar year for which the report is made.  *31 C.F.R. § 1010.306(c).*
[3] For accounts over which the U.S. person has signature authority, they also must identify the account owner or owners.
[4] See Form TD F 90-22.1, Gov. Exs. 1-5.
[5]  Joint Committee on Taxation, General Explanation of Tax Legislation enacted in the 108th Congress, JCS- 5-05 NO 32 (I.R.S.), 2005 WL 5783636 at *34–35.
(continued...)

19

preventing the use of abusive tax schemes and scams.[6]  "Congress believed that increasing the prior-law penalties for willful noncompliance with the reporting requirements and imposing a new civil penalty that applies without regard to willfulness in such noncompliance would improve the reporting of foreign financial accounts."[7]

   As a result, Congress increased the willful FBAR penalty to be 50% of the account balance or $100,000 per account regardless of the account balance.   Congress also enacted a non-willful FBAR penalty violation to increase the reporting of foreign accounts.   Under 31 U.S.C. § 5321(a)(5)(A)-(B), any person who non-willfully fails to accurately and timely report a foreign financial account relating to such an account violates 31 U.S.C. § 5314 and can be subjected to a penalty "not to exceed $10,000."  A non-willful FBAR penalty violation under 31 U.S.C. § 5321(a)(5)(A)-(B), is a per account violation and not per year.  *United States v. Boyd*, No. 18-cv-803, 2019 WL 1976472 (C.D. Cal. Apr. 23, 2019).[8]   In the *Boyd* case, the IRS assessed thirteen separate FBAR penalties against Boyd, and the IRS treated each account that was not listed on a timely filed FBAR as a separate non-willful violation for the 2010 year. *Id.* at *2.   The court determined that the FBAR statute contemplates that the relationship with each foreign financial account constitutes the non-willful FBAR violation."  *Id.* at *4-5.  The court granted the United States' motion for summary judgment, finding that "[e]ach non-willful FBAR violation relates to a foreign financial account, and the IRS may penalize such violation with a penalty not to exceed $10,000."  *Id.* at *1.

---

[6] *Id.* (emphasis added).
[7] *Id.  See* 31 U.S.C. § 5321 of American Jobs Creation Act of 2004, § 821, Pub. L. No. 108-357, 118 Stat. 1418 (2004), emphasis added.
[8] The Court in the *Boyd* is the only court to have opined on the contested issue of $10,000 per account versus per year issue.  *United States v. Boyd*, 2019 WL 1976472.

The per account violation conclusion is also confirmed by language for the reasonable cause exception to the penalty found in 31 U.S.C. § 5321(a)(5)(B)(ii).  The exception, available only with respect to non-willful violations, provides that "[n]o penalty shall be imposed . . . with respect to any violation if (I) such violation was due to reasonable cause, and (II) . . . the *balance in the account* . . . was properly reported."  31 U.S.C. § 5321(a)(5)(B)(ii) (emphasis supplied). The existence of a reasonable cause defense shows that the non-willful penalty applies on an account-by-account basis.   Thus, each account stands on its own because a non-willful failure to report it can be penalized up to $10,000 on its own and, if reasonable cause is shown for the failure to disclose a particular account, no penalty can be imposed for such account.

In any event, Congress's choice to use the singular "account" and "balance" in § 5321(a)(5)(B)(ii), each proceeded by the definite article "the," is most naturally read as referring to the particular account for which the violation at issue relates.  If, the penalty applied to the annually required FBAR *form*, Congress would not have used the language that it did.  The statute does not use word "form".

 The same singular language of "account" and "balance" appears in § 5321(a)(5)(C)-(D), which governs the calculation of the penalty for willful violations.  The *Boyd* court, based on this reasoning, found that the United States' reading of the statute—that the penalty applies per account, rather than per annual FBAR form—was "the more reasonable interpretation."  *Boyd*, 2019 WL 1976472, at *4.  Similarly, willful violations can be penalized by the greater of $100,000 or 50% of the "balance in the account at the time of the violation", 31 U.S.C. § 5321(a)(5)(C)-(D), and there is no indication that Congress intended to use a different violation trigger for non-willful penalties.

