

**Department of the Treasury**
**Internal Revenue Service**
**Large Business & International**
12309 N. Mopac Expressway
Suite 200, MS 4309AUNW
Austin, TX 78758

Alexandru Bittner
3927 Ranch Estates
Plano, TX 75074

**Date:**
06/06/2017
**Filer ID number:**
0102
**Form:**
FinCEN Report 114
**Calendar years:**
2007 - 2011
**Person to contact:**
Anh Reach
**Contact telephone number:**
(512) 490-0216
**Contact fax number:**
(512) 490-0201
**Employee ID number:**
1000245909
**Refer reply to:**
LB&I:WIIC:1555
**Response due date:**
06/13/2017

Dear Alexandru Bittner:

**Why you are receiving this letter**
We're proposing a penalty for violating the reporting or record keeping requirements for foreign financial accounts. We checked the box for the penalty paragraphs that apply to you. Review this proposed penalty and let us know if you agree by following directions at the end of this letter. We enclosed a summary memorandum describing the violations. The summary also includes a penalty calculation.

**Proposed assessment (See the checked box and attached Form 13449)**

☒ We're proposing a penalty under 31 U.S.C. § 5321(a)(5) for failing to meet the filing requirements of 31 U.S.C. § 5314. A United States person is required to file FinCEN Report 114 (formerly Form TD F 90-22.1), *Report of Foreign Bank and Financial Accounts (FBAR),* with the Financial Crimes Enforcement Network (FinCEN) by June 30th of the following year if he or she has a financial interest in (or signature authority over) one or more foreign financial accounts whose aggregate balance exceeds $10,000 at any time during the calendar year.

    ☒ For a non-willful failure to file a complete and accurate FBAR, the maximum penalty is $10,000 per violation.

    ☐ For a willful failure to file a complete and accurate FBAR, the maximum penalty is the greater of 1) $100,000 or 2) 50% of the balance in the account at the time of the violation, for each violation.

☐ We're proposing a penalty under 31 U.S.C. § 5321(a)(5) for failing to meet the record keeping requirements under 31 U.S.C. § 5314. A United States person is required to keep certain records of foreign financial accounts and their maximum value during the year if he or she has a financial interest in (or signature authority over) one or more foreign financial accounts whose aggregate balance exceeds $10,000 at any time during the calendar year.

    ☐ For a non-willful failure to meet the record keeping requirement, the maximum penalty is $10,000 per violation.

    ☐ For a willful failure to meet the record keeping requirement, the maximum penalty is the greater of 1) $100,000 or 2) 50% of balance in the account at the time of the violation.

**Letter 3709 (Rev. 9-2015)**
Catalog Number 36614Q

**Government Exhibit**
63

DOJ 000231

☐ We're proposing a penalty under 31 U.S.C. § 5321(a)(6)(A) for negligent failure to meet the filing requirements for financial institutions or non-financial trades or businesses under 31 U.S.C. § 5314 and 31 C.F.R. § 1010.350 . The maximum penalty is $500.

☐ We're proposing a penalty under 31 U.S.C. § 5321(a)(6)(A) for negligent failure to meet the record keeping requirements for financial institutions or non-financial trades or businesses under 31 U.S.C. § 5314 and 31 C.F.R. § 1010.420. The maximum penalty is $500.

☐ We're proposing a penalty under 31 U.S.C. § 5321(a)(6)(B) for a pattern of negligent violations of any provision of 31 U.S.C. § § 5311-5332 and the regulations under them. The penalty will be in addition to any penalties imposed under 31 U.S.C. § 5321(a)(6)(A), but the maximum penalty is $50,000.

**If you agree**

If you agree to the assessment and collection of the proposed penalties, please sign, date, and return the enclosed Form 13449, *Agreement to Assessment and Collection of Penalties Under 31 USC 5321(a)(5) and 5321(a)(6)*, in the envelope provided by the response due date, which is 30 days from the date of this letter. Make your check or money order payable to the United States Treasury for the amount indicated on the agreement form. If you agree but can't pay in full, pay what you can with the Form 13449 by the response due date and we'll send you a bill for the remaining amount with information on your payment options. We enclosed Notice 1330, *Information on Making FBAR Penalty Payment by Check*.

**If you disagree**

If you don't agree to the assessment and collection of the proposed penalties, you can request a conference with our Appeals Office. To do so, mail your written protest to the address shown at the top of this letter. Direct your letter to the attention of the person listed as the "Person to contact" at the top of this letter. We must receive your protest by the response due date, which is 30 days from the date of this letter. Include the following in your written protest:

1. A request for conference;

2. Your name, address, and daytime telephone number;

3. Your social security number, individual taxpayer identification number, or employer identification number;

4. The date and number of this letter;

5. The calendar years involved;

6. The penalties you're contesting;

7. An explanation of why you contest those penalties, including any reasonable cause explanation;

8. All information pertinent to your position;

9. If applicable, a statement of law or other authority that you relied on, and how that law or other authority applies to your case; and

10. The following signed statement: "Under penalties of perjury, I declare that I have examined the facts presented in this statement and any accompanying information, and, to the best of my knowledge and belief, they are true and complete."

Note: If you're a representative submitting a protest on behalf of another person, you should substitute a statement that you prepared the protest, and that you know personally the statement of facts contained in the protest are true and correct. Generally, you can rely in good faith on information your client provides. However, you must ask reasonable questions if the information appears to be incorrect, inconsistent, or incomplete.

Letter 3709 (Rev. 9-2015)
Catalog Number 36614Q

DOJ 000232

**If you do nothing**
If you don't take any action by the response date listed at the top of this letter, we'll assess the penalty and begin collection procedures.

If you have questions, contact the person listed at the top of this letter.

Thank you for your cooperation.

Sincerely,

Joseph M. Reneau

Joseph M. Reneau
Group Manager

Enclosures:
Form 13449
Summary memorandum
Notice 1330
Envelope

Letter 3709 (Rev. 9-2015)
Catalog Number 36614Q

DOJ 000233

| Form **13449**<br>(May 2015) | Department of the Treasury - Internal Revenue Service<br>**Agreement to Assessment and Collection of Penalties Under 31 USC 5321(a)(5) and 5321(a)(6)** |
|---|---|

Name of account holder

ALEXANDRU BITTNER

Social security number (SSN) or Employer identification number (EIN)

·0102

Address of account holder *(Number, Street, City or Town, State, ZIP code)*
3927 RANCH ESTATES DR.
PLANO, TX 75074

**Definition of Penalty Statutes**

**1. Foreign Financial Agency Transaction Violation — willful failure to meet recordkeeping requirements and/or report a foreign account on FinCEN Report 114, Report of Foreign Bank and Financial Accounts (FBAR): 31 USC 5321(a)(5) and 31 CFR sections 1010.350, 1010.420 and 1010.820(g)(2)**

**2. Foreign Financial Agency Transaction Violation — non-willful failure to meet recordkeeping requirements and/or report a foreign account on FinCEN Report 114, Report of Foreign Bank and Financial Accounts (FBAR): 31 USC 5321(a)(5) and 31 CFR sections 1010.350, 1010.420 and 1010.820(g)(2)**

**3. Negligent Failure to Report: 31 USC 5321(a)(6) and 31 CFR sections 1010.350 and 1010.820(h)**

**4. Negligent Failure to Meet Recordkeeping Requirements: 31 USC 5321(a)(6) and 31 CFR sections 1010.420 and 1010.820(h)**

**5. Pattern of Negligent Activity: 31 USC section 5321(a)(6)(B)**

| TOTAL proposed penalty *(from Page 2 of 2)* | $ 2720000 |
|---|---|

**Signature Authorization**

I consent to the immediate assessment and collection of the penalty amount specified above plus any interest and penalty as provided by law.

| Your signature | Date signed |
|---|---|
| Representative's signature *(valid only with Power of Attorney attached)* | Date signed |

Name of entity *(for corporations, partnerships, trusts, etc., when EIN specified above)*

| Signature of authorized officer | Title | Date signed |
|---|---|---|
| Signature of authorized officer | Title | Date signed |

| Name of examiner<br>ANH REACH | Employee ID number<br>1000245909 | Date *(mmddyyyy)*<br>06/06/2017 |
|---|---|---|

Office of examiner

12309 N. MOPAC EXPRESSWAY, MS4309AUNW, AUSTIN, TX 78757

| Name of supervisor<br>JOSEPH M. RENEAU | Employee ID number<br>1000729989 | Date *(mmddyyyy)*<br>06/06/2017 |
|---|---|---|

Office of supervisor

12309 N. MOPAC EXPRESSWAY, MS4309AUNW, AUSTIN, TX 78757

DOJ 000234

Page 2

## Foreign Account Penalty Information

| Name of account holder | Account holder ID *(EIN or SSN)* |
|---|---|
| ALEXANDRU BITTNER | 0102 |

### Foreign Account 1

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| 2007 | SEE ATTACHED SPREADSHEET | ☐ (1)  ☒ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ 10,127,860 | SEE ATTACHED SPREADSHEET | $ 610000 |

### Foreign Account 2

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| 2008 | SEE ATTACHED SPREADSHEET | ☐ (1)  ☒ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ 10,420,152 | SEE ATTACHED SPREADSHEET | $ 510000 |

### Foreign Account 3

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| 2009 | SEE ATTACHED SPREADSHEET | ☐ (1)  ☐ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ 3,053,884 | SEE ATTACHED SPREADSHEET | $ 530000 |

### Foreign Account 4

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| 2010 | SEE ATTACHED SPREADSHEET | ☐ (1)  ☐ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ 16,058,319 | SEE ATTACHED SPREADSHEET | $ 530000 |

### Foreign Account 5

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| 2011 | SEE ATTACHED SPREADSHEET | ☐ (1)  ☐ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ 15,137,405 | SEE ATTACHED SPREADSHEET | $ 540000 |

### Foreign Account 6

| Calendar year | Foreign Bank, Institution, or Agent(s) | Proposed penalty per "Definition of Penalty Statutes" *(Check applicable box(es))* |
|---|---|---|
| | | ☐ (1)  ☐ (2)  ☐ (3)  ☐ (4)  ☐ (5) |
| Maximum value of account | Foreign account number(s) | Amount of penalty |
| $ | | $ |

| TOTAL proposed penalty *(Enter here and on Page 1 of 2)* | $ 2720000 |
|---|---|

DOJ 000235

### Personal Foreign Financial Accounts

| T/P's Ref | W/P Tab# | Name on Account | Name of Bank | Currency | Account # |
|---|---|---|---|---|---|
| A | 1 | Alexandru Bittner | UniCredit Tiriac Bank | RON | 0310 |
| A | 2 | Alexandru Bittner | UniCredit Tiriac Bank | USD | 0020 |
| A | 3 | Alexandru Bittner | UniCredit Tiriac Bank (HVB Bank) | EUR | 0320 |
| B | 4 | A. Bittner | Pireaus | LEU | 0000 |
| B | 5 | A. Bittner | Pireaus | LEU | 1000 |
| B | 6 | A. Bittner | Pireaus | USD | 1000 |
| B | 7 | A. Bittner | Pireaus | USD | 2000 |
| B | 8 | A. Bittner | Pireaus | USD | 2000 |
| B | 9 | A. Bittner | Pireaus | USD | 3000 |
| C | 10 | Alexandru Bittner | Raiffeisen Bank S.A. | USD | 7874 |
| C | 11 | Alexandru Bittner | Raiffeisen Bank S.A. | USD | 7875 |
| D | 12 | Bittner Alexandru | Finansbank (Romania) S.A., Finansbank Sucursala Doamnei | USD | 1170 |
| E | 13 | | Banque SCS Alliance | USD | 250 7 |
| F | 14 | Alexandru Bittner | Leichtensteinische Landesbank Aktiengesellschaft | EUR | 536 0 |
| F | 15 | Alexandru Bittner | Leichtensteinische Landesbank Aktiengesellschaft | USD | 537 1 |
| G | 16 | | Royal Bank of Canada (Suisse) SA | USD | 010 0 |
| G | 17 | | Royal Bank of Canada (Suisse) SA | EUR | 070 0 |
| | | Bittner | Banca Agricola | | 4598027000/4598027200 |

