US DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:19-cv-00415 |
| | ) | |
| ALEXANDRU BITTNER | ) | |
| Defendant. | ) | |

## DEFENDANT ALEXANDRU BITTNER'S RESPONSE TO THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant Alexandru Bittner ("Defendant" or "Mr. Bittner") submits his Response to the United States' Motion for Partial Summary Judgment ("Plaintiff's Motion"), ECF No. 29, and would respectfully show the Court as follows:

## I.   RESPONSE TO THE STATEMENT OF ISSUES

In its Motion, the government purports to seek judgment on three issues: (1) whether Mr. Bittner "is liable for the non-willful FBAR penalties assessed against him" for the years 2007-2010, (2) whether the maximum statutory penalty for non-willful violation of the statute is $10,000 per year (or form) or per bank account, and (3) whether the penalties violate the Eighth Amendment's prohibition of Excessive Fines. *See* Plaintiff's Motion, at ¶¶ 1–3.

As to the first issue, the government's Motion only addressed whether Mr. Bittner had reasonable cause for not timely filing his FBARs. *See* Plaintiff's Motion, at ¶¶ 13–16. Reasonable cause is the first of several defenses Mr. Bittner raised in his Amended Answer. The government entirely ignores several of Mr. Bittner's other defenses. Indeed, nothing is said regarding Mr. Bittner's allegation that the IRS acted arbitrarily and capriciously in failing to apply its FBAR penalty mitigation deadlines and violated his right to be treated like similarly situated taxpayers, right to due process, and right to equal protection under the law. *See* Defendant's First Amended Answer, at ¶¶ 56–63, ECF No. 13. It also does not respond to his allegation that the excessively large assessment

violates the APA as it is arbitrary, capricious, an abuse of discretion and unwarranted by the facts. *Id.* at ¶¶ 64–72. Nor does the government address Mr. Bittner's Sixth Defense, that the assessment is an improper criminal sanction (*Id.* at ¶¶ 82–84) or his Seventh Defense that the assessment is unconscionable punishment (*Id.* at ¶¶ 85–91). Since these defenses have not been addressed, the Court could at most rule on reasonable cause and not whether Mr. Bittner owes the penalties.[1]

## II.  **INTRODUCTION**

The Defendant believes this case involves the largest aggregate non-willful penalty ever imposed by the government against an individual for filing delinquent Reports of Foreign Bank and Financial Accounts (FBARs). In 2017, approximately 4 years after Mr. Bittner voluntary filed correct FBARs for the years at issue, the IRS assessed non-willful delinquency penalties against him totaling $2.72 million dollars plus interest.

Mr. Bittner was born and grew up in Romania. As a young man he came to the United States ("US") to escape discrimination. Mr. Bittner became a naturalized citizen at the age of 30, and a mere three years later, he returned to Romania where he lived for over 20 years. During the years he resided in Romania, Mr. Bittner became a successful businessman and investor, acquiring a number of interests in companies. He made and lost significant amounts of money. He complied with Romanian tax laws. *See* Alexandru Bittner Statement of Reasonable Cause ("Bittner Reasonable Cause Stmt."), Gov. Ex. 39 to Plaintiff's Motion.

After Mr. Bittner moved back to Romania, he had virtually no contact with the US for nearly 20 years. *See* Declaration of Alexandru Bittner ("Bittner Declaration"), Ex. A to Defendant Alexandru Bittner's Motion for Partial Summary Judgement ("Defendant's Motion"), at ¶ 2, ECF No. 28. He owned no real estate in the US, lived in Romania, spoke exclusively Romanian, and only visited the US on 3 or 4 occasions. *See* Ex. A, Bittner Tr. 260:10-262:2; 240:19-241:17, attached

---

[1] The government has excluded the year 2011 from its Motion, so that year is not in issue.

hereto as Ex. A. Like many other dual citizens who reside outside of the US, Mr. Bittner was

unaware that he was required to file US income tax returns reporting income earned and taxed

outside of the US. *See* Alexandru Bittner Streamlined Certification Statement ("Bittner

Certification"), at ¶¶ 4-5, attached hereto as Ex. B. While in Romania, Mr. Bittner had no idea about

the existence of FBARs or his legal obligation to file information reporting forms to the US

government about his interests in non-US bank accounts. *See* Bittner Declaration, Ex. A to

Defendant's Motion, at ¶ 2.

Shortly after Mr. Bitter returned to the US, he hired a local CPA, Mr. Jeff Beckley ("CPA

Beckley'), in order to come into compliance with his US tax-related obligations. *Id.* at ¶ 3. CPA

Beckley advertised that he had experience assisting US citizens living and earning money abroad. *Id.*

CPA Beckley prepared and filed Form 1040 tax returns for Bitter for the years 1990-2011. *Id.* CPA

Beckley also prepared and filed FBARs on behalf of Bitter for the years 1996-2011. *Id.* Unknown to

Mr. Bittner, CPA Beckley made numerous errors in preparing the tax returns and FBARs. *Id.* at ¶ 4.

In 2012, Mr. Bittner engaged tax counsel and a new CPA, who prepared corrected FBARs

and amended tax returns. *Id.* at ¶ 5. In 2013, prior to IRS's commencement of its income tax and

FBAR examinations, Mr. Bittner filed corrected FBARs and amended tax returns for the years at

issue. *Id.*; *see* Reach Tr. 34:12-25; 35:1-12, attached hereto as Ex. C.

Mr. Bittner's amended tax returns showed a total liability of $625 because of foreign tax

credits and capital losses. *See* Bittner Declaration, Ex. A to Defendant's Motion, at ¶ 5. Following an

examination, the IRS issued a Notice of Deficiency for those years, proposing to assess millions of

dollars in additional tax liabilities. *See* Tax Court Notice of Deficiency, attached hereto as Ex. D. Mr.

Bittner challenged the Notice of Deficiency before the United States Tax Court, and ultimately, the

Tax Court entered an agreed decision that Mr. Bittner owed no taxes for the years 2008, 2009, and

2010 and modest amounts for the years 2007 and 2011, all of which have been paid, including the

estimated interest due thereon. *See* Bittner Deposition Def. Ex. 20, attached hereto as Ex. E; Ex. A, Bittner Tr. 283:11-284:10.

The IRS had no knowledge that Mr. Bittner was delinquent on concerning any US tax and information reporting obligations until he came forward and made a voluntary disclosure by filing tax returns and FBARs. *See* Ex. C, Reach Tr. 16:5-25.

The relevant statute provides that no penalties should be imposed if Mr. Bittner had "reasonable cause" for his failure to file FBARs. 31 U.S.C. § 5321(a)(5)(B)(ii). IRS guidance on the statute and regulations on closely related penalties provide that "reasonable cause" depends on all the relevant facts and circumstances and that "no single factor is determinative." *See e.g.*, 26 U.S.C. § 6038(c)(4)(B) & 26 C.F.R. § 1.6038-3(k)(4); 26 U.S.C. § 6038A(d)(3) & 26 C.F.R. § 1.6038A-4(b)(2)(iii); 26 U.S.C. § 6038D(g) & 26 C.F.R. § 1.6038D-8(e)(3). The IRS contends that because Mr. Bittner did not ask someone in Romania whether he had to report his bank accounts to the IRS—a question he did not even know to ask—he should be penalized at least $1.7 million, and as much as $2.72 million, for his innocent failure to file FBARs for the years 2007-2011; forms that the IRS did not use here except for the purpose of imposing penalties. The IRS further contends that Mr. Bittner should not have any opportunity to present evidence and the Court should summarily enter judgment against him. For the following reasons, the government's Motion should be denied.

### III. RESPONSE TO THE STATEMENT OF UNDISPUTED FACTS

#### A. The Government ignores Rule 56, Misstates the Relevant Facts, and Impermissibly Interprets all Evidence in its Favor

Under Rule 56, the movant must show that there is no dispute as to any material fact and that it is entitled to judgment as a matter of law. All evidence is viewed in the light most favorable to the nonmovant, here Mr. Bittner. *See W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 233 (5th Cir. 2019). The government, however, disregards these rules in its "Statement of Undisputed Material Facts."

