Exhibit B
Def. Response

Alexandru Bittner /
Sherry Bittner /

## Attachment to Certification by U.S. Persons Residing Outside of the United States for Streamlined Filing Compliance Procedures

I was born in Romania in 1957.  I attended high school in Romania and served one mandatory year in the Romanian Army.  Following my military service, I obtained a Master's degree in mechanical engineering, specializing in chemistry.

Because I did not like the communist regime, and because I am of Jewish origin and my sister had already immigrated to Israel (in 1977), I felt heavily discriminated against so I decided to leave Romania.  I received support for a visa as well as financial support from the Hebrew Immigrant Aid Society ("HIAS") and I legally arrived in the USA in December of 1982.  In 1987, I became a naturalized United States citizen.  I met my wife, Sherry, in 1984.  Sherry was a legal Chinese immigrant to the United States who, independently, obtained her naturalization as well.  Sherry received no formal higher education and may have obtained only a high school diploma.  Sherry speaks very little English.  We were married in 1985 and had a daughter in 1987.

In 1989, I worked as a plumber for the Los Angeles School District.  After the December 1989 revolution and the fall of communism in Romania, I returned to Romania in January of 1990.  Over the years, I became a successful businessman in Romania and invested in numerous and diverse businesses including real estate, telecommunications, tourism, and aquaculture.  In the mid-2000s, my business interests suffered and I sustained a number of substantial losses.

While living in Romania, we complied with all Romanian tax laws and hired Romanian accountants to keep records and assist with tax compliance.  We were not aware during that time that we had to file United States tax returns simply because we had become naturalized US citizens.  Nor did our accountants inform us of that fact.  We reasonably believed that we had no US tax obligations for income from Romania when we were living in Romania and paid taxes to Romania.

Up to about 2000, I had some US source income from an S corporation.  I was issued a K-1 and I filed returns reporting that income and paying any tax which I understood was my only obligation under US tax laws.  During my 22 years of living in Romania, we were registered with the US embassy in Romania.  During all that time, the US embassy never contacted us about any tax returns due.  We had no reason to believe that the taxing jurisdiction of the United States differed from other foreign countries that tax earnings only in the jurisdiction where the income was generated.

Based on the English grammar that I learned in school, when you balance the conflicting paragraphs from the US-Romania tax treaty: A "art4-3 a contracting state MAY tax its citizens" and B "art 7-1 business profits: Industrial or commercial profits of a

1643907.1/SPSA/26861/0101/102314

RESIDENT of one of one of the Contracting states SHALL BE EXEMPT from tax by the other Contracting state" the latter prevails.

My wife and I returned to the United States from Romania in late 2011.  After returning to the United States, we learned that we should have filed US tax returns while we were living in Romania because we are naturalized citizens.  We engaged a CPA to prepare our tax returns.  After reading the United States-Romania Tax Treaty, I believed that, because we were exclusively  Romanian residents during those years, only Romania could tax our income.  I discussed this with my CPA and he agreed with this conclusion.  Because I had a mistaken understanding of the United States – Romania Tax treaty, which on its face appears to limit taxation to the country of residency, and because of the CPA's advice, I mistakenly understood that the filing of the back returns was simply a formality.  As a result, in preparing those returns I estimated my income from each year based on my recollection which amounts I believed were approximately correct.  I did not consult any financial records (which they were all in Romania), nor did I claim any business deductions, losses or expenses on those returns.  Following the accountant's advice, I excluded the entire amount of the reported income, expressly relying on the United States-Romania tax treaty.

We never understood, until we returned to the United States, that we were required to file US tax returns for the Romanian income.  Nor did I understand that the CPA's and my interpretation of the United States-Romania tax treaty was incorrect (i.e., it did not exclude my Romanian income from U.S. taxation).  Indeed, the treaty's "savings clause", which allows the United States to tax its citizens' income despite the treaty, is an obscure provision.

We were also completely unaware that we had to file Forms 5471, Information Return of U.S. Persons with Respect to Certain Foreign Corporations with our US tax returns.  My CPA was aware that we had interests and stock ownership in several Romanian companies.  However, he failed to advise us that we had to complete any additional forms concerning my ownership of these foreign companies.  Also, we were unaware of the requirement to file FBARs concerning our accounts in Romania and in Europe.  Our advisors did not inform us of the FBAR filing requirement and it was only until we came back to the U.S. that we learned of the requirement to file these forms.

My wife, Sherry Bittner, relied entirely upon me to handle obligations, such as filing tax returns and had no awareness of any obligation to file U.S. tax or information returns.

1643907.1/SPSA/26861/0101/102314