1              UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF TEXAS
2                   SHERMAN DIVISION

3

UNITED STATES OF AMERICA,      §
4         Plaintiff,           §
                               §
5    v.                        §    Case No. 4:19-cv-00415
                               §
6    ALEXANDRU BITTNER,        §
          Defendant.           §
7

8

9

10    **************************************************

11                   ORAL DEPOSITION OF

12                     ANH REACH

13                  FEBRUARY 10, 2020

14    **************************************************

15

16         ORAL DEPOSITION OF ANH REACH, produced as a

17   witness at the instance of the Defendant, and duly

18   sworn, was taken in the above-styled and numbered cause

19   on the 10th day of February, 2020, from 10:05 a.m. to

20   2:38 p.m., before Cynthia Warren, Certified Shorthand

21   Reporter for the State of Texas, reported by machine

22   shorthand, at the offices of Clark Hill Strasburger, 720

23   Brazos Street, Suite 700, Austin, Texas 78701, pursuant

24   to the Federal Rules of Civil Procedures and the

25   provisions stated on the record.

```
 1                          APPEARANCES

 2

    FOR THE PLAINTIFF:
 3
         MR. HERBERT W. LINDER
 4       UNITED STATES DEPARTMENT OF JUSTICE
         717 North Harwood Street
 5       Suite 400
         Dallas, Texas 75201
 6       Tel: 214-880-9754
         Fax: 214-880-9741
 7       herbert.w.linder@usdoj.gov

 8
    FOR THE DEFENDANT:
 9
         MS. RACHAEL E. RUBENSTEIN
10       MR. FARLEY P. KATZ
         CLARK HILL STRASBURGER
11       2301 Broadway
         San Antonio, Texas 78215-1157
12       Tel: 210-250-6006
         Fax: 210-258-2714
13       rachael.rubenstein@clarkhillstrasburger.com
         farley.katz@clarkhillstrasburger.com
14

15

16

17

18

19

20

21

22

23

24

25
```

LEXITAS

1                              INDEX

2                                                           PAGE

3    Appearances..................................      2

4    ANH REACH

5         Examination by Ms. Rubenstein..........      5
          Examination by Mr. Katz................     59
6         Examination by Mr. Linder..............    100
          Further Examination by Mr. Katz........    101

7

8    Changes and Corrections....................    104

9    Signature..................................    105

10   Reporter's Certificate.....................    106

11

12   REPORTER'S NOTE:  Questions by Mr. Katz during
     Ms. Rubenstein's examination indicated as
13   "(By Mr. Katz)" in the transcript.

14

15

16                            EXHIBITS

17   NO. DESCRIPTION                     PAGE REFERENCED

18   Exhibit 1..................................     17
          Examining Officer's Activity Record
19
     Exhibit 2..................................     18
20        1996 CP11, 8/13/2012

21   Exhibit 3..................................     19
          July 2014 e-mails between Anh Reach and
22        Debra Alcorte

23   Exhibit 4..................................     24
          9/12/2013 transmittal letter from
24        Elizabeth Copeland and Farley Katz to
          Cherrie Mayberry-Jones

25

10:21  1  been 1991 through 2011.

10:21  2      A.   Some were in the administrative file but not

10:22  3  all.  I don't know which ones there were in the file.

10:22  4      Q.   FBARs, do you recall which ones were in the

10:22  5  files with the original?

10:22  6      A.   I don't remember.

10:22  7      Q.   There were original FBARs filed for 2007

10:22  8  through 2011, correct?

10:22  9      A.   Yes.  Could you repeat that again?  I didn't

10:22 10  hear that first year.

10:22 11      Q.   2007 through 2011?

10:22 12      A.   That's correct.

10:22 13      Q.   These filings, these original filings, the

10:22 14  income tax exam return -- or the income tax returns and

10:22 15  the FBARs, Mr. Bittner reported previously undisclosed

10:22 16  foreign income in bank accounts?

10:23 17      A.   Yes.

10:23 18      Q.   He did so voluntarily?

10:23 19      A.   I don't know.

10:23 20      Q.   Do you have anything to suggest he did not do

10:23 21  that voluntarily?

10:23 22              MR. LINDER:  Objection, calls for

10:23 23  speculation.  You can answer the question.

10:23 24      A.   I don't know.

10:23 25      Q.   (By Ms. Rubenstein)  Was Mr. -- you don't know

10:23  1   if you have any or you don't know if you have any

10:24  2   information?

10:24  3        A.   Could you repeat that?

10:24  4        Q.   I think we should move on.

10:24  5             Was Mr. Bittner under examination at the

10:24  6   time he filed the initial returns in May of 2012?

10:24  7        A.   No.

10:24  8        Q.   Did the IRS have any information about

10:24  9   Mr. Bittner's noncompliance before May of 2012?

10:24  10       A.   I don't know.

10:24  11       Q.   Anything in the file to suggest?

10:24  12       A.   No.

10:24  13       Q.   There was no information from any third-party

10:24  14  sources with respect to Mr. Bittner's foreign income in

10:24  15  bank accounts before 2012?

10:25  16       A.   No.

10:25  17       Q.   Do you remember the math error assessments?

10:25  18       A.   I do.

10:25  19       Q.   What do you remember about that?

10:25  20       A.   I remember that Mr. Bittner took a treaty

10:25  21  position on the original returns that was -- that was

10:26  22  not allowed during the initial processing and that

10:26  23  was -- was coded as a math error correction.

10:26  24       Q.   So Mr. Bittner files a bunch of returns in

10:26  25  2012, shortly thereafter the IRS processes -- attempts

10:26   1   to process those returns, changes them and sends out a

10:26   2   bunch of notices assessing over 6 million of tax

10:26   3   penalties and interest for 12 years?

10:26   4              MR. LINDER:  Objection, that's not what

10:26   5   she testified to.  Objection, relevancy.  You can answer

10:26   6   if you know the answer.

10:26   7      A.   I don't know.

10:26   8      Q.   (By Ms. Rubenstein)  You had communications

10:26   9   with the appeals officer about those assessments?

10:27  10      A.   Yes.

10:27  11      Q.   And you were provided copies of the abatement

10:27  12   requests that counsel for Bittner prepared?

