UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:19-cv-00415 |
| | ) | |
| ALEXANDRU BITTNER | ) | |
| Defendant. | ) | |

**DEFENDANT ALEXANDRU BITTNER'S SUR-REPLY TO THE UNITED STATES' REPLY TO DEFENDANT'S RESPONSE TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Defendant Alexandru Bittner ("Defendant" or "Mr. Bittner") submits his Sur-Reply to the United States' Reply, ECF No. 56, ("Plaintiff's Reply") to Defendant's Response, ECF No. 47, to Plaintiff's Motion for Partial Summary Judgment, ECF No. 29, ("Plaintiff's Motion") and respectfully state as follows:

**I.   The Government Mischaracterizes the Law Regarding Reasonable Cause**

The government again argues in its Reply that Defendant cannot establish a genuine issue of material fact regarding reasonable cause because lack of knowledge regarding FBAR obligations can never establish reasonable cause. Plaintiff's Reply at p. 3–6. The government is mistaken.

This Court rejected this very argument in a similar case where the government sought to impose a penalty under Internal Revenue Code Section 6038 for failure to file a complete IRS Form 5471, a form reporting ownership of a foreign corporation.  See *Congdon v. United States*, 4:09-CV-289, 2011 WL 3880524, at *3 (E.D. Tex. Aug. 11, 2011) (Mazzant, J.), *report and recommendation adopted*, 4:09-CV-289, 2011 WL 3880564 (E.D. Tex. Aug. 31, 2011).  The government argued that, as a matter of law, Congdon's ignorance of the law could not constitute reasonable cause, which would have negated the penalty. The Court rejected that, stating:

1

> [R]easonable cause may be established if the taxpayer shows ignorance of the law in conjunction with other facts and circumstances. Some factors to be considered include the following: the taxpayer's education, if the taxpayer has been previously subject to the tax, if the taxpayer has been penalized before, if there were recent changes in the tax forms or law which a taxpayer could not reasonably be expected to know, and the level of complexity of a tax or compliance issue. Generally, the most important factor in determining whether the taxpayer has reasonable cause and acted in good faith is the extent of the taxpayer's effort to report the proper tax liability. Failure to file because of an erroneous belief that no return is required to be filed is not reasonable cause. However, a taxpayer's sophistication with respect to tax laws, at the time the return was filed, is relevant in determining whether the taxpayer acted with reasonable cause.

*Id.* (internal citations omitted).

In *Congdon*, the Court found that "there is a genuine dispute regarding whether Plaintiff acted with ordinary business care and prudence." *Id.* at *4. Among other factors indicating good faith and reasonable cause, the Court pointed to that fact that, in addition to being unaware of the law, Mr. Congdon "alleges other factors such as his inexperience in tax matters, and the complexity of the area of law. *Id.* Combined, those factors could be found by the finder of fact to constitute reasonable cause." *Id.*

It was not dispositive that Mr. Congdon "has obtained his Master's in Business Administration," as "he had little to no instruction in the area of accounting, tax law, or finances." *Id.* It was also important that Mr. Congdon "had never been penalized for a violation of section 6038 prior to this occasion." *Id.* Finally, the Court noted that when Mr. Congdon "was alerted to the error, he filed an amended Form 5471." *Id.* The Court held that ignorance of the law, together with these factors, was sufficient to establish "that a genuine issue of fact exists regarding whether Plaintiff acted with ordinary business care and prudence, and therefore, whether Plaintiff had reasonable cause for his failure to file a substantially complete Form 5471." *Id.*

The factors evidencing Mr. Bittner's reasonable cause are much stronger than those in Mr. Congdon's case. Unlike Mr. Congdon who was educated in the United States and had a master's in business administration, Mr. Bittner obtained an engineering degree from a Romanian university.

2

Unlike Mr. Congdon who "had little to no instruction in the area of accounting, tax law, or finances[,]" Mr. Bittner had absolutely zero instruction in those areas. Moreover, unlike Mr. Congdon who apparently lived in the United States and set up foreign entities for clients, Mr. Bittner lived for over two decades in Romania and had close to no contact with the United States during that period. Like Mr. Congdon, when Mr. Bittner learned of his compliance failure, he took prompt steps to correct it.

In addition, the Court should consider the nature of the form in question. Unlike income tax returns for which the standard of reasonable cause was developed, an FBAR is an obscure information reporting form that many, perhaps most, ordinary citizens have never heard of. Indeed, in 2008, the total number of FBARs filed was 247,106.[1] Of those, 96,744 were from persons who identified a non-U.S. address. *Id.* A mean estimated number of 4,330,387 U.S. citizens resided abroad in 2010.[2] It is unreasonable and senselessly punitive to impose millions of dollars of penalties on someone who lived abroad for over twenty years, had minimal contacts to the U.S., and had no communications with any U.S. professionals, simply because he was unaware of a particular U.S. information reporting obligation, and did not take affirmative steps to learn about it. Importantly, those living outside of the U.S. do not consider their non-U.S. bank accounts to be "foreign."[3] Under any reasonable cause standard, that perspective is important. Here, contrary to the government's assertion, Defendant does not rely solely on ignorance of the law to establish reasonable cause. Instead, Defendant has put forth evidence concerning numerous facts and circumstances relevant to his reasonable cause, summarized as follows:

