1

```
1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF TEXAS
2                        SHERMAN DIVISION

3

UNITED STATES OF AMERICA     :      DOCKET NO. 4:19CV415
4                            :
VS.                          :      SHERMAN, TEXAS
5                            :      JUNE 4, 2020
ALEXANDRU BITTNER           :      9:00 A.M.
6

7

8                        TELEPHONE CONFERENCE
              BEFORE THE HONORABLE AMOS L. MAZZANT,
9                 UNITED STATES DISTRICT JUDGE

10   APPEARANCES (BY TELEPHONE):

11   FOR THE PLAINTIFF:          MR. HERBERT WEST LINDER
                                 US DEPARTMENT OF JUSTICE
12                               717 N. HARWOOD, SUITE 400
                                 DALLAS, TX  75201
13

14   FOR THE DEFENDANT:          MR. FARLEY P. KATZ
                                 MS. RACHAEL ELISA RUBENSTEIN
15                               MR. FORREST MATHEW SEGER III
                                 CLARK HILL STRASBURGER
16                               2301 BROADWAY
                                 SAN ANTONIO, TX  78215
17

18   COURT REPORTER:            MS. JAN MASON
                                OFFICIAL REPORTER
19                              101 E. PECAN #110
                                SHERMAN, TEXAS  75090
20

21

22

23

24   PROCEEDINGS REPORTED BY MECHANICAL STENOGRAPHY, TRANSCRIPT

25   PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.
```

2

1             THE COURT:  Good morning.  This is Judge Mazzant.

2      We're here in 4:19CV415, and we're here for argument on the

3      various motions for summary judgment.

4             And I know that there was an email exchange I think

5      with my staff and Mr. Michaels regarding the amicus.  I did

6      not grant your ability to speak at the hearing.  I did allow

7      the fact that you could file a brief and we would consider

8      that.  But I didn't know if you had any conversation with

9      the other parties in this case regarding the hearing, but I

10     know you included in your amicus brief the request and, of

11     course, I hadn't ruled on that.  But typically in District

12     Court we look at motions that are filed separately, not as

13     included in the brief, and so I'll be candid, I didn't pay

14     attention to that.

15            But my intent was never to have you argue at the

16     hearing but simply we would consider your briefs on the

17     matter.  But you're welcome to listen in to the hearing

18     since we are in the courtroom and it's a live hearing.

19            So let me ask for the two parties, since you have

20     competing motions, have y'all discussed who would like to go

21     first?  It does not make a difference to the Court.

22            MS. RUBENSTEIN:  Your Honor, this is Rachael

23     Rubenstein, Defendant Bittner's counsel.  I looked at the way

24     it was scheduled and I understood that we would go first.

25            THE COURT:  That's fine.  Go ahead.

3

1          MR. LINDER:  That's fine.

2          MS. RUBENSTEIN:  Okay.  So I'm going to start with

3    the issue -- there's one issue in Defendant's motion.

4    Defendant's motion asks, does 31 USC 5321(a)(5)(B)(1) limit the

5    maximum penalty that can be assessed for a non-willful failure

6    to timely file an FBAR to $10,000?  Defendant contends it does.

7    The language of the statute is clear.  Resolution issue would

8    limit the Government's claim to a maximum of $50,000 and not

9    the $2,720,000 the Government is seeking.

10         Before I get into -- excuse me -- our argument, I would

11   like to go over some background facts which I think are

12   helpful.  This -- so, Your Honor, we did provide a

13   PowerPoint presentation and I'll reference that when I, you

14   know, am talking about that part.  The background facts are

15   not there.

16         THE COURT:  And I have that.

17         MS. RUBENSTEIN:  Thank you.

18      Mr. Bittner was born and raised in Communist Romania,

19   and he lived there for his childhood into early adult life.

20   In 1982 in his early twenties he legally immigrated to the

21   United States to escape the Communist regime and

22   discrimination against Jews.

23      He had help from the immigrant -- the Hebrew Immigrant

24   Aid Society.  He learned English as his third language.

25         In 1987 he became a naturalized citizen.  When he was

4

1    in the United States, Mr. Bittner was a dishwasher, a waiter

2    and eventually a plumber.

3         In 1990, that was when the Romanian Revolution occurred

4    and the fall of communism.  Mr. Bittner at that point had

5    been living in the United States for eight years.  Three of

6    those years he was a naturalized citizen.

7         He decided to return to Romania after the fall of

8    communism, believing that he would have better opportunity

9    there in his home country.  When he returned to Romania, he

10   formally moved back there in 1991 with his family and there

11   he remained.  He continued to reside in Romania for 20 --

12   more than 20 years, and it wasn't until 2011 that he moved

13   back to the United States.

14        For those 20 plus years he was living in Romania, he

15   only visited the United States on a few occasions.

16        While in Romania, Mr. Bittner did file some U.S. tax

17   returns.  Those were prepared by either his sister or his

18   brother-in-law, and these would have been a few tax returns

19   in the 1990s.  In those 1040 returns prepared by his sister

20   or his brother-in-law, he reported a small amount of U.S.

21   source income, and that U.S. source income came from a

22   minority interest Mr. Bittner had in his sister and

23   brother-in-law's restaurant in California.

24        When he moved back to the United States in 2011, he

25   discovered -- he learned at that point that he should have

5

1    been filing tax returns to the United States Government

2    reporting his worldwide income, not just his U.S. source

3    income.

4         At that point Mr. Bittner became quite nervous that he

5    was out of compliance with U.S. tax law, and as a result, he

6    very soon began -- very soon after his return he began

7    searching for a professional that could help him come into

8    compliance with U.S. law.

9         He located a CPA named Jeff Beckley in Plano, Texas,

10   and tha CPA advertised on his website that he had expertise

11   in advising individuals like Mr. Bittner, individuals who

12   earned income abroad.

13        When Mr. Bittner -- Mr. Bittner visited Mr. Beckley

14   many times to try to see what needed to happen to get into

15   compliance.  In visiting with CPA Beckley, he told him

16   he had foreign income.  He told him he had foreign accounts.

17   He told him he had Romanian business interests, and he

18   provided Mr. Beckley with pretty much -- or he did provide

19   Mr. Beckley with everything Mr. Beckley asked him to

20   provide.

21        Mr. Beckley went on and prepared Form 1040 tax returns,

22   22 years' worth of back tax forms.  He also prepared back

23   FBARs for Mr. Bittner.

24        FBARs are the forms at issue here.  They require filers

25   to report financial interest or signatory authority or other

1   interest that they have in foreign financial accounts.

2   It was only from Mr. Beckley where Mr. Bittner first

3   learned anything about FBARs.  He had never heard about that

4   obligation before, and frankly, there would be no reason for

5   him to have ever heard of it before, before that time, while

6   he was living in Romania.

7   He went ahead and filed, through Beckley, FBARs.  These

8   FBARs and the tax returns filed by Beckley had many errors.

9   Beckley was, frankly, not competent to represent somebody

10   like Mr. Bittner and was not competent to render advice in

11   this area of law.

12   One of the main mistakes Beckley made with respect to

13   the prior year tax returns is he made a treaty election.  He

14   reported basically the gross income that he determined Mr.

15   Bittner had in those years from worldwide sources, but then

16   he backed it out from the return under a treaty exemption.

17   Well, the treaty doesn't apply.

18   So after that happened, Mr. Bittner began to get

19   notices from the IRS.  These notices are called mass error

20   notices.  Mass error notices allow the IRS to automatically

21   assess, without what we call deficiency rights,

22   automatically assess taxes due.  That happened at the

23   beginning of this case.  There was over $6 million of

24   automatic assessments that Mr. Bittner began to receive

25   notices for in 2012.

7

1    That panicked him, as it should, and he retained legal

2    counsel.  He retained Mr. Katz in our firm.  That was in

3    2012.

4    Shortly thereafter he also retained a new CPA.  The new

5    CPA, Mr. Booker, went on to prepare amended tax returns for

6    Mr. Bittner, correctly identifying, you know, all the income

7    and foreign tax credits and the items that needed to be

8    reported.  That was for years 2006 through 2011.

9    Then also Mr. Booker prepared corrected FBARs on behalf

10   of Mr. Bittner, and those corrected FBARs were submitted to

11   the IRS in 2013.  In this matter the Government concedes

12   those FBARs were accurate for the purposes of analyzing this

13   motion.  And those FBARs simply required Mr. Bittner to give

14   basic information, to identify that he had 25 or more

15   accounts, financial interest, and to list the number of

16   accounts.  No further information was required under the

17   statute or the regulations or the instructions with respect

18   to what needed to go in the FBARs.  He wasn't required to

19   report the account number, the account name, or the account

20   balance.  Simply, he was required to check the box, report

21   the number of accounts and that was all.