21

The plain language of § 5321(a)(5) shows that the United States' interpretation is the correct one.  Subsection A authorizes the Secretary of the Treasury to "impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314."  Subsection B provides that "in general" the penalty imposed under subsection A is limited to $10,000, except as provided in Subsection C, which addresses willful violations.  In turn, Subsection C provides that, where the violation is willful, "the maximum penalty under subparagraph (B)(i)" shall be increased.  Subsection C explicitly provides that the penalty for a willful violation is the same penalty for a non-willful violation (i.e., the penalty under subparagraph (A)) but that the maximum amount of that penalty can be increased for willful violations.  Given that the penalty is in the same statute but increased for willful violations, the underlying violation must also be the same.  Nothing in the text indicates that the term "violation" for purposes of Subsection C has a meaning different from the meaning of "violation" in Subsection A and, indeed, the cross-referencing of those two subparagraphs in subparagraph (B)(i) confirms that the violation is the same.  Subsection D states that "in the case of a violation involving a failure to report the existence of an account" the penalty can be assessed with regard to the balance in the account which was not reported (as stated in Subsection C, the penalty can be up to 50 percent of that balance).  Again, the willful variant of the penalty is assessed with reference to each account.  *See United States v. Shinday*, Case No. 2:18-cv-6891-CAS-Ex, 2018 WL 6330424 at *3-4 (C.D. Cal. Dec. 3, 2018); *United States v. Colliot*, Case No. AU-16-CA-01281-SS, 2018 WL 4178343 at *1 (W.D. Tex. Aug. 16, 2018).

Given that the underlying violation is the same for willful and non-willful penalties, the non-willful penalty should be interpreted as applying to each undisclosed account.  Nothing in the BSA or its legislative history suggests that Congress intended to distinguish non-willful

violations from willful ones, in terms of what conduct is being penalized.  *See* H.R. Conf. Rep.

108-755 at *1667-68.  Before 2004, civil penalties were authorized only with respect to willful

violations of the FBAR reporting requirements. Congress added a non-willful variant of the

penalty after receiving estimates that "hundreds of thousands of taxpayers with offshore bank

accounts [were] attempting to conceal income from the IRS." S. Rep. 108-192 at *108.  By

removing the government's burden of demonstrating an accountholder acted willfully, Congress

intended to "improve compliance with [the FBAR] reporting requirement." *Id.; see* American

Jobs Creation Act of 2004, Pub. L. No. 108-357, 118 Stat. 1418 (2004).  The conduct that

underlies the penalty—here, the failure to disclose financial accounts—is not different between

willful and non-willful penalties; the only difference is whether such violation is willful (giving

rise to the higher penalty) or non-willful.  Limiting the penalty to $10,000 per form, regardless of

how many accounts are not reported would drastically limit the deterrent value of the penalty, as it

would incentivize accountholders with large amounts of money in multiple overseas accounts to be

less diligent in determining whether they are obligated to disclose such accounts or to disclose all

the of their accounts and would lead to absurd results.

In the present case, Bittner has admitted to not timely filing FBARS for 2007-2010

reporting his financial interests in some 51, 43, 42, and 41 separate foreign accounts,

respectively.  Since Bittner had more than 25 accounts he was required to file an FBAR in each

of years 2007-2010, checking the box on line 14, yes and then report the actual "**total number of**

**accounts**"  Yet, he failed to timely report his financial interests in 51 accounts in 2007, failed to

timely report 43 accounts in 2008, failed to timely report 42 accounts in 2009 and failed to

timely report 41 accounts in 2010.   Accordingly, Bittner had 51, 43, 42, and 41 separate FBAR

penalty violations in 2007, 2008, 2009 and 2010, respectively.

23

It would also be an absurd result to treat a taxpayer who fails to list just one foreign account per year in the same manner as someone who failed to disclose 51 foreign accounts. Moreover, interpreting the penalty to be a maximum of $10,000 per year rather than per account is not consistent with the remedial nature of the statute to compensate the government for the cost of investigating hidden foreign accounts.  *See United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1369-73 (M.D. Fla. 2018) (civil penalty for willful failure to file FBAR is remedial, not punitive, in nature, such that it survives the death of the person assessed).  *See also,* H.R. Rep. No. 91-975, at 12- 13 (1970), *reprinted in* 1970 U.S.CC.A.N. 4394, 4397-98 (investigating secret foreign bank accounts is time consuming and expensive).  A greater number of hidden foreign accounts increases the costs of an investigation and the potential damage to the government in lost tax revenue.  Thus, making the penalty vary by the number of undisclosed accounts satisfies the remedial purpose.