TOTALS of Personal Accts

Total from Business Accts

| T/P's Ref | W/P Tab# | 09/27/13 Max. Bal 2006 | 05/21/12 Max. Bal 2007 | 09/27/13 Max. Bal 2007 | Max. Bal 2008 | 09/27/13 Max. Bal 2008 | 05/21/12 Max. Bal 2009 | 09/27/13 Max. Bal 2009 | 05/21/12 Max. Bal 2010 | 09/27/13 Max. Bal 2010 | 05/21/12 Max. Bal 2011 | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | 1 | $1,329,595 | | $495,373 | | $227,365 | | $362,508 | | $665,021 | | $1,013,382 |
| A | 2 | $12,400 | | $36,100 | | $30,725 | | $42,462 | | $105,775 | | $990,150 |
| A | 3 | $1,806,206 | $470,278 | $405,940 | $500,000 | $293,144 | $333,333 | $74,935 | $659,350 | $656,044 | | $257,284 |
| B | 4 | | | | | | | | | | | $835,111 |
| B | 5 | | | | | | | | | | | |
| B | 6 | | | | | | | | | | | |
| B | 7 | | | | | | | | | | | |
| B | 8 | | | | | | | | | | | |
| B | 9 | | | | | | | | | | $996,000 | $1,112,400 |
| C | 10 | | | | | | | | | | | |
| C | 11 | $9,565 | | $10,270 | | $10,900 | | $6,785 | | $10,945 | | $4,980 |
| D | 12 | $48,010 | | $7,450 | | $7,327 | | $7,243 | | $7,212 | | n/a |
| E | 13 | $53,241 | | | | | | | | | | |
| F | 14 | $191,962 | | $10,000 | | $9,999 | | $9,999 | | $9,999 | | $9,999 |
| F | 15 | $5,993 | | | | | | | | | | |
| G | 16 | | | | | | | | | | | |
| G | 17 | $1,056,148 | | $516,148 | | $474,179 | | $411,825 | | $878,955 | | $93,987 |

$1,140,000

| | | 09/27/13 Max. Bal 2006 | 05/21/12 Max. Bal 2007 | 09/27/13 Max. Bal 2007 | Max. Bal 2008 | 09/27/13 Max. Bal 2008 | 05/21/12 Max. Bal 2009 | 09/27/13 Max. Bal 2009 | 05/21/12 Max. Bal 2010 | 09/27/13 Max. Bal 2010 | 05/21/12 Max. Bal 2011 | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | $4,513,120 | $470,278 | $1,483,281 | $500,000 | $1,053,639 | $1,473,333 | $915,752 | $659,350 | $2,333,951 | $996,000 | $4,317,293 |
| # Pers. Accts | | | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 7 | 8 | 8 |
| # Bus. Accts | | 54 | 54 | 54 | 44 | 44 | 47 | 47 | 46 | 46 | 46 | 46 |
| Total # accts | | 61 | 61 | 61 | 51 | 51 | 54 | 54 | 53 | 53 | 54 | 54 |
| | | $8,646,579 | | | | $9,366,513 | | $2,138,127 | | $13,724,368 | | $10,820,112 |
| | | $10,127,860 | | | | $10,420,152 | | $3,053,884 | | $16,058,319 | | $15,137,405 |

9/27/13

**FBARs**     Business Foreign Financial Accounts

| | Name on Account | Name of Bank | Currency | IBAN or CONT: |
|---|---|---|---|---|
| A-1 | Piscicola Tour SRL | Piscicola Tour SRL | ROL | 0310 |
| A-2 | Piscicola Tour SRL | Piscicola Tour SRL | | 0320 |
| A-3 | Piscicola Tour SRL | Piscicola Tour SRL | | 0020 |
| B-1 | Piscicola Tour SRL | Banca Romana Pentru Dezoltare | | 3700 |
| B-2 | Piscicola Tour SRL | Banca Romana Pentru Dezoltare | | 3700 |
| B-3 | Piscicola Tour SRL | Banca Romana Pentru Dezoltare | 3700 EUR | |
| X | Piscicola Tour SRL | Banca Romana Pentru Dezoltare | | 8310 |
| C-1 | Piscicola Tour SRL | Raiffeisen Bank | | 5107 |
| C-2 | Piscicola Tour SRL | Raiffeisen Bank | 5685 EURO | |
| D-1 | Piscicola Tour SRL | Banca Comerciala Romana | | 0001 |
| A-1 | Ecofish SRL | HVB Bank Romania SA | | 7310 |
| A-2 | Ecofish SRL | HVB Bank Romania SA | | 7320 |
| B-1 | Ecofish SRL | Exim Bank | | RO02 |
| B-2 | Ecofish SRL | Exim Bank | | EU02 |
| C-1 | Ecofish SRL | Raiffeisen Bank | | 5744 |
| D-1 | Ecofish SRL | BRD Group Societe Generale | | 3700 |
| D-2 | Ecofish SRL | BRD Group Societe Generale | | 3700 |
| E-1 | Ecofish SRL | Banca Comerciala Romana | | 0001 |
| E-2 | Ecofish SRL | Banca Comerciala Romana | | 0003 |
| A-1 | Danubiu RO 2002 SRL | HVB Bank Romania SA | | 9310 |
| B-1 | Danubiu RO 2002 SRL | Exim Bank | | RO02 |
| B-2 | Danubiu RO 2002 SRL | Exim Bank | | US02 |
| D-1 | Danubiu RO 2002 SRL | BRD Group Societe Generale | | 3700 |
| D-2 | Danubiu RO 2002 SRL | BRD Group Societe Generale | | 3700 |
| E-1 | Danubiu RO 2002 SRL | Banca Comerciala Romana | | 0003 |
| A-1 | Piscicola Murighiol SRL | BRD Group Societe Generale | | 3700 |
| B-1 | Piscicola Murighiol SRL | Trezorerie | | 4461 |
| C-1 | Piscicola Murighiol SRL | Banca Comerciala Romana | | 0001 |
| C-1 | Turism Si Agrement SA | Raiffeisen Bank | | 5744 |

DOJ 000238

9/27/13

FBARs    Business Foreign Financial Accounts

| | Name on Account | Name of Bank | Currency | IBAN or CONT: |
|---|---|---|---|---|
| D-1 | Turism Si Agrement SA | BRD Group Societe Generale | | 3700 |
| C-1 | Piscicola Jurilovca SA | Raiffeisen Bank | | 5335 |
| A-1 | Aviprod SRL | BRD Group Societe Generale | | 3700 |
| B-1 | Aviprod SRL | Trezorerie | | 0374 |
| C-1 | Aviprod SRL | Raiffeisen Bank | | 1519 |
| A-1 | Aquarom Elite SRL | Raiffeisen Bank | | 3741 |
| A-2 | Aquarom Elite SRL | Raiffeisen Bank | | 7308 |
| A-3 | Aquarom Elite SRL | Raiffeisen Bank | | 2246 |
| A-4 | Aquarom Elite SRL | Raiffeisen Bank | | 5227 |
| A-1 | Rondo Invest SRL | Unicredit Tiriac Bank | | 6000 |
| A-2 | Rondo Invest SRL | Unicredit Tiriac Bank | | 6001 |
| B-1 | Rondo Invest SRL | RBS Romania Bank | | 7892 |
| C-1 | Rondo Invest SRL | Piraeus Bank | | 1000 |
| A-1 | Top Invest | Europe Bank Romania SA | | RO01 |
| A-1 | Starmob International SRL | Credit Europe Bank | | RO01 |
| A-1 | Supermob Intl SRL | Credit Europe Bank | | RO01 |
| A-1 | Midas Construct SRL | Credit Europe Bank | | RO02 |
| A-1 | Intelgralnet SRL | OTP Bank (ex RoBank) | | RO01 |
| A-1 | Metamob Intl SRL | OTP Bank (ex RoBank) | | RO01 |
| A-1 | Beta Mac Grup SRL | Unicredit Tiriac Bank | | 0310 |
| A-1 | LCA Service SRL | Credit Europe Bank | | RO02 |
| A-1 | Midas Constructii 2000 SRL | Credit Europe Bank | | RO03 |
| B-1 | Midas Constructii 2000 SRL | Raiffeisen Bank | 1800 | |
| C-1 | Midas Constructii 2000 SRL | Banca Comerciala Romana | 1-911.1ROL | |
| D-1 | Midas Constructii 2000 SRL | OTP Bank (ex RoBank) | 17412ROL01/1100 | |
| A-1 | Stibro 2000 SRL | Credit Europe Bank | | RO01 |
| A-2 | Stibro 2000 SRL | Credit Europe Bank | | EUR1 |
| B-1 | Stibro 2000 SRL | Raiffeisen Bank | | 1279 |
| B-2 | Stibro 2000 SRL | Raiffeisen Bank | | 1280 |
| A-1 | Hotel Venetia SRL | Credit Europe Bank | | RO02 |

DOJ 000239

9/27/13
FBARs   **Business Foreign Financial Accounts**

| | Name on Account | Name of Bank | Currency | IBAN or CONT: |
|---|---|---|---|---|
| not listed | Hotel Venetia Co SA | La Banca Comerciala Comana | | 0001 |
| A-1 | Hotel Venetia Co SA | Banca Comerciala Romana | | 0001 |
| A-2 | Hotel Venetia Co SA | Banca Comerciala Romana | | 0001 |
| A-3 | Hotel Venetia Co SA | Banca Comerciala Romana | | 0001 |
| B-1 | Hotel Venetia Co SA | Alpha Bank Romania | | EU01 |
| B-2 | Hotel Venetia Co SA | Alpha Bank Romania | | RO01 |
| B-3 | Hotel Venetia Co SA | Alpha Bank Romania | | US01 |
| A-1 | Afrodita Estival SRL | Bana Comerciala Romana | | 0001 |
| B-1 | Afrodita Estival SRL | Raiffeisen Bank | | 4978 |
| A-1 | Agercom Grup SRL | Credit Europe Bank | | RO01 |
| A-1 | Metacom Grup SRL | Credit Europe Bank | | RO01 |
| A-1 | Citymob International SRL | Credit Europe Bank | | RO01 |
| A-1 | Comprest SA | Unicredit Tiriac Bank | | 0003 |
| B-1 | Comprest SA | RBS Romania Bank | | 2746 |
| C-1 | Comprest SA | Piraeus Bank | | .000 |
| D-1 | Comprest SA | Banca Transilvania | | 47XX |
| E-1 | Comprest SA | Raiffeisen Bank | | 1606 |
| F-1 | Comprest SA | Volksbank | | 2701 |
| A-1 | NBN Com SRL | Raiffeisen Bank | | 0465 |
| A-1 | Grupul Roman de Investitii- GRI SRL | Credit Europe Bank | | RO02 |
| B-1 | Grupul Roman de Investitii- GRI SRL | OTP Bank (ex RoBank) | | RO01 |
| A-1 | Agrement Serv SRL | Banca Comerciala Romana | | 0001 |
| A-2 | Agrement Serv SRL | Banca Comerciala Romana | | 0001 |
| B-1 | Agrement Serv SRL | Unicredit Tiriac Bank | | 8310 |
| A-1 | Terra Invest SRL | OTP Bank (ex RoBank) | | RO01 |
| A-1 | Prodlemn Maneciu SRL | BRD Group Societe Generale | | 3000 |
| A-1 | Anfrance Impex SRL | BRD Group Societe Generale | | 4450 |