Mr. Bittner testified and submitted multiple sworn declarations that, when he lived in Romania, he was entirely unaware of the existence of FBAR forms. *See* Ex. A, Bittner Tr. 223:3-21, 232:5-7, 273:20-274:22; *see also* Bittner Declaration, Ex. A to Defendant's Motion, at ¶ 2; Ex. B, Bittner Certification, at ¶ 9. The IRS has, in fact, recognized that US citizens residing abroad are often unaware of their FBAR obligations. *See, e.g.,* FS-2011-13, attached hereto as Ex. F. Importantly, when Mr. Bittner learned of his obligation to file FBARs, soon after returning to the US, he took remedial action in an effort to come into compliance.  Ex. B., Bittner Certification, at ¶7.  After obtaining competent tax counsel and discovering that his initial FBAR filings were not accurately prepared, he promptly engaged a new CPA to correct them.  *Id.* The corrected FBARs were filed in September of 2013.  *See* Ex. C, Reach Tr. 26:11-27:4. As further evidence of good faith, Mr. Bittner attached a 36-page spreadsheet to those corrected FBARs, which provided detailed information about each account.[2]  *See id.* at 40:1-10. Additionally, during the examination phase, Mr. Bittner supplied the IRS with significant amounts of information related to the accounts, which Agent Reach entirely relied upon to compute the penalty assessments. *See id.* at 16:5-16, 26:24-25-27:1-4, 40:1-25-41:1-25, 46:2-7, 63:18-21, 85:5-8.

Plaintiff's Motion ignores basic material facts, misstates evidence and testimony, misleadingly omits facts, cites entirely irrelevant facts, and interprets the evidence in the light most favorable to plaintiff, the movant.  The result is to paint a false picture of Mr. Bittner as a highly sophisticated businessman, savvy to the intricacies of international taxation whose actions are skillfully designed to avoid US taxation.  This entirely mischaracterizes the actual summary judgment evidence.

For example, in the mid-1990s after Mr. Bittner left the US, he invested in a restaurant in Los Angeles owned by his brother-in-law, apparently an S-corporation. *See* Bittner Declaration, Ex. A to Defendant's Motion, at ¶2; *see also* Ex. A, Bittner Tr. 31:22-32:21. After he moved to Romania,

---

[2] Because he had a financial interest in more than 25 accounts, that information was not required to be reported on his FBARs.

he understood that he was supposed to report to the US, on an individual Form 1040 tax return, income he received from the restaurant in Los Angeles. Ex. B., Bittner Certification, at ¶5. However, he did not know or understand that he was required to report to the US or pay US income taxes on income earned in Romania. *See* Ex. A, Bittner Tr. at 31:22-32:21, 245:15-246:3; Bittner Declaration, Ex. A to Defendant's Motion, at ¶3. When he lived in Romania and had income from the Los Angeles restaurant, 1997 through 2000, his sister prepared 1040s for him reporting that US income, which he signed and sent back to her. *See* Ex. A, Bittner Tr. 248:17-250:7. The government, however, states simply that he filed "tax returns" (*See* Plaintiff's Motion, at ¶ 10), without disclosing that those returns included *only* modest amounts of US income,[3] to give the false impression that Mr. Bittner knew he had to report his Romanian income.

Other facts the government cites are irrelevant and do not show that Mr. Bittner had any knowledge about FBARs. For example, the fact that Mr. Bittner has a degree in mechanical engineering from a "good" university in Romania (*See* Plaintiff's Motion, at ¶ 1) shows nothing about his sophistication regarding FBARs. *See* Ex. A, Bittner Tr. 16: 25-17:12. Similarly, the government argues that the fact that Mr. Bittner used a corporation to purchase some apartments in Brussels shows he "was sophisticated enough to put his apartments in the name of an entity." *See* Plaintiff's Motion, at ¶ 7. That has no relevance to Mr. Bittner's knowledge of US banking laws, or US information reporting obligations for citizens who have non-US bank accounts. The government further states that Mr. Bittner "negotiated deals with the Romanian government to purchase government assets" and "used lawyers and sought legal advice when negotiating deals with the Romanian government." *See* Plaintiff's Motion, at ¶ 9. But there are no facts whatsoever about the specifics of the actual negotiations and no reason to believe, as the government seems to suggest, that they were so difficult that Mr. Bittner had to be an expert on international business. To the

---

[3] Total income reported on those original Form 1040s was from $20,312 to 52,381. *See* Form 886-A, Explanation of Items for Income Tax Examination, at p. 3, attached hereto as Ex. G.

6

contrary, Mr. Bittner testified that a lawyer, who was a general civil lawyer and not a business specialist, sat with him and corrected his mistakes. *See* Ex. A, Bittner Tr. 91:15-92:16, 94:21-95:9-17. The fact that Mr. Bittner was generally aware that under US law he was required to declare cash of $10,000 or more upon entering the US (*See* Plaintiff's Motion, at ¶ 34) shows only that he read the cards airlines hand out before landing in the US (or heard someone explain them). And the fact that Mr. Bittner was aware that funds deposited in US bank accounts are government insured (*See* Plaintiff's Motion, at ¶ 33) hardly needs comment. The government goes so far as to state that Mr. Bittner was "intelligent enough to know about, and the difference between, the Napoleonic and Anglo-Saxon legal codes." *See* Plaintiff's Motion, at ¶ 35. In fact, there is no "Anglo-Saxon legal code" and Mr. Bittner's general understanding that there are different legal systems has no bearing on whether he knew anything about FBARs.

Another of the government's themes is that Mr. Bittner made millions of dollars of income in Romania and had investments in many companies. *See* Plaintiff's Motion, at ¶¶ 10-19, 22, 28-29. Mr. Bittner certainly was a successful businessman in Romania. The government, however, overstates that success. For example, it states that "During 1990-2011, Bittner generated some $70,537,310 of income through his foreign businesses and investments…" *See id.*, at ¶ 11. This is false. The government cites Govt. Ex. 31 for this number. *See id.*, at ¶ 11. That exhibit is a summary of estimates of five different and unrelated items, which includes bank balances and gross sales proceeds, prepared by Mr. Bittner's assistant in Romania to give to Mr. Bittner's initial CPA, Beckley. The government has simply added together all these different numbers, though they are but an amalgamation of unrelated sums prepared for a different purpose. The sum is meaningless and does not represent "income".  Moreover, there was extensive testimony that this schedule, which was used by CPA Beckley to prepare Mr. Bittner's original tax returns, overstates sale amounts, understates or ignores cost basis and losses, and incorrectly reports some non-taxable transfers as taxable. As a result of these and other errors, Mr. Bittner hired a different CPA to correct his tax

B6544\A63010\4831-4013-9194.v3

returns for the years 2006-2011. Those amended returns showed a total amount of tax due of $625, which Mr. Bittner paid in 2013 at the time the amended returns were filed. Bittner Declaration, Ex. A to Defendant's Motion, at ¶ 5.

In any event, the government does not state what significance earning a lot of money from business investments over many years supposedly has.  It is not a crime to be a successful businessman. The government might be suggesting that Mr. Bittner made great amounts of money and therefore may have been avoiding his US tax liability. But there is no evidence of that. In fact, the evidence is to the contrary.  The evidence shows that even though Mr. Bittner, individually, had high amounts of gross income in some years, he paid taxes on that income in Romania; and, as a result of tax credits for those taxes, corrected basis in assets, and certain losses, he ultimately owed no tax liabilities for the years 2008, 2009 and 2010, and modest deficiencies for the years 2007 and 2011, which have been paid in full.  *See* Ex. E; Ex. A, Bittner Tr. 283:11-284:10.