10:27  13              MR. LINDER:  Objection, calls for

10:27  14   speculation.  You can answer.

10:27  15      A.   I don't remember.

10:27  16              MS. RUBENSTEIN:  Let's go ahead and mark

10:27  17   this as Exhibit 1.  This is Form 9984, Examining

10:27  18   Officer's Activity Record.

10:27  19              (Exhibit No. 1 marked.)

10:27  20      Q.   (By Ms. Rubenstein)  Ms. Reach, I've handed you

10:27  21   your Form 9984, Examining Officer's Activity Record.  Do

10:28  22   you recognize it?

10:28  23      A.   Yeah, that's mine.

10:28  24      Q.   So you would have prepared this?

10:28  25      A.   Yes.

10:41  1      Q.   That's fair.  Let me ask this.  When you were

10:41  2  assigned the case he had representation, Farley Katz and

10:41  3  Elizabeth Copeland?

10:41  4      A.   Yes.

10:41  5      Q.   Let's take a look at the activity log.  This is

10:41  6  Exhibit 1.  Let's go to page -- the second page.  So

10:41  7  here, the entry 9/19/2013?

10:41  8      A.   Yes.

10:41  9      Q.   Okay.  So that's when the case is transferred

10:41 10  from a prior revenue agent, Cherrie Mayberry-Jones, to

10:41 11  you?

10:41 12      A.   Yes.

10:41 13      Q.   Okay.  So before that, before the transfer,

10:41 14  let's look a little back.  The taxpayer through his new

10:42 15  representatives submitted 9/17/2013 amended tax returns,

10:42 16  numerous Forms 5471, and a check as well as a reasonable

10:42 17  cause statement, correct?

10:42 18              MR. LINDER:  Objection, calls for

10:42 19  speculation.  You can answer if you know.

10:42 20      A.   That's what is written here, yes.

10:42 21      Q.   (By Ms. Rubenstein)  Let's go ahead and mark

10:42 22  Exhibit 4.

10:42 23              (Exhibit No. 4 marked.)

10:43 24              All right.  Exhibit 4 is a transmittal

10:43 25  letter, correct?  It's a letter describing the content

10:43   1   of what was submitted on September 12, 2013, correct?

10:43   2        A.   It looks like it, yes.

10:44   3        Q.   All right.  So as of September 12, 2013,

10:44   4   Mr. Bittner is filing amended tax returns for tax years

10:44   5   2006 through 2012, numerous 5471s, and a reasonable

10:44   6   cause statement.  Yes?

10:44   7        A.   Yes.

10:44   8        Q.   These amended returns were the returns that

10:44   9   were part of your income tax examination.  Yes?

10:44   10       A.   That's correct.

10:44   11       Q.   And you wrote about them extensively in your

10:44   12  income tax examination report?

10:44   13                 MR. LINDER:  Objection to relevancy.  You

10:44   14  can answer.

10:45   15       A.   Yes.

10:45   16       Q.   (By Ms. Rubenstein)  I mean, wouldn't this be

10:45   17  the whole basis of the examination?

10:45   18       A.   I was trying to figure out what you mean by

10:45   19  extensively, so I can't remember but I think that my

10:45   20  report could be considered extensive, yes.

10:45   21       Q.   You reviewed and analyzed these returns?

10:45   22       A.   Yes, I did.

10:45   23       Q.   When did you start that process?

10:45   24       A.   It looks like early 2014.

10:47   25       Q.   Okay.  So the amended returns, the 5471s, and

10:47   1   the reasonable cause statement were supplied right

10:47   2   before you were assigned the case?

10:47   3       A.   That's correct.

10:47   4       Q.   Do you recall when the corrected FBAR forms

10:47   5   were submitted?

10:47   6            MR. LINDER:  Objection, assumes facts not

10:47   7   in evidence.  You can answer.

10:47   8       A.   I don't remember.

10:47   9       Q.   (By Ms. Rubenstein)  Let's go ahead and mark

10:47   10  Exhibit 5.  This is a letter dated September 25, 2013

10:47   11  from Elizabeth Copeland to agent Cherrie Mayberry-Jones.

10:47   12            (Exhibit No. 5 marked.)

10:48   13            September 25, 2013, Exhibit 5, this would

10:48   14  have been when the FBARs, the corrected FBARs, were

10:48   15  filed for years 2006 through 2011?

10:49   16      A.   Yes.

10:49   17      Q.   Again, at this point you were or were not

10:49   18  assigned to the case?

10:49   19      A.   Which case?

10:49   20      Q.   Okay.  Let me rephrase that.  Bad question.

10:49   21  This was right around the time when you first started

10:49   22  working on Mr. Bittner's case?

10:49   23      A.   That's correct.

10:49   24      Q.   Okay.  So by September 25, 2013, the taxpayer

10:49   25  has submitted corrected FBARs as reflected in this

10:49  1  September 25, 2013 letter.  A week before he submitted

10:50  2  Forms 5471, amended 1040s, and a reasonable cause

10:50  3  statement.  Yes?

10:50  4      A.   Yes.

10:50  5      Q.   And the taxpayer here is requesting to be

10:50  6  treated in accordance with FS 2011-13?

10:50  7      A.   Yes.

10:50  8      Q.   And are you familiar with that guidance?

10:50  9      A.   Not very.

10:50 10      Q.   What do you know about it?

10:50 11      A.   I remember that Mr. Katz and Ms. Copeland

10:50 12  provided some material on it, but I don't remember the

10:51 13  content of that material.

10:51 14      Q.   Okay.

10:51 15           MR. LINDER:  We want to correct the

10:51 16  record.  While you were getting that out is that for the

10:51 17  record Ms. Reach testified about the documents she

10:52 18  reviewed.  There was a document reviewed that she

10:52 19  inadvertently left off.  Can you describe this other

10:52 20  document that we reviewed in preparation for your

10:52 21  deposition?

10:52 22           THE WITNESS:  Defendant Alexandru

10:52 23  Bittner's First Amended Answer.

10:52 24           MR. LINDER:  I just wanted to clear that

10:52 25  up.

11:06  1          MR. KATZ:  (Nodded head.)

11:07  2          MR. LINDER:  Can you repeat the question?