---

[1] Niels Johannesen et al., *Taxing Hidden Wealth: The Consequences of U.S. Enforcement Initiatives on Evasive Foreign Accounts* at p. 41 (October 7, 2019) (IRS SOI Publication) *available at* www.irs.gov › pub › irs-soi › 19rptaxinghiddenwealth (last visited May 8, 2020).
[2] Fors March Group LLC, *A Model for Developing Estimates of U.S. Citizens Aboard: Final Technical Report* at p. 63 (July 2013) (Submitted to the Federal Voting Assistance Program).
[3] Niels Johannesen et al., *Taxing Hidden Wealth,* at 14.

- Bittner was born in Romania in 1957 where he lived until 1982 during the communist era.
- Bittner attended a high school in Romania that emphasized technical education, and after his second year he opted into mathematics for his curriculum track. At the Politehnica University of Bucharest, Bittner studied mechanical and chemical engineering. He also served in the army, as required. he had little to no instruction in the area of accounting, tax law, or finances Bittner obtained a master's degree in chemical engineering in 1981.
- In 1982, he immigrated to the United States with the assistance of the Hebrew National Aid Society. Bittner did not speak English growing up in Romania and learned it as his third language. He became a naturalized citizen in 1987 and resided in the United States until 1990.
- His first job in the U.S. was a dishwasher. After a year or so in the U.S., he became a plumber's apprentice. Later, he obtained a master plumbing certificate. Bittner then worked as a plumber with various employers until he moved back to Romania. He also fixed up a few houses on the side.
- Bittner has never taken any educational courses in accounting, law, or taxation.
- Bittner returned to Romania in 1990. His family joined him to relocate back to Romania in 1991, where Bittner and his wife resided until late 2011. He moved back to Romania following the revolution and fall of communism because he believed there would be opportunity for a better life in his home county. He registered with the United States embassy in Romania and updated the embassy when his address changed.
- During those two decades he resided in Romania, he returned to the United States only 3–4 times for short visits.
- During the long period Bittner lived in Romania, he had no awareness that FBAR forms existed or that, as a naturalized US citizen who resided in Romania, he was obligated to file such forms.
- While in Romania, Bittner did file some Form 1040 tax returns reporting U.S. sourced income from his minority interest in a California restaurant operated by his sister and brother-in-law. They prepared those returns on his behalf.
- After returning to the United States and discovering he had been required to file tax returns (reporting worldwide income), Bittner hired CPA Beckley with the goal of getting into compliance with U.S. law. CPA Beckley advertised on his website that he had the expertise to advise U.S. citizens who earned money from outside the country.
- As part of the return preparation process, Bittner informed CPA Beckley that he had foreign income; bank accounts; and business interests, and he supplied CPA Beckley with information requested of him about those items.
- In 2012, Beckley informed Mr. Bittner about the obligation to file FBARs, which is the first time he learned about this duty.
- On Mr. Bittner's behalf, CPA Beckley prepared Forms 1040 for the years 1990 to 2011 and FBARs for the years 1996 through 2011.
- After discovering that Beckley had made a number of errors in preparing the tax returns and forms, Bittner engaged tax counsel and a new CPA. On September 25, 2013, Bittner filed corrected FBARs, disclosing all bank accounts and balances.

4

*See* Alexandru Bittner Streamlined Certification Statement, Ex. B to Defendant's Response; Bittner Deposition Transcript, attached hereto as Ex. A, 16:1-19:9, 20:5-29:24, 35:6-36:9, 37:19-39:9, 40:4-13, 44:2-47:16, 202:20-205:12, 208:8-23, 212:6-213:13, 219:9-21, 222:11-224:9, 224:25-226:22, 232:5-7, 245:15-246:8, 249:2-250:7, 260:10-24, 273:9-274:25, 280:10-281:17; Bittner Declaration, Ex. A to Defendant's Motion; *see also* First Amended Answer, ECF 13, at ¶¶ 37-49.

In sum, the government's assertion that "ignorance of the law may not be a defense since the taxpayer must take reasonable steps to determine the law and apply it" is wrong. *See* Plaintiff's Reply at 4. Indeed, Mr. Bittner's particular facts and circumstances establish a genuine issue of material fact as to whether he had reasonable cause for his failure to timely file the FBARs at issue. Thus, Plaintiff's Motion should be denied.