22   However, in 2013, on advice of counsel, Mr. Bittner

23   went ahead and included a 36 page schedule, with attached

24   the FBARs he filed as corrected, and that schedule fully

25   disclosed the account numbers, the bank, the balances, all

8

1   of that information.

2       Importantly, most of these accounts -- the vast

3   majority of these accounts are company accounts.  The reason

4   Mr. Bittner is required under the regulation to report those

5   company accounts is because he had 50 percent or he had more

6   than 50 percent interest, he owns more than 50 percent of

7   the company.

8       These were operating Romanian companies.  Mr. Bittner

9   was really an investor in these companies.  He did not

10  operate the day-to-day.  He did not have signatory authority

11  over any of the accounts.  He simply had controlling

12  interest, and that controlling interest is what really at

13  that point gives rise to the obligation to report the

14  account.  Beckley didn't know that.  Mr. Bittner didn't know

15  that.  And that's -- that's why the corrections were made.

16  And, again, the corrections were voluntarily made and they

17  were made before the IRS ever opened an examination of Mr.

18  Bittner.

19      So going on, after the amended return and the

20  examination of Mr. Bittner, in 2017 the IRS issued a notice

21  of deficiency related to additional taxes the IRS was

22  proposing.  That case went to tax court.  An agreed decision

23  was entered on November 12th, 2019.

24      And importantly, with respect to the years at issue

25  here, 2008, '09 and '10, Mr. Bittner owed no tax deficiency.

1   For 2007 he owed a small deficiency of about $46,000, which

2   has been fully paid.  So there is no non-tax compliance at

3   issue in this case.  Mr. Bittner is fully compliant with his

4   tax obligations.

5       In June of 2017 the IRS also assessed, after four years

6   of an examination, FBAR penalties.  These FBAR penalties are

7   non-willful.  They were assessed on a per account basis by

8   the Department, and those penalties total 2 million --

9   $2,720,000.  So $10,000 per each account, there was 272

10  accounts in total, and that's what the Government went with.

11      So in calculating this penalty and in making their

12  penalty assessment, the sole information relied upon by the

13  Government, by the IRS, is information supplied by Mr.

14  Bittner voluntarily before an exam commenced.

15      We're talking about non-willful penalties.  Non-willful

16  conduct is conduct that is innocent, or at worst, negligent.

17  This contrasts to willful.  Willful penalties and the

18  definition of willfulness is intentional violations of known

19  legal duties.

20      So with that said, we get back to the issue here, the

21  statute.  Does the Statute 5321(a)(5)(B)(1) tax the

22  non-willful penalty to $10,000 per form?  It does.

23      Going to slide -- well, let me back up a minute.  Let's

24  go to slide four of Bittner's PowerPoint demonstrative

25  exhibit.  Slide four is 31 USC 5314.  Forty-one -- 31 USC

1   5314, that is where the FBAR reporting obligation -- that is

2   the statute that gives rise to the reporting obligation.  It

3   begins with a limiting instruction.  It says considering the

4   need to avoid impeding or controlling the export or import

5   of monetary instruments and the need to avoid burdening

6   unreasonably a person making a transaction with a foreign

7   financial agency, the Secretary of the Treasury shall

8   require a resident or a citizen essentially to keep records,

9   file reports when such person maintains a relation with a

10  foreign financial agency.

11      That's all the statute says with respect to the

12  obligation.  It's the regulation, the implementing

13  regulation that gives further detail about what is required

14  when somebody has a relation with a foreign financial

15  agency.

16      The implementing regulation on slide five is 31 CFR

17  1010.350, reports of foreign financial accounts.  So that

18  regulation says a person who is a resident or a citizen of

19  the United States who has a financial interest in, signatory

20  authority over, or other authority with respect to a foreign

21  financial account shall provide such information essentially

22  on an FBAR.  They shall provide such information as required

23  on an FBAR.

24      The implementing regulation also notes that there is a

25  special rule with respect to persons with financial

11

1    interests in 25 or more accounts.  This special rule

2    actually modifies the reporting obligation making it less

3    burdensome.

4        On slide six -- slide six is Subsection G(1) of the

5    implementing regulation for somebody who has financial

6    interest in 25 or more accounts, and it right there in the

7    regulation says they need only provide the number of

8    financial accounts and certain other basic information on

9    the report at the time of filing, right?  But they are

10   required to essentially retain information and they are

11   required to provide that, if they're requested to do so by

12   the Secretary or a delegate, such as the IRS.  So, again,

13   Mr. Bittner though, he provided that information in advance

14   of being requested.

15       So the implementing regulation refers to a form.  We

16   call that form an FBAR.  The -- the filing threshold that

17   gives rise to the FBAR obligation to file, it's a $10,000

18   filing threshold, so 10,000 of the aggregate balance in all

19   foreign financial accounts.  So that's important in the

20   sense that an individual is only required to file an FBAR if

21   the aggregate value across all foreign financial accounts

22   exceeds $10,000.

23       So they can have, for example, you know, ten accounts

24   and three of those accounts could have a dollar in it, but

25   if one of the accounts has more than $10,000, all of the

12

1   accounts get identified and reported on the FBAR, unless

2   there's a special waiver of the FBAR.

3        Significantly -- excuse me.  I'm going to skip slide

4   eight.  Slide 9 is a screenshot of the actual FBAR form.

5   Question 14 on the FBAR form, that is the question of does

6   the filer have a financial interest in 25 or more accounts.

7   If yes, you enter the number of accounts.  In the

8   parenthetical it says, if yes is checked, do not complete

9   part two or part three but retain records of this

10  information.

11       Moving to slide ten, to summarize, a U.S. citizen or a

12  resident who has a financial interest in or signatory

13  authority over foreign accounts with an aggregate balance of

14  10,000 is required to file an annual form, the FBAR.  They

15  only file one form, regardless of the number of accounts.

16  Again, 25 or more accounts, you check a box and you list the

17  number of accounts.  You do not complete any other

18  information with respect to amounts, the balance, the

19  account number or the address or the name of the bank.

20       So it's undisputed in this case that Mr. Bittner had a

21  financial interest in 25 or more accounts for each of the

22  years at issue.  Most -- again, the vast majority of these

23  accounts are not his personal accounts.  These were accounts

24  of Romanian entities, operating companies in which he owned

25  more than 50 percent of the interest.

13

1    So Mr. Bittner was required to file five FBARs, one per

2  year, to check the box indicating he had a financial

3  interest, identify the number of accounts.

4    Slide 12 has a screenshot of the 2007 FBAR that was

5  filed and stamped as received, the corrected FBAR filed and

6  stamped as received in September of 2013.  This is all the

7  information -- this is the complete form.  You'll see the

8  signature and then date 9-17-2013.

9    Slide 13, that is a sample of one page of the 36 page

10  schedule that Mr. Bittner voluntarily included.  So this is

11  a sample showing, for instance, the entity Ecofish.  Ecofish

12  had, you know, various bank accounts at one, two, three --

13  five different banks, and then Mr. Bittner is indicating the

14  highest balance, you know, in each year in each account and

15  providing that information to the IRS for Ecofish.

16    So there was one -- there would have been a schedule

17  page for each entity describing the amounts, the numbers of

18  the bank, all of that info.

19    Moving to slide 14, these are Mr. Bittner's personal

20  accounts and his only personal accounts that gave rise to

21  any FBAR obligation.  You know, in A through E, those are

22  all Romanian accounts.  Count F, that was an account in

23  Liechtenstein where he did some business there, and then

24  you'll notice that the Liechtenstein account had less than

25  $10,000 in it for each year.  It was, you know, a de minimus

14

1    account.

2         Then the last account, the Royal Bank of Canada

3    account, which is focused on extensively by the Government,

4    that is a Swiss account that Mr. Bittner had.

5         Moving to slide 15, slide 15 is where we really get

6    into the statutory construction issue here.  31 USC

7    5321(a)(5)(A), that authorizes a penalty.  The Secretary of

8    the Treasury may impose a -- a civil money penalty on any

9    person who violates or causes any violation of any provision

10   of Section 5314.  We discussed 5314 earlier, and 5314 --

11   5314 gives rise to the obligation to file an FBAR.  So

12   Subparagraph A is the authorization statute.

13        Moving to slide 16, Subparagraph B is the amount.  This

14   is what authorizes the amount of the penalty.  The amount of

15   any civil penalty imposed under Subparagraph A shall not

16   exceed $10,000.  The amount of any civil penalty, any

17   non-willful civil penalty, shall not exceed $10,000.  Mr.