Additionally, Congress' intended to provide greater deterrence against hiding foreign bank accounts.  While statutory interpretation is not driven by the level of deterrence it would provide to a specific individual, Bittner's case provides a stunning example of why Congress was right to be concerned and impose a penalty for each unreported foreign account.  Bittner argues for a maximum penalty of $10,000 per year, but readily suggested in his deposition that he would consider such a penalty to be a jaywalking ticket that he would gladly pay.[9]  And, given that Bittner admitted planning to gamble $50,000 in advance of one trip to Las Vegas[10], a combined five years' worth of penalties totaling only $50,000 under his suggested interpretation of the law

---

[9] *Depo pg. 263 ln. 18 pg. 264 ln. 16.; and Depo. pg. 265 lns. 4-10.*
[10] *Depo. pg. 261 ln. 1-19.*

would not be an effective deterrent from future failures to comply with reporting requirements.

Thus, the statutory maximum penalty under 31 U.S. § 5321(a)(5)(A) for a non-willful violation

should be $10,000 per each financial account not reported.

3. **The FBAR penalty assessments against Bittner do not violate the Eighth Amendment of the United States' Constitution.**

A. *Civil FBAR Penalty Is Not a Fine Within the Eighth Amendment.*

Bittner has indicated he intends to argue that the penalty at issue in this case violates

the Eighth Amendment of the United States' Constitution. *See ECF #13 at ¶ 73.*  However, the

FBAR type of penalties assessed against Bittner are not "fines" covered by the Eighth

Amendment, because they are not punishment for some offense.  *United States v. Bajakajian*,

524 U.S. 321, 328 (1998) determined that a fine for purposes of the Eighth Amendment needs

to be a punishment for some offense.  In *Bajakajian*, the Court held that a fine is a punishment

if it is "imposed at the culmination of a criminal proceeding" and requires "conviction of an

underlying" crime. *Id.* at 328.  Those conditions are absent in this case because Bittner was not

charged with, or convicted of, a crime related to the FBAR penalties at issue in this case.

Bittner has been assessed civil FBAR penalties for the 2007-2011 years.  And, the civil FBAR

penalty can be imposed even where, as here, the Secretary chooses not to undertake a criminal

action.  In fact, in 31 U.S.C. § 5322, Congress separately provided criminal penalties to punish

those who willfully fail to file FBAR forms.  Congress described the criminal penalties— but

*not* the civil penalties—as "fine[s]." 31 U.S.C. § 5322(a) & (b); *cf. One Lot Emerald Cut

Stones & One Ring v. United States*, 409 U.S. 232, 236-37 (1972) (civil forfeiture provisions,

as distinct from parallel criminal provisions, are remedial for double jeopardy purposes).

The purpose of the civil FBAR penalty is instead at least partially remedial, which is to

say that it has the "purpose of compensating the Government for a loss." *Bajakajian*, 524 U.S. at 328.  When it enacted the BSA, Congress called the use of "secret foreign bank account[s]" the "largest single tax loophole permitted by American law," and one that caused the "debilitating effect[ ]" of "hundreds of millions" of dollars in lost tax revenues. H.R. Rep. No. 91-975, at 12- 13 (1970), *reprinted in* 1970 U.S.CC.A.N. 4394, 4397-98 (investigating secret bank accounts is time consuming and expensive). The civil penalties in § 5321 serve to offset these losses to the Treasury. *See United States v. Estate of Schoenfeld*, 344 F. Supp. 3d 1354, 1369-73 (M.D. Fla. 2018) (civil penalty for willful failure to file FBAR is remedial, not punitive, in nature, such that it survives the death of the person assessed).   Accordingly, the civil FBAR penalties assessed against Bittner for the 2007-2010 years are not fines subject to the Eighth Amendment excessive fines clause.

### B. The FBAR Penalties at Issue are Not Constitutionally Excessive.

Even if the civil FBAR penalties were a fine, the FBAR penalties assessed against Bittner would not be excessive.  In addressing excessiveness challenges, the courts consider factors used by the Supreme Court in *Bajakajian* to determine whether a fine is grossly disproportionate: (1) the amount of the penalty authorized by Congress; (2) the class of persons for whom the statute at issue was principally designed; (3) the seriousness of the offense and the harm it caused; and (4) a comparison with the potential criminal penalties, including imprisonment. *See, e.g.,* U*nited States v. Viloski,* 814 F.3d 104, 110-11 (2d Cir. 2016); *United States v. 132,245.00 in U.S. Currency*, 764 F.3d 1055, 1058 (9th Cir. 2014); *United States v. Cheeseman*, 600 F.3d 270, 283-84 (3d Cir. 2010).  The burden of proof rests on Bittner to show that the penalty is excessive under these factors. *E.g.*, *Viloski*, 814 F.3d at 109; *132,245.00 in U.S. Currency*, 764 F.3d at 1058; *Cheeseman*, 600 F.3d at 283. Bittner cannot carry that burden.