DOJ 000240

9/27/13
FBARs

Business Foreign Financial Accounts

| | Name on Account | Name of Bank | Currency | IBAN or CONT: |
|---|---|---|---|---|
| | Intertrade Distributie | | | |
| A-1 | Produse Alimentare SRL | Banca Comerciala Romana | | 0001 |
| | Intertrade Distributie | | | |
| A-2 | Produse Alimentare SRL | Banca Comerciala Romana | | 0002 |
| | Intertrade Distributie | | | |
| B-1 | Produse Alimentare SRL | BRD Group Societe Generale | | 4450 |
| | Intertrade Distributie | | | |
| B-2 | Produse Alimentare SRL | BRD Group Societe Generale | | 4450 |
| | Intertrade Distributie | | | |
| B-3 | Produse Alimentare SRL | BRD Group Societe Generale | | 4450 |
| | Intertrade Distributie | | | |
| C-1 | Produse Alimentare SRL | Trezorerie | | 6559 |
| | Intertrade Distributie | | | |
| C-2 | Produse Alimentare SRL | Trezorerie | | 7728 |
| | Intertrade Distributie | | | |
| C-3 | Produse Alimentare SRL | Trezorerie | | 3225 |
| | Intertrade Distributie | | | |
| D-1 | Produse Alimentare SRL | Banca Italo Romena | | CC01 |
| | Intertrade Distributie | | | |
| D-2 | Produse Alimentare SRL | Banca Italo Romena | | CK01 |
| | Intertrade Distributie | | | |
| D-3 | Produse Alimentare SRL | Banca Italo Romena | | CC01 |

DOJ 000241

| 9/27/13 FBARs | | 09/27/13 Max. Bal 2006 | | 09/27/13 Max. Bal 2007 | | 09/27/13 Max. Bal 2008 | | 09/27/13 Max. Bal 2009 | | 09/27/13 Max. Bal 2010 | | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A-1 | 1 | $495,275 | 1 | $1,442,328 | 1 | $2,176,972 | 1 | $229,550 | 1 | $158,425 | 1 | $52,588 |
| A-2 | 1 | $449,959 | | | | | | | | | | |
| A-3 | 1 | $289,789 | | | | | | | | | | |
| B-1 | 1 | $498,030 | 1 | $481,964 | 1 | $291,020 | 1 | $124,785 | 1 | $671,277 | 1 | $1,091,844 |
| B-2 | 1 | $34,154 | 1 | $21,307 | 1 | $24,349 | 1 | $52,030 | 1 | $45,529 | 1 | $49,853 |
| B-3 | 1 | [X] | 1 | $18,431 | | | | | | | | |
| C-1 | 1 | $143,866 | | | | | | | | | | |
| C-2 | | | | | | | | | | | | |
| D-1 | 1 | $71,349 | 1 | $18,092 | 1 | $15,995 | | | | | | |
| A-1 | 1 | $79,853 | 1 | $75,830 | | | 1 | $28,055 | | | | |
| A-2 | 1 | $58,730 | | | | | | | | | | |
| B-1 | 1 | $127,884 | 1 | $487,310 | | | | | | | | |
| B-2 | 1 | $18,500 | | | | | | | | | | |
| C-1 | 1 | $17,535 | | | | | | | | | | |
| D-1 | 1 | $374,761 | 1 | $533,479 | 1 | $84,250 | 1 | $67,850 | | | | |
| D-2 | 1 | $18,500 | 1 | $12,310 | 1 | $107,477 | 1 | $10,530 | | | | |
| E-1 | 1 | $70,768 | 1 | $37,009 | 1 | $50,220 | 1 | $24,929 | | | | |
| E-2 | | | 1 | $62,570 | 1 | $70,325 | | | | | | |
| A-1 | 1 | $370,166 | 1 | $22,955 | 1 | $49,314 | 1 | $19,271 | | | | |
| B-1 | 1 | $75,010 | 1 | $395,205 | 1 | $58,409 | | | | | | |
| B-2 | | | | | | | | | | | | |
| D-1 | 1 | $199,322 | 1 | $90,640 | | | | | | | | |
| D-2 | | | 1 | $25,613 | | | | | | | | |
| E-1 | 1 | $34,239 | 1 | $102,500 | 1 | $142,786 | 1 | $100,093 | | | | |
| A-1 | | | | | | | 1 | $51,851 | 1 | $1,355,585 | 1 | $1,359,333 |
| B-1 | | | | | | | | | | | 1 | $1,372,859 |
| C-1 | 1 | | 1 | $95,404 | | | | | | | | |
| C-1 | | | | | | | | | | | | |

DOJ 000242

| 9/27/13 FBARs | 09/27/13 Max. Bal 2006 | 09/27/13 Max. Bal 2007 | 09/27/13 Max. Bal 2008 | 09/27/13 Max. Bal 2009 | 09/27/13 Max. Bal 2010 | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|
| D-1 | | | | | | |
| C-1 | | $5,811 | $5,453 | $4,987 | $9,013 | $3,666 |
| A-1 | | | $73,811 | $15,780 | $25,443 | $18,616 |
| B-1 | | | | $16,504 | | |
| C-1 | | | | | | |
| A-1 | | $108,813 | $165,621 | $148,717 | $48,595 | $20,001 |
| A-2 | | | | | $568,910 | $1,898,831 |
| A-3 | | | | | | |
| A-4 | | | | | | $348 |
| A-1 | | | | | $117 | $24,745 |
| A-2 | | | | | $315,734 | $52 |
| B-1 | | | | | $300,446 | |
| C-1 | $149,926 | $169,447 | $362,390 | $163,704 | $128,114 | $1,428,908 |
| A-1 | $19,048 | $55,271 | $231,024 | $158,313 | $5,880,729 | $79,755 |
| A-1 | $8,858 | $12,567 | $16,216 | $16,713 | $78,621 | $14,154 |
| A-1 | $47,694 | $24,930 | $2,634,987 | $12,392 | $61,861 | $4,922 |
| A-1 | $5,183 | $21,645 | $18,301 | $10,923 | $213,688 | $5,065 |
| A-1 | $12,661 | $7,062 | $11,862 | $17,937 | $13,434 | $34,646 |
| A-1 | $10,621 | $205 | $80 | $12,902 | $54,128 | $98,586 |
| A-1 | $7,867 | | | | $8,468 | |
| A-1 | $871 | $127,116 | $195,249 | $197 | $204 | $33 |
| A-1 | $84,245 | $25,476 | $12,043 | $29,791 | $13,706 | $1,083 |
| B-1 | $261,529 | $14,690 | | | | |
| C-1 | $23,565 | | | | | |
| D-1 | $2,036 | | | | | |
| A-1 | $6,694 | $460,914 | $31 | $25 | $24 | $25 |
| A-2 | $317 | $366 | $290 | $234 | $229 | $230 |
| B-1 | $5,856 | $328,584 | $13,127 | $17,028 | $12,056 | $5,166 |
| B-2 | $2,249 | | | | | |
| A-1 | $15,435 | $3,876 | $2,769 | $385 | $479 | |

DOJ 000243

| 9/27/13 FBARs | not listed | 09/27/13 Max. Bal 2006 | 09/27/13 Max. Bal 2007 | 09/27/13 Max. Bal 2008 | 09/27/13 Max. Bal 2009 | 09/27/13 Max. Bal 2010 | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|---|
| A-1 | 1 | $16,834 | $1,136 | $1,432 | $444 | $415 | $406 |
| A-2 | 1 | $194,662 | $132,607 | $818 | $647 | $854 | $790 |
| A-3 | 1 | $367 | $410 | $388 | $292 | $299 | $292 |
| B-1 | 1 | $663,808 | $83,818 | $1 | $1 | $1 | $1 |
| B-2 | 1 | $374,423 | $4,279 | $84 | $62,532 | $695 | $726 |
| B-3 | 1 | $20 | $23 | $22 | $18 | $17 | $18 |
| A-1 | 1 | $7,853 | $2,995 | $611 | $477 | $431 | $426 |
| B-1 | 1 | $21,416 | $1,928,242 | $216,388 | $133,158 | $117,145 | $56,633 |
| A-1 | 1 | $11,779 | | | | | |
| A-1 | 1 | $22,924 | | | | | |
| A-1 | 1 | $8,505 | | | | | |
| A-1 | 1 | $26,740 | $36,189 | $30,762 | $52,955 | $103,131 | $151,505 |
| B-1 | 1 | $86,942 | $187,510 | $538,440 | $217,847 | $231,309 | $140,974 |
| C-1 | 1 | | | | | $6 | $297,595 |
| D-1 | 1 | | $10,031 | $8,018 | $11,578 | $45,430 | $52,735 |
| E-1 | 1 | | | | | $635 | $45,602 |
| F-1 | 1 | | | | | | $131,358 |
| A-1 | 1 | $18,754 | $22,632 | $17,546 | $16,865 | $14,967 | $95,539 |
| A-1 | 1 | | | | | | |
| B-1 | 1 | | | | | | |
| A-1 | 1 | $4,338 | | | | | |
| A-2 | 1 | $24,375 | $18,687 | $37,589 | $2,596 | | |
| B-1 | 1 | $10,835 | $24,376 | | | | |
| A-1 | 1 | $19,354 | $15,878 | | | | |
| A-1 | 1 | | | | | | $11,256 |
| A-1 | 1 | $1,543 | $1,096 | $379 | $287 | $294 | $316 |

DOJ 000244

| 9/27/13 FBARs | 09/27/13 Max. Bal 2006 | 09/27/13 Max. Bal 2007 | 09/27/13 Max. Bal 2008 | 09/27/13 Max. Bal 2009 | 09/27/13 Max. Bal 2010 | 09/27/13 Max. Bal 2011 |
|---|---|---|---|---|---|---|
| A-1 | 1  $119,329 | $118,508 | | | | |
| A-2 | 1  $55,301 | $55,512 | | | | |
| B-1 | 1  $113,916 | 1  $402,211 | 1  $773,247 | 1  $80,507 | 1  $1,663,291 | $783,898 |
| B-2 | 1  $30,610 | 1  $292,553 | 1  $904,289 | 1  $105,567 | 1  $45,417 | $70,599 |
| B-3 | 1  $54,137 | | | | | |
| C-1 | 1  $16,613 | | | | | |
| C-2 | 1 | 1  $18,166 | 1  $22,128 | $28,879 | | |
| C-3 | | | 1 | 1  $21,396 | $17,259 | |
| D-1 | | | 1 | 1  $33,818 | 1  $1,018,700 | $989,592 |
| D-2 | | | | 1 | 1  $10,966 | $12,908 |
| D-3 | | | 1 | 1  $32,787 | 1  $488,291 | $411,634 |
| | 54  $5,997,723 | 44  $8,646,579 | 47  $9,366,513 | 46  $2,138,127 | 46  $13,724,368 | $10,820,112 |

Handwritten annotations:
- 2006: +7 / 61
- 2007: -7 / 51
- 2008: -7 / 54
- 2009: -7 / 53
- 2010: -8 / 54
- Left of totals: 62

DOJ 000245

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

## Non-Will FBAR Penalty

| Tax Period | Penalty Amount |
|---|---|
| 200712 | $610,000 |
| 200812 | $510,000 |
| 200912 | $530,000 |
| 201012 | $530,000 |
| 201112 | $540,000 |

### Issue

Whether the penalty under 31 U.S.C. § 5321(a)(5)(B) should be imposed against Alexandru Bittner for his failure to report foreign bank accounts on his FBARs for calendar years ending 12/31/2007, 12/31/2008, 12/31/2009, 12/31/2010, and 12/31/2011.

### Key Facts

- Mr. Bittner had full access, control and economic benefit of accounts held at numerous foreign banks.
- Mr. Bittner did not report all income earned in foreign accounts.
- The highest balance in the account for each of calendar years 2007 – 2011 exceeded $10,000.
- The original delinquent FBARs filed on May 21, 2012 and the amended FBARs filed on September 17, 2013 were not complete or accurate.  Taxpayer failed to report that he had beneficial ownership in accounts held for him by nominees including at least one account held by nominee Negrea Gheorghe.

#### Case Background

Mr. Bittner is a Romanian citizen and a naturalized U.S. citizen.  He lived in the U.S. from 1982 through 1990.  He is married to Sherry Bittner.  In 1990, Mr. Bittner and his family moved back to Romania and lived there until 2011 when they returned to the U.S.  Mr. Bittner claimed that he did not know that he was required to file U.S. Federal income tax returns, FBARs, and Forms 5471 because he was a U.S. citizen.  Upon their return, he filed delinquent FBARs.