In a similar vein, the government states that Mr. Bittner transferred $2.5 million in 2010 and 2011 from his Romanian bank accounts to U.S. bank accounts owned by him, his wife, daughter and brother-in-law. *See* Plaintiff's Motion, at ¶¶ 13-16. Those transfers were legal transfers of his money to the US for legitimate purposes and have no relevance here.  *See* Ex. A, Bittner Tr. 150:18-157:2, 175:18-176:7. It is hard to see how transferring one's own legal money from outside of the US to be used for legal purposes in the US can be viewed as wrong. Moreover in 2011, Mr. Bittner and his wife moved back in the US – of course they would transfer funds to the country where they planned to live.

The government also mischaracterizes Mr. Bittner's bank accounts. The vast majority of accounts were in Romania, and all accounts were used for legitimate personal and business purposes. Mr. Bittner also had a personal account at a bank in Switzerland and a personal account at a bank in Liechtenstein. In addition, he owned more than 50 percent of a number of Romanian companies and consequently is treated as having a "financial interest" in those company bank

8

accounts for FBAR purposes, even though he had no signature control over them (because he did not run the day-to-day operations). All of those company accounts served legitimate business purposes. Most importantly, the IRS conceded that Mr. Bittner had no unreported income in the years at issue from *any* of his bank accounts. *See* Joint First Supplemental Stipulation of Settled Issues for United States Tax Court, Docket No. TL-19894-17, attached hereto as Ex. I. The government, however, starts off its brief by suggesting this case is about Swiss bank accounts.  It narrowly focuses on Mr. Bittner's account at the Royal Bank of Canada in Switzerland (*See* Plaintiff's Motion, at ¶ 5). As Mr. Bittner testified, he wanted to keep some money in a safer location than Romania which was historically unstable.  *See* Ex. A, Bittner Tr. 170:21-171:2. The government's brief also highlights the Liechtenstein account (*See* Plaintiff's Motion, at ¶ 6). The Liechtenstein account was established because Mr. Bittner had two rental apartments in Brussels. *See id.* at 104:23-105:1-17, 163:4-164:9. In all the years in issue, that account had a nominal balance of under $10,000. *See* Plaintiff's Motion, at Ex. 42, p. 000296.

The government also falsely portrays Mr. Bittner as not cooperating with the IRS examination of his returns and FBARs.  It states that Mr. Bittner "*now* admits" that he was required to file FBARs (*See* Plaintiff's Motion, at ¶ 28, emphasis supplied), suggesting that he just recently made such admission. The government ignores, however, that Mr. Bittner informed the IRS that he had not filed returns or FBARs in 2012 when he learned of those obligations and hired a CPA to prepare and file those forms. *See* Bittner Declaration, Ex. A to Defendant's Motion, at ¶ 3. And it fails to acknowledge that in 2013, Mr. Bittner filed corrected FBARs voluntarily reporting all details about all foreign accounts. *See* Ex. C, Reach Tr. 26:2-25-27:1-4. The government similarly asserts that the examining agent stated "The IRS cannot issue a summons for foreign bank records to a foreign jurisdiction," (*See* Plaintiff's Motion, at ¶ 27), ignoring the fact that Mr. Bittner voluntarily provided all bank records he had and could obtain going back many years, and that the IRS relied

9

exclusively on those records and the workpapers prepared by Mr. Bittner's representatives to make its assessments. *See id.* at 16:5-16, 26:24-25-27:1-4, 40:1-25-41:1-25, 46:2-7, 63:18-21, 85:5-8.

Finally, the government notes that Mr. Bittner did not ask persons in Romania, Liechtenstein or the U.S. embassy whether he had an obligation to file FBARs on his accounts, and "simply did not care about learning foreign bank reporting laws." *See* Plaintiff's Motion, at ¶¶ 36-44. It quotes two words from his deposition: that he "did not 'feel like'" inquiring about his foreign bank reporting obligations." *See id.* at ¶ 38.

Again, the government ignores the context and falsely portrays Mr. Bittner's testimony.  Mr. Bittner was asked at least a dozen times whether he had asked accountants or lawyers in Romania about his US tax obligations and bank reporting obligations, and he repeatedly answered that he did not because they were Romanian and did not know about US laws. *See* Ex. A, Bittner Tr. 131:2-13, 210:19-211:16, 239:1-240:18, 244:1-24; 272:23-273:8.  Moreover, since Mr. Bittner had no knowledge that FBARs even existed, why would he ask anyone about his obligation to file such reports?

The government's suggestion of bad faith is undermined by the fact that, as soon as Mr. Bittner returned to the US and learned he was required to file returns reporting income earned outside of the US, he hired a CPA to assist him. *See* Bittner Declaration, Ex. A to Defendant's Motion, ¶ 3. Despite the fact that the CPA told him he only needed to file 6 years of forms, he wanted to come into complete compliance. *See* Beckley CPA Notes, p. 000027, attached hereto as Ex. K. Thus, he filed 16 years of FBARs (and 22 years of income tax returns). *See* Bittner Declaration, Ex. A to Defendant's Motion, ¶ 3. This was before the IRS had any awareness he existed. *See* Ex. C, Reach Tr. 34:12-15. After obtaining competent tax counsel and discovering that his initial FBAR filings were not accurately prepared, he promptly engaged a new CPA to correct them. *See* Bittner Declaration, Ex. A to Defendant's Motion, ¶ 5. The corrected FBARs were filed in September of 2013, before the IRS opened an examination. *See* Ex. C, Reach Tr. 34:12-15. As further evidence of good faith, Mr. Bittner attached a 36-page schedule to those corrected FBARs,

which provided detailed information about each account. *See id.* at 40:1-10. These facts show a

person who, like many other dual citizens living abroad, was unaware of FBARs, but when he

learned he should have filed them, acted in good faith to correct his mistake. And, Mr. Bittner's

filing 22 years of tax returns and 16 years of FBARs hardly shows that he is sophisticated about

these matters.

## IV. ARGUMENTS AND AUTHORITIES

### A. Mr. Bittner had Reasonable Cause for Failure to Timely file the FBARs at Issue

### 1. Whether Mr. Bittner had Reasonable Cause for Failing to Timely File Depends on all the Facts and Circumstances, No Single Factor is Determinative

Under 31 U.S.C. Section 5321(a)(5)(B)(ii), Mr. Bittner is not liable for any penalty if he had

"reasonable cause" for failure to timely file FBARs and has reported the balance in his accounts.

The government does not dispute that Mr. Bittner's has accurately reported the balances in his

accounts.  It does contend, however, that he did not have "reasonable cause" for not filing those

FBARs timely.  And, the government requests that this Court rule, as a matter of law, that Mr.

Bittner did not have reasonable cause.

As the government recognizes (*See* Plaintiff's Motion, ¶ 13), "reasonable cause" is not

defined in the Bank Secrecy Act or the regulations issued under it.  The term, however, appears

some 85 times in the Internal Revenue Code (Title 26 USC) and countless times in the IRS's

employee manual in relation to Title 26 obligations.  Some of these Title 26 provisions are similar to

the FBAR filing requirement.  For example, 26 U.S.C. § 6038(a) requires US persons to file

information forms on certain foreign entities they have interests in (done on IRS Form 5471). Like

the FBAR provisions, there is a $10,000 penalty (per year) for failure to comply, which can increase

to $50,000 if the taxpayer fails to comply after notice.  26 U.S.C. § 6038(b)(1) & (2). The penalty

does not apply, however, to delays in complying for which the taxpayer had "reasonable cause" and

the relevant regulations provide that "reasonable cause" shall be "determined … under all the facts and circumstances." 26 U.S.C. § 6038(c)(4)(B); 26 C.F.R. § 1.6038-3(k)(4).