11:07  3  Let's go from there.  There was a lot of talking in

11:07  4  there.  Maybe can you read back the question?  That

11:07  5  would be easier for us.  Can we do that?

11:07  6          (Reporter read previous question.)

11:07  7          MR. LINDER:  Objection, calls for

11:07  8  speculation.  You can answer.

11:07  9     A.   It wasn't the fact that he filed returns that

11:07 10  it came to exam.  It was that he filed returns claiming

11:07 11  a treaty position that it came to me.

11:08 12     Q.   (By Ms. Rubenstein)  What kicked off the

11:08 13  process with the IRS and Mr. Bittner was the filing of

11:08 14  the returns?

11:08 15     A.   With the treaty position, yes.

11:08 16     Q.   It's assigned to you in 2013, September,

11:08 17  correct?

11:08 18     A.   Yes.

11:08 19     Q.   Then the taxpayers file same month you're

11:08 20  assigned but right before amended returns 2006 to 2011.

11:08 21  Do you recall if those amended returns had the treaty

11:08 22  position on them?

11:08 23     A.   They did not.

11:08 24     Q.   Also filed numerous 5471s September 2013,

11:08 25  taxpayers, correct?

11:17  1          MS. RUBENSTEIN:  Why don't we take a

11:17  2  break.  And if you have a chance to read it during your

11:17  3  break that would be great.  If not, we can pick up

11:17  4  reading it when we resume.

11:17  5          THE WITNESS:  Okay.

11:17  6          (Recess taken from 11:17 a.m. to

11:25  7  11:25 a.m.)

11:25  8     Q.   (By Ms. Rubenstein)  Okay.  Let's go back to

11:25  9  Exhibit 7.  This is the TD F 90-22.1 and the

11:25 10  instructions.  Did you have a chance to review it or

11:26 11  would you like to go through it together?

11:26 12     A.   I'm reading it now, but you can point me to

11:26 13  where you want me to focus.

11:26 14     Q.   Page 7.

11:26 15     A.   Okay.

11:26 16     Q.   Why don't you just take a minute to read the

11:26 17  item 14 instructions.

11:27 18          (Witness reviews document.)

11:27 19     A.   Okay.

11:27 20     Q.   Going back I think to about what my last

11:27 21  question was is, is it correct that when a taxpayer has

11:27 22  25 or more accounts they have a financial interest in,

11:28 23  they check the yes box on 14 and do not have to provide

11:28 24  any additional account information on the form?

11:28 25     A.   Yes, according to this item 14 instruction.

Anh Reach

11:28   1          Q.    Let's go ahead and go back to the Exhibit 5,

11:28   2    which was the September 25, 2013 submission with the

11:28   3    FBARs.  Looking at the cover letter, although not

11:28   4    required to, Mr. Bittner went ahead and attached these

11:28   5    36 pages of charts, one page for each separate taxpayer

11:28   6    name or entity with the banking information.  Yes?

11:29   7          A.    I'm sorry, what was your question?

11:29   8                MS. RUBENSTEIN:  Could you read it back?

11:29   9                (Reporter read previous question.)

11:29   10         A.    Yes.

11:29   11         Q.    (By Ms. Rubenstein)  And just looking quickly

11:29   12   at the charts, just a quick look, these charts include

11:30   13   account names?

11:30   14         A.    I'm not sure about that.

11:30   15         Q.    Well, do you recall seeing this before?

11:30   16         A.    Yes.

11:30   17         Q.    Okay.  So let's just start at the top then.

11:30   18   Let's look at the first one.  It says bank branch, bank

11:30   19   address, account number on the top left of the first

11:30   20   chart.

11:30   21         A.    Yes.

11:30   22         Q.    Below that what information is located in that

11:30   23   column?

11:30   24         A.    The name of the bank.

11:31   25         Q.    What about the address?

11:31  1      A.   And the address, yes.

11:31  2      Q.   What about the account number?

11:31  3      A.   And the account number.

11:31  4      Q.   And to the right there are columns for each

11:31  5  year, 2006, '7, '8, '9, '10, '11, correct?

11:31  6      A.   That's correct.

11:31  7      Q.   And what are in the columns to the right per

11:31  8  year?

11:31  9      A.   Amounts.

11:31  10     Q.   What amounts?

11:31  11          MR. LINDER:  Objection, calls for

11:31  12  speculation.  I don't think she created this chart.

11:31  13     Q.   (By Ms. Rubenstein)  Well, let's read the top

11:31  14  title.

11:31  15     A.   The title says Maximum Amount For a Day in

11:31  16  Romanian Banks (USDollars).

11:31  17     Q.   (By Mr. Katz)  Did you use this chart in

11:31  18  preparing your FBAR penalty assessments?

11:31  19     A.   Yes, I did.

11:31  20     Q.   (By Mr. Katz)  Did you use these same numbers

11:31  21  and rely on all these numbers?

11:32  22     A.   Yes, I did.

11:32  23     Q.   (By Mr. Katz)  And all these bank accounts?

11:32  24     A.   Yes, I did.

11:32  25     Q.   (By Mr. Katz)  Do you have any reason to think

11:38  1      A.    I don't think that would be correct.

11:38  2      Q.    When would you say you began working on it?

11:38  3      A.    In 2000 -- late 2013 and early 2014.

11:39  4      Q.    Maybe I need to be clear in my questions.

11:39  5 Administrative tasks like sending consents, is that --

11:39  6 that's not working on it in the way I was describing

11:39  7 before.  Let me fix that question.  Strike that.

11:39  8            When did you begin substantively reviewing

11:39  9 records relevant to the determination of Mr. Bittner's

11:39 10 FBAR penalties?

11:39 11      A.    I don't recall when it would be substantive.

11:40 12      Q.    Your log wouldn't -- there's a thing on your

11:40 13 log that helps you refresh your memory about that?

11:40 14      A.    No.

11:40 15      Q.    Looking at the log we're both looking at, is it

11:40 16 fair to say or to characterize you did not begin

11:40 17 substantively working on the FBAR case in relevance to

11:40 18 determining Mr. Bittner's penalties until 2017?

11:40 19            MR. LINDER:  Objection, argumentative.