    **II.    The Government's Flawed "Constructive Knowledge" Argument Does Not Establish, as a Matter of Law, that Defendant Did Not Have Reasonable Cause**

The government also contends that Defendant had knowledge of his FBAR obligation because he filed tax returns for the years 1988 and 1989, years before he returned to Romania, and those returns allegedly contained a Schedule B requiring a taxpayer to state whether he had an interest in foreign accounts. Plaintiff's Reply at p. 5–6. Essentially, the government argues that Defendant had "constructive knowledge," of his need to report foreign accounts (resulting in unavailability of a reasonable cause defense). This is wrong, and at least one court in this Circuit has rejected this "constructive notice" argument in the context of FBAR violations. *United States v. Flume*, 5:16-CV-73, 2018 WL 4378161, at *7–8 (S.D. Tex. Aug. 22, 2018). A district court in the Eleventh Circuit has similarly rejected that argument. *United States v. Schwarzbaum*, No. 18-CV-81147, 2020 WL 1316232, at *8 (S.D. Fla. Mar. 20, 2020) ("[T]he Court agrees with the recent decision in *United States v. Flume*, No. 5:16-CV-73, 2018 WL 4378161, at *7 (S.D. Tex. Aug. 22, 2018), that the theory of constructive knowledge is unpersuasive in this instance.").

In *Flume*, the government argued, in a motion for summary judgment, that the Defendant was constructively aware of his FBAR obligation, and therefore acted willfully, because he signed two tax returns that included Schedules B. *Id.* at *7. However, the court rejected that argument which would "ignore the distinction Congress drew between willful and non-willful violations of Section 5314." *Id.* Indeed, "[i]f every taxpayer, merely by signing a tax return is presumed to know of the need to file an FBAR, it is difficult to conceive of how a violation could be non-willful." *Id.* (internal quotations and citations omitted). Additionally, the court noted that it would have "exceed[ed] its summary-judgment authority if it presumed that Flume 'examined' his returns" and therefore was aware of the FBAR requirements "merely because he signed the returns under penalty of perjury." *Id.* Importantly, Flume later testified, again under penalty of perjury, that he was unaware of the FBAR requirements. *Id.*

Here, Defendant had no Romanian bank accounts when he filed his 1988 and 1989 tax returns as he did not open any foreign accounts until after he returned to Romania in 1990. Bittner Tr. 38:12-19, attached hereto as Ex. A. Moreover, the government has failed to supply any evidence to demonstrate that Schedules B were filed with his 1988 and 1989 returns. Only when such schedule is filed can there be a question whether a taxpayer has made a false statement. Plaintiff's purported Schedule B evidence constitutes of only printouts from the IRS IMF (Individual Master File) system. Those IMF printouts do not indicate whether Schedules B were included with the tax returns filed by Mr. Bittner in 1988 and 1989 (but do indicate if Schedules C, D, or Fs were). *See* Plaintiff's Reply at Ex. 75. In short, there is simply no evidence demonstrating that Defendant ever saw, reviewed, understood, prepared or filed a tax return containing a Schedule B before calendar year 2012.

Moreover, even assuming *arguendo* that Schedules B were included in the 1988 and 1989 tax returns, that does not entitle the government to summary judgment. There is no evidence that

6

Defendant saw, read, understood or answered the question regarding foreign bank accounts (he did not even have any such accounts then). Like Mr. Flume, Defendant has repeatedly sworn under penalty of perjury that he was entirely unaware of his FBAR obligations until he returned to the United States after living in Romania for over twenty years. *See* Bittner Tr. at 223:3-21, 232:5-7, 273:20-274:22, attached hereto as Ex. A; Bittner Declaration, Ex. A to Defendant's Motion; Alexandru Bittner Streamlined Certification Statement, Ex. B to Defendant's Response, at ¶¶4–5. Thus, the Court would be "exceeding its summary-judgment authority" if it determined that the unproven filing of a Schedule B for years in which there is no evidence Defendant had non-U.S. bank accounts conclusively established his knowledge about FBAR obligations. *See Flume*, 2018 WL 4378161, at *7. This Court should refuse to find that Defendant had knowledge, actual or constructive, of his obligation to file FBARs, at the time they were due, for any of the years at issue.

### III. Conclusion and Prayer

For the foregoing reasons, Defendant Alexandru Bittner respectfully requests that the Court deny Plaintiff's Motion for Partial Summary Judgment.

B6544\A63010\4823-8738-5020.v1

Respectfully submitted,

**CLARK HILL STRASBURGER**
2301 Broadway St.
San Ant0onio, Texas 78215
(210) 250-6006 (Ph.)
(210) 258-2714 (Fax)

By: /s/ Farley P. Katz
**FARLEY P. KATZ**
LEAD ATTORNEY
State Bar No. 11108790
fkatz@clarkhill.com
**RACHAEL RUBENSTEIN**
State Bar No. 24073919
rrubenstein@clarkill.com
**FORREST M. "TEO" SEGER III**
Texas Bar No. 24070587
tseger@clarkhill.com

**ATTORNEYS FOR DEFENDANT
ALEXANDRU BITTNER**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 11, 2020 a true and correct copy of the foregoing was electronically filed with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the following:

Herbert W. Linder
Attorney, Tax Division
United States Department of Justice
717 N. Harwood, Suite 400
Dallas, Texas 75201
Herbert.W.Linder@usdoj.gov
*Attorney for Plaintiff*

/s/ Rachael Rubenstein
**RACHAEL RUBENSTEIN**

B6544\A63010\4823-8738-5020.v1