18   Bittner is assessed only non-willful penalties.  We are not

19   talking about any other type of penalties except

20   non-willful.

21        Subparagraph B(2) is the reasonable cause exception.

22   B(2) is a safe harbor reasonable cause exception.  It allows

23   for the imposition of no penalty, provided that the filer

24   had a reasonable cause and that eventually they cured any

25   defects that they had in the original filing.  Just like Mr.

1   Bittner did, right?  And eventually correctly reported, you

2   know, the balance.

3        Slide 17, Subparagraph C, that deals solely with

4   willful violations.  That is the amount talking about for

5   willful violations, and when there's a willful violation,

6   that willful violation is tied to the --

7        There's a lot of feedback in the background.  I'm

8   sorry.  Can I pause for a moment?

9             THE COURT:  That's fine.  We're not hearing it here,

10  so --

11            MS. RUBENSTEIN:  Okay.  I'll try to ignore it.

12       All right.  Subparagraph C of 31 USC 5321(a)(5), that

13  is for willful.  A willful penalty is different, right?  A

14  willful penalty is tied to account balances by statute,

15  because it allows for a max penalty of the greater of a

16  hundred thousand or 50 percent of the amount determined

17  under Subparagraph D.

18       When you go to the next page, right, that's

19  Subparagraph D.  That's talking about amounts.  But

20  Subparagraph D for this penalty statute is only connected to

21  the willful.  Subparagraph D has nothing to do with the

22  non-willful component of the penalty statute.

23            THE COURT:  Let me ask you this.  How do you

24  reconcile the language in the non-willfulness provision with

25  that here in the willfulness provision?  Because it appears

1    that the underlying violation is the same, failure to report.

2    So the penalty for willful failure to report is assessed based

3    on the balance in the account, which seems to contemplate a

4    penalty on an account by account basis.  Why wouldn't the

5    non-willful penalty be understood in the same way?

6               MS. RUBENSTEIN:  Well, I think that goes back to the

7    legislative history.  You know, prior to 2004 and the passage

8    of the American Jobs Act, there was no penalty for any

9    non-willful violation, right?  Only willful violations were

10   penalized.

11              THE COURT:  Well --

12              MS. RUBENSTEIN:  It was in --

13              THE COURT:  Well, let me just ask you -- I mean, you

14   want to pull out the legislative history, but the Court looks

15   at the text first and we don't go beyond the text of either the

16   regulation or the statute unless there's some ambiguity.  So

17   reading those all together, and absent the legislative history,

18   why should it be treated differently, since the overall concept

19   is failure to file a report, whether willful or non-willful in

20   terms of the penalty?

21              MS. RUBENSTEIN:  Well, I think when we look at 31 USC

22   5321, you know, and we look at the non-willful, we've got one

23   statutory provision to look at, Subparagraph B, amount of

24   penalty.  And it says the amount of any civil penalty imposed

25   under Subparagraph A, right?  The non-willful shall not exceed

1    $10,000, period.  So I'm not sure there is any language to

2    reconcile.

3        The part two, right, that's just the safe harbor.  It

4    shouldn't be construed to expand further upon what is

5    already limited by part one.

6        I'm not sure how -- how we would read the safe harbor

7    that's allowing for no penalty to end up putting an

8    unlimited amount of penalties under, you know, Subparagraph

9    1, which specifically says the amount of any civil penalty

10   imposed shall not exceed $10,000.

11       THE COURT:  Well, wouldn't it be absurd -- an absurd

12   result to penalize somebody with 58 accounts who fails to file

13   an annual FBAR the same as someone who just has two or three

14   accounts who also fails to file his FBAR?

15       MS. RUBENSTEIN:  Not if it's not willful, because

16   non-willful is sort of innocent or negligent conduct.  You

17   know, it's inadvertent.  So, no, I don't think it would be

18   absurd.  I mean, the opposite would be absurd.

19       So if -- I think I've got an example here, so let's

20   see.  Let's take the example of the Government's

21   interpretation, right?  So let's consider an individual who

22   maintains a foreign account, one with $150,000 balance,

23   right?  And they willfully do not report that.  In that

24   instance, the maximum penalty under the statute, under

25   Subparagraph C(1), would be a hundred thousand dollars.

1      Say you have another individual, right, who
2  non-willfully fails to file an FBAR and that person has 20
3  accounts and their highest aggregate balance for all those
4  accounts is $70,000.  If you go with the Government's
5  interpretation, that's absurd because that person with
6  non-willful would owe $200,000, double the amount of the
7  non-willful -- yeah, double the amount of the willful actor.
8  That doesn't make any sense.
9      So getting back to -- we discussed the legislative
10  history a bit.  I'll just finish that up by saying, I mean,
11  yes, there was no penalty before 2004 for non-willful
12  conduct.  Congress felt that there should be a de minimus,
13  you know, modest penalty for that as well to encourage
14  compliance.  And this is to encourage compliance, not to be
15  punitive, right?
16      So encouraging compliance -- I'm on slide 19 -- the
17  provision adds an additional civil penalty, an additional
18  civil penalty may be imposed on any person who violates this
19  reporting requirement, without regard to willfulness.  This
20  new civil penalty is up to $5,000.  Now, the --
21      THE COURT:  Well, let me -- let me ask you this.  So
22  if deterrence is the issue and penalties are supposed to deter
23  future violations, how does your interpretation of Section 5321
24  provide the requisite amount of deterrence when it would assess
25  only a small penalty for an otherwise large violation?  It

1    could encourage those with a lot of money in foreign bank

2    accounts to basically turn a blind eye to the reporting

3    obligations and simply accept the $10,000 penalty as a small

4    price to pay for keeping their accounts out of the U.S.

5    supervision.  What about that?

6            MS. RUBENSTEIN:  Well, that's -- that's one of the

7    distinctions between willful and non-willful.  So if it's

8    non-willful -- I mean, if it's willful conduct, they're going

9    to be penalized much, much greater.  If it's non-willful, a

10   small penalty is a sufficient deterrence because it's sort of

11   an education mechanism, not a punitive mechanism.

12       And it worked for somebody like Mr. Bittner perfectly

13   because, one, he volunteered to do it even before he had to,

14   and two, he has continued to do it.  So, I mean, it

15   served -- it's sufficient, and it's sufficient to deter when

16   this conduct is non-willful.  And if the conduct is not

17   non-willful, if it's willful, then the deterrence -- then

18   it's beyond deterrence.  Then there's some punitive

19   penalties that come into play.

20       So moving to slide 20, again, we are talking about a

21   determination that has been made of non-willfulness.  You

22   know, there's a lot of argument in the Government's motion

23   or innuendo and extraneous information trying to hint around

24   willfulness concepts, but that's not what we have here.

25   There's already been a determination of non-willful conduct.

20

1       So rather than fine Mr. Bittner $10,000, which would

2   have totaled 50,000, which is still not an insignificant

3   amount of money, you know, the Government is charging a

4   $2,720,000 penalty for not filing an information reporting

5   form, not filing five information reporting forms.  They're

6   interpreting this as 272 separate violations.

7       Again, you know, we think the interpretation is fairly

8   clear that Section 50 -- or it's fair to say the statute

9   says "a", in the singular, civil monetary penalty when

10  you're talking about non-willful, and it shall not exceed

11  $10,000.

12      He didn't file five FBARs.  He should have.  He didn't.

13  It was non-willful.  He didn't know about it.  He was in

14  Romania.  He had no reason to know about it.  You know, he

15  doesn't -- people that live abroad for decades or even, you

16  know -- they don't view their accounts as foreign when their

17  accounts are where they live.  You know, Mr. Bittner is in

18  Romania.  These are Romanian business accounts.

19      And for those reasons -- oh, and the rule -- I do want

20  to bring up the rule of lenity here and then I'll finish.

21  The rule of lenity essential says it applies in the context

22  of civil penalties and it says it only comes into play if

23  the statute is ambiguous.

24      Mr. Bittner contends it is not.  But if the Court is to

25  find the statute is ambiguous, then the rule of lenity

21

1  applies.  Where there's two reasonable interpretations, you

2  go with the more lenient interpretation, not the more

3  punitive interpretation.

4      Also important is even the IRM guidance -- and the IRM

5  is the Internal Revenue Manual -- is not binding but still

6  guidance that is imposed on examiners when they're reviewing

7  FBARs.  It also limits.  It says, you know, only one $10,000

8  penalty in almost every case should apply unless there is

9  unique facts and circumstances and then there's sort of

10 different layers of review.  But the guidance is fairly

11 clear in almost all instances, a max -- only a $10,000

12 penalty is supposed to be applied, and that's sufficient to

13 deter compliance.