The FBAR penalties assessed against Bittner are not grossly disproportionate considering that he failed to report some 178 foreign accounts averaging aggregate account balances of almost $10,000,000 per year over a four-year period.  By comparison, the court in *Moore*, 2015 WL 1510007, at *12-1 determined that the imposition of multiple maximum $10,000 penalties for non-willful violations of the FBAR requirement did not violate the excessive fines clause of the Eighth Amendment. The court determined that under *United States v. Bajakajian,* 524 U.S. 321, 328, (1998), the an aggregate $40,000 FBAR penalty was not grossly disproportionate to Moore's offense of failing to report an account worth between $300,000 and $550,000 over a four-year period. *Id.*  The court considered that Congress authorized both the FBAR reporting mandate and penalties of up to $10,000 without regard to the size of the unreported account and that a small penalty would have little deterrent effect in reaching its decision. *Id.*.

In the present case, Bittner failed to file FBARs reporting his interest in 51, 43, 42, and 41 separate foreign financial accounts in 2007, 2008, 2009 and 2010, respectively.  The aggregate maximum balances in these foreign bank accounts was as follows:

|  | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|
| Maximum account balances | $10,127,860 | 10,420,152 | $3,053,884 | $16,058,319 |
| FBAR penalties | $510,000 | $430,000 | $420,000 | $410,000 |

While in Romania, Bittner failed to timely file FBAR reports for 1996-2010.  Bittner also failed to timely file federal income tax returns for some 15 years.  He also failed to timely report his interest in some 38 foreign companies for at least 15 years.  FBAR penalties of $510,000, $430,000, $420,000 and $410,000 in relation to the number of accounts and the millions held in these accounts are not grossly disproportional to his offenses for the 2007-2010 years.

While the court in *Moore* appears to be the only the case to opine that the imposition

27

of the maximum non-willful penalties does not violate the Eighth Amendment excessive fines clause, other courts have upheld the imposition of the larger willful FBAR penalties against Eighth Amendment challenges.[11]  *See United States v. Bussell*, 699 F. App'x 695 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 1697 (2018), *Estate of Schoenfeld*, 344 F. Supp. 3d at 1359, 1375, (a willful FBAR penalty in the amount of "$614,300—50 percent of [an] account's $1,228,600 balance"—is not "excessive), *Crawford v. U.S. Dep't of the Treasury*, Case No. 3:15-cv-250, 2015 WL 5697552, at \*16 (S.D. Ohio Sept. 29, 2015) (rejected a facial challenge to the FBAR penalty, determining that "[a] maximum penalty fixed by Congress is due substantial deference from the courts" and that "the maximum penalty" in § 5321(a)(5)(C) "will be constitutional in at least some circumstances.").

Even applying the *Bajakajian* factors leads to the conclusion that these FBAR penalty assessments do not violate the Eighth Amendment: (1) The amount of the FBAR penalty assessed per violation by the IRS was authorized by Congress. Acts of Congress are entitled to a strong presumption of constitutionality (*e.g.*, *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963)), and the Supreme Court emphasized in *Bajakajian* that "judgments about the appropriate punishment for an offense belong in the first instance to the legislature" 524 U.S. at 336. The courts, therefore, give substantial deference to legislative judgments regarding the appropriate penalty. *See, e.g.*, *132,245.00 in U.S. Currency*, 764 F.3d at 1058; *United States v. $134,750 U.S. Currency*, 535 F. App'x 232, 240 (4th Cir. 2013); *United States v. Chaplin's, Inc.*, 646 F.3d 846, 851 (11th Cir. 2011); *Crawford*, 2015 WL 5697552, at \*16.   In 2004,

---

[11] *See also United States v. Garrity*, No. 3:15-CV-243(MPS), 2019 WL 1004584, at \*5 (D. Conn. Feb. 28, 2019) (continued...)