DOJ 000246

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS**<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

### Filing of Delinquent and Amended FBARs

Mr. Bittner hired Jeffrey Beckley, a Texas CPA, to prepare and file delinquent FBARs for calendar years 2007, 2008, 2009, 2010, and 2011 on or around 5/21/2012.  He reported the following:

| | 2007 | 2008 | 2009 | 2010 | 2011 |
|---|---|---|---|---|---|
| # Pers. Accts | 1 | 1 | 2 | 1 | 1 |
| # Bus. Accts | 0 | 0 | 0 | 0 | 0 |
| Max Bal. of all Accts | $470,278 | $500,000 | $1,473,333 | $659,350 | $996,000 |

He provided this information to Beckley on a summary spreadsheet.

On 09/27/2013, after hiring his attorney and new accountants, Mr. Bittner filed amended FBARs with the IRS and reported the following.

| | # | 2007 | # | 2008 | # | 2009 | # | 2010 | # | 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| personal accounts | 7 | $1,481,281 | 7 | $1,053,639 | 7 | $915,757 | 7 | $2,333,951 | 8 | $4,317,293 |
| Business accounts | 54 | $8,646,578 | 44 | $9,366,513 | 47 | $2,138,127 | 46 | $13,724,368 | 46 | $10,820,112 |
| nominee account | 1 | unknown | 1 | unknown | 1 | unknown | 1 | unknown | 1 | Unknown |
| Total | 62 | $10,127,859 | 52 | $10,420,152 | 55 | $3,053,884 | 54 | $16,058,319 | 55 | $15,137,405 |
| Less # accts reported | 1 | | 1 | | 2 | | 1 | | 1 | |
| # violations | 61 | | 51 | | 53 | | 53 | | 54 | |

### Mr. Bittner's Education

Mr. Bittner obtained a Master's degree in mechanical engineering, specializing in chemistry.  He provided a copy of his Romanian diploma.

### Mr. Bittner's Business Background

Mr. Bittner is a businessman and entrepreneur with connections to people in high levels of the Romanian government.  Delinquent Forms 5471 showed that he had varying degrees of ownership in 38 entities that operated a variety of business in Romania as listed below. This indicates that he had knowledge and experience in a variety of business operations and understands the rules, regulations, and laws in place to operate these various businesses.  He also hired knowledgeable accountants and professionals to advise him.

DOJ 000247

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

| # | Entity | Type of Business |
|---|---|---|
| 1 | Afrodita Estival SA | Vacation Resort |
| 2 | Agercrom Grup SRL | Rent & real estate |
| 3 | Agrement Serv SRL | Rent & real estate |
| 4 | Anfrance Impex SRL | Holding Company |
| 5 | Aquarom Elite SRL | |
| 6 | Aviprod SRL | Poultry & Eggs |
| 7 | Beta Mac Grup SRL | Rent & real estate |
| 8 | Bio Medica International SA | Offices of physicians |
| 9 | Citymob Grup SRL | Rent & real estate |
| 10 | Comprest SA | Rent & real estate |
| 11 | Danubiu RO | Seafood prod, prep |
| 12 | Ecofish SRL | Seafood prod, prep |
| 13 | Gama Mac Grup SRL | Rent & real estate |
| 14 | Global RE | Condo rental/Belgium |
| 15 | Hotel Venetia Co SA | Hotel Holding Co. |
| 16 | Hotel Venetia SRL | Hotel Holding Co. |
| 17 | Integralnet SRL | Rent & real estate |
| 18 | Intertrade Distributie Produse SRL | Wholesale food, fish |
| 19 | LCA Service SRL | Construction of bldgs |
| 20 | Light System SA, | Hotels, Restaurants |
| 21 | Metacom Grup SRL | Rent & real estate |
| 22 | Metamob International | Rent & real estate |
| 23 | Midas Construct SRL | Rent & real estate |
| 24 | Midas Constructii 2000 SRL | Construction of bldgs |
| 25 | NBN Com SRL | Restaurant |
| 26 | Piscicola Jurilovca SA | Aquaculture |
| 27 | Piscicola Murighiol SA | Aquaculture |
| 28 | Piscicola Tour SRL | Aquaculture |
| 29 | Prodlemn Maneciu SRL | Logging & sawmills |
| 30 | RFD Jurilovca Holding SA | Other direct selling |
| 31 | Rondo Invest SRL | Rent & real estate |
| 32 | Starmob International SRL | Rent & real estate |
| 33 | Stibro 2000 SA | Glass & production |
| 34 | Supermob International SRL | Rent & real estate |
| 35 | Terra Invest Grup SRL | Rent & real estate |

DOJ 000248

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer Alexandru Bittner | | Year/Period Ended 2007 through 2011 |

| 36 | Top Invest SRL | Rent & real estate |
| 37 | Trei Cocosi Complex Intern'l SRL | Restaurant & food fac |
| 38 | Turism si Agrement SA | Traveler accommdns |

Mr. Bittner's POA stated in a letter dated 04/04/2013 that "…Mr. Bittner has an accounting firm in Romania that maintains information regarding his foreign corporations. Our accounting firm here has extensively communicated with the Romanian accountants, often on a daily basis, and has received extensive information regarding Mr. Bittner's finances." Mr. Bittner hired attorneys to draft legal documents as evidence of transactions going back at least to 2006. He uses nominees to insulate himself and claimed that he uses nominees to protect his privacy. He is knowledgeable in law and hired attorneys to file lawsuits against debtors. Mr. Bittner is a businessman with extensive knowledge of various businesses and prudently employs professional advisors and accountants to provide services to him.

Description of Foreign Bank Accounts

Owners of Financial Accounts
Based on records provided, most of Mr. Bittner's personal foreign accounts are opened under the following names: Alexandru Bittner, A. Bittner, or Bittner Alexandru. For several accounts, the records provided do not indicate the name of the account holder. Mr. Bittner provided records for one nominee account opened in the name of Negrea Gheorghe. The records provided do not indicate that Sherry Bittner's name was on any of the accounts.

Signature or Other Authority over Accounts
Signature cards were requested for all foreign financial accounts but not provided. However, it is probable that the named account holder has signature authority over the account. In addition, it appears that Mr. Bittner also had authority over the account held in the name of Negrea Gheorghe. A review of the incomplete records that Mr. Bittner provided indicated that funds going out of the financial account of Negrea Gheorghe were invested in or loaned to companies for Mr. Bittner's benefit.

Account of Negrea Gheorghe
Records for the financial account of Negrea Gheorghe at HVB Bank, account number 19918310, were provided in response to a request for documentation of

---

DOJ 000249

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

basis in worthless stocks of $2,382,551 in Danubiu RO and $4,549,621 in Ecofish SRL.

The records consist of sporadic pages from monthly account statements that span the period of 03/05/2004 through 12/19/2006.  The statements are in Romanian. This account does not appear to be a personal account of Negrea Gheorghe.  This account appears to exist solely for Mr. Bittner's benefit:  to receive funds (sources unknown) and to disburse funds to invest or pay to Mr. Bittner's related entities.

Revenue Agent is unable to complete a thorough analysis of this account because Mr. Bittner failed to provide complete records.  Mr. Bittner's representative admitted that Negrea Gheorghe is Mr. Bittner's nominee.

Use of Funds from Accounts
Revenue Agent determined that the funds from the identified foreign financial accounts were used in a variety of ways including, but not limited to, personal living expenses, investments, and asset purchases.  While Sherry Bittner's name does not appear on any of the known foreign personal accounts, she received the benefit of these foreign accounts.  For example, she paid certain personal expenses using a credit card that was attached to at least one of these foreign accounts.

On September 19, 2011, Mr. Bittner and his wife opened account number 9023045 at Golden Bank, whose main office is located in Houston, TX with a branch office in Plano, TX on Legacy Drive.  This account was opened under their names with a $500 initial deposit.  On September 20, Sherry Bittner initiated a wire transfer deposit of $200,000 into this account from an unidentified account.  On November 3, 2011, the Bittners wired $89,387.19 to Luna & Luna, LLP as Trustee.  The purpose of this payment is unknown.

On September 29, 2011, the Bittners opened account number 4888 3616 1991 at Bank of America under their names with a transfer of $1,818.04 from an unidentified account.  On November 15, 2011, the Bittners received a transfer deposit of $199,000 from an unidentified account.

The Bittners opened account number 4880 3616 2000 at Bank of America under their names.  No statements or records were provided to indicate the date the

DOJ 000250

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>*Alexandru Bittner* | | Year/Period Ended<br>*2007 through 2011* |

account was opened.  However, this account received a transfer deposit of $425,000 on December 13, 2011.

Sherry Bittner opened account number 4460 2124 4328 at Bank of America under her name on or around May 3, 2011.  No statements or records were provided to indicate the date that this account was opened and to identify any deposits or withdrawals were made in 2011.  However, records from Unicredit Tiriac Bank (USD acct) indicated that on May 3, 2011, a withdrawal from the Unicredit Tiriac Bank (USD acct) was made to transfer funds of $4,500 into this account.  On May 24, 2011, $2,500 was transferred into this account.  On August 19, 2011, $500,000 was transferred to this account.

These funds brought to the U.S. from abroad were used by the Bittners to purchase their residence in Plano, TX and to purchase numerous other real estate properties in the north Texas area for investments or rental.  These properties were later transferred to LLCs in exchange for ownership interests in these LLCs.  See the table below for additional information.  The Bittners owned between 50% and 100% of these domestic LLCs but later transferred 80% of their interests in these LLCs to Ion Petre after the examination periods.

| Address | Legal Description | Details |
|---|---|---|
| 3927 Ranch Estate Circle, Plano, TX 75074 | Lot 11, Block A, Ranch Estates, Plano, TX | Property was purchased by Taxpayers on 09/30/11 from George K Buchanan.  The purchase price was $565,000.  They paid $553,947.24 in full pymt.  They transferred the deed to Petre Ion on 09/30/12. |
| 3708 LaSalle Drive Arlington, TX 76016 | Lot 5, Block 2, Burgundy Hill 1, Arlington, TX | Property was purchased by Taxpayers and deeded to RoCalTex, LLC in exchange for capital in RoCalTex, LLC on 11/01/11, then transferred to Petre Ion on 8/29/2013, then transferred to TexRom, LLC on 10/26/2013. |
| 2608 Rush Valley Ct. Arlington, TX 76016 | Lot 5, Block 8, Rushmoor Addition, Arlington, TX | Property was purchased by Taxpayers and deeded to RoCalTex, LLC in exchange for capital in RoCalTex, LLC on 11/01/11and then transferred to Petre Ion on 8/26/13, then to TexRom, LLC on 10/26/2013. |

DOJ 000251

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer Alexandru Bittner | | Year/Period Ended 2007 through 2011 |

| 2912 Charter Oak Drive, Plano, TX 75074 | Lot 4, Block 16 of Royal Oaks, Plano, TX | Property was purchased by Taxpayers on 11/01/11 and deeded to RoCalTex, LLC in exchange for capital in RoCalTex, LLC on 11/01/11. Property was transferred to Petre Ion on 09/01/2013, and then transferred to TexRom, LLC on 10/26/2013. |
|---|---|---|
| 10716 Eastcrest Lane, Dallas, TX 75217 | | Transferred to Ion Petre, then transferred to TexRom, LLC on 12/13/2013 and finally sold to 3rd party on 2/5/2014. |
| 5605 Squires Drive, The Colony, TX 75056 | Lot 2, Block 147, The Colony, TX | Property was purchased by Taxpayers and deeded to RoCalTex, LLC in exchange for capital in RoCalTex, LLC on 11/17/11. Transferred to Petre Ion on 8/29/13, then to TexRom, LLC. |
| 4502 Creekside Dr., Arlington, TX 76013 | Lot 34, Block 17 of Woodland Park South, 2nd Installment, Arlington, TX | Property was purchased from the Estate of Frances McCarthy on 11/22/11 then transferred to Petre Ion on 8/26/13, then to TexRom. |
| 520 Huntington, Lewisville, TX | Lot 4, Block K, Serendipity Village No.2, Lewisville, TX | Property was purchased by Taxpayers on 12/23/11 and deeded to RoCalTex, LLC on 12/24/11 in exchange for capital in RoCalTex, LLC. |