Similarly, Code section 6038A requires domestic corporations which are owned 25 percent or more by foreign persons to file information returns (which is done on IRS Form 5472). *See* 26 U.S.C. § 6038A. There is a penalty of $25,000 per year which can increase if non-compliance continues after notice. 26 U.S.C. § 6038A(d).  No penalty is imposed, however, if the non-compliance was due to "reasonable cause."  26 U.S.C. § 6038A(d)(3).  The regulations provide that: "The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all pertinent facts and circumstances."  26 C.F.R. § 1.6038A-4(b)(2)(iii).

Code section 6038D similarly requires taxpayers to disclose certain "specific foreign financial assets," which is done on IRS Form 8938. 26 U.S.C. § 6038D.  Failure to timely provide the required information is subject to a $10,000 penalty which can increase to $50,000 if the taxpayer fails to comply after notice.  26 U.S.C. § 6038D(d). No penalty is imposed, however, if the failure to comply was due to "reasonable cause and not due to willful neglect." 26 U.S.C. § 6038D(g). Like all these provisions, the regulations provide that: "The determination of whether a failure to disclose a specified foreign financial asset on Form 8938 was due to reasonable cause and not due to willful neglect is made on a case-by-case basis, taking into account all pertinent facts and circumstances." 26 C.F.R. § 1.6038D-8(e)(3).

Although there is no statute or regulation under Title 31 defining or explain "reasonable cause," the IRS has issued guidance confirming that "reasonable cause" for not timely filing an FBAR is based on all the relevant facts and circumstances, and it has provided examples of facts that indicate an individual may or may not have reasonable cause. *See* Ex. F, FS-2011-13 at pp. 2-3.

It is common for individuals living abroad for many years not to be aware of their obligation to file FBARs, especially nonresident dual citizens who comply with their local laws.  For example,

12

in 2002, the Treasury Department issued a report on FBAR compliance and estimated "that there may be as many as 1 million U.S. taxpayers who have signature authority or control over a foreign bank account and may be required to file FBARs," but "the approximate rate of compliance with the FBAR filing requirements … could be less than 20 percent."[4] The Report noted that the "primary notification to a person that it may need to file an FBAR form … is the guidance provided in the IRS Form 1040, U.S. Individual Income Tax Return and accompanying instructions" and acknowledged that "there appear to be a number of taxpayers who fail to file because of lack of knowledge or confusion about the filing requirements."[5]

In 2011, the IRS issued specific guidance on determining whether dual citizens living abroad and were unaware of their obligation to file FBARs had reasonable cause. *See* Ex. F, Fact Sheet 2011-13 at pp. 2-3. Consistent with the regulations regarding reasonable cause for tax forms, the IRS stated that the determination of reasonable cause is "based on all the facts and circumstances" and that "no single factor is determinative." *See id.* The government, however, here completely ignores this direct authority on the specific issue before it.

In Fact Sheet 2011-13, the IRS thus addressed dual citizens living abroad who were unaware of their obligation to file FBARs, but who "are now aware of their filing obligations and seek to come into compliance with the law." *See id.* at p.1. The IRS gave an example of an individual who had a foreign checking account exceeding $10,000 but was not aware of his filing obligation until "reading recent press and learning of his FBAR filing obligations." *Id.* at p. 4. There, the taxpayer attached a written explanation why he did not file timely. The IRS did not claim that all taxpayers are deemed to know the law and consequently automatic penalties apply. Instead, the "IRS will

---

[4] Secretary of the Treasury, "A Report to Congress in Accordance with §361(b) of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA Patriot Act)" (Apr. 26, 2002) at 6, online at https://www.treasury.gov/press-center/press-releases/Documents/fbar.pdf  (hereinafter "Report to Congress").
[5] *Id.*

determine whether the violation was due to reasonable cause based on all the facts and circumstances." *Id.* Fact Sheet 2011-13 also described factors that would support and oppose a finding of reasonable cause for not timely filing FBARs:

> Factors that might weigh in favor of a determination that an FBAR violation was due to reasonable cause include reliance upon the advice of a professional tax advisor who was informed of the existence of the foreign financial account, that the unreported account was established for a legitimate purpose and there were no indications of efforts taken to intentionally conceal the reporting of income or assets, and that there was no tax deficiency (or there was a tax deficiency but the amount was de minimis) related to the unreported foreign account, among others. *See id.* Factors that might weigh against a determination that an FBAR violation was due to reasonable cause include whether the taxpayer's background and education indicate that he should have known of the FBAR reporting requirements, whether there was a tax deficiency related to the unreported foreign account, and whether the taxpayer failed to disclose the existence of the account to the person preparing his tax return.

*See id.* at pp. 4-5. Though no single factor is determinative, the factors weigh in Mr. Bittner's favor.

**2. Summary Judgment is not Appropriate to Determine Reasonable Cause**

Summary judgment is ordinarily not an appropriate method of resolution of issues that depend on all the relevant facts and circumstances such as whether an individual acted with reasonable cause.  *See Davidson v. Stanadyne, Inc.,* 718 F.2d 1334, 1339 (5th Cir. 1983) (internal citation omitted)  ("Where . . . the decision of a question of law by the Court depends upon an inquiry into the surrounding facts and circumstances, the Court should refuse to grant a motion for a summary judgment until the facts and circumstances have been sufficiently developed to enable the Court to be reasonably certain that it is making a correct determination of the question of law.); *see also Matthews v. Ashland Chemical, Inc.,* 703 F.2d 921, 925–26 (5th Cir. 1983).

**3. In Any Event, the Summary Judgment Evidence Shows that Mr. Bittner had Reasonable Cause for his Untimely FBARs**

Even assuming that it was appropriate to resolve this deeply factual question at the summary judgment stage, applying the FS 2011-13 factors to the instant facts, Mr. Bittner had reasonable cause for filing his FBARs late.  All the unreported accounts were "established for a legitimate

B6544\A63010\4831-4013-9194.v3

purpose…," i.e., his personal and business needs in Romania (and for the apartments in Brussels) and the operating accounts of companies he invested in. He paid his taxes in Romania,[6] and he took no actions "to intentionally conceal the reporting of income or assets" from either the Romanian government or the IRS.[7] To the contrary, he voluntarily disclosed all his income, sales, investments and bank accounts to the IRS before it had any awareness of those. Significantly, "there was no tax deficiency" for most of the years here in issue – 2008, 2009 and 2010. And the tax deficiencies for the other two years ($46,386 for 2007 and $127,000 for 2011) were not "related to [an] unreported foreign account,"[8] and are modest in any event.

In addition, since Mr. Bittner honestly, but incorrectly, believed he was not required to file US tax returns reporting his Romanian income, he never saw the "primary notification to a person that it may need to file an FBAR form," namely "the guidance provided in the IRS Form 1040, U.S. Individual Income Tax Return and accompanying instructions."[9]

The government ignores and does not cite the IRS guidance on dual citizens failing to file FBARs in FS 2011-13, which is directly applicable here. It similarly ignores the guidance in regulations dealing with similar forms, which all provide that the reasonable cause test is based on all the facts and circumstances. Instead, it first states that taxpayers "are generally charged with the knowledge of the law..." Plaintiff's Motion at p.14. If that principal were enough here, the facts would be entirely irrelevant; anyone who failed to timely file would be punished. The references in

---

[6] *See* Joint Second Supplemental Stipulation of Settled Issues for United States Tax Court, Docket No. TL-19894-17, attached hereto as Ex. J.

[7] Mr. Bittner did arrange to have certain investment assets held in the name of nominees, and he opened two numbered accounts for the legitimate purpose of keeping his ownership private. He was well known in Romania, Jewish, and he wanted to conceal his name for legitimate business purposes and privacy: "let's say I wanted to buy this property. Who wanted to buy the property? Bittner. Oh, double the price." *See* Ex. A, Bittner Tr. 164:12-166:18; 173:6-12. This was not done for tax reasons.