11:40 20 Objection, mischaracterizes the evidence.  You can

11:41 21 answer if you want -- or if you can, excuse me.

11:41 22      A.    No.

11:41 23      Q.    (By Ms. Rubenstein)  Why not?

11:41 24      A.    Because working on the tax case, the 1040 case,

11:41 25 is also working on the FBAR case.



11:41 1    Q.    In what way?

11:41 2    A.    When I review and analyze the bank records.

11:41 3    Q.    And where did you get those bank records?

11:41 4    A.    From that CD.

11:41 5    Q.    The CD we discussed that was supplied to you in

11:41 6    May of 2014?

11:41 7    A.    Yes.

11:41 8    Q.    So in reviewing bank records for the income tax

11:41 9    case, that's also working on the FBAR case?

11:42 10   A.    Yes.

11:42 11   Q.    Can you give me some more detail in what way?

11:42 12          MR. LINDER:  Objection to the form of the

11:42 13   question.  You can answer if you.

11:42 14   Q.    (By Ms. Rubenstein)  Can you describe your work

11:42 15   process of reviewing bank accounts as they relate to the

11:42 16   income tax case and the FBAR case?

11:42 17   A.    When I analyzed the bank records, I analyze the

11:42 18   amounts going in, the withdrawals, the transfers, and

11:43 19   the balances.

11:43 20   Q.    But as discussed before, you didn't make any

11:43 21   changes to the spreadsheets provided to you with respect

11:43 22   to Mr. Bittner's balances for purposes of you making

11:43 23   your determination regarding FBAR penalties?

11:43 24   A.    The penalties were based on the number of

11:43 25   accounts, not the balances.

11:56   1          Q.   (By Mr. Katz)  On that account --

11:57   2               MS. RUBENSTEIN:  All right.  I think we're

11:57   3   at Exhibit 10.

11:57   4               (Exhibit No. 10 marked.)

11:58   5          Q.   (By Ms. Rubenstein)  Okay, Exhibit 10.

11:58   6   Exhibit 10 is a letter dated May 24, 2014.  It

11:58   7   references IDR responses to information document

11:58   8   requests.  So, Ms. Reach, this was a long time ago, but

11:58   9   do you recall what this is?  Scratch that question.

11:58   10              Would it be fair to say this is --

11:58   11  Exhibit 10 is the Bittners' response to the IDR 1 you

11:58   12  issued for tax years 2006 through 2011?

11:59   13         A.   Yes.

11:59   14         Q.   Let's go to page 14.  Page 14 mentions

11:59   15  nominees, correct?

11:59   16         A.   Yes.

11:59   17         Q.   So Mr. Bittner here discloses that he had

11:59   18  assets held in the name of a number of nominees,

11:59   19  correct?

11:59   20         A.   Yes.

11:59   21         Q.   And he says, "Note that, to protect privacy in

11:59   22  Romania"?

11:59   23         A.   Yes, that's what it says.

11:59   24         Q.   And then it's got a list?

11:59   25         A.   Yes.

LEXITAS

Anh Reach

11:59  1      Q.    And then on that list is Negrea, or Negrea

11:59  2  [pronunciation], Gheorghe; Gheorghe Negrea or Negrea

11:59  3  Gheorghe?

11:59  4      A.    Yes.   First on the list.

11:59  5      Q.    And is that the same person we were talking

11:59  6  about with respect to a nominee account you believed was

12:00  7  not disclosed?

12:00  8      A.    Yes.

12:00  9      Q.    Along with this May 29, 2014 submission, there

12:00 10  was a CD?

12:00 11      A.    Yes.

12:00 12      Q.    And the CD had a bunch of folders with

12:00 13  information broken down per year per topic?

12:00 14      A.    Yes.

12:00 15      Q.    Go ahead and move to that.

12:01 16          MS. RUBENSTEIN:   Can we go off the record

12:01 17  for a second?

12:01 18          (Brief interruption.)

12:02 19      Q.    (By Ms. Rubenstein)  Okay.  When we left last

12:02 20  we were talking about the May 2014 IDR responses

12:02 21  supplied by Bittner that included that CD broken down

12:03 22  into various topics with lots of info.  I'm going to go

12:03 23  ahead and now mark Exhibit 11.

12:03 24          (Exhibit No. 11 marked.)

12:03 25          Exhibit 11 is a cover sheet that was

12:49  1    nominee in the FinCEN report?

12:49  2        A.    Yes.

12:49  3        Q.    So all information concerning the existence of

12:49  4    nominees that you know about, where did that come from?

12:50  5    It came from Bittner, right?

12:50  6        A.    Yes.

12:50  7        Q.    So he disclosed he held assets in various

12:50  8    nominees and provided you a list of those nominees?

12:50  9        A.    Yes.

12:50  10       Q.    Thinking back to the amended returns and the

12:50  11   income tax examination, on those amended returns Bittner

12:50  12   reported significant amounts of income from the sale of

12:50  13   nominee assets.  Is that fair to say?

12:50  14       A.    I don't remember -- I don't remember if it was

12:50  15   nominee or not.

12:50  16                      EXAMINATION

12:50  17   BY MR. KATZ:

12:50  18       Q.    Do you remember if there were any sales of

12:50  19   assets reported on the returns that were held by

12:50  20   nominees?

12:50  21       A.    Yes, there were.

12:50  22       Q.    And you disallowed the cost basis for all of

12:51  23   those, right?

12:51  24                  MR. LINDER:  Objection to relevance.

12:51  25   Objection, calls -- to the form of the question.  You

12:56  1   speculation.  You may answer if you know.

12:56  2       A.   No.

12:56  3       Q.   (By Mr. Katz)  In fact don't you believe,

12:56  4   didn't you conclude that Mr. Bittner used Mr. Negrea's

12:56  5   account to run some money through?

12:56  6       A.   I don't know what this account was used for.

12:57  7   It was provided to me to -- as backup for this

12:57  8   statement.

12:57  9       Q.   You didn't conclude that Mr. Bittner's money --

12:57  10  some of Mr. Bittner's money went through that Negrea

12:57  11  account?

12:57  12            MR. LINDER:  Objection; asked and

12:57  13  answered, argumentative.  You can answer.