14     And for those reasons, we ask the Court to grant Mr.

15 Bittner's motion.

16         THE COURT:  Well, let me ask you one other question

17 regarding United States versus Boyd.  I know it's not -- it's

18 outside our jurisdiction, but how do you distinguish that

19 decision and why I shouldn't follow the reasoning there?

20         MS. RUBENSTEIN:  Well, a couple things with Boyd.  I

21 mean, it was wrongly decided.  It's on appeal.  And there, the

22 Court focused too much on the language that had to do with

23 willful, not non-willful, so the Court I believe got a bit

24 distracted by the willful provision.  And the Court also overly

25 relied on analyzing the safe harbor to expand further upon the

22

1   actual -- you know, the Court relied too much on the safe

2   harbor provision and the language therein and didn't look at

3   the actual penalty authorization and the penalty amount of the

4   non-willful statute.

5       Also, when we're talking about Boyd from a factual

6   distinction, you know, Boyd's penalty was I believe $40,000,

7   around that amount.  And also in Boyd, the IRS examiner --

8   there was a bigger account at issue, but the IRS examiner

9   applied mitigation and did a lesser penalty for the years at

10  issue.

11      So, I mean, we don't have the same level of sort of

12  overreach and abuse in Boyd as we have here, and I think

13  that does come into play when you're thinking about this

14  case and the big picture and, you know, this huge penalty

15  being asserted against an individual for non-willful

16  conduct.

17      I mean, in addition, Boyd misapplied the rule of

18  lenity.  Boyd sort of looked at the rule of lenity, and then

19  instead of taking the more reasonable interpretation that is

20  the more lenient approach, it goes with the more punitive

21  interpretation.

22              THE COURT:  Okay.  Thank you.

23              MS. RUBENSTEIN:  Thank you, Your Honor.

24              THE COURT:  Mr. Linder?

25              MR. LINDER:  Thank you, Your Honor.  Good morning.

23

1      In regards to some of the background information

2  counsel has brought up, the tax -- tax court and tax

3  liability is really not at issue in this case.  That was

4  decided in the tax court, and all the reliance on Mr.

5  Beckley and all the information about Mr. Beckley is really

6  not at issue because that goes to reasonable cause and that

7  really goes -- it really only would be applicable to 2011

8  year.

9      What is clear in this case is that Mr. Bittner had 272

10  accounts he should have reported and he failed to timely

11  report those.

12      In regards to the legal issues, I think Mr. Bittner's

13  position wants to -- I think, as the Court pointed out, he

14  wants to ignore or not consider the other parts of the

15  statute, which are the willful, which is on a per account

16  basis, and on the reasonable cause which specifically refer

17  to a per account basis.  And when these are read in

18  conjunction with the purpose of the statute under 5314 and

19  the implementing regulation, 10.350, the purpose is the

20  statute wants the reporting of financial accounts.  And the

21  failure to report the financial account is the violation.

22      The goal is to have individuals report their foreign

23  financial accounts as required.  The goal is not just to

24  file a form that is meaningless.  The form is a convenience

25  or the mechanism that a taxpayer is to use to report all

24

1    their financial accounts.

2            THE COURT:  Well, Mr. Linder, let me ask, if Congress

3    wanted to authorize penalties per account, why doesn't the

4    statute say per account or otherwise indicate an intent to

5    penalize individuals on the basis of each account maintained?

6        Presumably Congress knew how to use this sort of

7    language, as reflected in the willfulness portion of the

8    statute which references the balance in the account, but it

9    didn't do so here.  So why?

10           MR. LINDER:  I'm not sure why.  I guess they could

11   have written it better, but I think when you look at the

12   statute as written in conjunction with the other parts of the

13   statute and in conjunction with what they were trying to

14   achieve, is the reporting of accounts by the legislature

15   history and by looking at 5314 and 1010.350, if they wanted the

16   reporting of account.

17       How it was to be reported is left up to the Secretary.

18   I mean, I guess the Secretary could have implemented a rule

19   that said you have to file an FBAR for every account.  That

20   would be incredibly burdensome.  But they didn't.  They

21   lessened the burden on the taxpayer and said you have to

22   file one form but you have to report all your accounts.  If

23   it's more than 25, you don't have to report the specific

24   account information, like was explained by counsel.

25       But it doesn't relieve the taxpayer of reporting the

1   accounts.  That's the information Congress sought.  The

2   violation is the reporting of the account, not the form.

3   Congress didn't look for a form.  They're looking for the

4   account.  Account is used everywhere in the statute.  It's

5   in the regulations.  That's what they're looking for is the

6   account information and the reporting, not a form.  The form

7   is the mechanism of the reporting.

8           THE COURT:  But doesn't the statute penalize

9   violations of the Secretary implementing regulations which are

10  reporting requirements?  So shouldn't the penalty be understood

11  in terms of whether the report was filed, which does not depend

12  on the number of accounts?

13          MR. LINDER:  I would disagree.  I think it -- I think

14  if you look at the U.S. demonstrative and you look at an FBAR

15  that reports one account over five years at five and an FBAR

16  that should have reported 272 accounts, they're completely

17  different, and I think it's understood.  I mean, they don't

18  provide the same information and they're not the same, and so

19  the violation should not be the same.

20      The violation is the account, not reporting the

21  account.  The form is the mechanism.  I don't see how -- if

22  they wanted to violate a form, they wouldn't have had to

23  mention accounts anywhere in the statute.  They could have

24  said hey, if you don't file the form, it's $10,000.  That's

25  not the case here.  The case is they want the accounts

26

1    reported.

2           THE COURT:  Well, doesn't this result or your

3    interpretation lead to some absurd results?  For example -- and

4    I know they gave an example.  I'll give you a different one.

5    But if someone with a foreign account with $50,000 in it who

6    fails to file the FBAR would be subject to a $10,000 civil

7    penalty, whereas somebody with five foreign accounts with

8    $10,000 balances in each account would be subject to five

9    $10,000 civil penalties under your interpretation, for a total

10   of $50,000 in penalties.  Why would Congress want to penalize

11   those two individuals so drastically differently?

12          MR. LINDER:  I think that they're penalized

13   drastically differently because the purpose is they want the

14   accounts reported.  They don't want the hidden accounts.  The

15   problem that was going on --

16          THE COURT:  But, Mr. Linder --

17          MR. LINDER:  -- is --

18          THE COURT:  Mr. Linder, let me interrupt.  We're

19   dealing with non-willful failure to report, not willful.

20          MR. LINDER:  I agree.  I understand.  My point is,

21   regardless of willful or non-willful, the purpose of the

22   statute is to get people -- people were hiding accounts in

23   foreign countries.  They were -- they were not reporting this

24   on their tax returns.  They're using these accounts for illegal

25   purposes.

27

1      The purpose is to report the account, and that's what

2   they're penalizing is they want the accounts to be reported.

3   Not some of them.  All of them.  And I don't see those two

4   people -- those are two different people.  I mean, they

5   result in different things, which you have one person

6   reporting an account and one person failing to report five.

7   I think they're different.

8      Were there more questions?  I'm sorry, Your Honor.  I

9   was waiting for your question or follow-up.

10           THE COURT:  Oh, you can go ahead and continue.  If I

11   have other questions, I'll jump in.  Go ahead.

12           MR. LINDER:  Oh, okay.  I'm sorry.

13      So I think one of the other -- I think as we were going

14   over it, the purpose -- what Congress was trying to do and

15   the purpose of these statutes is to increase account

16   reporting, and having a -- having it to just be a violation

17   for not filing a form isn't going to accomplish that

18   purpose.

19      I think what is important here is I think Mr. Bittner's

20   position is asking the Court to ignore the relevant case

21   law.  I think Boyd is a case on point.  Another case that

22   decided that was Ott and another case is Gardner.  None of

23   these courts have come in and said that the statute is so

24   unclear that they couldn't determine that it was an on

25   account basis.  The most recent court was Schwarzbaum.  Even

28

1    though it's a willful case, it specifically looked at a per

2    form violation versus a per account violation and said if it

3    is willful, it is a per account violation.

4        There's nothing in the statute or the legislative

5    history to suggest, other than the magnitude of the penalty,

6    that we're treating willful and non-willful violations and

7    the reporting requirements for foreign accounts differently.

8            THE COURT:  Well, but there's different language

9    between -- and that's the issue here in terms of the willful

10   versus non-willful.  And it seems like common sense says you

11   might treat those differently, someone who doesn't willfully

12   fail to file a report versus someone who intentionally does it.