Congress enacted a non-willful FBAR penalty violation of a maximum of $10,000 per account to increase the reporting of foreign financial accounts without regard to the size of the unreported account.[12]  Under 31 U.S.C. § 5321(a)(5)(B) the statutory maximum penalty under 31 U.S. § 5321(a)(5)(A) for a non-willful violation is $10,000 per each financial account not reported regardless of the balance in the account.[13]

In the present case, the IRS assessed the maximum penalty of $10,000 per FBAR violation for 2007, 2008, 2009 and 2010 for the number of accounts that Bittner reported on his late filed amended FBARs.  The FBAR penalties assessed against Bittner do not exceed the maximum amount that Congress prescribed to ensure foreign account reporting.  Since the IRS assessed penalties in accordance with the law, the penalties are presumptively constitutional. *See Qwest Corp. v. Minn. PUC*, 427 F.3d 1061, 1069 (8th Cir. 2005); *Kelly v. U.S. EPA*, 203 F.3d 519, 524 (7th Cir. 2000).

(2) Bittner is in the class of persons for whom the statute at issue was principally designed.  Congress enacted the non-willful penalties in 2004 to increase the reporting for foreign accounts.  Bittner had a reportable financial interest in 51, 43, 42, and 41 separate foreign financial accounts in 2007, 2008, 2009 and 2010, respectively.  Bittner failed to timely file FBAR reports for years 2007-2010 to disclose his interest in these foreign accounts.  Bittner is the type of individual for whom the non-willful FBAR penalty was intended to reach.

(3) The government is harmed by Bittner failing to timely report his foreign financial accounts.  As Congress noted, investigating hidden foreign accounts is time consuming and

---

[12] See 31 U.S.C. § 5321(A)(5)(A), (B); Joint Committee on Taxation, General Explanation of Tax Legislation enacted in the 108th Congress, JCS- 5-05 NO 32 (I.R.S.), 2005 WL 5783636 at *34–35.
[13] See United States discussion supra section II.

expensive.  H.R. Rep. No. 91-975, at 12- 13 (1970), reprinted in 1970 U.S.CC.A.N. 4394, 4397-98. However, because Congress based the non-willful FBAR penalty on a per account violation and not the tax loss, it is irrelevant whether the penalty in any given case is correlated with a tax loss. *See Chaplin's, Inc.*, 646 F.3d at 852 ("Congress * * * can distill the monetary value society places on harmful conduct"); *United States v. Sperrazza*, 804 F.3d 1113, 1128 (11th Cir. 2015) (acknowledging harm from structuring beyond direct financial loss); *United States v. Mackby*, 339 F.3d 1013, 1019 (9th Cir. 2003) (harm of false claims "extends beyond the money paid out of the treasury").

Finally, (4) the penalty at issue is not excessive when compared with the potential criminal sanctions for Bittner's actions. Those sanctions include imprisonment of up to five years in addition to a fine of up to $250,000 for an FBAR offense standing alone (and double that if there are other violations or a pattern of illegal activity). 31 U.S.C. § 5322(a)–(b). The criminal penalties, in other words, include a substantial fine in addition to the prospect of a prison term— a consequence more serious than even the maximum civil penalty permitted by § 5321(a)(5)(B) for non-willful violations.  Furthermore, the FBAR penalties assessed against Bittner are less than what the IRS could have assessed against Bittner if he was determined to be willful.  In sum, the *Bajakajian* factors weigh heavily against any contention that the penalties assessed against Bittner violate the Eighth Amendment.

## V.      CONCLUSION

For these reasons, the United States requests that the Court grant the United States' Partial Motion for Summary Judgment.

RICHARD E. ZUCKERMAN
Principal Deputy Assistant Attorney General


 /s/ Herbert W. Linder
HERBERT W. LINDER
Ohio Bar No. 0065446
Attorney, Tax Division
U.S. Department of Justice
717 N. Harwood St., Suite 400
Dallas, Texas 75201
Phone: (214) 880-9754
Fax (214) 880-9741
herbert.w.linder@usdoj.gov

ATTORNEYS FOR UNITED STATES

## CERTIFICATE OF SERVICE

IT IS HEREBY CERTIFIED that service of the foregoing Motion and Declaration of

Herbert W. Linder has been made on March 12, 2020, by the Clerk's ECF filing system to:

CLARK HILL STRASBURGER
Farley P. Katz
Rachael Rubenstein
2301 Broadway St.
San Antonio, Texas 78209

  /s/ Herbert W. Linder
HERBERT W. LINDER

32