## Previously Subject to FBAR Filing Requirements

When Mr. Bittner moved to Romania in 1990 and opened foreign bank accounts, he was immediately subject to FBAR filing requirements. Mr. Bittner claimed that he was unaware of his requirement to file federal income tax returns and FBARs until his return to the U.S. However, the portion of his statement regarding his knowledge about his income tax filing obligations is false. Mr. Bittner knew about and did file returns for taxable years 1990, 1991, 1997, 1998, 1999, and 2000 while he was living in Romania. The following is a summary of the items reported on the original, timely filed income tax returns:

| Tax Year | Date Filed | Wage Income | Interest Inc. | Original Total Pos. Income | Itemized Ded. | AGI | Total Tax | Tax Withheld | EIC | (Total Refund) Tax Due |
|---|---|---|---|---|---|---|---|---|---|---|
| 1990 | 06/26/1991 | $8,161 | $304 | $28,702 | $8,178 | $8,105 | $0 | $611 | $953 | ($1,564) |
| 1991 | 08/16/1992 | $0 | $42 | $2,318 | $0 | $2,318 | $0 | $0 | $0 | $0 |
| 1997 | 08/14/1998 | $0 | $0 | $20,312 | $0 | $20,312 | $1,219 | $0 | $0 | $1,219 |
| 1998 | 04/15/1999 | $0 | $0 | $49,102 | $0 | $49,102 | $5,089 | $0 | $0 | $5,089 |
| 1999 | 04/15/2000 | $0 | $0 | $62,724 | $0 | $62,724 | $7,641 | $0 | $0 | $7,641 |
| 2000 | 04/15/2001 | $0 | $0 | $52,382 | $0 | $52,382 | $5,494 | $0 | $0 | $5,494 |

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

Mr. Bittner filed Forms 1040 for taxable years above at or around the time that the returns were due. For all of these years, Mr. Bittner would have been required to answer the question regarding whether he had foreign financial accounts and whether he had a requirement to file an FBAR or T DF 90-22.1.

On or around May 21, 2012, Mr. Bittner filed delinquent FBARs for calendar years 1993 through 2011. On or around September 27, 2013, Mr. Bittner filed amended FBARs.

Previous FBAR Penalties

Mr. Bittner had not been previously examined for FBAR filing requirements or been assessed the FBAR penalty.

Taxpayers Concealed Income and Assets to Minimize Reported Income of the original and amended returns filed for the taxable years 2002 through 2004 and 2006 through 2011

The examination of the Bittners' returns of the referenced taxable years indicates that they failed to report income from all of their foreign sales and failed to report the existence of all of his foreign financial accounts to Beckley, their original return preparer. They disclosed more assets and income to the preparer of their amended returns.

The amended returns reported gains and losses from sale or other disposition of assets. Some of these assets were not held in the Bittners' names. Mr. Bittner made concerted efforts to conceal true ownership of assets in Romania. Mr. Bittner's representative made the following statement in his May 29, 2014 letter to the IRS:

> *"Note that, to protect privacy in Romania, Mr. Bittner had assets held in the name of a number of nominees, including:*
>
> > *Negrea Gheorge [Negrea Gheorghe]*
> > *Ruiana Mircea*
> > *Popescu Ileana*
> > *Nicolae Dumitru Emilian*
> > *Barbulescu Serghei*
> > *Matache Marian*
> > *Cofigen*
> > *Comatrans*

DOJ 000253

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer Alexandru Bittner | | Year/Period Ended 2007 through 2011 |

> *Master Trade Group*
> *Mellwood & Partners*
> *Burgstate*
> *Heavy Industries*
> *Global RE"*

Mr. Bittner provided one nominee contract with Negrea Gheorghe and did not provide nominee contracts with the remaining nominees.  Mr. Bittner did not provide copies of his Romanian tax returns to show that income and assets reported as being owned by him to the U.S. government were also reported to the Romanian government.

- The Bittners made concerted efforts to conceal true ownership of assets in the U.S. after the processing of the original delinquent returns resulted in large deficiencies.  They transferred their U.S. home and 80% of the interests in their U.S. companies that held interests in U.S. real properties to an individual named Ion Petre (or Petre Ion).  When asked whether Petre Ion was a nominee for Mr. Bittner, the representative made the following statement in his 05/29/14 letter:

> *"Mr. Bittner holds a power of attorney to act on behalf of Mr. Ion in the US.  Mr. Ion has not acted as a nominee for Mr. Bitter.  While in Romania, Mr. Bittner and Mr. Ion were business partners.  Mr. Ion also managed properties for Mr. Bittner and operated his Romanian businesses and assets when Mr. Bittner was not available.  Mr. Ion has held and currently holds Powers of Attorney for Mr. Bittner or his nominees to act on his behalf in Romania."*

Records and documents, however, indicate that Petre Ion (or Ion Petre) is a nominee for Mr. Bittner and acted on Mr. Bittner's behalf in Romania during the examination periods.

In 2012, Mr. Bittner claimed that he transferred assets to Ion Petre to repay a $4,000,000 debt that arose in 2000.  This appears to be a conveyance of assets to avoid collection.  The expenses related to these assets such as property taxes are paid from an account named/styled "Ion Petre, Alexandru Bittner POA" to give the appearance that Mr. Bittner is now representing Ion Petre and paying expenses on behalf of Mr. Petre.  It is likely that Mr. Bittner is using this account to pay his own personal and business expenses.

DOJ 000254

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>*EXPLANATION OF ITEMS*<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

Adjustments to Income after examination

Mr. Bittner's failure to report all of his foreign financial accounts resulted in tax adjustments to their reported income, after analysis of his foreign bank accounts.  The result of this analysis is that there are unexplained deposits for which the Bittners have offered no explanation as to whether these deposits result from nontaxable sources of income.  In fact, the examination has uncovered that Mr. Bittner has reportable income from his numerous businesses and his connections to those in power in the Government of Romania.

Law

§ 5321.  Civil penalties (a)

(5)  FOREIGN FINANCIAL AGENCY TRANSACTION VIOLATION.--

a.  PENALTY AUTHORIZED.--The Secretary of the Treasury may impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314.

b.  AMOUNT OF PENALTY.--

(i)  IN GENERAL.--Except as provided in subparagraph (C), the amount of any civil penalty imposed under subparagraph (A) shall not exceed $10,000.

(ii)  REASONABLE CAUSE EXCEPTION.--No penalty shall be imposed under subparagraph (A) with respect to any violation if--

1.  such violation was due to reasonable cause, and

2.  the amount of the transaction or the balance in the account at the time of the transaction was properly reported.

IRM 4.26.16.3  (11/06/2015)
FBAR Filing Criteria
a.  An FBAR is required if all of the following apply:
  a.  The filer is a U.S. person.
  b.  The U.S. person has a financial interest in a financial account or signature or other authority over a financial account.

DOJ 000255

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer Alexandru Bittner | | Year/Period Ended 2007 through 2011 |

   c. The financial account is in a foreign country.

   d. The aggregate amount(s) in the account(s) valued in dollars exceed $10,000 at any time during the calendar year.

### IRM 4.26.16.3.2 (11/06/2015)
### Financial Account

1. A reportable financial account includes a:
   a. Bank account, such as a savings deposit, demand deposit, checking, time deposit (CD), or any other account maintained with a financial institution or other person engaged in the business of banking.
   b. Securities account, securities derivatives account, or other financial instruments account held with a person engaged in the business of buying, selling, holding or trading stock or other securities.

### IRM 4.26.16.3.3 (11/06/2015)
### Financial Interest

1. Direct Financial Interest:
   a. A U.S. person has a financial interest in each account for which such person is the owner of record or has legal title, whether the account is maintained for his own benefit or for the benefit of others including non-U.S. persons.
   b. If an account is maintained in the name of two persons jointly, or if several persons each own a partial interest in an account, each of those U.S. persons has a financial interest in that account and, generally, each person must file the FBAR.

2. Indirect financial interest:  A U.S. person has an "other financial interest" in each bank, securities, or other financial account in a foreign country for which the owner of record or holder of legal title is:
   a. A person acting as an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person.
   d. Any other entity in which the U.S. person owns directly or indirectly more than 50 percent of the voting power, total value of the equity interest or assets, or interest in profits.

### IRM 4.26.16.3.4 (11/06/2015)
### Signature or Other Authority Over an Account

1. An individual has signature or other authority over an account if that individual (alone or in conjunction with another) can control the disposition of money, funds or other

DOJ 000256

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>*Alexandru Bittner* | | Year/Period Ended<br>*2007 through 2011* |

assets held in a financial account by direct communication (whether in writing or otherwise) to the person with whom the financial account is maintained.

### IRM 4.26.16.4.1  (11/06/2015)
**General FBAR Filing**
1. The FBAR must be filed on or before June 30 each year for the previous calendar year.
2. All FBARS filed after June 30, 2013, bust be filed electronically through the FinCEN BSA E-Filing website at www.bsaefiling.fincen.gov/main.html unless the filer requested, and was granted, an exception to e-filing by FinCEN.

### IRM 4.26.16.4.6  (11/06/2015)
**FBAR Filing for Financial Interest in 25 or More Accounts**
1. 31 CFR 1010.350(g) provides that a United States person that has a financial interest in 25 or more foreign financial accounts only needs to provide the number of financial accounts and certain other basic information on the report, but will be required to provide detailed information concerning each account if the IRS or FinCEN requests it.
2. Filers must comply with FBAR record-keeping requirements.  See IRM 4.26.16.5.1.

### IRM 4.26.16.6.1  (11/06/2015)
**FBAR Penalty Authority**
1. IRS was delegated the authority to assess and collect civil FBAR penalties. 31 CFR 1010.810(g).  The delegation includes the authority to investigate possible civil FBAR violations, provided in Treasury Directive No. 15-41 (December 1, 1992), and the authority to assess and collect the Penalties for violations of the report and recordkeeping requirements.

### IRM 4.26.16.6.2  (11/06/2015)
**FBAR Penalty Structure**
1. There are four civil penalties available for FBAR violations:
   a. Negligence. 31USC 5321 (a)(6)(A).
   b. Pattern of negligent activity. 31 USC 5321 (a)(6)(B).
   c. Penalty for non-willful violation. 31 USC 5321 (a)(5)(A) and (B).
      NOTE:  Although the term "non-willful" is not used in the statute, we use it to distinguish this penalty from the penalty for willful violations.
   d. Penalty for willful violations. 31 USC 5321 (a)(5)(C).

DOJ 000257

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

2. A filing violation occurs at the end of the day on June 30th of the year following the calendar year to be reported (the due date for filing the FBAR).
3. A recordkeeping violation occurs on the date when the records are requested by the IRS examiner if the records are not provided.


**IRM 4.26.16.6.4 (11/06/2015)**
**Penalty for Nonwillful FBAR Violations**

1. For violations occurring after October 22, 2004, a penalty, not to exceed $10,000 per violation, may be imposed on any person who violates or causes any violation of the FBAR filing and recordkeeping requirements. 31 USC 5321(a)(5)(B).
2. The penalty should not be imposed if:
    a. The violation was due to reasonable cause, and
    b. The person files any delinquent FBARs and properly reports the previously unreported account.
3. Examiners have discretion in determining the penalty amount and should use the mitigation guidelines in making their determinations. See the discussion of the mitigation guidelines below. See Exhibit 4.26.16-1. Examiners should take the facts and circumstances of each case into account when determining if a warning letter or penalties that are less than the mitigation guidelines are appropriate. The purpose of FBAR penalties is to promote compliance with the FBAR reporting and recordkeeping requirements.