[8] Although the IRS did an analysis of Mr. Bittner's personal bank accounts and asserted in a statutory notice of deficiency that there was unreported income in those accounts, Mr. Bittner disputed that assertion before IRS Appeals and in his Tax Court proceeding. He presented extensive evidence and analysis regarding the Agent's flawed bank deposit analysis. *See* Declaration of Laura Sanders, attached hereto as Ex. L. The IRS conceded all "adjustments for Unexplained Bank Deposits as stated in the notice of deficiency." *See* Joint First Supplemental Stipulation of Settled Issues for United States Tax Court, Docket No. TL-19894-17, attached hereto as Ex. I.

[9] Report to Congress, at 6.

15

the regulations to "all the facts and circumstances" would be superfluous, and FS 2011-13 and the Streamlined Filing Compliance Procedures developed by IRS would be entirely pointless.[10] Moreover, imposing millions of dollars of fines on a no-fault basis would surely violate due process as well as the "unreasonable fines" clause of the Eighth Amendment. *See, infra*, Section B(3).

The government, however, does not base its argument on that point.  Its real argument is that "Bittner is an educated, sophisticated and successful businessman who has knowledge about several U.S. banking and U.S. Customs' regulations but failed to exercise ordinary business care and prudence in regard to learn[ing] about his foreign account reporting requirements." Plaintiff's Motion at p. 14.  This assertion is full of factual statements, the significance of all of which is in dispute.  None of these facts show that he knew anything about FBARs.  Instead, the unrefuted evidence is that he didn't.

The government cites a number of FBAR cases which held that certain individuals did not have reasonable cause.  Significantly, the facts in those cases are very different from Mr. Bittner's unique circumstances.  They all involved persons who lived or grew up in the US.  None involved dual citizens who lived abroad for over 20 years.  All involved persons who signed tax returns that explicitly included the check-the-box question as to whether they had foreign bank accounts, which put them on notice of the issue.  In fact, those persons concealed from their US return preparers that they had foreign accounts, and those who prepared their own returns falsely checked the box "no" or left it blank.  In all but one, the persons had set up bank accounts in countries where they did not live.  All involved exclusively personal accounts, although one involved a corporation that

---

[10] The IRS Streamlined Filing Compliance Procedures provide relief from FBAR penalty assessments, and other international information return penalties, as well as tax-related penalties for eligible taxpayers who apply to participate and certify that their failure to report foreign financial assets and pay all tax due in respect of those assets did not result from willful conduct.  The Streamlined Filing Compliance Procedures were announced in 2012 for nonresidents, and in 2014 the Procedures were modified and expanded to include certain residents.  See IRS Streamlined Filing Compliance Procedures, *available at* https://www.irs.gov/individuals/international-taxpayers/streamlined-filing-compliance-procedures (last visited April 16, 2020).

B6544\A63010\4831-4013-9194.v3

owned only one account. None involved legitimate operating accounts held by foreign corporations actively engaged in businesses.

*Jarnagin v. United States,* 134 Fed. Cl. 368 (2017), involved a couple raised and educated in the US who moved to Canada but continued to own and operate U.S. businesses, and Mrs. Jarnagin continued to live partly in the US. Their income tax returns were prepared by accountants in the US, but they did not tell the accountants that they had bank accounts in Canada and the returns they signed and filed stated "no" to the question whether they had foreign bank accounts. *Moore v. United States*, No. C13-2063RAJ, 2015 WL 1510007 (W.D. Wa. Apr. 1, 2015), involved an individual who had set up a Bahamas corporation which ultimately held a Swiss bank account. He did not answer the question whether he had a foreign bank account on one return and lied to his return prepare about that in another year. *United States v. Ott*, No. 19-cv-12174, 2019 WL 3714491 (E.D. Mich. Aug. 7, 2019), involved a US couple who had accounts in Canada. They hired an advisor to prepare their tax returns but did not inform the advisor they had foreign bank accounts. Although it is not discussed, they apparently checked "no" to the foreign bank account question on the returns or did not answer the question. *United States v. Agrawal*, No. 18-C-0504, 2019 WL 6702114 (E.D. Wa. Dec. 9, 2019), involved a naturalized citizen educated in the US who opened Swiss bank accounts where he deposited nearly $1 million. Mr. Agrawal falsely told his return preparers that he did not have any foreign bank accounts and in later years prepared the returns himself but did not answer the foreign bank account question.

In contrast with these cases, Mr. Bittner lived in the US only for a few years as a young man and refugee. He returned to his native country at age 33 where he lived for over 20 years and had minimal contact with the Unites States. While residing in Romania, he complied with Romanian tax laws, but had no awareness that he should have reported his Romanian income or his personal foreign bank accounts or indeed that FBARs even existed. He certainly had no possible reason to suspect that he was required to report bank accounts held by companies he had an interest in. Since

17

he never filed U.S. returns reporting his Romanian income, he was never put on notice by the form that certain bank accounts need to be reported.   He never falsely denied having those accounts and, upon discovering his error, he promptly took steps to rectify it. *See* Declaration of Alexandru Bittner, Ex. A to Defendant's Motion.

### B.  The Non-Willful Penalty is Calculated on a Per Form, not Per Account, Basis

The government claims that a non-willful failure to file an FBAR is subject to a $10,000 penalty per unreported account. *See* Plaintiff's Motion, at ¶ 17. Defendant addressed this argument in his Motion at ¶¶ 24–28, which is adopted herein. As explained in Defendant's Motion, the government misinterprets the regulations, mischaracterizes congressional intent, and ignores the plain language of the non-willful penalty provisions in reaching its conclusion.[11]

### 1.  Congress Intended that Non-Willful Violations be Computed Per Form, Not Per Account

The government's argument that congressional intent supports the proposition that a non-willful FBAR penalty should be computed on a per account basis is incorrect. Before 2004, only willful failures to file an FBAR were penalized. *See* Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 108th Congress, JCS-5-05 No 32, 2005 WL 5783636, at *34–35 (May 2005).   Thus, an individual who non-willfully failed to report one account or fifty accounts would not be subject to any penalty whatsoever.   However, to increase compliance the Congress determined that imposing a modest non-willful penalty of $10,000 was appropriate for that conduct. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821(a), 118 Stat. 1418 (2004).  Now, the government wishes to increase this modest penalty to an unlimited amount. One of its principle arguments is that because the underlying conduct is the same for a willful or non-willful violation, the penalties must be interpreted the same; *See* Motion, at p. 22–23, ECF No. 29.

---

[11] The government's reliance on a district court opinion from the Central District of California to support its position. *Boyd v. United States,* 2019 WL 1976472 (C.D. Cal. Apr. 23, 2019), *on appeal* (9th Cir. No. 19-55585), also is misplaced as *Boyd* was wrongly decided and in any event is not binding. *See* Defendant's Motion, at ¶¶ 24–28.

Not only is this argument absurd, it ignores the plain language of the statute.

Indeed, while both the willful and non-willful penalties penalize an individual who fails to file an FBAR, only one penalty provision - the willful provision - contains any reference to a per account penalty. Importantly, when drafting the non-willful penalty rather than use the willful penalty language as a starting point, Congress chose to enact completely separate and distinct language - language that does not contain a single reference to the number of or balance in the unreported accounts. But, according to the government, because each penalty involves the failure to file an FBAR, this Court should ignore the language of the provisions imposing the non-willful penalty and instead look to the willful provision to compute the penalty. This defies logic. If the willful and non-willful violations were the same, why would Congress have created an entirely separate non-willful provision? Further, the "conduct" as the government argues is not the same for each violation. A willful violator intentionally failed to file an FBAR, while a non-willful violator was innocent or, at most, negligent. Our society routinely punishes intentional violations more harshly than mere negligent violations. This area of the law is no different.