12:57  14       A.   In your letter you stated that Mr. Bittner had

12:57  15  nominees and there's an account under this person's

12:58  16  name.

12:58  17            MR. KATZ:  Objection, nonresponsive.

12:58  18       Q.   (By Mr. Katz)  All the accounts that you used

12:58  19  for your FBAR penalty were bank accounts Mr. Bittner had

12:58  20  informed you of.  Is that right?

12:58  21       A.   Yes, but one wasn't counted.

12:58  22       Q.   You're referring to the one that was listed on

12:58  23  the returns prepared by -- the original FBARs prepared

12:58  24  by the CPA?

12:58  25       A.   No.  This one here was not listed.

01:11  1  income that could be generated from not -- from the --

01:11  2  from not reporting the correct and accurate FBARs.

01:12  3      Q.    But are you saying that it was intentional?

01:12  4      A.    I'm not saying that at all.  This related

01:12  5  statute memo is the revenue agent's form to start an

01:12  6  FBAR examination, and so we have to provide information

01:12  7  to the territory manager to justify opening up an FBAR

01:12  8  examination.  This is not a conclusion.  This is just

01:12  9  the beginning, but I'd have to be able to tell them I

01:12 10  believe it is in furtherance of.

01:12 11      Q.    And in furtherance in your mind doesn't mean

01:12 12  to -- with a goal or a purpose?

01:12 13      A.    No.

01:12 14      Q.    What does it mean?

01:12 15      A.    It means that there is a potential of a

01:12 16  Title 26 violation.  Just adjustments.

01:13 17      Q.    Had you looked at anything else at this point

01:13 18  to base your determination on?  This is December

01:13 19  of 2013.

01:13 20      A.    No, I think I just looked at the delinquent

01:13 21  FBARs and the 5471s.

01:13 22      Q.    And by this time you had already been provided

01:13 23  CDs with thousands of pages of response.  Isn't that

01:13 24  correct?

01:13 25      A.    No, that would be incorrect.



01:13  1        Q.    When did those come?

01:13  2        A.    May 2014.

01:13  3        Q.    Okay.  When did you look at those?

01:13  4        A.    After that period of time, after May 2014.

01:14  5        Q.    A year after?

01:14  6        A.    During that time period.

01:14  7        Q.    Do you remember a meeting we had in Austin at

01:14  8  your offices on April 14, 2015?

01:14  9        A.    I remember a meeting.  I just don't remember

01:14  10  the date.

01:14  11        Q.    Do you remember that you called me and told me

01:14  12  that Dan Price wanted to schedule a meeting?

01:14  13        A.    I wanted to schedule a meeting.

01:14  14               MR. KATZ:   Objection, nonresponsive.

01:14  15        Q.   (By Mr. Katz)  Do you recall that Dan Price --

01:14  16  that you told me that Dan Price wanted to schedule a

01:14  17  meeting?

01:14  18               MR. LINDER:   Objection, asked and answered

01:14  19  already.  You can answer it.

01:14  20        A.   No, I don't remember that it was Dan that

01:15  21  wanted to schedule the meeting.

01:15  22        Q.   (By Mr. Katz)  Do you recall at that meeting

01:15  23  you said that you had not looked at the documents and

01:15  24  the CDs that had been provided in response to your IDRs?

01:15  25        A.    I had not looked at it substantially.

01:15  1        Q.    And that's nearly a year later?   Is that right,

01:15  2   nearly a year later?

01:15  3        A.    That might be correct.

01:15  4        Q.    Can you look at your Exhibit 1, your action

01:15  5   activity record.  Will you look at August 31, 2015, the

01:16  6   entries on that date?

01:16  7        A.    What date?

01:16  8        Q.    August 31, 2015.

01:16  9        A.    Okay.

01:16  10       Q.    Does that show that after you were contacted by

01:16  11  Taxpayer Advocate Service you first started printing

01:16  12  records provided on the CDs?

01:16  13       A.    Yes, just the printing.

01:16  14       Q.    Had you been studying them before?

01:16  15       A.    Yes.

01:16  16       Q.    Let's mark this as Exhibit No. 15.

01:17  17             (Exhibit No. 15 marked.)

01:18  18             Have you had a chance to look at that?

01:18  19       A.    No, I just now -- yes.

01:18  20       Q.    Do you recognize the first page as including an

01:19  21  e-mail you sent on February 27, 2015?

01:19  22       A.    Yes.

01:19  23       Q.    And if you turn to the next page, it's entitled

01:19  24  IPN Issue Discussion.  Do you see that?

01:19  25       A.    Uh-huh.

01:19   1       Q.    Is that some document you prepared?

01:19   2       A.    Yes.

01:19   3       Q.    And look down at the middle under Audit

01:19   4   Techniques/Research Completed.   Do you see the second

01:19   5   sentence?

01:19   6       A.    Uh-huh.

01:19   7       Q.    Could you read that?

01:19   8       A.    "Only IDRs have been issued; however, time has

01:19   9   prevented me from looking through the records to

01:19   10  determine if these IDRs were complied with."

01:19   11      Q.    So does that help you narrow down when you

01:19   12  first started looking at the documents in the CD

01:19   13  substantively?

01:19   14              MR. LINDER:   Objection, asked and

01:19   15  answered.   You can answer the question.

01:19   16      A.    I had looked at them but I hadn't done anything

01:19   17  with them, analyze them.   So when I say that, I hadn't

01:20   18  concluded anything with them.   There was just a lot of

01:20   19  records that I scanned through.

01:20   20      Q.    (By Mr. Katz)   Thousands of pages?

01:20   21      A.    Yes.

01:20   22      Q.    Let's go on and discuss a little bit more about

01:20   23  that April 14 meeting.   Do you recall at that meeting

01:20   24  that you and Mr. Price made an offer to the taxpayer's

01:20   25  representatives?

01:20  1               MR. LINDER:  Objection, under Rule 408

01:20  2    these are settlement discussions.  I'm going to instruct

01:20  3    the witness not to answer.

01:20  4               MR. KATZ:  They're fully discoverable.

01:20  5               MR. LINDER:  You think so?

01:20  6               MR. KATZ:  Absolutely.

01:20  7               MR. LINDER:  I don't agree.

01:20  8               MR. KATZ:  They're fully discoverable.