13           MR. LINDER:  And I think -- I think the statute

14   recognizes that.  I think that's why the penalties for willful

15   violations are at least ten times greater.  It's a hundred

16   thousand per account versus 10,000 per account.  I think that's

17   the recognition of the difference between the willful and

18   non-willful.

19       There's also taking into account the 50 percent balance

20   of accounts for the willful, and that takes into account

21   somebody who might have just one account but with an

22   incredibly high balance in that.  So I do think the statute

23   provides a difference between willful and non-willful, and I

24   think it has to do with the magnitude of the penalty.

25       But the underlying point of the statute is to report

1    accounts.  The underlying point of the penalty is to get

2    people to report accounts and to -- and to issue violations

3    for people who don't report the accounts.

4              THE COURT:  Well, let me ask you this.

5              MR. LINDER:  Sure.

6              THE COURT:  So Section 1010.350(a), it seems to

7    contemplate an annual reporting requirement.  So looking at the

8    statute and its implementing regulation, how does the phrase,

9    quote, the amount of any civil penalty shall not exceed

10   $10,000, close quote, mean anything other than that?  No matter

11   how the Secretary decides to calculate the penalty for

12   non-willful violators, the penalty cannot exceed $10,000 for

13   every year of non-compliance.

14             MR. LINDER:  Well, I -- I think -- I don't think -- I

15   think you can read that, but I think what you're looking at is

16   you're looking -- I don't think that you're inserting form --

17   1010.350 is talking about accounts and reporting accounts and

18   it's not talking about forms.

19        I think the difference is you're -- it's trying to

20   insert "form" in the place of "accounts", and I think that's

21   the difference.  I do think the statute is clear on that.

22             THE COURT:  Well, so if we find that this statute

23   command is somehow ambiguous, what principle of law or method

24   of statutory interpretation should apply here to allow a nearly

25   $1.7 million penalty, if it's ambiguous?

30

1          MR. LINDER:  If it's ambiguous.  I think what you're

2    looking at, I think you look back to the intent of Congress and

3    what they were trying to achieve with the passing of the

4    statute.  And I don't think Congress was concerned, when you

5    look at the history, with the filing of additional forms and

6    let's get some more forms filed from people.  I think they're

7    looking to get the accounts and get the proper number of

8    accounts and the proper account information.

9       And that's the requirement.  That's the purpose of the

10   statute, the reporting statute, and that's the purpose of

11   the penalties for not filing a reporting statute.  I think

12   that's what you look to.

13      And under rule of lenity, I mean, this isn't a casual

14   situation.  I mean, you can look at the demonstrative and

15   see that all the accounts aren't reported.  There's a high

16   level of penalty, a high amount of penalty in the aggregate

17   because there are a high number of accounts in the aggregate

18   not reported, and the statute makes no distinction between

19   whether it's a personal account or a 50 percent account.

20   It's an account that has to be reported.  If it's not

21   reported, it's treated as the same.

22          THE COURT:  Well, could the rule of lenity apply in

23   this situation if there's two reasonable interpretations?

24          MR. LINDER:  I -- I don't think it does.  One, I

25   don't think there's two reasonable interpretations.  I don't

31

1    think the rule of lenity applies because you have to look at --

2    I think for the rule of lenity you're looking at the conduct,

3    and the conduct does not -- that they reported is not innocent.

4    I don't think the conduct of a person failing to report one

5    account is the same as somebody that didn't report 272.  And I

6    think that's why the rule of lenity is -- you wouldn't apply

7    it.  That's why I don't think you would apply the rule of

8    lenity, because it's not the same conduct and it shouldn't be

9    treated the same.

10           THE COURT:  Well --

11           MR. LINDER:  And applying the rule of lenity

12   automatically makes every person, every violation the same.

13           THE COURT:  Well, even in the Boyd case which y'all

14   cite, the Central District of California, they describe Section

15   5321 as somewhat unclear as to whether the $10,000 negligence

16   penalty applies per year per account.  So if the Court,

17   likewise, finds that Section 5321 is unclear, why should the

18   Court not apply the rule of lenity and hold that Section 5321

19   applies on a per year basis?

20           MR. LINDER:  Because I think before you get to the

21   rule of lenity and the statutory construction, you have to look

22   back at the purpose of the statute, and applying the rule of

23   lenity in every case is not going -- is not going to further

24   the purpose of the statute and further reporting of the

25   accounts.

32

1          THE COURT:  And let me ask you too, in Boyd the Judge

2     there references an administrative rule of lenity.  Does the

3     Court need to even make such an inquiry versus congressionally

4     enacted rather than administratively promulgated regulations?

5        I haven't really looked at that concept, but I know the

6     Judge there makes reference to administrative rule of

7     lenity.

8          MR. LINDER:  I --

9          THE COURT:  Is there a difference, in your mind, of

10    how -- if we get there?

11         MR. LINDER:  No, there -- I haven't -- I have to be

12    honest with the Court, I haven't looked at the administrative

13    rule of lenity that closely, if at all, and I don't think it

14    would make a difference in our analysis or in my argument

15    today, Your Honor.

16         THE COURT:  Okay.

17         MR. LINDER:  And we've covered I think -- I think

18    when you look at our demonstrative number two on the accounts,

19    I think it's clear what the purpose of Congress and the

20    purposes of the statute in reporting accounts, that a person

21    that has five unreported accounts is not the same as somebody

22    who has 272.

23       Likewise, I think five violations does not equal 272

24    violations, and I think that's why the $10,000 maximum

25    penalty should be on a per account basis.

33

1          THE COURT:  Well, let me ask you this.  So the

2    non-willfulness portion of the statute authorizes a civil

3    penalty against any person, quote, who causes any violation,

4    end quote, of Section 5314.  So a person who causes a violation

5    of Section 5314 would not need to have any personal control

6    over the money in the account or personal control over the

7    number of accounts maintained, would he?  It wouldn't seem so

8    from the statutory language.

9          MR. LINDER:  Wouldn't have control?  I think --

10          THE COURT:  Well, because it says who causes the

11    violation, so in terms of 5314, it authorizes the penalty

12    against someone who causes a violation of it.

13          MR. LINDER:  Well, one, I think you have to look at

14    the reporting requirement, who has to report.  And I think when

15    you're talking about causes the violation, there's other --

16    there's other individuals who have to file reports.  Some have

17    to do with people that have signatory authority or authority

18    over accounts that aren't theirs but they're just in charge of

19    the corporation by their -- be it they're president or CEO.

20        So I think when you look at that, I think the person

21    that causes the violation -- I think what's throwing you

22    off, the person that causes the violation is the person that

23    does the violation, and I think that's the taxpayer, the

24    person that failed to file the report.

25          THE COURT:  Well, Mr. Linder, what I'm getting to is

34

1    how does it make sense to punish that individual on a per

2    account basis when the accounts and money may not even be his?

3              MR. LINDER:  Because -- because you have a reporting

4    requirement of the accounts.  You have a -- of accounts that

5    are yours, that you have a financial interest in and signature

6    authority over, and then you have -- then the reporting statute

7    requires you to report accounts that you have control over

8    where you have more than 50 percent ownership.  For example,

9    your own company, so you would have control over that.  I think

10   that goes back to what you have to report.

11             THE COURT:  So in your mind, if Mr. Bittner -- if

12   this was not his money or not his accounts but he caused the

13   violation of Section 5314 relating to those accounts, you think

14   that the multimillion dollar penalty would still be statutorily

15   authorized?

16             MR. LINDER:  Yes, because the cause of the violation

17   is -- Mr. Bittner is the one that's required to file the

18   report.  He caused the violation.  It's his report he has to

19   file.  And if he has a reporting requirement based on ownership

20   in a company of more than 50 percent, which he did have some

21   of -- many of these or some of the accounts, if not many,

22   however you want to term it, he did have a reporting interest.

23   He had greater than 50 percent ownership of that company.

24        So, yes, he has to report those, and the person that

25   causes the violation is him because he didn't report the

35

1   accounts.

2           THE COURT:  And let me ask you, on -- is Boyd the

3   only case -- I think it's the only case y'all cited that deals

4   with the direct question we have in this case, that actually

5   deals with the question of a non-willful violation, whether it

6   should be based on per year or per account.

7           MR. LINDER:  I would say yes, Boyd is the one that

8   was the most -- it was a contested issue in Boyd.  I think the

9   question was addressed in the Ott case but the Court -- I don't

10  think it was a dictum.  I think the Court made a conclusion or

11  determination that it was a 10,000 per account issue.  But I

12  don't believe, based upon my review of some of the pleadings,

13  that that was a very hotly contested issue as it was in Boyd.