**IRM 4.26.16.6.4.1 (11/06/2015)**
**Penalty for Nonwillful FBAR Violations—Calculation**

1. After May 12, 2015, in most cases, examiners will recommend one penalty per open year, regardless of the number of unreported foreign accounts. The penalty for each year is limited to $10,000. Examiners should still use the mitigation guidelines and their discretion in each case to determine whether a lesser penalty amount is appropriate.
2. For multiple years with nonwillful violations, examiners may determine that asserting nonwillful penalties for each year is not warranted. In those cases, examiners, with the group manager's approval after consultation with an Operating Division FBAR Coordinator, may assert a single penalty, not to exceed $10,000, for one year only.

---

DOJ 000258

| Form 886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS**<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

3. For other cases, the facts and circumstances (considering the conduct of the person required to file and the aggregate balance of the unreported foreign financial accounts) may indicate that asserting a separate nonwillful penalty for each unreported foreign financial account, and for each year, is warranted.
4. In no event will the total amount of the penalties for nonwillful violations exceed 50 percent of the highest aggregate balance of all unreported foreign financial accounts for the years under examination.

**IRM 4.26.16-1  (11/06/2015)**
**FBAR Penalty Mitigation Guidelines for Violations Occurring After October 22, 2004**

To qualify for mitigation, the person must meet four criteria:

1. The person has no history of criminal tax or BSA convictions for the preceding 10 years and has no history of prior FBAR penalty assessments.
2. No money passing through any of the foreign accounts associated with the person was from an illegal source or used to further a criminal purpose.
3. The person cooperated during the examination.
4. IRS did not determine a fraud penalty against the person for an underpayment of income tax for the year in question due to the failure to report income related to any amount in a foreign account.

31 CFR 1010.350(e)(2)

1010.350(e)(2)--

(e) *Financial interest.* A financial interest in a bank, securities or other financial account in a foreign country means an interest described in this paragraph (e):

(1) *Owner of record or holder of legal title.* A United States person has a financial interest in each bank, securities or other financial account in a foreign country for which he is the owner of record or has legal title whether the account is maintained for his own benefit or for the benefit of others. If an account is maintained in the name of more than one person, each United States person in whose name the account is maintained has a financial interest in that account.

DOJ 000259

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>*EXPLANATION OF ITEMS*<br>*Exhibit* | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>*Alexandru Bittner* | | Year/Period Ended<br>*2007 through 2011* |

(2)*Other financial interest.* A United States person has a financial interest in each bank, securities or other financial account in a foreign country for which the owner of record or holder of legal title is -

(i) A person acting as an agent, nominee, attorney or in some other capacity on behalf of the United States person with respect to the account;

(ii) A corporation in which the United States person owns directly or indirectly more than 50 percent of the voting power or the total value of the shares, a partnership in which the United States person owns directly or indirectly more than 50 percent of the interest in profits or capital, or any other entity (other than an entity in paragraphs (e)(2)(iii) through (iv) of this section) in which the United States person owns directly or indirectly more than 50 percent of the voting power, total value of the equity interest or assets, or interest in profits;

(iii) A trust, if the United States person is the trust grantor and has an ownership interest in the trust for United States Federal tax purposes. *See* 26 U.S.C. 671- 679 and the regulations thereunder to determine if a grantor has an ownership interest in the trust for the year; or

(iv) A trust in which the United States person either has a present beneficial interest in more than 50 percent of the assets or from which such person receives more than 50 percent of the current income.

(3)*Anti-avoidance rule.* A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

Indirect financial interest: A U.S. person has an "other financial interest" in each bank, securities, or other financial account in a foreign country for which the owner of record or holder of legal title is a person acting as an agent, nominee, attorney, or in some other capacity on behalf of the U.S. person.

<u>Taxpayer's Position:</u>

Mr. Bittner has not been interviewed.  However, his positions were stated through letters written by or signed by him or by letters from his representatives.  These are made as exhibits as follows:

DOJ 000260

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

Exhibit 1:  Mr. Bittner's cover letter for the filing of original delinquent Forms 1040 for taxable years 1990 through 2011.

Exhibit 2:  Mr. Bittner's cover letter for the filing of original delinquent FBARs for calendar years 1993 through 2011.

Exhibit 3:  Unsigned, third-person Statement of Reasonable Cause Per FS-2011-13.

Exhibit 4:  Statement of Reasonable Cause per Treas. Regs. § 1.6038-2(k)(3) signed by Mr. Bittner and dated 02/15/2014.

Mr. Bittner, through these Exhibits, claimed that the following facts and circumstances support his assertions of reasonable cause against the imposition of any FBAR penalties:

1.  Ignorance of filing obligation

Mr. Bittner moved back to Romania in 1990 and initially claimed that he "....was unaware that as a U.S. citizen I was required to file tax returns with the Internal Revenue Service." "Since returning to United States in 2011, I have learned that my understanding of the tax rules was incorrect." See Exhibit 1.

"I was not aware during that time that I had to file United States tax returns simply because I had become a naturalized US citizen.... I reasonably believed that I had no US tax obligations for income from Romania when I was living in Romania...." See Exhibit 4.

Because Mr. Bittner is a sophisticated businessman, his claim of reasonable cause due to ignorance of the law lacks credibility.  Lammerts Est. v. Commissioner, 456 F.2d 681 (2d Cir. 1972); IRM 20.1.1.3.2.2.6 (2-22-06).  This includes a taxpayer's erroneous belief (not based on advice of counsel) that no return is required to be filed.  Southeastern Finance Co. v. Commissioner, 4 T.C. 1069 (1945), affd. 5th Cir (1946); Baclit v. Commissioner, T.C. Memo. 1989-576.  Ordinary business care and prudence requires taxpayers to be aware of their tax obligations.

DOJ 000261

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS**<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

2. Language barrier

   "I moved to Romania in 1991.  At that time my English was not good…."  See Exhibit 2.

   Language barrier is not a reasonable basis for failing to comply with tax obligations.

3. Taxpayers could not afford to hire accountant

   "….I was poor and couldn't hire an accountant."  See Exhibit 2.

   FBARs and delinquent returns indicated that Mr. Bittner had achieved wealth and success in business and had the means to hire competent advisors knowledgeable in U.S. taxation but chose not to do so.  Wealth or lack of wealth is not a reasonable basis for failing to comply with tax obligations.

4. Taxpayers severed ties to U.S.

   "Mr. Bittner severed his connections with the United States and reasonably believed he [had] and [sic] no further United States tax obligations."  See Exhibit 3.

   Mr. Bittner maintained his U.S. citizenship and registered with the U.S. Embassy in Romania; therefore, he did not sever all connections.

5. Mr. Bittner was not informed of his tax obligations

   "I was not aware during that time that I had to file United States tax returns ….Nor did my accountants inform me of that fact…."  See Exhibit 4.

   Mr. Bittner did not state whether he informed his accountants of his U.S. citizenship status.  He did not assert that he asked his accountant about his U.S. tax obligations. He did not claim that his Romanian accountants and advisors were knowledgeable about U.S. tax laws.  Mr. Bittner cannot reasonably rely on lack of advice if they cannot show that they provided sufficient information and sought advice regarding his tax obligations.

   "During all that time, the US embassy never contacted me about any tax returns due." See Exhibit 4.  Again, Mr. Bittner did not state whether they asked anyone at the

DOJ 000262

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

Embassy about his U.S. tax obligations.  It is not the mission or responsibility of the U.S. Embassy to notify Mr. Bittner of his U.S. tax obligations.  This assertion does not constitute reasonable cause.

6.  <u>Taxpayers are in compliance with Romanian tax laws</u>

"While living in Romania, I complied with all Romanian tax laws...."  See <u>Exhibit 4</u>.

This assertion cannot be verified since Mr. Bittner has failed to provide copies of his Romanian tax returns as requested in Information Document Requests.

**<u>Analysis and Argument</u>**:

For tax years 2007 through 2011, Alexandru Bittner was required to file FBARs for all foreign financial accounts.  He met all criteria necessary to require FBAR filings:

- He is a U.S. naturalized citizen; therefore, he is a U.S. person.
- He has foreign financial accounts in the following foreign countries:  Romania, Switzerland, and Liechtenstein.
- He has a financial interest in these accounts, signature, or other authority over these foreign financial accounts.
- The aggregate amounts in the accounts valued in dollars exceed $10,000 at any time during each calendar year.

Mr. Bittner does not qualify for mitigation of penalties for the following reasons:

- There are indications that Mr. Bittner is hiding receipt of cash of unknown sources from Romanian authorities and/or U.S. authorities.  Mr. Bittner's nominee, Negrea Gheorghe, received cash from Mr. Bittner to deposit into the account in the name of the nominee.  Mr. Bittner has not explained the source of large amounts of cash and why he would need to use a nominee to receive these funds if they were legal sources of funds/income.  It appears to be an attempt to hide the true source and nature of the funds.
- Mr. Bittner did not cooperate during the examination.  He did not produce records as requested.

DOJ 000263

| Form<br>886-A | U.S. Treasury Department-Internal Revenue Service<br>**EXPLANATION OF ITEMS**<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

Additionally, the following factors were analyzed in making a determination of reasonable cause:

Factors to consider <u>for</u> reasonable cause:

1. <u>Reliance upon the advice of a professional tax advisor who was informed of the existence of the foreign financial account</u>:

   Mr. Bittner did not consult with a professional tax advisor and did not disclose the existence of his foreign financial accounts until after the due dates for filing FBARs; therefore, he cannot reasonably rely on any advice given by the advisor.  In addition, he did not provide his return preparer enough information to prepare accurate FBARs in the original or amended filings.

   Mr. Bittner has not shown that he provided his return preparer with information regarding his FBAR filing requirement prior to the due date for filing FBARs for each of the 2007 through 2011 FBARs.  In addition, he only brought to the return preparer a summary sheet detailing the highest aggregate balance.  The return preparer relied on the accuracy of this information to prepare the original delinquent FBARs.

   Mr. Bittner was asked in an Information Document Request whether he received any tax or legal opinions in Romania or in the U.S.  His representative refused to answer the question regarding whether Mr. Bittner received any opinions in Romania.  He stated that Mr. Bittner did not receive any opinions in the U.S.

   <u>Disclosure to Tax Return Preparer</u>
   Based on Beckley's notes, Mr. Bittner learned of his FBAR filing requirement before hiring Beckley.  He hired Beckley to prepare delinquent FBARs but only disclosed the existence of one account.  The disclosure was made after the due dates for filing FBARs had passed.  Mr. Bittner did not provide Beckley with all the information necessary to file accurate and complete FBARs.  Based on documents provided by the return preparer, Mr. Bittner only provided a spreadsheet that listed the highest account balance for one account.

DOJ 000264

| Form<br>**886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

2. Unreported account was established for a legitimate purpose:

   While it is true that Mr. Bittner lived and operated his businesses in Romania and that most of these foreign accounts may have been established for a legitimate purpose, some do appear to be established for an illegitimate purpose including hiding assets, funds, etc. from the Government of Romania, creditors, and possibly, from the U.S.

3. There were no indications of efforts taken to intentionally conceal the reporting of income or assets:

   Mr. Bittner, through his representative, admitted that he owned assets or held notes in the names of others named as nominees. His representative stated in his written response to IDRs that Mr. Bittner wanted to protect his privacy in Romania. When these assets were sold or the notes became worthless, Mr. Bittner reported the gain/loss from the sale or other disposition of these assets and claimed a bad debt deduction for the worthlessness of the debts. However, Mr. Bittner failed to report the accounts held by Negrea Gheorghe in his FBAR filings.

   It is the IRS' contention that Mr. Bittner directed the nominee to receive funds into this account and to disburse funds as he directed. See copies of accounts held under the name Negrea Gheorghe. It is clear from inspection of this account that Negrea Gheorghe did not use this account as his personal account. All disbursements were to entities and/or individuals connected to or related to Mr. Bittner.

4. There was no tax deficiency related to the unreported foreign account:

   This factor does not apply since it is the IRS' contention that there are tax deficiencies related to the foreign financial accounts.