In addition, the government argues that a $10,000 penalty per form does not carry sufficient deterrent value. *See* Motion, at p. 22–25. However, when Congress created the non-willful penalty in 2004, it specifically noted its purpose was to increase compliance, and in doing so, authorized a single $10,000 penalty for a non-willful failure to file. *See* Joint Committee on Taxation, General Explanation of Tax Legislation Enacted in the 108th Congress, JCS-5-05 No 32, 2005 WL 5783636, at *34–35 (May 2005). That the government now feels its deterrence value is not sufficient is of no consequence - congressional intent is determined by what the *Congress* intended, not what the IRS wants to happen.

In sum, Congress determined that in order to increase compliance with FBAR filing requirements, a maximum penalty of $10,000 per year should be imposed for a non-willful failure to file. The government cannot be permitted to ignore the plain language of the statute and

congressional intent and now impose a penalty with seemingly no limits.

**2.  The Reasonable Cause Exception Does Not Support the Government's Erroneous Position**

The government argues that the use of the phrase "balance in the account" in the reasonable cause safe harbor, 31 U.S.C. § 5321(a)(5)(B)(ii), supports its argument that the non-willful penalty applies on a per account basis. *See* Motion, at 21. According to the government, the Congress chose to use the term "account" in the singular because it intended to penalize non-willful violations $10,000 for *each* account that was unreported.

However, as discussed in Defendant's Motion, the government has turned its attention to the wrong provision. *See* id., p. 24–26. Instead, the focus should be on the statutory provisions actually imposing the non-willful penalty - which do not mention the word "account."  31 U.S.C. § 5321(a)(5)(B)(i); *see also Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 135 S.Ct. 913, 919 (2015) ("This is significant because Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another."). Furthermore, the government's interpretation ignores 1 U.S.C. § 1, which provides that when a statute is unclear as to whether the singular or plural applies, the singular shall include the plural. Thus, in the FBAR context, the term "account" includes "accounts."

**3.  Section 5314 Does Not Always, and Did Not Here, Require Providing Any Information on Individual Accounts**

Section 5314 requires that any "report" must include: "(1) the identify and address of participants in a transaction or relationship; (2) the legal capacity in which a participant is acting; (3) the identity of real parties in interest; and (4) a description of the transaction." 31 U.S.C. § 5314(a). The government states that these requirements are met only by providing the required information on an account-by-account basis. *See* Motion, at p.18. The government is incorrect. As explained in Defendant's Motion, if an individual has 25 or more accounts, the regulations and form instruct him

not to list any accounts on an FBAR, but merely to provide the number of such accounts. 31 C.F.R. § 1010.350(g); *see* Defendant's Motion, Exhibits C, D, and E.  Thus, Section 5314's requirements are often met without providing information on specific accounts.

The government here is thus arguing that because Mr. Bittner should have filed an FBAR form in one year stating simply that he had (say) 40 foreign bank accounts, but did not timely file that form, he should be punished by a penalty of 40 x $10,000 or $400,000.  This is unsupported and unreasonable.  Congress did not intend to impose such a gargantuan penalty on such minor and innocent conduct.

### C.  The FBAR Penalty is a Fine, and, Therefore, is Subject to the Eighth Amendment

"The Excessive Fines Clause limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Austin v. United States*, 509 U.S. 602, 609-10 (1993) (internal citations omitted). The government contends that the Eighth Amendment applies only to fines imposed at the culmination of a criminal proceeding where there was a conviction of an underlying crime, and consequently cannot apply to FBAR penalties. *See* Plaintiff's Motion, at 25.

The government is wrong. The argument that the Excessive Fines Clause applies only to criminal offenses was expressly rejected in *Austin*.  *See id.* at 606-611. Rather, it applies to "punishment." "The notion of punishment, as we commonly understand it, cuts across the division between the civil and the criminal law." *Id.* at 610, internal quotations omitted. Accordingly, "the question is not, as the government would have it, whether [a challenged penalty] . . . is civil or criminal, but rather whether it is a punishment." *Austin*, at 610. The Court recognized that "It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both punitive and remedial goals may be served by criminal penalties. A civil penalty may be considered 'punishment' covered by the Eighth Amendment as long as the statute authorizing it possess punitive elements and serves, at least in part, retributive purposes." *Id.*

(internal quotations omitted).[12]

The courts have held various civil penalties to be subject to the Excessive Fines Clause.  *See, e.g.*, *United States v. Mackby*, 261 F. 3d 821 (9th Cir. 2001) ("civil sanctions provided by the False Claims Act are subject to analysis under the Excessive Fines Clause"); *Korangy v. U.S. F.D.A.*, 498 F.3d 272, 277 (4th Cir. 2007) (FDA fine for performing medical procedures after certification lapsed subject to analysis under the Excessive Fines Clause).  As the court stated in *Korangy*:

> The Excessive Fines Clause of the Eighth Amendment prohibits the government from imposing excessive fines as punishment. While Eighth Amendment claims often arise in the criminal context, civil sanctions may fall within the scope of the amendment. *See Austin v. United States*, 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *Thomas v. Commissioner*, 62 F.3d 97, 99 (4th Cir.1995). Civil fines serving remedial purposes do not fall within the reach of the Eighth Amendment. However, if a civil sanction "can only be explained as serving in part to punish," then the fine is subject to the Eighth Amendment. *Austin*, 509 U.S. at 610, 113 S.Ct. 2801.

It cannot be seriously disputed that penalties of $2.72 million for Mr. Bittner's failure to timely file five information forms constitute "punishment."  As the Court stated in *Halper* "a civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term." 490 U.S. at 448.   The relevant statutes demonstrate that the FBAR penalty is a punishment subject to the constraints of the Eighth Amendment. *See* 31 U.S.C. § 5321(a)(5)(A) (referring to a "civil money *penalty*" for failure to file and FBAR); *see also United States v. Simonelli*, 614 F. Supp. 2d 241, 244 (D. Conn. 2008) ("The Bank Secrecy Act and its implementing regulations thus expressly denominate the penalty imposed on Defendant to be a 'civil penalty'"). Furthermore, the FBAR penalties are not simply a revenue raising tax penalty, instead the penalties are a punishment for the failure to report an interest in foreign accounts.[13] *Simonelli*, 614 F. Supp. 2d at 246 (noting the

---

[12] *United States v. Bajakajian*, 524 U.S. 321 (1998), did not state, as the government contends (Plaintiff's Motion at p. 25) that "a punishment [subject to the Eighth Amendment] … requires 'conviction of an underlying crime.'"  Rather, the Court stated only that since the forfeiture before it arose from a conviction, it cannot be denied it was "punishment."
[13] Additionally, "[t]he FBAR penalty also fits the definition of a 'penalty' in Black's Law Dictionary. A penalty is "[p]unishment imposed on a wrongdoer, usu[ally] in the form of imprisonment or fine; esp[ecially], a sum of money exacted as a punishment for either a wrong to the state or a civil wrong (as distinguished from compensation for the

FBAR is not a tax).

Indeed, one of the government's principle arguments for a per account fine is that any other penalty would not sufficiently punish or deter Mr. Bittner. *See* Plaintiff's Motion, at p.17 and 25. Since learning of his FBAR obligations and obtaining a competent CPA (2013), Mr. Bittner has timely and accurately filed an annual FBAR. The government's assessment of $2.72 million in penalties in June of 2017, due to his prior lack of knowledge, has no connection to any ongoing FBAR compliance concerns.  The penalties at issue in this case were assessed solely as punishment.