01:20  9               MR. LINDER:  I don't agree.

01:20 10               MR. KATZ:  It's not privileged.  I was

01:20 11    there.

01:20 12               MR. LINDER:  Then you can testify to that.

01:20 13    You're asking -- we can stay on the record.

01:20 14               MS. RUBENSTEIN:  Let's go off the record.

01:21 15               (Discussion off the record.)

01:21 16       Q.   (By Mr. Katz)  Based on our discussion I'm

01:21 17    going to ask you a series of questions related to that

01:21 18    meeting, and your counsel I understand is going to state

01:21 19    an objection to these.  So let me read all the

01:21 20    questions.

01:21 21               MR. LINDER:  No, please take your

01:21 22    questions one by one.

01:21 23       Q.   (By Mr. Katz)  Do you recall at that April 14,

01:21 24    2015 meeting you and Mr. Price made a settlement offer

01:21 25    to Mr. Bittner through his counsel?

01:31   1   of the case.

01:31   2         Q.   So what are the standard penalties for a

01:31   3   non-willful case?

01:31   4         A.   The standard penalty is $10,000 per year.

01:31   5         Q.   10,000 per year.  So for five years it would be

01:31   6   50,000?

01:31   7         A.   (Nodded head.)

01:31   8         Q.   And are you sure the standard penalty is not

01:31   9   10,000 total?

01:31  10              MR. LINDER:  Objection, calls for a legal

01:32  11   conclusion.  You can answer the question.

01:32  12         A.   I don't know.  I think it's 10,000 per year.

01:32  13         Q.   (By Mr. Katz)  Okay.  And you said that you can

01:32  14   deviate from it based on facts and circumstances.

01:32  15         A.   Yes.

01:32  16         Q.   And I assume you -- I gather you found facts

01:32  17   and circumstances that you believe supports 2.7 million

01:32  18   of penalties?

01:32  19         A.   Yes.

01:32  20         Q.   What are those facts and circumstances?

01:32  21         A.   One, Mr. Bittner had 50 to 60 bank accounts.

01:33  22   He had 38 foreign entities that operated numerous types

01:33  23   of businesses.  He was educated.  That's all I can think

01:34  24   of right now, but I don't have all the facts memorized.

01:34  25         Q.   Let's talk about some of those factors.  He was

01:34 1  educated, did he have any education in United States

01:34 2  taxation or accounting?

01:34 3          MR. LINDER:  Objection, calls for

01:34 4  speculation.  You can answer.

01:34 5      A.   I don't know.

01:34 6      Q.   (By Mr. Katz)  Well, you said he's educated.

01:34 7  How is he educated?

01:34 8      A.   I think he has a degree in engineering in

01:34 9  Romania I think.

01:34 10     Q.   And what does a degree in engineering in

01:34 11 Romania, what is the relationship of that to whether he

01:34 12 should be punished for not filing FBARs?

01:34 13         MR. LINDER:  Objection, argumentative.

01:34 14 You can answer.

01:35 15     A.   It just goes to his level of education.

01:35 16     Q.   (By Mr. Katz)  So a degree in engineering you

01:35 17 think is a very high level of education?

01:35 18     A.   I don't think everybody can get a degree in

01:35 19 engineering, so yes.

01:35 20     Q.   And does that have any particular relationship

01:35 21 with being aware of FBARs or not being aware of FBARs?

01:35 22         MR. LINDER:  Objection, calls for

01:35 23 speculation.

01:35 24     Q.   (By Mr. Katz)  I don't understand what your

01:35 25 relationship is.  Why does he having a degree in

01:35  1    engineering justify millions of dollars of penalties?

01:35  2        A.   It's a fact --

01:35  3                MR. LINDER:  Objection to the form of the

01:35  4    question.  Objection, argumentative.  You can answer.

01:35  5        A.   Having a degree shows his level of education

01:36  6    and sophistication.

01:36  7        Q.   (By Mr. Katz)  Did anyone at the IRS advise you

01:36  8    or recommend that you impose the maximum possible

01:36  9    non-willful penalty?

01:36 10        A.   No.

01:36 11        Q.   That was your decision?

01:36 12        A.   Yes.

01:36 13        Q.   And it's legal to have bank accounts if you

01:36 14    live in Romania?

01:36 15                MR. LINDER:  Objection, calls for a legal

01:36 16    conclusion.  You can answer the question.

01:36 17        A.   Yes, of course.

01:36 18        Q.   (By Mr. Katz)  And it's legal for Mr. Bittner

01:36 19    to have owned companies in Romania?

01:36 20                MR LINDER:  Objection, calls for a legal

01:36 21    conclusion.  You can answer.

01:36 22        A.   Yes.

01:36 23        Q.   (By Mr. Katz)  And the government has admitted

01:36 24    that this is a non-willful case?

01:36 25                MR. LINDER:  Objection, assumes facts not

Anh Reach

01:36 | 1 | in evidence.  You can answer.

01:36 | 2 | A.   I don't know if I would use the word admitted,

01:37 | 3 | but it was all I could impose based upon the facts I had

01:37 | 4 | at the time.

01:37 | 5 | Q.   (By Mr. Katz)  So you ultimately made a

01:37 | 6 | conclusion to impose a non-willful penalty?

01:37 | 7 | A.   Yes.

01:37 | 8 | Q.   And that was all that could be supported by the

01:37 | 9 | facts; you couldn't come up -- you didn't have facts

01:37 | 10 | showing it was willful?

01:37 | 11 | A.   I didn't have enough facts.

01:37 | 12 | Q.   And non-willful means that he did not know that

01:37 | 13 | he was supposed to file FBARs?

01:37 | 14 | MR. LINDER:  Objection, calls for a legal

01:37 | 15 | conclusion.  You can answer.

01:38 | 16 | A.   I didn't conclude that he did not know.

01:38 | 17 | Q.   (By Mr. Katz)  Did you conclude that he knew

01:38 | 18 | about FBARs?

01:38 | 19 | A.   I concluded that he should have known.

01:38 | 20 | Q.   Okay.  Did you conclude that he knew about

01:38 | 21 | FBARs?

01:38 | 22 | MR. LINDER:  Objection, asked and

01:38 | 23 | answered.  You can answer.