14      Gardner was a default judgment case where the Court

15  made its own rulings, so obviously that would not be

16  contested.

17      And I think the most recent Court that addressed the

18  per account versus per form was Schwarzbaum, but I do have

19  that, Your Honor, and I can provide that opinion to the

20  Court.  That was a willful case.

21      So I think the most contested case out there, in

22  fairness, is Boyd, and that is up on appeal.  I think the

23  briefing is completed on that.

24          THE COURT:  And would it be safe to say -- I know the

25  Judge in Boyd makes a conclusion but I didn't see necessarily a

1    lot of analysis of coming to that conclusion, that it should be

2    based on the way the Government -- what you're advocating here

3    today in the Bittner case.

4              MR. LINDER:  I mean, are you asking --

5              THE COURT:  Well, does that conclusion --

6              MR. LINDER:  I guess it would be better for the

7    Government if there had been more analysis because then it

8    would be more supportive.  But I think there was analysis, and

9    we were working off that analysis.  I mean, I can only work

10   with what the Court did in the case and reported, Your Honor.

11             THE COURT:  I understand.  So that probably wasn't a

12   fair question.  Let me ask you, are you aware of any

13   interagency interpretations of the relevant statute and

14   regulatory provisions?

15             MR. LINDER:  Interagency?  Well, I mean, the only --

16   I don't think -- we really don't have interagency

17   interpretations.  I think you have the IRM, which is their

18   guidance of what they think it is.

19        I can tell you the position of the Government is that

20   it's -- of the United States is that it's a per account

21   basis.

22        We don't publish -- I don't think there's any Treasury

23   regulation.  I would have to look, but I think we would have

24   cited them.  But I think that's the Government's position,

25   it's a per account basis.

37

1          THE COURT:  And then let me ask you, you know, in the

2   statute Congress sought to, quote, avoid burdening unreasonably

3   a person making a transaction with a foreign financial agency,

4   end quote.  Congress then divided the appropriate penalties

5   between two the types of violators, willful and non-willful.

6   Shouldn't the Court read the non-willful provision in such a

7   way as to err on the side of under-burdening rather than

8   overburdening a non-willful violator?

9          MR. LINDER:  Well, I -- I don't think the

10  overburdening has to go to the violation.  I think the

11  overburdening has to go to how the accounts are reported.  I

12  don't think -- I don't think Congress wanted -- for example, in

13  the case of Mr. Bittner, I think over a five year period I

14  think it would be burdensome to file 272 FBARs.

15      I think the overburdensome comes to -- was an

16  instruction of how -- or maybe an instruction of how the

17  Treasury Secretary should make the reporting of the accounts

18  in such a way that it wasn't burdensome.

19      I don't think it goes to the -- to the violation.  I

20  don't think those are read in conjunction.  I think the

21  violation is not reporting the accounts.

22          THE COURT:  Thank you.

23          MR. LINDER:  And that's all I have on the issue

24  regarding the 10,000 per account issue.

25          THE COURT:  And I know -- did you want to address

38

1    other issues?  Your motion, of course -- their motion only

2    dealt with the one issue, but your motion deals with others.

3    That's totally up to you if you want to address that or rely on

4    the papers.

5            MR. LINDER:  I think -- well, we've been on for a

6    long time.  That was the main issue.  I think we would like to,

7    one, address a couple of issues I think to kind of clear up for

8    the Court the United States' motion for summary judgment.

9        I think when we look at the Government's first

10   demonstrative, our complaint sought 2.7 million worth of

11   non-willful FBAR penalties for the 2007 to 2011 years.

12       The United States did not move on -- move for summary

13   judgment on the 2011 year that we thought there was -- based

14   upon our analysis, there was a reasonable fact issue

15   regarding that year.

16       In regards to what we did, the Government did move for

17   full summary judgment on the accounts that Mr. Bittner in

18   the case admitted he was required to report, and there

19   isn't -- there were several accounts.  I think I have listed

20   on here 38 that Mr. Bittner later asserted that he didn't

21   have a reporting requirement for those accounts.  So we

22   excluded those so we could get to the real issue on the

23   rulings, and that's Bittner's liability for the accounts

24   that he admitted on as set forth in this, in the

25   demonstrative, and that's the 1.77 million.

39

1      And that is still consistent on the per account basis.

2  So we removed those accounts that would have been a

3  contested fact issue.   There is no contested fact issue Mr.

4  Bittner was required, and he admitted he was required to

5  report 177 accounts over the 2007 to 2010 timeframe.

6      There's no contested issue he failed to report those

7  accounts.   Mr. Bittner is a U.S. person required to do so,

8  and Mr. Bittner is liable.

9      It's uncontested that the IRS assessments were timely

10  and this suit was filed timely.

11      Therefore, the United States moves for summary judgment

12  to establish his liability for those 177 violations for the

13  2007 to 2010 year.

14      We believe Mr. Bittner has -- cannot establish

15  reasonable cause.   Mr. Bittner has to establish reasonable

16  cause.   It's his burden.

17      The United States addressed this issue in its motion

18  for summary judgment because it is a safe haven and it is

19  directly in the statute, so the United States addressed it.

20      Mr. Bittner, as all defendants who have FBAR

21  violations, claims and asserts that he didn't know.   And the

22  few courts that we have that are reviewing non-willful FBAR

23  penalties for reasonable cause, which are Jarnagin, Moore --

24  I'll get this name wrong -- Agrawal and Ott recognize this

25  and all came in and wanted some additional steps, some

40

1    affirmative steps that the taxpayer did to learn of their

2    reporting requirements.

3         In this case Mr. Bittner had done nothing.  He did

4    nothing during the years at issue to learn of his reporting

5    requirements.  He didn't do any research.  He had an entire

6    accounting staff or department in Romania.  He didn't ask

7    them one question the entire time he was there about federal

8    income taxes or federal bank reporting requirements.

9         Mr. Bittner asserts he registered at the Embassy, but

10   he didn't ask a single U.S. official about any kind of

11   foreign bank account reporting or even about taxes.  He's

12   admitted he failed to make any inquiries of anyone while he

13   was in Romania regarding his federal income taxes or these

14   foreign bank accounts.

15        He simply has taken no steps, and it's clear he just

16   didn't want to do it.  He didn't care.  And that's not

17   reasonable cause.  He didn't care because he was more

18   interested in making money, more interested in doing

19   business, and that doesn't meet reasonable cause.

20        And one of the issues brought up on the sur-reply was

21   you offered this opinion, the Congdon case versus United

22   States, where it was found -- summary judgment was denied on

23   reasonable cause.  But there was a big fact left out by Mr.

24   Bittner when analyzing the Congdon case was that in Congdon,

25   that issue was 5471 penalties that goes with the return that

41

1    in Congdon they actually filed the Form 5471s.  They were

2    substantially complete, but they actually filed them.

3         Mr. Bittner didn't timely file his 2007 to 2010 FBARs.

4         The Congdon case would be more applicable to the 2011

5    year where Mr. Bittner did file a FBAR, an incomplete FBAR,

6    timely but incomplete.  But that -- we did not move for

7    summary judgment on that year.  So we did believe the

8    Congdon case was not applicable.

9         Congdon also reported much of the information that was

10   on or should have been on his 5471 on his tax returns.  In

11   this case Mr. Bittner didn't do that.  He didn't timely file

12   his 2007 through 2010 tax returns, so the IRS didn't have

13   the information about the accounts, didn't have all the

14   information about his income that would have been related to

15   unreported foreign accounts.

16        So we think -- we think the Congdon case is not

17   applicable.

18        The United States has moved forward to establish Mr.

19   Bittner's liability on all the accounts that he's admitted

20   to, this 177.

21        We believe we have met all of the -- the elements.  We

22   believe we have established he failed to have reasonable

23   cause.

24        And I think the last main issue was the Eighth

25   Amendment, which the United States addressed.  And simply

42

1   put, we don't think the -- the FBAR penalties are a fine.

2   It's the Government's position that these are -- the FBAR

3   penalties are more remedial in nature, following Schwarzbaum

4   and Schoenfeld and that they don't just don't rise to the

5   level of a fine that's subject to the excessive fine clause.

6        The FBAR penalties are not in conjunction with any kind

7   of criminal charge or criminal proceeding, like a

8   forfeiture, and the FBAR penalties can be imposed without

9   any kind of conviction, similar to a tax fraud penalty,

10  which is also not an excessive fine.