Factors against having reasonable cause:

1. Taxpayer's background and education indicate that he should have known of the FBAR reporting requirements:

DOJ 000265

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

Mr. Bittner claimed that he was ignorant of his FBAR filing requirements.
However, his education, vast background in various types of businesses, and his
connections to Romanian government officials indicate that he should have known
of the FBAR reporting requirements.  See facts regarding Mr. Bittner's background
and education above.

Compliance History
There is no record of an FBAR filing from Mr. Bittner prior to the 2012 filings for
calendar years 1993 through 2011.

Length of time between failure to meet tax obligations and time of compliance
Mr. Bittner returned to the U.S. on or around September 2011 and hired a CPA to
prepare his delinquent FBARs in January 2012.  He filed his delinquent returns and
delinquent FBARs on or around May 21, 2012.  These original delinquent FBARs
were not substantially complete.  He filed amended FBARs on September 27, 2013
but failed to report all financial accounts held by nominees.  Therefore, a significant
amount of time had passed between the time the 2007 through 2010 FBARs were
due and the 09/27/13 amended filings.

Circumstances beyond a taxpayer's control
Mr. Bittner did not describe any circumstances beyond his control other than the
fact that no one from the U.S. Embassy informed him of his tax filing obligations.
His attorney claimed that he was registered with the U.S. Embassy in Romania, yet
he did not inquire with them about his U.S. filing requirements.

2.  Tax deficiency related to the unreported foreign account:

Since Mr. Bittner failed to file timely, all the income reported on the delinquent
returns as well as any examination adjustments were due to the foreign financial
accounts.  An analysis of Mr. Bittner's personal foreign financial accounts indicated
that Mr. Bittner failed to report all income deposited into these accounts.  Mr.
Bittner's failure to file federal income tax returns and his failure to report all of his
foreign financial accounts resulted in tax deficiencies.  Mr. Bittner has unexplained
deposits for which there is no obvious explanation of their source and character.
Mr. Bittner's representative stated that he had no sources of nontaxable income.
These unexplained deposits are likely from his numerous Romanian businesses and
his connections to Romanian government officials.

DOJ 000266

| Form 886-A | U.S. Treasury Department-Internal Revenue Service **EXPLANATION OF ITEMS** Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer Alexandru Bittner | | Year/Period Ended 2007 through 2011 |

3.  <u>Whether Taxpayer failed to disclose the existence of the account to the person preparing his tax return:</u>

After the due dates for the 2007 – 2011 FBARs, Mr. Bittner disclosed the existence of one or two accounts to the return preparer.  The balance of this (these) account(s) was provided in a summary sheet.  Mr. Bittner did not appear to be concerned with the accuracy of the original delinquent FBARs.  This was apparent when comparing the original delinquent FBARs with the amended FBARs filed during the examination.

4.  <u>Efforts taken to Conceal Reporting</u>

There are indications of efforts taken by Mr. Bittner to intentionally conceal the reporting of income, assets, or foreign activities.  While Mr. Bittner and his representatives vehemently claim that he expended time and money to ensure that the amounts reported on Form 1040, Forms 5471, and FBARs were as accurate as possible, there appears to be efforts by Mr. Bittner to conceal true ownership of assets in Romania and in the U.S.

Mr. Bittner's representative made the following statement in his May 29, 2014 letter to IRS:

*"Note that, to protect privacy in Romania, Mr. Bittner had assets held in the name of a number of nominees, including:*

> *Negrea Gheorge [Negrea Gheorghe]*
> *Ruiana Mircea*
> *Popescu Ileana*
> *Nicolae Dumitru Emilian*
> *Barbulescu Serghei*
> *Matache Marian*
> *Cofigen*
> *Comatrans*
> *Master Trade Group*
> *Mellwood & Partners*
> *Burgstate*
> *Heavy Industries*

DOJ 000267

| Form **886-A** | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| Name of Taxpayer<br>Alexandru Bittner | | Year/Period Ended<br>2007 through 2011 |

Global RE"

Mr. Bittner did not provide any documents to indicate that these individuals and entities did have agreements with him to act as a nominee for them.  Mr. Bittner did not provide copies of Romanian tax returns to show that income and assets reported as being owned by him to the U.S. government were also reported to the Romanian government.

When asked whether Petre Ion was a nominee for Mr. Bittner, the representative made the following statement in his 05/29/14 letter:

> *"Mr. Bittner holds a power of attorney to act on behalf of Mr. Ion in the US.  Mr. Ion has not acted as a nominee for Mr. Bitter.  While in Romania, Mr. Bittner and Mr. Ion were business partners.  Mr. Ion also managed properties for Mr. Bittner and operated his Romanian businesses and assets when Mr. Bittner was not available.  Mr. Ion has held and currently holds Powers of Attorney for Mr. Bittner or his nominees to act on his behalf in Romania."*

Records and documents, however, indicate that Petre Ion (or Ion Petre) is a nominee for Mr. Bittner and currently holds U.S. assets under his name on behalf of Mr. Bittner.

Records also indicated that Mr. Bittner failed to inform his return preparer of his foreign businesses and the number of foreign bank accounts that he held.  He did not provide source documents to the return preparer.  He provided a spreadsheet summarizing the information to report to his return preparer.

In addition to the use of nominees, it is the Government's position that Mr. Bittner is attempting to conceal the facts regarding his Romanian tax compliance.  Although he has claimed that he paid taxes to Romania, he has refused to provide any records to substantiate this claim.

In addition to having Romanian bank accounts, Mr. Bittner also had accounts in Liechtenstein and Switzerland.

DOJ 000268

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>Exhibit | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>Alexandru Bittner | | *Year/Period Ended*<br>2007 through 2011 |

5. Taxpayer's Conduct during the Examination
   Mr. Bittner has been uncooperative during the examination and has tried to obstruct and delay the examination by various tactics including the following:

   - Controlling the Examination by limiting the amount of records provided;
   - Failing to provide translated documents;
   - Involving TAS and upper management in an attempt to limit the scope and depth of the examination;
   - Attempting to interfere with the interview of a third-party;
   - Making allegations including harassment, depriving him of his rights, unfair treatment, extortion, and religious persecution against the Examiner and the original Counsel attorney.

## Penalties - Recommended

As of the date of this report, the non-willful penalty with no mitigation is recommended. Mr. Bittner does not have reasonable cause for failure to file FBARs. In addition, Mr. Bittner does not qualify for any mitigation of the penalties.

Maximum non-willful penalty is calculated as followed:

| Computation of Non-Willful FBAR Penalty | | | | | |
|---|---|---|---|---|---|
| Calendar Year | 2007 | 2008 | 2009 | 2010 | 2011 |
| Maximum Aggregate Balance | $10,127,860 | $10,420,152 | $3,053,884 | $16,058,319 | $15,137,405 |
| Maximum Total Penalty | $8,029,159.50 | | | | |
| Penalty is $10,000 per violation (statutory maximum) | $10,000 | $10,000 | $10,000 | $10,000 | $10,000 |
| # violations | 61 | 51 | 53 | 53 | 54 |
| Total Penalty per Year | $610,000 | $510,000 | $530,000 | $530,000 | $540,000 |
| Total Penalty | $2,720,000 | | | | |

DOJ 000269

| Form<br>*886-A* | U.S. Treasury Department-Internal Revenue Service<br>***EXPLANATION OF ITEMS***<br>*Exhibit* | Schedule No. or |
|---|---|---|
| *Name of Taxpayer*<br>*Alexandru Bittner* | | *Year/Period Ended*<br>*2007 through 2011* |

As noted in the accompanying Form 13449, Agreement to Assessment and Collection of Penalties under Title 31 USC 5321(a)(5) and 5321 (a)(6), this office has determined that one or more violations have occurred with respect to FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBARs), for foreign financial accounts maintained during calendar years 2007 through 2011. Too little time remains to provide an Appeals hearing before the expiration of the statute of limitations for assessing the proposed penalty; however, you have the right to request a post-assessment hearing with our Appeals office once you receive Letter 3708, *Notice and Demand for Payment of FBAR Penalty*. Letter 3708 will be mailed to you shortly. Please retain the enclosed Letter 3709 for reference if you plan to request a post-assessment hearing. You should follow the same procedures for requesting a post-assessment hearing as those listed in the enclosed Letter 3709 for pre-assessment hearings.

Post-assessed FBAR cases in excess of $100,000 cannot be compromised by Appeals without approval of Department of Justice (DOJ). See 31 USC § 3711(a)(2) and 31 CFR § 901.1(a) and (b). Once assessed, the penalty becomes a claim of the U.S. Government. See IRM 8.11.6.1(6).

DOJ 000270

Exhibit 1

U.S. Department of the Treasury
Internal Revenue Service

Dear Sirs,

I moved to Romania in 1990.  At the time I was unaware that as a U.S. citizen I was
required to file tax returns with the Internal Revenue Service.  Since returning to United
States in 2011, I have learned that it is necessary to satisfy that requirement.  With that
background information, I have employed Beckley CPA to prepare all 1040 tax returns
for the tax years 1990 through 2011.  You will find copies of the 1040 for those years
attached.

Regards,

Alexandru Bittner

**Beckley-IRS-Summons-0212**

Exhibit 2

Alexandru Bittner
3927 Ranch Estates
Plano, TX 75074


U.S. Department of the Treasury
Internal Revenue Service

Dear Sirs,

I moved to Romania in 1991. At that time my English was not good, I was poor and couldn't hire an accountant and it was my understanding that if you didn't have any income, you did not need to file a return.

Since returning to United States in 2011, I have learned that my understanding of the tax rules was incorrect. I have employed Beckley CPA to prepare all TD F 90-22.1 tax reports for the tax years 1993 through 2011. You will find the prepared copies of the TD F 90-22.1 for those years attached.


Regards,


Alexandru Bittner

**Beckley-IRS-Summons-0027**

DOJ 000272

Alexandru Bittner / SSN        0102
Sherry Bittner / SSN        -6797

*Exhibit 3*

### Statement of Reasonable Cause Per FS-2011-13

Alexandru Bittner was born in Romania in 1957.  He attended high school in Romania and served one mandatory year in the Army.  After his military service, he obtained a Master's degree in mechanical engineering, specializing in chemistry.

Because Mr. Bittner did not like the communist regime, and since he was of Jewish origin and his sister had already immigrated to Israel (in 1977), he felt heavily discriminated against so he decided to leave Romania.  He received support for a visa as well as financial support from the Hebrew Immigrant Aid Society ("HIAS") and he legally arrived in the USA in December of 1982.  In 1987, he became a naturalized United States citizen.  Mr. Bittner met his wife, Sherry, in 1984.  Sherry was a legal Chinese immigrant to the United States who, independently of Mr. Bittner, obtained her naturalization as well.  Sherry received no formal higher education and may have obtained only a high school diploma.  Sherry speaks very little English.  They were married in 1985 and had a daughter in 1987.

In 1989, Mr. Bittner was employed as a plumber for the Los Angeles School District.  After the December 1989 revolution and the fall of communism in Romania, Mr. Bittner returned to Romania in January, 1990.  Over the years, Mr. Bittner became a successful businessman in Romania and invested in numerous and diverse businesses including real estate, telecommunications, tourism, and aquaculture while living there.  In the mid-2000s, Mr. Bittner's business interests suffered and he sustained substantial losses.

While living in Romania, Mr. Bittner complied with Romanian tax laws and hired Romanian accountants to keep records and assist with tax compliance.  He had no awareness during that time that he was obligated to file United States tax returns simply because he had become a naturalized US citizen.  Nor did his accountants inform him of that fact.  Mr. Bittner had severed his connections with the United States and reasonably believed he had no further United States tax obligations.  He was unaware that the United States, unlike most countries (including Romania), taxes citizens on their worldwide income.  During his 22 years of living in Romania, Mr. Bittner was registered as a US citizen with the US embassy in Romania.  During all that time, he was never contacted by the embassy about any tax returns due.  He had no reason to believe that the taxing jurisdiction of the United States differed from other foreign countries that tax earnings only in the jurisdiction where the income was generated.  He had no US source income.