The government also argues that the statute is remedial because it compensates the government for a loss. *Id.* at 25–26. However, the government has not in fact suffered any loss as a result of Mr. Bittner's failure to file FBARs, much less a loss amounting to $2.72 million. As shown above, the bank accounts are not related to any tax deficiencies. Indeed, it has not made even the slightest attempt to qualify the actual losses it supposedly suffered due to Bittner's non-willful failure to report the foreign accounts at issue – accounts that were voluntarily disclosed to the IRS – rather, it simply imposed the maximum possible penalty of $2.72 million and claims its sole purpose is to "compensate the government." *See United States v. Hall,* 730 F. Supp. 646, 655 (M.D. Pa. 1990) (determining that a civil penalty under 31 U.S.C. § 5321 violated the double jeopardy clause, at least in part, because the government made no attempt to qualify the actual losses it suffered and instead made "general assertions concerning the heavy burden of investigation and prosecution . . ."). The unprecedented penalty in this case does not simply make the government whole – Bittner did that when he voluntarily filed FBARs before the government was even aware they were late – rather it unconstitutionally punishes Bittner for a mistake.  *See Simonelli*, 614 F. Supp.2d at 244 n.6 ("The FBAR penalty is assessed on Defendant as punishment, not as any sort of compensation for any pecuniary harm.").

---

injured party's loss)." *Simonelli*, 614 F. Supp. at 244 n.6 (citing Black's Law Dictionary 1168 (8th ed.2004)) (alterations in original).

B6544\A63010\4831-4013-9194.v3

In short, because a purpose of the FBAR penalty is to punish individuals for failing to report foreign financial accounts – in this case, accounts that the IRS determined Mr. Bittner innocently failed to report, and which were later voluntarily disclosed to the IRS – the penalties are subject to the Eighth Amendment Excessive Fines Clause.

### D.  The Nearly Three Million Dollars in Non-Willful FBAR Penalties are Grossly Disproportionate to Mr. Bittner's Innocent Mistake

In *Bajakajian*, the Supreme Court held that penalties violate "the Excessive Fines Clause if [they are] grossly disproportional to the gravity of a defendant's offense." *United States v. Haro*, 753 Fed. Appx. 250, 259 (5th Cir. 2018) (citing *United States v. Bajakajian*, 524 U.S. 321, 328 (1998)).

Here, the millions of dollars in penalty assessed against Mr. Bittner is plainly disproportionate to the underlying offense. Mr. Bittner failed to file *five* forms on which he was required to simply check a box stating that he maintained more than 25 foreign accounts. He owed the IRS no tax for three of the five years involved, and nominal amounts for the other two years. This was entirely a mistake, as Mr. Bittner had no knowledge of the existence of FBARs, let alone that he should have filed them.  Yet, the government has penalized him for *272 separate* violations. This is absurd.

Applying the factors from *Bajakajian*, it is apparent that the penalty in this case is excessive. While the Supreme Court did not set rigid factors for the proportionality analysis, it did consider: (1) the maximum penalty that could have been imposed; (2) whether the defendant was within the class of people for whom the statute at issue was principally designed; (3) the other penalties that may be imposed for the violation; (4) the nature and extent of the offense and whether the violation was related to other illegal activities; and (5) the harm caused[14]. *See e.g.*, *United States v. Mora*, 644 Fed.

---

[14] While the government only cited four factors in its motion, there is not a set number of factors to be applied. Courts have made clear that the Supreme Court did not create a set of rigid factors. *See United States v. Mackby*, 339 F.3d 1013, 1016 (9th Cir. 2003) ("*Bajakajian* does not mandate the consideration of any rigid set of factors in deciding whether a punitive fine is grossly disproportional to the gravity of a defendant's offense.").

Appx. 316, 317 (5th Cir. 2016) (citing *United States v. Wallace*, 389 F.3d 483, 485–88 (5th Cir. 2004));

*United States v. Bussell*, 2015 WL 9957826, at *7 (C.D. Cal. Dec. 8, 2015) (analyzing the factors in an

FBAR context). Here, the factors all demonstrate the penalty imposed is grossly disproportionate in

the extreme.

By its own admission, the IRS has imposed the absolute maximum penalty here of $10,000

times 272 accounts, or $2.72 million. In *Mackby* the court reasoned that the penalties imposed

totaling about imposed $729,000 were substantially less than the maximum possible of $85.98

million weighed against a finding of gross disproportionality.[15] 339 F. 3d at 1018. Here, the fact that

the IRS has imposed the absolute maximum possible penalty supports the opposite finding.

Agent Reach made the decision to impose the maximum possible FBAR penalty on Mr.

Bittner but, in her deposition, she could not recall any facts that might reasonably justify the

maximum possible penalty. *See* Ex. C, Reach Tr. 81:16-24; 83:7-12, 87:3-13, 92:17-93:6. Instead,

Agent Reach concluded that, since Mr. Bittner was a successful businessman in Romania and had a

degree of engineering, "he should have known" about FBARs and "should have known" he has to

report not only his few personal bank accounts, but also the accounts held by companies in which

he had an interest, and therefore it's reasonable to penalize him nearly $3 million. *See id.* at 83:23-

84:19. The undisputed fact is that Mr. Bittner did not know that FBARs even existed; much less that

he had to file them for himself and certain companies he had invested in. Mr. Bittner contends his

mistake was due to reasonable cause; the government contends it was negligent. On its face, this is

disproportionate punishment for conduct that at worst was negligent.

Significantly, Agent Reach's written analysis to support imposition of the penalty is based on

incorrect facts, misunderstanding of IRS guidance and reflects a predetermined decision to impose

the maximum possible penalty regardless of the facts. For example, she stated that that the fact that

---

[15] The penalties imposed in *Mackby* thus represented less than 1 percent of the possible statutory penalties.

Mr. Bittner filed tax returns for the years 1997-2000 shows that he his statement that he was

unaware he was obligated to file returns was "false." *See* Ex. G, Form 886-A, p. 85. In fact, Mr.

Bittner stated that he understood that he was only required to file returns if he had income earned in

the US, which he did. *See* Ex. A, Bittner Tr. 241:9-17. 248:17-250:7, 273:17-19. There is no evidence

to support the government's suggestion that Mr. Bittner may have checked a Box on Schedule B

indicating that he did not have foreign accounts or even that that schedule was included with the

Form 1040 tax returns prepared by his sister. Nor does the fact that Mr. Bittner held assets in

Romania in the name of nominees indicate nefarious activity. *See* Ex. H, FinCen Report, Form 886-

A, pp. 8-9. Mr. Bittner disclosed information about his nominees, reported gain from nominee sales,

and explained they were used for the legitimate purpose of keeping his ownership of assets private

since in Romania, unlike the US, anyone can look up the owners of a corporation. *See* Ex. A, Bittner

Tr. 164:12-166:18; Ex. C, Reach Tr. 53:5-54:4, 59:3-21. The Agent's bank account analysis, which

supposedly evidenced millions of dollars of unreported income, was shown to be defective legally

and factually. *See* Declaration of Laura Sanders, attached hereto as Ex. L. The IRS ultimately

stipulated that Mr. Bittner had no unreported income from those accounts. *See* Joint First

Supplemental Stipulation of Settled Issues for United States Tax Court, Docket No. TL-19894-17.

The agent's statement that "Mr. Bittner did not cooperate during the examination" (Ex. H, p. 18) is

false. Mr. Bittner produced massive amounts of documents, including bank account records, and

provided extensive written answers to IRS questions. The fact that he objected to some questions as

overbroad and burdensome – such as the demand to translate tens of thousands of pages of

documents which would have taken years and cost hundreds of thousands of dollars – does not

mean that he failed to cooperate.

It is apparent that, early on and before she conducted any substantive analysis of the facts,

the agent decided that Mr. Bittner should be punished. For example, in December of 2013, before

she had reviewed any of the documents produced by Mr. Bittner and before she had even begun

looking at his amended tax returns, she certified that she had made a "determination … that the failure of the taxpayer to report … the foreign financial account(s) *was in furtherance* of a Title 26 [income tax] violation." *See* Ex. C, Reach Tr. 25:3-26:3, 72:7-73:3, 73:16-74:22. (emphasis supplied).