01:38 | 24 | A.   I did not conclude that he knew.

01:38 | 25 | Q.   (By Mr. Katz)  What -- all the information you

01:38   1   have about this case, about Mr. Bittner's income and

01:38   2   assets and bank accounts, all that came from

01:38   3   Mr. Bittner, correct?

01:39   4        A.   Could you repeat that question?

01:39   5        Q.   All the information you have about

01:39   6   Mr. Bittner's assets and income and bank accounts came

01:39   7   from -- was supplied by Mr. Bittner?

01:39   8        A.   Yes.

01:39   9        Q.   Are you aware of what happened to the tax court

01:39  10   case -- strike that.

01:39  11              Are you aware if the tax court case has

01:39  12   been resolved?

01:39  13        A.   Yes.

01:39  14        Q.   Are you aware of what the resolution was?

01:39  15        A.   No.

01:39  16        Q.   Did you discuss at all with Ashley Targac

01:40  17   the -- your bank account analysis?

01:40  18              MR. LINDER:  Objection, attorney-client

01:40  19   privilege.  I'm going to instruct the witness not to

01:40  20   answer.

01:40  21        Q.   (By Mr. Katz)  Are you aware that there were

01:40  22   serious defects in your bank account analysis?

01:40  23              MR. LINDER:  Objection, relevancy.

01:40  24   Objection, assumes facts not into evidence.  You can

01:40  25   answer if you can.

01:40  1      A.   No.

01:40  2      Q.   (By Mr. Katz)  No one has ever explained to you

01:40  3  that there are serious problems in the bank account

01:40  4  analysis?

01:40  5           MR. LINDER:  Objection, assumes facts not

01:40  6  in evidence.  Objection, argumentative.  You can answer.

01:40  7      A.   I am not aware.

01:40  8      Q.   (By Mr. Katz)  Have you ever imposed

01:40  9  non-willful penalties against other taxpayers for FBARs?

01:40 10           MR. LINDER:  Objection, instruct the

01:40 11  witness not to answer.  It's a 6103 issue.  She cannot

01:40 12  provide information regarding other taxpayers that would

01:40 13  be regarding their tax and information.  She cannot

01:41 14  provide information under 26 USC 6103 regarding other

01:41 15  taxpayers.

01:41 16           MR. KATZ:  Well, I'm not asking to

01:41 17  identify any other taxpayers.  I'm just asking in

01:41 18  general how she --

01:41 19           MR. LINDER:  I'm going to instruct the

01:41 20  witness not to answer.  6103, other taxpayer

01:41 21  information.

01:41 22           MR. KATZ:  We will reserve our rights to

01:41 23  go back to the judge on that one.

01:41 24           MR. LINDER:  Absolutely.

01:41 25           MR. KATZ:  Let's take a little break, if



01:41   1   that's okay.

01:41   2                  (Recess taken from 1:41 p.m. to 1:57 p.m.)

01:57   3        Q.   (By Mr. Katz)  Ms. Reach, let me ask you a

01:57   4   general question, which is, what harm did Mr. Bittner do

01:57   5   to the government by not filing FBARs?

01:57   6                  MR. LINDER:  Objection, calls for

01:57   7   speculation.  Objection, argumentative.  You can answer.

01:57   8   Objection, calls for a legal conclusion.  You can still

01:57   9   answer.

01:57  10        A.   I believe there was adjustments to income based

01:58  11   upon those foreign bank accounts and those adjustments

01:58  12   resulted in a deficiency of tax.

01:58  13        Q.   (By Mr. Katz)  Anything else?

01:58  14        A.   I can't think of anything right now.

01:59  15        Q.   Let me ask you the name of some people.  I'd

01:59  16   like to know what role they did -- they played in this

01:59  17   FBAR audit.  Jeff Johnson?

01:59  18        A.   I don't know if he played a role.

01:59  19        Q.   Who was he?

01:59  20        A.   I'm not sure what his title is, but. . .

02:00  21        Q.   Was he a general manager?

02:00  22        A.   I don't know.  I don't think so.

02:00  23        Q.   You can't think of anything he did in

02:00  24   connection with the FBAR audit?

02:00  25        A.   No.

02:07  1      Q.    (By Mr. Katz)  Mr. Reynaud, what did he do in

02:07  2  this case as far as FBARs are concerned?

02:07  3      A.    He approved the assertion of the penalties, he

02:08  4  reviewed my 886-A, and he signed the Form 13449, I

02:08  5  believe.

02:08  6      Q.    Did you have any discussion with him about

02:08  7  imposing the maximum penalty?

02:08  8      A.    Yes.

02:08  9      Q.    And tell me about that discussion.

02:08  10     A.    Initially he and I considered the willful

02:08  11 penalty and we submitted it.  We are required, if we

02:09  12 believe it to be willful, to submit like a memo to

02:09  13 counsel to explain our positions and only if it's

02:09  14 approved can we assert willful.  So initially he and I

02:09  15 discussed the willful penalty.

02:09  16     Q.    And what did counsel do?

02:09  17             MR. LINDER:  Objection.  Instruct the

02:09  18 witness not to answer.  It's attorney-client privilege.

02:09  19     Q.    (By Mr. Katz)  Counsel didn't approve it?

02:09  20             MR. LINDER:  Objection, attorney-client

02:09  21 privilege.  Do not answer the question.

02:09  22     Q.    (By Mr. Katz)  You didn't assert fraud penalty

02:09  23 when this is all over -- I'm sorry, willful penalty?

02:09  24     A.    I did not assert the willful penalty.

02:09  25     Q.    And did Joseph Reynaud discuss with you

02:09  1  asserting the maximum non-willful penalty?

02:10  2      A.   I don't recall specific conversations with him.

02:10  3      Q.   Was there a discussion over what factors

02:10  4  support that non-willful penalty with Mr. Reynaud?

02:10  5      A.   I don't remember having that discussion, but I

02:10  6  submitted my Form 886-A to him.

02:10  7      Q.   And you told us before the break that the

02:10  8  factors and circumstances -- the facts and circumstances

02:10  9  that you looked to to supporting the maximum non-willful

02:11 10  penalty were the number of bank accounts Mr. Bittner had

02:11 11  abroad, the number of foreign entities, and his level of

02:11 12  education.  Is that right?