11       We also believe under the Eighth Amendment that if the

12  Court were to find that the Government's position that it --

13  that a non-willful violation is a 10,000 per account

14  violation, that by law that would not be an excessive fine

15  because the Government assessed within the statute.

16       That is all I have at this time, Your Honor.

17            THE COURT:  Thank you.  Anything you would like to

18  respond to on behalf of Mr. Bittner?

19            MS. RUBENSTEIN:  This is Rachael Rubenstein.  I'm

20  just going to make two quick responses and then I'm going to

21  let lead counsel finish up.

22       With respect to Mr. Linder's comments about it's

23  everywhere in the statute and regs, the terminology of

24  accounts, looking back at 31 CFR 1010.350 giving rise to the

25  obligation, Subsection A doesn't say anything about account

43

1    but it does mention a reporting form.  It doesn't mention

2    accounts with respect to that obligation to file an FBAR.

3         I -- one other point regarding the Court's inquiry is,

4    are there any inter-regulatory interpretation -- I can't

5    remember the exact question, but having to do with whether

6    or not inter-agencies.  I did want to mention FinCEN.

7    FinCEN did release in 2010 some proposed rules, and in that

8    proposed rule, which is Exhibit G to Defendant's motion, it

9    specifically states penalties:  A person who is required to

10   file an FBAR and fails to properly file may be subject to a

11   civil penalty not to exceed $10,000.  FinCEN is the agency

12   where you actually submit the FBAR to.

13        So those are all of my responses, and then lead

14   counsel, Mr. Katz, was going to respond to the arguments

15   made in the Government's motion.

16             THE COURT:  Go ahead.

17             MR. KATZ:  Thank you.  This is Farley Katz.  And as

18   Rachael explained, we divided this up for me to respond to the

19   Government, its motion for partial summary judgment.

20        First of all, the Government basically argues -- Mr.

21   Bittner has repeatedly from the beginning stated under oath,

22   in various witness statements and testimony and in

23   depositions and otherwise, that he had never heard of an

24   FBAR until he returned to the U.S., discovered that he

25   should have been filing returns, finds an accountant who's

44

1    supposedly familiar with this, and in the course of meeting

2    with that accountant he learned about FBARs.  He never had

3    any clue that foreign bank account reports were required of

4    him, because he had been a naturalized citizen many years

5    ago, even though he was living in his country of birth for

6    over 20 years.  He had never heard of it.

7         And that's not at all surprising.  There is a Treasury

8    report which we quoted saying that many, many people living

9    abroad are not aware of these things, of the FBAR

10   requirements.

11        The IRS has issued special guidance saying that the IRS

12   is aware -- this is FS 2011-13.  The IRS is aware that some

13   taxpayers, who are dual citizens of the U.S. and a foreign

14   country, may have failed to timely file tax returns and

15   FBARs, despite being required to do so.  Some of those

16   taxpayers are now aware of their filing obligations and seek

17   to come into compliance with the law.

18        And that goes on and says you can do that.  You should

19   do that.  You should do six years' worth.  And if you had

20   reasonable cause, you can avoid penalties.  And that's been

21   the IRS's position throughout these cases, that if you have

22   reasonable cause, you can avoid the penalty.

23        The IRS does not say everyone is deemed to know the

24   law, that Mr. Bittner, despite the fact that he did not know

25   about FBARs, is deemed to know the law, and therefore, you

1   must -- everyone must pay the maximum penalty.

2       This Court's opinion in Congdon is very similar to Mr.

3   Bittner's case.  It involved Internal Revenue Code Form

4   5471, which like an FBAR, is a report on a foreign relation

5   or related transaction, in that case owning an interest in a

6   foreign company, and Mr. Congdon -- he did file one but it

7   was basically blank.  He thought that that was sufficient,

8   and he didn't understand that he had an obligation to fill

9   it out.  And the Government argued -- the Government in that

10  case -- he believed it was sufficient just to put the

11  information on his 1040, which it really wasn't there, and

12  just putting a simple entry on 5471.  The 5471 is like a

13  virtual tax return for a corporation.  It's a very long,

14  complicated form.  The Government argued that neither

15  ignorance of the law nor complexity constitutes reasonable

16  cause.

17      It's the same situation we have here.  He -- in our

18  situation, he, Mr. Bittner, was not aware the forms even

19  existed.  Mr. Congdon knew about the form, filed it, but had

20  no clue that he actually had to fill it out.  Not that

21  different.

22      This Court said ignorance of the law by itself is not

23  reasonable cause, but reasonable cause may be established if

24  the taxpayer shows ignorance of the law in conjunction with

25  other facts and circumstances, such as the taxpayer's

46

1   education, whether he's previously been subject to the tax,

2   if he's been penalized before, et cetera, et cetera.

3        The Government's central argument here is that Mr.

4   Bittner, living in Romania for 20 years, he does comply with

5   Romanian tax law, pays his Romanian taxes.  In fact, he was

6   given credit, tax credits for those in the tax case and

7   that's -- that's one reason why he owed nothing for '08, '09

8   and '10.  Zero U.S. tax owed for those years.

9        The Government said -- the Government's position is,

10  gee, Mr. Bittner, who had never heard of such a thing about

11  a reporting to the U.S. Government or the Treasury if you

12  have a foreign bank account, he had never heard that

13  existed, he is supposed to go and ask people, does that

14  exist.  How can he even formulate that question?  He had no

15  awareness it existed.

16       They're saying, you know, you didn't -- you know, you

17  didn't ask people.  You should have asked people in Romania.

18  Well, the people in Romania, as he testified in his

19  deposition, don't have a clue about that stuff.

20       And he did have an accountant in Romania who helped

21  him, and his accountant did not explain -- his accountant

22  knew everything he was doing, was very cooperative, and his

23  accountant didn't tell him that he had to file FBARs because

24  his accountant had never heard of it.

25       Even the accountant he goes to here had no clue about

47

1    having to report foreign bank accounts of companies that

2    he had an interest in.  So it's just not that -- it's not

3    that simple of a form.  It's not like an income tax return

4    that almost everyone, maybe everyone knows about.  People

5    don't know about FBARs.

6         The -- the reasonable cause is not defined in the FBAR

7    statutes, but as -- as this Court recognized, in regs of the

8    5171 forms and there are several similar income tax forms

9    dealing with foreign entities, reporting of those things,

10   they all say, all of them say reasonable cause is all the

11   facts and circumstances.

12        And the IRS has routinely allowed people who were not

13   aware that they had to file FBARs, had never heard of FBARs,

14   they routinely allow them to avoid -- to escape penalties

15   under that, under the reasonable cause state.

16        When you look at the factors here, the accounts, these

17   are factors Courts have looked at to see if there's

18   reasonable cause, besides being unaware of the law.

19        Again, it's not -- this is not a situation where it's a

20   person living in the U.S. who knows about the taxes that

21   says I never heard of a 1040.  That's not the situation.

22   It's a situation where the Government has recognized people

23   have not heard of this.

24        The accounts all have legitimate purposes.  They all

25   relate to businesses in Romania.  He had paid his taxes.  He

48

1    was given tax credits for them.  He's not -- he wasn't doing

2    anything to cheat on U.S. taxes.  He had no clue that he had

3    any taxes owed.

4         He voluntarily disclosed everything.  These were

5    voluntary disclosure, and it's a voluntary disclosure but

6    the -- he comes forward and, you know, there's been lots of

7    voluntary disclosures.  There are programs where we refer to

8    them as streamline programs.  There are programs where he

9    could come in today, and other people in his same situation

10   could come in and avoid paying any penalty, no penalty

11   whatsoever.  And yet, for some reason, the IRS has decided

12   that the absolute maximum is the only thing that would

13   justify here.

14        We said -- and I'm going to -- let me go on to the

15   excessive fines.  The Supreme Court in Bajakajian and in

16   other cases often has held that the -- the excessive fines

17   clause applies to civil fines and penalties.  The basic

18   question is, are you looking at something as punishment?

19   Are you looking at something as punishment?

20        And it's subject to the Eighth Amendment, even if

21   there's some remedial purpose.  And somewhere in the bruits

22   here the Government admitted that this was at least

23   partially remedial.

24        But clearly we're looking at punishment here.  This is

25   definitely punishment.  To begin with, the amount is

49

1    astronomical.  2.7, 1.7, whatever it is, would not -- for,

2    at worst, negligently not filing one form each year for five

3    years?  It can't be anything but a penalty.  It's called a

4    penalty.

5          The purpose is deterrence, and when you look at the

6    definition in these cases, in Bajakajian and Austin, the

7    Supreme Court cases, they say if it's to -- if it's to

8    compel or prevent or deter non-compliance, it's a penalty.

9          The Government, indeed, argues that a lesser amount

10   here wouldn't be sufficiently deterrent, so it's clearly

11   punishable.  It's not remedial.

12         There is no loss to the Government here.  No loss

13   whatsoever.  They never heard of Bittner before he came

14   forward and tried to make things right with this country.

15         He overdid it.  He wanted -- anyone else would have

16   done six years.  He wanted to do 22 years because he had

17   this idea, probably from dealings with the Government

18   elsewhere, that he wanted to be absolutely straight with the

19   Government.

20         The Government hasn't made any proof or attempts to

21   prove any losses whatsoever.

22         I might point out that in the tax case, the agent in

23   this case wrote -- initially determined -- she did a bank

24   accounts analysis and determined that Mr. Bittner didn't

25   report $11 million of income deposited to his personal bank

50

1   account, 11 million.  And we gave them schedules.  We have

2   an expert and we gave them schedules showing she miscounted.

3   She ignored non-taxable transfers.  She put in income that

4   was otherwise non-taxable.  She double counted.  She

5   counted -- there was a CD that was mature.  She treated that

6   as two separate items.

7       And when we got to the tax court, the IRS conceded

8   every single dollar of the bank accounts was accounted for,

9   so there was no underreporting from these bank accounts that

10  have anything -- that could possibly have -- have given --

11  have resulted in harm.

12      So what's the rule?  The rule is it violates -- under

13  the Eighth Amendment, it violates the Eighth Amendment if

14  the penalty, the punishment is grossly disproportional to

15  the conduct.

16      I -- I can't imagine a case and I have never seen a

17  case where it could be more clear.  2.7 million, 1.7 million

18  for not filing five pieces of paper that you had no idea

19  existed, what could be more disproportionate?  And it's

20  necessarily disproportionate because the agent, the same

21  revenue agent who had no clue about how to do a bank account

22  deposit, she had no clue about what the Internal Revenue

23  manual, their own internal rules were for determining what

24  the penalty was.

25      When you look at those rules, and we've got them quoted

51

1   in our brief, the manual says that in non-willful cases, the

2   default rule, the standard rule, even if it's multiple

3   years, is one $10,000 penalty.  The IRS says that's the

4   standard.  We will ordinarily recommend one $10,000 penalty.

5   The IRS has recognized, getting back to the question raised

6   earlier, that is sufficiently adequate to encourage

7   compliance.

8        Then it goes on and says in fact, you can -- you can

9   actually impose nothing.  You can just give a warning

10   letter.

11       And then it says if the facts deserve it, you can go

12   higher.  If the facts warrant it, you can impose 10,000 for

13   each year, which would be 50,000.

14       Then they go further than that, which we disagree with,

15   and they say in fact, you can go up to -- higher than

16   50,000, higher than one penalty per year, if the facts -- if

17   the manager reviews it, if there's justification for doing

18   it, if it's an extreme case.

19       So the agent thought -- it's her understanding, and we

20   quoted her testimony in deposition, her understanding was

21   you have four choices:  No penalty, one $10,000 penalty,

22   five $10,000 penalties, or if she thought that it was -- it

23   was worse than five $10,000 penalties, she had no choice,

24   she couldn't have -- she had to go then to the statutory

25   maximum of 2.7 million.  That's how she read those rules.

52

1          Those rules don't read that way.  It would be -- it
2     would be inherently absurd for those rules to read that way.
3     The Government has acknowledged that she doesn't have to do
4     that.  She could choose -- she could choose -- if 50,000
5     wasn't enough, she could choose a hundred thousand.  But she
6     could propose a hundred thousand, given her manager approved
7     it.
8          But she made no determination that it was
9     proportionate.  She made -- and she admitted this.  She made
10    absolutely no determination.  All she decided was it's worse
11    than 50,000, and therefore, I'm going to the statutory
12    maximum.  So she made no determination of proportionality.
13    So on its face, it's not going to be proportional.
14         Her penalty was based on false and irrelevant facts.
15    She said Mr. Bittner has an engineering degree from Romania,
16    and therefore, he should have known about foreign bank
17    account reports in the U.S.  I don't get that.
18         She said he filed U.S. tax returns, and the Government
19    repeats it.  He filed U.S. tax returns in early years.
20    Well, she doesn't mention that those were prepared by family
21    and reported only income from some business in the U.S. that
22    he had an interest in.
23         He had no clue that he had to file U.S. tax returns on
24    Romanian income.  He's testified to that many times.  And
25    many people do that.

53

1          Now, this isn't in isolation.  We're not dealing with

2     something in isolation here.  Every action the IRS has taken

3     against Mr. Bittner has been grossly disproportionate.

4     They -- the agent decided he had $11 million of unreported

5     bank deposits.  In fact, when we actually got someone who

6     could analyze the account, they agreed it was zero, not one

7     cent.

8          Then they asserted $14 million of income tax and

9     penalties that went to the tax court.  It was settled for

10    4.6 percent of that, 4.6 percent.

11         And I point that out just to show that the IRS, for

12    reasons that I do not understand, has decided to treat Mr.

13    Bittner worse than anyone else, and everything they have

14    done is grossly disproportional.  In fact, we believe that

15    this is the greatest fine the IRS has ever asserted on

16    anyone, any individual, for non-willful conduct, for

17    innocent conduct.  Maybe it was negligent, but we have never

18    seen anything like this.  The Government doesn't want to

19    answer that question in discovery, but we have not seen

20    anything.

21         And Mr. Bittner -- getting back to the factors you look

22    at, he's not in a class of persons the statute is directed

23    at.  The statute is directed at persons engaged in unsavory

24    activity, income evasion, schemes to defraud, et cetera.

25    That's not true.  He returned to his country of birth.

54

1          And I'll just -- excuse me just one second.  Let me

2     make sure I covered everything here.

3          Let me just sum up.  I'm going to quote something from

4     our -- our sur-reply.  And I didn't write this.  Someone

5     else here wrote this and I like it.  It is unreasonable and

6     senselessly punitive to impose millions of dollars of

7     penalties on someone who lived abroad for over 20 years, had

8     minimal contact with the U.S., had no communications with

9     any U.S. professional, simply because he was unaware of a

10    particular U.S. information reporting obligation and did not

11    take affirmative steps to learn about it, which he -- there

12    was no reason for him to do so.

13         If you can't -- if you don't know there are U.S.

14    banking requirements, reporting requirements, how can you

15    ask someone?  And if he had asked those people in Romania,

16    they wouldn't have known.

17         Thank you, Your Honor.

18              THE COURT:  Thank you.  Any response, Mr. Linder?

19              MR. LINDER:  Your Honor, I'm not going to respond to

20    the unsubstantiated allegations by Mr. Katz.  I think the

21    facts -- the United States has set forth its facts in the

22    exhibits and in its motion and response, and Mr. Bittner has

23    set forth his facts.  And other than that, we won't comment on

24    his -- I don't think it's proper for the Court to consider his

25    allegation regarding the agent and her conduct.

55

1          The point is Mr. Bittner failed to report 272 account

2     violations.   The IRS assessed its maximum amount that was in

3     the law, and the assessments were proper and timely and Mr.

4     Bittner is liable.

5          That's all we have to say, Your Honor.

6               THE COURT:  Okay.  And then anything -- anything else

7     before we finish?  Okay.

8               MS. RUBENSTEIN:  No, Your Honor, not from Mr.

9     Bittner.

10              THE COURT:  Okay.  Well, thank y'all for your

11    argument.  I'll take the matter under advisement and I hope

12    to -- I'll try to get a decision out as quick as I can.

13         I will tell you the Court -- because we're past the

14    issue of the virus, the Court is really busy.  I had a bench

15    trial last week and we've been back in court and I did 35

16    sentencings over the last two days, and I resume jury trials

17    starting Monday.  And I have a jury trial set June 8th,

18    June 15th, June 23rd and June 30th.  So the Court is getting

19    back into it.

20         And so I say all that because this may take me a little

21    time.  This is a very -- it's an important issue and it's

22    first impression here in the Fifth Circuit, so we'll be

23    working on it and try to get it done as quick as possible.

24         If there's nothing else --

25              MS. RUBENSTEIN:  Thank you, Your Honor.

56

1          THE COURT:  The Court will be in recess.  Thank

2    y'all.

3          MR. LINDER:  Thank you, Your Honor.

4          MR. KATZ:  Thank you.

5

6

7

8

9

10

11

12

13

14

15

16

17

18    I certify that the foregoing is a correct transcript from

19    the record of proceedings in the above-entitled matter.

20

21    _____          _____

22    Jan Mason                               Date

23

24

25