Mr. Bittner and his wife returned to the United States from Romania in late 2011.  After returning to the United States, Mr. Bittner learned that he had been required to file tax returns in the United States because he was a naturalized citizen.  He engaged a CPA, a solo practitioner, to prepare his tax returns.  Mr. Bittner mistakenly understood that he

1344087.2/SPSA/26861/0101/091213

DOJ 000273

needed to file tax returns for all years he had been absent from the United States. Additionally, after reading the United States-Romania Tax Treaty, Mr. Bittner believed that, because he was exclusively a Romanian resident during those years, only Romania could tax his income.  He discussed this with his tax return preparer who agreed with this conclusion.  Mr. Bittner and the CPA prepared and filed 22 years of tax returns.  Because Mr. Bittner had a mistaken understanding of the United States – Romania Tax treaty, which on its face appears to limit taxation to the country of residency, and because of the CPA's advice, Mr. Bittner mistakenly understood that the filing of the back returns was simply a formality.  As a result, in preparing those returns he simply estimated his income from each year based on his recollection as to the large income events that had occurred.  He did not consult his financial records, nor did he claim any business deductions, losses or expenses on those returns.  Following the accountant's advice, he excluded the entire amount of the reported income, expressly relying on the United States-Romania tax treaty.

Mr. Bittner never understood, until he returned to the United States, that he was required to file U.S. tax returns for every year, including the years he lived exclusively in Romania.  Nor did he understand that his and the CPA's interpretation of the United States-Romania tax treaty was incorrect (i.e., it did not exclude his Romanian income from U.S. taxation).  Indeed, the treaty's "savings clause", which allows the United States to tax its citizens' income despite the treaty, is an obscure provision.  Even experienced tax lawyers who have not specifically studied tax treaties often will misread the savings clause.

Throughout the entire time he lived exclusively in Romania, Mr. Bittner was simply unaware, as many other United States citizens in similar circumstances, that he had any United States filing obligations whatsoever.  Although Mr. Bittner dealt routinely with foreign accountants, he was never informed that he had any United States tax obligations.  Upon returning to the United States and discovering the facts, he immediately attempted to correct his mistakes and acted in good faith to comply with his tax obligations.  In so doing, he overreacted and filed many more returns than would ever be required in similar circumstances.

As we have discussed, F.S. 2011–13 specifically covers this type of situation, involving United States persons that are dual citizens and living abroad.  In such circumstances, the Internal Revenue Service has recognized the basic fact that such dual citizens often are not aware that the United States still taxes their worldwide income despite the fact that they have no connection with the United States.  This is especially true in circumstances like Mr. Bittner, where an individual has returned to and is living in his country of origin.

F.S. 2011–13 summarizes the accepted rule and practice that, in these circumstances, a dual citizen should, upon discovering his legal obligations, file the last six years of tax returns.  It further recognizes that, in such circumstances, dual citizens who have reasonable cause, and act appropriately, may not be subject to penalties (e.g. negligence, failure to file, failure to pay, failure to make estimated tax payments, or

1344087.2/SPSA/26361/0101/091213

DOJ 000274

failure to file information returns).  Mr. Bittner's case is a typical situation covered by F.S. 2011–13.  He simply and reasonably had no awareness of his United States tax obligations and upon returning to the United States and becoming aware of those obligations, acted promptly and in good faith to rectify his omissions.

Under these circumstances, Mr. Bittner did not act negligently and had reasonable cause for not filing his returns and information forms.  The Service accordingly should not apply any penalties.

1344087.2/SPSA/26861/0101/091213

DOJ 000275

Exhibit 4

Alexandru Bittner / SSN          -0102
Sherry Bittner / SSN          -6797

Statement of Reasonable Cause Per Treas. Regs. § 1.6038-2(k)(3)

I was born in Romania in 1957.  I attended high school in Romania and served one mandatory year in the Romanian Army.  Following my military service, I obtained a Master's degree in mechanical engineering, specializing in chemistry.

Because I did not like the communist regime, and because I am of Jewish origin and my sister had already immigrated to Israel (in 1977), I felt heavily discriminated against so I decided to leave Romania.  I received support for a visa as well as financial support from the Hebrew Immigrant Aid Society ("HIAS") and I legally arrived in the USA in December of 1982.  In 1987, I became a naturalized United States citizen.  I met my wife, Sherry, in 1984.  Sherry was a legal Chinese immigrant to the United States who, independently, obtained her naturalization as well.  Sherry received no formal higher education and may have obtained only a high school diploma.  Sherry speaks very little English.  We were married in 1985 and had a daughter in 1987.

In 1989, I worked as a plumber for the Los Angeles School District.  After the December 1989 revolution and the fall of communism in Romania, I returned to Romania in January of 1990.  Over the years, I became a successful businessman in Romania and invested in numerous and diverse businesses including real estate, telecommunications, tourism, and aquaculture.  In the mid-2000s, my business interests suffered and I sustained a number of substantial losses.

While living in Romania, I complied with all Romanian tax laws and hired Romanian accountants to keep records and assist with tax compliance.  I was not aware during that time that I had to file United States tax returns simply because I had become a naturalized US citizen.  Nor did my accountants inform me of that fact.  I reasonably believed that I had no US tax obligations for income from Romania when I was living in Romania and paid taxes to Romania.

Up to about 2000, I had some US source income from an S corporation.  I was issued a K-1 and I filed returns reporting that income and paying any tax which I understood was my only obligation under US tax laws.  During my 22 years of living in Romania, I was registered with the US embassy in Romania.  During all that time, the US embassy never contacted me about any tax returns due.  I had no reason to believe that the taxing jurisdiction of the United States differed from other foreign countries that tax earnings only in the jurisdiction where the income was generated.

Based on the English grammar that I learned in school, when you balance the conflicting paragraphs from the US-Romania tax treaty: A "art4-3 a contracting state MAY tax its citizens" and B "art 7-1 business profits : Industrial or commercial profits of

DOJ 000276

a RESIDENT of one of one of the Contracting states SHALL BE EXEMPT from tax by the other Contracting state" the latter prevails.

My wife and I returned to the United States from Romania in late 2011.  After returning to the United States, I learned that I should have filed US tax returns while I was living in Romania because I am a naturalized citizen.  I engaged a CPA to prepare my tax returns.  I mistakenly believed that I needed to file tax returns for all the years that I was absent from the United States.  Additionally, after reading the United States-Romania Tax Treaty, I believed that, because I was exclusively a Romanian resident during those years, only Romania could tax my income.  I discussed this with my CPA and he agreed with this conclusion.  The CPA and I prepared and filed 22 years of tax returns in May of 2012.  Because I had a mistaken understanding of the United States – Romania Tax treaty, which on its face appears to limit taxation to the country of residency, and because of the CPA's advice, I mistakenly understood that the filing of the back returns was simply a formality.  As a result, in preparing those returns I estimated my income from each year based on my recollection which amounts I believed were approximately correct .  I did not consult any financial records (which they were all in Romania), nor did I claim any business deductions, losses or expenses on those returns.  Following the accountant's advice, I excluded the entire amount of the reported income, expressly relying on the United States-Romania tax treaty.

I never understood, until I returned to the United States, that I was required to file US tax returns for the Romanian income.  Nor did I understand that the CPA's and my interpretation of the United States-Romania tax treaty was incorrect (i.e., it did not exclude my Romanian income from U.S. taxation).  Indeed, the treaty's "savings clause", which allows the United States to tax its citizens' income despite the treaty, is an obscure provision.

I was also completely unaware that I had to file Forms 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations with my US tax returns.  My CPA was aware that I had interests and stock ownership in several Romanian companies.  However, he failed to advise me that I had to complete any additional forms concerning my ownership of these foreign companies.

In September of 2012, I contacted Mr. Farley Katz of the law firm of Strasburger & Price to assist me in resolving my outstanding tax issues.  Mr. Katz contacted the IRS concerning a way to resolve my outstanding tax issues.  After several communications with the IRS, Mr. Katz advised me that we should prepare amended returns to file with the IRS.  On January 9, 2013, Mr. Katz hired Lynn Booker, a CPA with Booker, Arceneaux, Laskowski & Myers, LLP in San Antonio, to assist me in preparing my amended returns 1040X for prior years.  During the course of preparing these returns, Mr. Booker informed me of the necessity of filing Forms 5471 with my returns.  This was the first time I had ever heard of Form 5471.  Prior to engaging Mr. Booker, I was unaware of the existence of this form, let alone the requirement of filing this form with my tax returns.

DOJ 000277

As all of the books and records for my Romanian companies are still in Bucharest, Romania, I introduced Mr. Booker to my administrative assistant Mr. Jenia Strungaru. Mr. Strungaru is in Bucharest and speaks fluent English.  Mr. Booker and Mr. Strungaru emailed each other and spoke on the phone frequently (despite the eight hour time zone difference) to gather the information necessary to complete the Forms 5471.  I had interests in over 40 Romanian companies during 2006 through 2011 and had voluminous documents in connection with my ownership of these companies.

Mr. Strungaru and my head accountant in Romania spent thousands of hours gathering the information necessary to complete approximately 140 Forms 5471.  Mr. Strungaru and my head accountant spent approximately 2,000 hours and 1,500 hours respectively on the project.  Additionally, 10 other accountants in other locations in Romania spent about 1,000 hours on this project.  Finally, I had other 5-10 persons spend approximately 4,500-5,000 hours to gather additional information.

The preparation of the Forms 5471 was a massive undertaking.  First, it took some time for my Romanian professionals to learn and understand the Form 5471 and the various schedules.  Mr. Booker spent many hours assisting Mr. Strungaru and the accountants in learning how to complete the required schedules.  Additionally, my people had to spend significant numbers of hours gathering records and information throughout various locations in Romania and from several archives.  My accountant also had to obtain documents from the Romanian courts and other local fiscal authorities.  Once my accountant gathered the information, they spent hundreds of hours translating the documents from Romanian into English.  Also, my professionals had to spend a lot of time learning the American method of accounting as it is different from the Romanian accounting method.  After my professionals completed translating all the documents and necessary information, they spent hundreds of hours inputting the data into the correct format and filling out the Forms 5471 and accompanying schedules to the best of their knowledge and ability.

After the Romanian professionals completed the 140 Forms 5471, Mr. Strungaru sent the Forms 5471 to Mr. Booker.  Mr. Booker reviewed and revised the Forms 5471 to comply with the Form 5471 Instructions.  Mr. Booker spent about 400 hours between January and October in assisting my Romanian professionals and reviewing and revising the Forms 5471.

In the course of preparing the amended returns and the Forms 5471, I spent many hours emailing and talking on the phone with both Mr. Katz and Mr. Booker.  I also met in person with Mr. Katz and Mr. Booker on several occasions in their offices in San Antonio.  I was constantly providing information and additional details concerning the items reported on the return.  Also, I routinely reviewed drafts of the returns as Mr. Booker prepared them.  On September 5, 2013, I participated in a phone call with Mr. Katz and Mr. Booker in which we finalized the returns and Mr. Booker prepared the returns for my signature.  On September 10, 2013, I signed the returns and sent them to Mr. Katz.  Mr. Katz then submitted the returns to the IRS on September 12, 3013.

1459498.3/SPSA/26861/0101/021414

Throughout the entire time I lived exclusively in Romania, I was simply unaware, as many other United States citizens in similar circumstances, that I had any United States filing obligations with respect to Romanian income, including filing Forms 5471. Although I dealt routinely with foreign accountants, I was never informed that I had any United States tax obligations.  Upon returning to the United States and discovering the facts, I immediately attempted to correct my mistakes and acted in good faith to comply with my tax obligations.  I was not aware of the obligation to file Forms 5471 until I had contacted Mr. Katz and Mr. Booker.  Upon learning of this obligation, I had my professionals in Romania begin gathering the necessary information.  They spent thousands of hours compiling the necessary data and completing the Forms 5471.

Under these circumstances, I did not act negligently and I had reasonable cause for not filing the Forms 5471 timely.  The IRS should not apply any penalties.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

_Alexandru Bittner_   02/19/2014

Alexandru Bittner

1459498.3/SPSA/26961/0101/021414