Additionally, Agent Reach misunderstood the IRS guidance on imposition of non-willful penalties and conceded that she did not, in fact, make any determination that the amount of the penalty was proportionate to Mr. Bittner's conduct. *See id.* at 97:24-99:16. The Internal Revenue Manual provides that the amount of the penalty is in the examining agent's discretion and "in most cases … will recommend one penalty per open year regardless of the number of unreported foreign accounts." IRM 4.26.16.6.4 & IRM 4.26.16.6.4.1 (11-06-2015), attached hereto as Ex. M. The agent, however, may choose not to impose any penalty and issue a warning letter, or if the facts warrant it, may impose penalties *up to* $10,000 per account. *Id.* Or, as the government has stated, "The IRS may exercise discretion to propose and assess FBAR penalties *in amounts less than maximum* of $10,000 per account violation." *Id.*; Response to Interrogatory No. 3, attached as hereto as Ex. N (emphasis supplied). Agent Reach, however, did not understand these provisions. Instead, she understood that she had only *four* choices: (1) no penalty, (2) a single $10,000 penalty for all years, (3) $10,000 penalty for each of the five years, totaling $50,000, or, if that was not sufficient, (4) the maximum penalty of $2.72 million ($10,000 per account per year):

> Q.   (By Mr. Katz)  So you had no wiggle room.  Your choice -- you had three choices?
> A.   Four.
> Q.   Four choices?
> A.   Yes.
> Q.   10,000 for (sic) no penalty, 10,000 for one – for all the years, one $10,000 penalty; five $10,000 penalties, one for each year; or the maximum, a $10,000 penalty for each account for each year?
> A.   Yes.

Ex. C, Reach Tr. 99:7-16; 97:24-99:6.

Since Agent Reach felt that a $50,000 penalty was insufficient, she imposed the maximum possible penalty and did not consider whether Mr. Bittner's circumstances would be appropriately

addressed with a penalty greater than $50,000 but under the maximum per account penalties.  This effectively establishes that the aggregate $2.72 million penalty imposed here, plus additional interest, is not proportionate to Mr. Bittner's conduct.

Second, Mr. Bittner is not within the class of persons for which the statute was principally designed. As the government recognized, Congress determined that undisclosed relationships with foreign accounts "facilitated a number of unsavory activities, including income tax evasion, schemes to defraud the US, and the illegal concealment of assets." *See* Plaintiff's Motion, 17.  With respect to taxes, the statute thus was directed at persons living in the US who move their money abroad to escape US taxation.  It was not directed on dual citizens who happen to live abroad for many years. Mr. Bittner took no improper actions. To the contrary, he was engaged in legitimate businesses in Romania.  He had no tax U.S. liability for three of the years involved here and nominal liabilities for the other two. Indeed, as the government has recognized, the failure to disclose the accounts was an innocent failure, not a scheme to defraud the US. Thus, Mr. Bittner is not the class of persons for which the statute was *principally* designed.

Third, the other penalties which could have been imposed demonstrate the excessiveness of the fine in this case. Indeed, Mr. Bittner's penalty could be larger than an individual who was found to have *willfully* violated the statute at issue. *See* Defendant's Motion, p. 18-19. Furthermore, Mr. Bittner's penalties for the years at issue are nearly *eleven* times greater than the $250,000 fine imposed for criminal offenders. 31 U.S.C. § 5322(a). *See United States v. Bussell*, 2015 WL 9957826, at *8 (finding a willful penalty that was five times the maximum amount allowed in the criminal provision of 31 U.S.C. § 5322(a) weighed in favor of finding that the government's assessment violated the Excessive Fines Clause).

Fourth, the nature of the offense was innocent, and did not involve any criminal activity. The government has expressly acknowledged that Bittner's failure to file was non-willful. This means *at worst* his conduct was negligent. Yet, the IRS wishes to fine Mr. Bittner nearly three million

28

dollars. Plainly, such an egregious fine is not proportionate to the nature of the offense. Indeed, we believe this is, by far, the greatest penalty the IRS has ever imposed on innocent, non-willful conduct and possibly the greatest penalty the government has imposed on such conduct.  We have never seen any instances where courts have upheld similar penalties on innocent conduct.

The government attempts to justify the enormous penalty by listing the number of alleged unreported accounts and aggregate maximum balances. This is misleading. The government is penalizing Bittner for each unreported account, many of which maintained balances far below $10,000, and some held as little as $1. *See* Bittner Declaration, Ex. A to Defendant's Motion. Simply put, a penalty of $10,000 for an account that held $1 is grossly disproportionate. Moreover, the government has conceded that Mr. Bittner's conduct did not involve *any* criminal or willful conduct. Notably, he was not involved in any of the above listed "unsavory" activities that the statutes at issue were designed to curtail.

Fifth, Mr. Bittner's conduct has caused the government no harm.  The only "harm" the agent who imposed the penalty could identify was that Mr. Bittner had foreign bank accounts and interests in companies that had accounts. *See* Ex. C, Reach Tr. 87:3-14; 92:17-93:6. On brief, the government alleges that Mr. Bittner's conduct harmed it because investigating "hidden" foreign accounts is time consuming and expensive. *See* Plaintiff's Motion, at p. 29-30. But Mr. Bittner's accounts were not "hidden." The corporate accounts were in the names of the companies that owned them.  And Mr. Bittner voluntarily provided the IRS with all bank account information before the government had anything to investigate. *See* Ex. C, Reach Tr. 84:25-85:8. Furthermore, the government's bare assertion that it was "harmed" does nothing to demonstrate how this nearly three-million-dollar penalty is necessary to compensate the IRS for its time and expense. As the *Hall* court stated:

> In the present case, the Government puts forth only the most minimal effort at establishing a rational relationship between the $1,035,000 civil penalty and the goal of making the Government whole. Beyond its general assertions concerning the

29

> "heavy burden" of investigation and prosecution and the injury to the US' trade and economic programs, which it characterizes as "impossible to measure, with precise certainty," the Government makes no attempt to quantify the actual losses it has suffered as a result of Hall's criminal misconduct. The absence of such a quantification, when coupled with the disproportionate relationship between the amount of the fine and the damages apparently caused by Hall's conduct, leads the court to conclude that this fine is not rationally related to the goal of making the Government whole.

*Hall*, 730 F. Supp. at 655. Here, the government has not even put forth a minimal effort to establish a rational relationship. Instead, it has arbitrarily assessed a penalty that bears no relationship to any "harm" Bittner may have caused. In addition, at least one court has determined that the failure to file an FBAR did not harm the government. *See Simonell*, 614 F. Supp. 244 n.6 ("Defendant's failure to file an FBAR was a wrong to the state; while Defendant's omission violated 31 U.S.C. § 5314, it resulted in no injured private party and no pecuniary harm, either to a private party or to the state."). In sum, the above listed *Bajakajian* factors weigh heavily in favor of finding the penalty imposed in this case violates the Eighth Amendment's prohibition against excessive fines.

## V.  CONCLUSION AND PRAYER

For the foregoing reasons, Defendant Alexandru Bittner respectfully requests that the Court deny the United States' Motion for Partial Summary Judgment.

B6544\A63010\4831-4013-9194.v3

Respectfully submitted,

**CLARK HILL STRASBURGER**
2301 Broadway St.
San Antonio, Texas 78215
(210) 250-6006 (Ph.)
(210) 258-2714 (Fax)

By:   /s/  Farley P. Katz
    **FARLEY P. KATZ**
    LEAD ATTORNEY
    State Bar No. 11108790
    fkatz@clarkhill.com
    **RACHAEL RUBENSTEIN**
    State Bar No. 24073919
    rrubenstein@clarkill.com
    **FORREST M. "TEO" SEGER III**
    Texas Bar No. 24070587
    tseger@clarkhill.com

**ATTORNEYS FOR DEFENDANT**
**ALEXANDRU BITTNER**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on April 17, 2020 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Herbert W. Linder
Attorney, Tax Division
United States Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
Herbert.W.Linder@usdoj.gov
*Attorney for Plaintiff*

/s/ Rachael Rubenstein
**RACHAEL RUBENSTEIN**