02:11 13      A.   Those were among the facts.

02:11 14      Q.   Any other significant facts you relied on?

02:11 15          MR. LINDER:  Objection, argumentative.

02:11 16  You can answer.

02:11 17      A.   I looked at his overall conduct.

02:11 18      Q.   (By Mr. Katz)  What do you mean by that?

02:11 19      A.   All the facts.

02:11 20      Q.   How would you characterize that overall

02:11 21  conduct?

02:11 22      A.   I don't understand your question.

02:11 23      Q.   You said you looked at his overall conduct so

02:11 24  I'm asking you to describe his overall conduct that you

02:12 25  relied upon.  What are you talking about?

Anh Reach

02:12  1      A.   The fact that he opened up bank accounts, had
02:12  2  foreign businesses, had foreign advisors, used the
02:12  3  funds, brought the funds back to the U.S.
02:12  4      Q.   Anything else?
02:12  5      A.   I'm sure there's others.  I just can't remember
02:12  6  it all at this moment.
02:12  7      Q.   Is there something you could look at that would
02:12  8  refresh your recollection?
02:12  9      A.   I'd have to take a look at the entire case.  I
02:12 10  don't have the case.
02:13 11      Q.   When you said used the funds, what do you mean
02:13 12  he used the funds?
02:13 13      A.   He brought the funds back to the U.S. and used
02:13 14  it to buy -- live off of and buy assets here in the U.S.
02:13 15      Q.   But you said also -- you had those as two
02:13 16  different things.  He used the funds and he brought the
02:13 17  funds back to the U.S.  Did you mean that just to be one
02:13 18  thing or two?
02:13 19      A.   He transferred funds from his foreign bank
02:13 20  accounts to his U.S. bank accounts and then from there
02:13 21  he used the funds in those accounts to buy assets and to
02:13 22  live off of.
02:13 23      Q.   That, you're talking about, was in late 2011,
02:14 24  2012 when he returned to the U.S.?
02:14 25      A.   Most of it, yes.

LEXITAS

02:20  1   that?  What was your response to that?

02:20  2       A.   My response is I didn't -- I'm not the one

02:21  3   having foreign businesses done in foreign languages, so

02:21  4   I think it's reasonable to ask for translated documents.

02:21  5   If you're going to buy something or invest in something

02:21  6   to substantiate your losses, your bases, it's reasonable

02:21  7   to ask for -- that's my. . .

02:21  8       Q.   You never came back and asked for specific

02:21  9   documents to be translated, did you?

02:21 10       A.   I don't remember.

02:21 11       Q.   I want to go back to this thing again, the

02:21 12   facts and circumstances, because, you know, 2.7 million

02:21 13   is a lot of money, right?

02:21 14       A.   Yes, it is a lot of money.

02:21 15       Q.   And I just want to make sure I know all the

02:21 16   reasons why you thought that is appropriate, you

02:22 17   concluded that was appropriate.

02:22 18       A.   I conclude that it's appropriate.

02:22 19       Q.   You conclude nothing short of the maximum was

02:22 20   appropriate?

02:22 21       A.   The IRM and the guidance that I had gives me

02:22 22   leeway to consider all the facts and circumstances in a

02:22 23   case to determine what penalties are applicable.

02:22 24       Q.   Are you saying that you had discretion to go

02:22 25   from the minimum penalty all the way up to 2.7 million

LEXITAS

02:22  1    or are you saying that it had to be the maximum?

02:22  2            MR. LINDER:  Objection, calls for a legal

02:23  3    conclusion.  You can answer.

02:23  4        A.  I had the discretion.

02:23  5        Q.  (By Mr. Katz)  And you did not see any reason

02:23  6    to exercise, say, 50 percent of the maximum or

02:23  7    30 percent or 40 percent of the maximum?

02:23  8        A.  The guidance doesn't -- from what I understand,

02:23  9    I can do nothing or I can penalize him $10,000 for all

02:23  10   years or I can penalize him $10,000 for every year or

02:24  11   $10,000 for every year for every account.

02:24  12       Q.  So you thought your choice was one --

02:24  13       A.  For willful -- I mean for the non-willful.  I'm

02:24  14   just talking about non-willful.

02:24  15       Q.  So just to summarize, you're saying that you

02:24  16   understood that under the IRS manual you could impose

02:24  17   one $10,000 penalty, $10,000 penalties for each of the

02:24  18   five years in issue, or a $10,000 penalty for each

02:24  19   account in each year?

02:24  20       A.  Yes.

02:24  21       Q.  That's -- those are your choices?

02:24  22       A.  Yes.

02:24  23       Q.  And you couldn't say, for example, I'm going to

02:24  24   impose -- you couldn't have said instead of imposing

02:24  25   $10,000 penalty for each year, five of those for 50,000,

Anh Reach

02:25  1   I'm going to impose two $10,000 penalties each year for

02:25  2   a total of 100,000?

02:25  3                  MR. LINDER:  Objection, calls for

02:25  4   speculation.  You can answer.

02:25  5       A.   I didn't read that I had that much wiggle room

02:25  6   with regard to the penalty structure.

02:25  7       Q.   (By Mr. Katz)  So you had no wiggle room.  Your

02:25  8   choice -- you had three choices?

02:25  9       A.   Four.

02:25  10      Q.   Four choices?

02:25  11      A.   Yes.

02:25  12      Q.   10,000 for no penalty, 10,000 for one -- for

02:25  13  all the years, one $10,000 penalty; five $10,000

02:25  14  penalties, one for each year; or the maximum, a $10,000

02:25  15  penalty for each account for each year?

02:25  16      A.   Yes.

02:25  17                  MR. KATZ:  We're going to take a break but

02:25  18  I think we're done.

02:26  19                  MR. LINDER:  Okay.

02:26  20                  (Recess taken from 2:26 p.m. to 2:31 p.m.)

02:31  21                  MR. LINDER:  Are you passing the witness?

02:31  22                  MR. KATZ:  Yes, I pass the witness.

02:31  23                  MR. LINDER:  I just have a few questions.

02:31  24                  EXAMINATION

02:31  25  BY MR. LINDER: