

# United States Court of Appeals
# for the Fifth Circuit

Certified as a true copy and issued
as the mandate on Jan 24, 2022

Attest: *Lyle W. Cayce*

Clerk, U.S. Court of Appeals, Fifth Circuit

No. 20-40597

United States Court of Appeals
Fifth Circuit

**FILED**

November 30, 2021

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

ALEXANDRU BITTNER,

*Defendant—Appellant/Cross-Appellee*.

---

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-415

---

Before OWEN, *Chief Judge,* and CLEMENT and DUNCAN, *Circuit Judges*.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

IT IS ORDERED and ADJUDGED that the judgment of the District Court is AFFIRMED IN PART and REVERSED IN PART, and the cause is REMANDED to the District Court for further proceedings in accordance with the opinion of this Court.

No. 20-40597

IT IS FURTHER ORDERED that appellant pay to appellee the costs on appeal to be taxed by the Clerk of this Court.

# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

November 30, 2021

Lyle W. Cayce
Clerk

No. 20-40597

UNITED STATES OF AMERICA,

*Plaintiff—Appellee/Cross-Appellant*,

*versus*

ALEXANDRU BITTNER,

*Defendant—Appellant/Cross-Appellee*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-415

Before OWEN, *Chief Judge*, and CLEMENT and DUNCAN, *Circuit Judges*.
STUART KYLE DUNCAN, *Circuit Judge*:

Alexandru Bittner non-willfully failed to report his interests in foreign bank accounts on annual FBAR forms, as required by the Bank Secrecy Act of 1970 (BSA) and regulations thereunder. *See* 31 U.S.C. § 5314; 31 C.F.R. §§ 1010.306, 1010.350. The government assessed $2.72 million in civil penalties against him—$10,000 for each unreported account each year from 2007 to 2011. The district court found Bittner liable and denied his reasonable-cause defense. But it reduced the assessment to $50,000, holding that the $10,000 maximum penalty attaches to each failure to file an annual FBAR, not to each failure to report an account.

No. 20-40597

We affirm the denial of Bittner's reasonable-cause defense but reverse with respect to application of the $10,000 penalty. We hold that each failure to report a qualifying foreign account constitutes a separate reporting violation subject to penalty. The penalty therefore applies on a per-account, not a per-form, basis. On this point, we part ways with a recent Ninth Circuit panel, which split on this issue. *See United States v. Boyd*, 991 F.3d 1077, 1080–86 (9th Cir. 2021) (adopting per-form interpretation). *But see id.* at 1086–91 (Ikuta, J., dissenting) (taking per-account view).[1] Accordingly, we affirm in part, reverse in part, vacate, and remand.

## I.

### A.

In 1970, Congress enacted the BSA "to require certain reports or records where such reports or records have a high degree of usefulness in criminal, tax, or regulatory investigations or proceedings." Currency and Foreign Transactions Reporting Act of 1970, Pub. L. No. 91-508, § 202, 84 Stat. 1114 (codified as amended at 31 U.S.C. § 5311). A primary purpose of the BSA was to curb the "serious and widespread use" of foreign financial accounts to evade taxes. *Cal. Bankers Ass'n v. Shultz*, 416 U.S. 21, 27 (1974).

---

[1] District courts have taken diverging views on this issue. *Compare United States v. Giraldi*, No. 20-2830 (SDW) (LDW), 2021 WL 1016215 (D.N.J. Mar. 16, 2021) (taking per-form view), *and United States v. Kaufman*, No. 3:18-CV-00787 (KAD), 2021 WL 83478 (D. Conn. Jan. 11, 2021) (same), *with United States v. Solomon*, No. 9:20-82236-CIV, 2021 WL 5001911 (S.D. Fla. Oct. 27, 2021) (taking per-account view), *and United States v. Stromme*, No. 1:20-cv-24800-UU (S.D. Fla. Jan. 25, 2021) (same on default judgment). The Fourth Circuit has suggested it would take a per-form view. *See United States v. Horowitz*, 978 F.3d 80, 81 (4th Cir. 2020) (observing but not holding, in a case concerning willful violations, that "[a]ny person who fails to file an FBAR is subject to a maximum civil penalty of not more than $10,000" (citing 31 U.S.C. § 5321(a)(5))). For the reasons explained *infra*, we find the decisions taking the per-form view unpersuasive.

No. 20-40597

The BSA, as amended, provides in relevant part, "the Secretary of the Treasury shall require a resident or citizen of the United States . . . to keep records, file reports, or keep records and file reports, when the . . . person makes a transaction or maintains a relation for any person with a foreign financial agency." 31 U.S.C. § 5314(a). The BSA requires that the records and reports contain specific information "in the way and to the extent the Secretary prescribes." *Ibid*. It directs the Secretary to consider "the need to avoid burdening unreasonably a person making a transaction with a foreign financial agency" when prescribing reporting and record-keeping procedures. *Ibid*.

As directed, the Secretary promulgated several regulations. Two are relevant here. The first provides that each person with a "financial interest in . . . [a] financial account in a foreign country shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists and shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons." 31 C.F.R. § 1010.350(a). A person is treated as having a "financial interest" in any foreign account that the person owns or that is owned by a corporation in which the person has an ownership interest greater than fifty percent. *Id*. § 1010.350(e)(1), (2)(ii). The prescribed reporting form is a Report of Foreign Bank and Financial Accounts, or "FBAR." *Id*. § 1010.350(a). The second regulation provides: "Reports required to be filed by § 1010.350 shall be filed . . . on or before June 30 of each calendar year with respect to foreign financial accounts exceeding $10,000 maintained during the previous calendar year." *Id*. § 1010.306(c).

A person generally is required to disclose on an FBAR specific information about each qualifying foreign account. But when a person has a financial interest in twenty-five or more qualifying accounts, the person need only disclose the number of accounts. *Id*. § 1010.350(g)(1). Those who fall

within this exception, however, are "required to provide detailed information concerning each account when so requested by the Secretary." *Ibid.*

The BSA authorizes the Secretary to "impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." 31 U.S.C. § 5321(a)(5)(A). Initially, only willful violations were subject to penalty. *See* § 207, 84 Stat. 1114. Congress added penalties for non-willful violations in 2004. *See* American Jobs Creation Act of 2004, Pub. L. No. 108-357, § 821(a), 118 Stat. 1418 (codified at 31 U.S.C. § 5321(a)(5)).

Different penalties attach to non-willful and willful violations. For a non-willful violation, "the amount of any civil penalty imposed . . . shall not exceed $10,000." 31 U.S.C. § 5321(a)(5)(B)(i). But no penalty attaches if the "violation was due to reasonable cause" and "the balance in the account . . . was properly reported." *Id.* § 5321(a)(5)(B)(ii). For a willful violation, the maximum penalty increases to the greater of $100,000 or fifty percent of "the amount of the transaction" (when a violation involves a transaction) or "the balance in the account at the time of the violation" (when a violation involves "a failure to report the existence of an account"). *Id.* § 5321(a)(5)(C)(i), (D). Willful violations are excluded from the reasonable-cause exception. *Id.* § 5321(a)(5)(C)(ii).

**B.**

Bittner was born in Romania in 1957. After serving in the Romanian army and earning a master's degree in chemical engineering, he immigrated to the United States in 1982. He was naturalized in 1987.

In 1990, Bittner returned to Romania, where he became a successful businessman and investor. He earned millions of dollars and acquired interests in a diverse array of companies, including real estate, hotels,

restaurants, construction, aquaculture, logging, and manufacturing. He negotiated purchases of Romanian government assets and transferred his business assets, including title to several investment properties, to holding companies in London and Geneva.

To manage his growing wealth, Bittner maintained dozens of bank accounts in Romania, Switzerland, and Liechtenstein, using "numbered accounts" "[t]o hide [his] name." He used accountants to maintain financial records and ensure compliance with Romanian tax laws. But Bittner was unaware that as a United States citizen he had to report his interests in certain foreign accounts. Consequently, Bittner never filed FBARs while living in Romania.

Bittner returned to the United States in 2011. Upon learning of his reporting obligations, he hired a CPA, who in May 2012 prepared and filed his outstanding FBARs. But those FBARs were deficient: they listed only his largest account and incorrectly stated he did not have an interest in twenty-five or more qualifying accounts. Bittner hired a new CPA, who in September 2013 filed corrected FBARs for the years 2007 to 2011, as penalties for prior years were time-barred. *See* 31 U.S.C. § 5321(b)(1). Although not required, Bittner disclosed with his corrected FBARs all foreign bank account information and balances. In June 2017, the IRS assessed $2.72 million in penalties against Bittner for non-willful violations of section 5314—$10,000 for each unreported account from 2007 to 2011, specifically 61 accounts in 2007, 51 in 2008, 53 in 2009, 53 in 2010, and 54 in 2011.

In June 2019, the government sued to reduce these penalty assessments to judgment. Bittner pleaded in defense that his violations were due to reasonable cause and therefore could not be penalized under 31 U.S.C. § 5321(a)(5)(B)(ii), that the maximum penalty allowed for a non-willful reporting violation under 31 U.S.C. § 5321(a)(5)(B)(i) is $10,000 per annual

FBAR form, and that the penalties as assessed violated the excessive fines clause of the Eighth Amendment. During discovery, Bittner admitted he was obligated to report 51 accounts in 2007, 43 in 2008, 42 in 2009, 41 in 2010, and 43 in 2011.

The parties cross-moved for summary judgment on application of the $10,000 maximum penalty, with Bittner arguing for a per-form basis and the government arguing for a per-account basis. The government also moved for summary judgment on Bittner's liability for $1.77 million in penalties—$10,000 for each admitted qualifying account from 2007 to 2010—arguing that Bittner did not qualify for the reasonable-cause exception for these years.

The district court held that the $10,000 maximum penalty for a non-willful violation applies on a per-form basis. *United States v. Bittner*, 469 F. Supp. 3d 709, 717–26 (E.D. Tex. 2020). Having thus interpreted the statute, it deemed Bittner's Eighth Amendment defense moot. *Id.* at 726–27. The court also granted summary judgment on Bittner's liability for the years 2007 to 2010, rejecting his reasonable-cause defense. *Id.* at 727–29. Bittner withdrew that defense as to the 2011 assessment, and the court entered judgment of $50,000—$10,000 for each year from 2007 to 2011. Both parties timely appealed.

## II.

We review a summary judgment *de novo. Ledford v. Keen*, 9 F.4th 335, 337 (5th Cir. 2021) (citation omitted). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fᴇᴅ. R. Cɪᴠ. P. 56(a). We view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in its favor. *Adams v. Alcolac, Inc.*, 974 F.3d 540, 543 (5th Cir. 2020) (per curiam) (citation omitted). We review issues of

statutory interpretation *de novo*. *Solorzano v. Mayorkas*, 987 F.3d 392, 396 (5th Cir. 2021) (citation omitted).

## III.

We begin with Bittner's argument that the district court erred in denying his reasonable-cause defense.

## A.

As stated above, the BSA imposes no penalty for a non-willful violation of section 5314 if "such violation was due to reasonable cause." 31 U.S.C. § 5321(a)(5)(B)(ii)(I).[2] The BSA and the pertinent regulations do not define "reasonable cause," and so we must determine the phrase's meaning. To do so, we consult reasonable-cause exceptions in the Internal Revenue Code (IRC).[3] Three cardinal principles of statutory interpretation support this approach.

First, "reasonable cause" is a legal term of art. *Denenburg v. United States*, 920 F.2d 301, 304 (5th Cir. 1991). "[W]e assume that when a statute uses such a term, Congress intended it to have its established meaning." *McDermott Int'l, Inc. v. Wilander*, 498 U.S. 337, 342 (1991) (citing *Morissette v. United States*, 342 U.S. 246, 263 (1952); and *Gilbert v. United States*, 370 U.S. 650, 658 (1962)). Specifically, "when Congress employs a term of art, it

---

[2] The government does not dispute that Bittner properly reported the balances of his accounts on his corrected FBARs, thus meeting the second prong of this exception. *See* 31 U.S.C. § 5321(a)(5)(B)(ii)(II).

[3] Most, if not all, courts to address a claim of reasonable cause under 31 U.S.C. § 5321(a)(5)(B)(ii) have consulted the IRC for guidance. *See, e.g.*, *Kaufman*, 2021 WL 83478, at *3–4; *United States v. Hidy*, 471 F. Supp. 3d 927, 932 (D. Neb. 2020); *United States v. Agrawal*, No. 18-C-0504, 2019 WL 6702114, at *4 (E.D. Wis. Dec. 9, 2019); *United States v. Ott*, No. 18-cv-12174, 2019 WL 3714491, at *2 (E.D. Mich. Aug. 7, 2019); *Jarnagin v. United States*, 134 Fed. Cl. 368, 376–77 (2017); *Moore v. United States*, No. C13-2063RAJ, 2015 WL 1510007, at *4 (W.D. Wash. Apr. 1, 2015).

presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken." *F.A.A. v. Cooper*, 566 U.S. 284, 292 (2012) (cleaned up) (quoting *Molzof v. United States*, 502 U.S. 301, 307 (1992)).

Second, under the presumption of consistent usage, "a term generally means the same thing each time it is used." *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring). The presumption applies not only to proximate terms but "also when different sections of an act or code are at issue." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 172 (2012) [SCALIA & GARNER]. The presumption is particularly relevant "when Congress uses the same language in two statutes having similar purposes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) (plurality opinion). The reasonable-cause exceptions in the BSA and the IRC serve the same purpose: to provide "grounds for avoiding penalties for admitted violations of federal tax law." *Thomas v. UBS AG*, 706 F.3d 846, 851 (7th Cir. 2013) (citing 26 U.S.C. § 6664(c), (d); and 31 U.S.C. § 5321(a)(5)(B)(ii)); *see Tex. Workforce Comm'n v. U.S. Dep't of Educ.*, 973 F.3d 383, 388 (5th Cir. 2020) (finding "particularly instructive" the interpretation of a term in a different statute with a "strikingly similar" purpose).

Third, the prior-construction canon counsels that a term is to be understood according to earlier, well-settled constructions of the same term. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 (2015) (discussing canon); *see also* SCALIA & GARNER, *supra*, at 323 ("[W]hen a statute uses the very same terminology as an earlier statute—especially in the very same field . . . —it is reasonable to believe that the terminology bears a consistent meaning."). Congress presumably was aware of settled judicial and administrative constructions of "reasonable cause" in the IRC when it amended the BSA in 2004 to add the non-willful penalty provision, including

the reasonable-cause exception. *See Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 439 (5th Cir. 2021). Congress's repetition of this term shows "the intent to incorporate its administrative and judicial interpretations as well." *Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) (citing *Lorillard v. Pons*, 434 U.S. 575, 580–81 (1978)).

Drawing on several reasonable-cause exceptions in the IRC and in regulations and caselaw interpreting these exceptions, we conclude that the reasonable-cause exception in section 5321(a)(5)(B)(ii)(I) requires showing that the individual exercised ordinary business care and prudence, considering all pertinent facts and circumstances on a case-by-case basis.[4] This standard is objective. *Lawinger v. Comm'r*, 103 T.C. 428, 440 (1994); *DiCarlo v. Comm'r*, T.C. Memo. 1992-280, 1992 WL 101156 (May 14, 1992). The taxpayer bears the "heavy burden" of establishing reasonable cause. *United States v. Boyle*,

---

[4] *See* 26 U.S.C. §§ 6038(c)(4)(B), 6038A(d)(3), 6038D(g), 6651(a), 6664(c)(1), 6677(d); 26 C.F.R. § 1.6038-3(k)(4) ("reasonable cause" exception under 26 U.S.C. § 6038 "will be determined . . . under all the facts and circumstances"); *id.* § 1.6038A-4(b)(2)(iii) ("reasonable cause" exception under 26 U.S.C. § 6038A "is made on a case-by-case basis, taking into account all pertinent facts and circumstances"); *id.* § 1.6038D-8(e)(3) ("reasonable cause" exception under 26 U.S.C. § 6038D "is made on a case-by-case basis, taking into account all pertinent facts and circumstances"); *id.* § 301.6651-1(c)(1) ("reasonable cause" exception under 26 U.S.C. § 6651 requires a showing taxpayer "exercised ordinary business care and prudence," considering "all the facts and circumstances of the taxpayer's financial situation"); *id.* § 1.6664-4(b)(1) ("reasonable cause" exception under 26 U.S.C. § 6664 "is made on a case-by-case basis, taking into account all pertinent facts and circumstances," with "the most important factor [being] the extent of the taxpayer's effort to assess the taxpayer's proper tax liability"); *In re Wyly*, 552 B.R. 338, 579 (Bankr. N.D. Tex. 2016) (because "there are no regulations that specifically interpret the meaning of the phrase[] 'reasonable cause'" in 26 U.S.C. § 6677(d), courts tend to adopt the "ordinary business care and prudence" definition); *see also Presley v. Comm'r*, 790 F. App'x 914, 919 (10th Cir. 2019) (applying ordinary-business-care-and-prudence standard to "reasonable cause" exception in 26 U.S.C. § 170(f)(11)(A)(ii)(II), which is not defined by statute or regulation).

469 U.S. 241, 245 (1985); *accord Klamath Strategic Inv. Fund ex rel. St. Croix Ventures v. United States*, 568 F.3d 537, 548 (5th Cir. 2009).

## B.

Bittner argues, as a threshold matter, that a reasonable-cause defense cannot be determined at summary judgment because it involves a "deeply factual question." We disagree. "[W]hether the elements that constitute 'reasonable cause' are *present* in a given situation is a question of fact, but what elements *must* be present to constitute 'reasonable cause' is a question of law." *Roberts v. Comm'r*, 860 F.2d 1235, 1241 (5th Cir. 1988) (citing *Boyle*, 469 U.S. at 249 n.8). While a reasonable-cause defense depends on all pertinent facts and circumstances, only *disputed* questions of material fact will preclude summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Smith v. Mobil Corp.*, 719 F.2d 1313, 1315–16 (5th Cir. 1983). We have not hesitated to affirm summary judgments rejecting claims of reasonable cause based on undisputed facts. *See Staff IT, Inc. v. United States*, 482 F.3d 792, 801–02 (5th Cir. 2007); *Denenburg*, 920 F.2d at 307.[5]

Turning to the merits of Bittner's defense, having considered all pertinent facts and circumstances, we conclude that Bittner did not exercise ordinary business care and prudence in failing to fulfill his reporting obligations. We have emphasized that when assessing reasonable cause, "[t]he most important factor is the extent of the taxpayer's effort to assess his proper liability." *Brinkley v. Comm'r*, 808 F.3d 657, 669 (5th Cir. 2015) (quoting *Klamath*,

---

[5] *See also, e.g.*, *Baccei v. United States*, 632 F.3d 1140, 1147–49 (9th Cir. 2011); *Diamond Plating Co. v. United States*, 390 F.3d 1035, 1038–39 (7th Cir. 2004); *Kaufman*, 2021 WL 83478, at *6, *8 (granting summary judgment where there were "no triable issues of fact concerning [defendant's] reasonable cause defense" and noting that "several courts, in the context of defendants who failed to file FBARs, have rejected a reasonable cause defense at the summary judgment stage" (collecting cases)).

568 F.3d at 548). Bittner conceded he put no effort into ascertaining and ful-
filling his reporting obligations. He testified he never even inquired about
them, and when asked why, he answered, "Why should I?," "I didn't feel
like it," and "Why? We're in Romania." The onus was on Bittner to find out
what he was supposed to do, and yet he admittedly did nothing. *Cf. Boyle*, 469
U.S. at 249 (noting "Congress intended to place upon the taxpayer an obli-
gation to ascertain the statutory deadline and then to meet that deadline").

As the district court observed, "Bittner was undoubtedly a
sophisticated business professional." *Bittner*, 469 F. Supp. 3d at 729. He held
interests in dozens of companies, negotiated purchases of Romanian
government assets, transferred his assets into holding companies, and
concealed his earnings in "numbered accounts." He even once inquired
about tax obligations "as a Romanian citizen . . . own[ing] property in
Brussels" before purchasing investment properties. Bittner's business savvy
makes his failure to inquire about his reporting obligations even more
unreasonable. *See, e.g.*, *Jarnagin*, 134 Fed. Cl. at 378 ("A reasonable person,
particularly one with the sophistication, investments, and wealth of the
[plaintiff], . . . would have sought advice regarding [his] obligation to file [an
FBAR].").

Bittner claims there are factual disputes that preclude summary judg-
ment. We disagree. To be sure, he highlights undisputed facts he believes
establish reasonable cause: he spoke little English; he had lived in the United
States for only eight years; he had minimal contacts with the United States
while living in Romania; he complied with Romanian tax laws; he was una-
ware of his reporting obligations; and he promptly filed outstanding FBARs
upon learning of his obligations. While relevant, these facts do not alter the
conclusion that it was unreasonable for Bittner, a sophisticated businessman,
not to ascertain his reporting obligations. *See Boyle*, 469 U.S. at 252 ("It

requires no special training or effort to ascertain a deadline and make sure that it is met.").[6]

Bittner points to an IRS Fact Sheet, which provides that "[r]easonable cause may be established if you show that you were not aware of specific obligations to file returns or pay taxes, depending on the facts and circumstances." But "general statements of policy and rules governing internal agency operations or 'housekeeping' matters," like the fact sheet, "do not have the force and effect of law, are not binding on the agency issuing them[,] and do not create substantive rights in the public." *Capitol Fed. Sav. & Loan Ass'n & Subsidiary v. Comm'r*, 96 T.C. 204, 216–17 (1991) (collecting cases).

Finally, Bittner argues that the district court "misunderstood" the reasonable-cause standard by equating it with ordinary business care and prudence. We disagree. As discussed above, the ordinary-business-care-and-prudence definition of reasonable cause is derived from the IRC, regulations, and case law. *See supra* Section III.A. The district court correctly applied that standard in rejecting Bittner's reasonable-cause defense.

## IV.

We next consider the government's argument that the district court erred in applying the $10,000 penalty to Bittner's reporting violations. As explained above, section 5321(a)(5)(A) provides that the Secretary "may

---

[6] *See also, e.g.*, *Hidy*, 471 F. Supp. 3d at 933 (finding defendant failed to show reasonable cause where she "admit[ted] she made no effort to learn" about her reporting obligation, "research the issue," or "seek professional advice or assistance"); *Agrawal*, 2019 WL 6702114, at *5 (rejecting argument that defendant's "naivety excuses him from exercising ordinary business care by seeking advice regarding his [reporting] obligation" where he had "sufficient mental acuity" to work as a math teacher and "sufficient financial savvy" to make specific requests regarding his investments).

impose a civil money penalty on any person who violates, or causes any violation of, any provision of section 5314." 31 U.S.C. § 5321(a)(5)(A). The maximum penalty is $10,000. *Id.* § 5321(a)(5)(B)(i). Properly assessing the penalty hinges on what constitutes a "violation" of section 5314: the failure to file an FBAR (as urged by Bittner) or the failure to report an account (as urged by the government).

When interpreting a statute, we begin with the text. *United States v. Lauderdale County*, 914 F.3d 960, 961 (5th Cir. 2019). "Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute, and consulting any precedents or authorities that inform the analysis." *Calogero v. Shows, Cali & Walsh, L.L.P.*, 970 F.3d 576, 584–85 (5th Cir. 2020) (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

## A.

The government argues the district court erred in determining what constitutes a "violation" under section 5314 by focusing on the regulations under section 5314 to the exclusion of section 5314 itself. We agree.

The district court began its analysis by quoting a sentence from *Shultz. See Bittner*, 469 F. Supp. 3d at 718. There, the Supreme Court noted that the BSA's "penalties attach only upon violation of regulations promulgated by the Secretary; if the Secretary were to do nothing, the Act itself would impose no penalties on anyone." *Shultz*, 416 U.S. at 26. Relying on this statement, the district court focused on the regulations and concluded "it is the failure to file an annual FBAR that is the violation contemplated" by section

5321(a)(5)(A). *Bittner*, 469 F. Supp. 3d at 718.[7] Bittner relies heavily on this reasoning on appeal.

The *Shultz* snippet does not help define a "violation of[] any provision of section 5314" under section 5321(a)(5)(A). *Cf. Smith v. Shettle*, 946 F.2d 1250, 1253 (7th Cir. 1991) ("We must not be mesmerized by judicial language taken out of context and hardened into formula."). *Shultz* did not interpret any penalty provision of the BSA, as we do here. Rather, it addressed constitutional challenges to the BSA and its regulations. *Shultz*, 416 U.S. at 25. The quoted sentence corrected the district court's ripeness analysis—it explained the analysis should be limited to reporting requirements the Secretary actually imposed, not ones "[that] might have been imposed by the Secretary under the broad authority given him in the Act." *Id.* at 63–64. Further, Congress amended section 5321(a)(5) to add penalties for non-willful violations thirty years after *Shultz. See* § 821, 118 Stat. 1418. And as we explain, a per-form interpretation is inconsistent with the text of the BSA and corresponding regulations. *See United States v. Yankowski*, 184 F.3d 1071, 1074 (9th Cir. 1999) (rejecting the "contention that [a] single statement by the Supreme Court, taken out of context, should be used . . . to reject the clear and express provisions of the [statute]").

Because section 5321(a)(5)(A) penalizes a "violation of[] any provision of section 5314," our analysis begins with section 5314, not the regulations. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Here, Congress did not refer to a "violation

---

[7] The Ninth Circuit and the other courts taking a per-form view have relied on the same statement from *Shultz. See Boyd*, 991 F.3d at 1081; *Girardi*, 2021 WL 1016215, at *5; *Kaufman*, 2021 WL 83478, at *9.

*of a regulation* prescribed under" section 5314 when it amended section 5321(a)(5)(A) in 2004, even though earlier-enacted penalty provisions in section 5321 do. *See* 31 U.S.C. § 5321(a)(1) (specifying "a violation of section 5318(a)(2) of this title or a regulation prescribed under section 5318(a)(2)"); *id.* § 5321(a)(3) (imposing liability for "not filing a report under a regulation prescribed under section 5315"). This omission is instructive. We thus focus on the text of section 5314.

Section 5314(a) "has both a substantive and procedural element." *Boyd*, 991 F.3d at 1088 (Ikuta, J., dissenting); *see Solomon*, 2021 WL 5001911, at *7–8. Substantively, it directs the Secretary to require a person to "file reports" when the person "makes a transaction or maintains a relation . . . with a foreign financial agency." 31 U.S.C. § 5314(a). Procedurally, "reports shall contain [certain] information in the way and to the extent the Secretary prescribes." *Id.*

The regulations themselves distinguish (1) the substantive obligation to file reports disclosing each account from (2) the procedural obligation to file the appropriate reporting form. *Boyd*, 991 F.3d at 1088 (Ikuta, J., dissenting); *see Solomon*, 2021 WL 5001911, at *7–8. Section 1010.350(a) implements the two distinct requirements: each person with a "financial account in a foreign country [1] shall report such relationship to the Commissioner of Internal Revenue for each year in which such relationship exists *and* [2] shall provide such information as shall be specified in a reporting form prescribed under 31 U.S.C. 5314 to be filed by such persons." 31 C.F.R. § 1010.350(a) (emphasis added).[8] Section 1010.306(d) likewise

---

[8] Bittner reads section 1010.350(a) differently. He argues the requirement to report a financial interest in a foreign account concerns "a Title 26 (income tax) obligation," while the obligation to provide certain information in a reporting form "is a Title 31 (banking) requirement." The district court similarly observed that the Secretary's "implementing regulations contain separate income tax reporting requirements that are independent of the

provides that "[r]eports required by" section 1010.350 "shall be filed on forms prescribed by the Secretary." *Id.* § 1010.306(d). And the next subsection specifies where a person may obtain "[f]orms to be used in making the reports required by" section 1010.350. *Id.* § 1010.306(e). The regulations thus consistently implement the distinction between the reports themselves (substance) and the reporting forms (procedure).

Together, then, the text of the BSA and its regulations impose (1) a statutory requirement to report each qualifying transaction or relation with a foreign financial agency and (2) a regulatory requirement to file these reports on an FBAR before a certain date each year (June 30). *See id.* § 1010.306(c); *see also Boyd*, 991 F.3d at 1088 (Ikuta, J., dissenting); *Solomon*, 2021 WL 5001911, at *7–8. By authorizing a penalty for "any violation of[] any provision of section 5314," as opposed to the regulations prescribed under section 5314, section 5321(a)(5)(A) most naturally reads as referring to the statutory requirement to report each account—not the regulatory requirement to file FBARs in a particular manner. Indeed, *Schultz* itself supports this reading. There, the Supreme Court explained that "[v]iolations of the reporting requirement of [section 5314] as implemented by the regulations are also subject to civil and criminal penalties." *Shultz*, 416 U.S. at 37.

---

FBAR reporting requirements." *Bittner*, 469 F. Supp. 3d at 722 n.6 (citing *Shultz*, 416 U.S. at 37).

This understanding of section 1010.350(a) is flawed. The Secretary promulgated section 1010.350(a) pursuant to her authority under 31 U.S.C. § 5314 and other sections of the U.S. Code, none of which are in Title 26. *See* Amendment to the Bank Secrecy Act Regulations—Reports of Foreign Financial Accounts, 76 Fed. Reg. 10234, 10245 (Feb. 24, 2011). Section 1010.350(a) does not interpret, apply, or otherwise correspond with any section of Title 26. *See* Off. of the Fed. Reg., Nat'l Archives & Recs. Admin., CFR Index and Finding Aids 973–78 (2021).

The district court reasoned that a violation of section 5314 "attach[es] directly to the obligation that the statute creates—the filing of a single report." *Bittner*, 469 F. Supp. 3d at 720. We disagree. Section 5314 does not create the obligation to file "a single report." Rather, it gives the Secretary discretion to prescribe how to fulfill the statute's requirement of reporting qualifying accounts.[9] Moreover, the district court's reading would lead to a result unmoored from the text of section 5314: it would give the Secretary discretion not only to define the reporting mechanism, but also to define the *number of violations* subject to penalty. After all, the Secretary could require multiple FBARs instead of allowing one FBAR to report multiple accounts (as she has done). Streamlining the process in this way, however, cannot redefine the underlying reporting requirement imposed by section 5314. *See Solomon*, 2021 WL 5001911, at *7 (observing "the requirement to submit a form to reflect [required] information does not alter the substantive nature of the underlying duty to report financial interests/relationships"). It merely honors Congress's desire "to avoid burdening unreasonably a person making a transaction with a foreign financial agency." 31 U.S.C. § 5314(a).

Finally, Bittner argues there is no basis "to distinguish between the obligation to report and the form created for that purpose." Again, the statute and its surrounding context refute this argument. As discussed, other provisions expressly penalize violations of the BSA's *regulations*. If, when it amended section 5321(a)(5)(A), Congress meant to penalize a violation only of the regulations under section 5314 (*i.e.*, the failure to file an FBAR), as

---

[9] *See* 31 U.S.C. § 5314(a) (emphasis added) (providing "reports shall contain [certain] information *in the way and to the extent the Secretary prescribes*"); *United States v. Khan*, No. 17-cv-7258(KAM) (VMS), 2019 WL 8587295, at *4 (E.D.N.Y. Sept. 23, 2019) ("Congress did not specify the form and substance of the report to be made in satisfaction of th[e] [reporting] requirement [but] vested the Secretary . . . with the authority to prescribe these specifics.").

opposed to a violation of section 5314 itself (*i.e.*, the failure to report an account), "it could have done so clearly and explicitly." *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 454 (2002); *see United States v. Lawrence*, 727 F.3d 386, 392–93 (5th Cir. 2013) (considering disparate exclusion after statutory amendment). It did the opposite.

## B.

The use of the term "violation" in other parts of section 5321(a)(5) confirms that the "violation" contemplated by section 5321(a)(5)(A) is the failure to report an account, not the failure to file an FBAR.

We first consider the willful penalty provisions. Increased penalties attach to a willful "violation of[] any provision of section 5314." 31 U.S.C. § 5321(a)(5)(C). The maximum penalty for a willful violation is the greater of $100,000 or fifty percent of "the amount of the transaction" (when a violation involves a transaction) or "the balance in the account at the time of the violation" (when a violation involves "a failure to report the existence of an account"). *Id.* § 5321(a)(5)(C)(i), (D). This language plainly describes a "violation" in terms of a failure to report a transaction or an account. *See Boyd*, 991 F.3d at 1089 (Ikuta, J., dissenting).

It is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Lexon Ins. Co. v. Fed. Deposit Ins. Corp.*, 7 F.4th 315, 324 (5th Cir. 2021) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)); *see* SCALIA & GARNER, *supra*, at 170–73 (discussing presumption of consistent usage). If a willful violation of section 5314 in subsection (C) involves failing to report a transaction or an account, then presumably so too does a non-willful violation of section 5314 in subsection (A). To be sure, the presumption of consistent usage yields when "there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different

parts of the Act with different intent." *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 595 (2004) (quoting *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932)). But nothing in section 5321 suggests Congress meant to define "violation" one way where a person acts willfully and another way where a person does not. *See Boyd*, 991 F.3d at 1090–91 (Ikuta, J., dissenting).

The district court drew the opposite inference, reading the willful penalty provisions to support a per-form theory. *See Bittner*, 469 F. Supp. 3d at 719–21. It reasoned that only the willful penalty provision references the "account," and so the penalty for non-willful violations could not relate to specific accounts. *Id.* at 720–21. We disagree. There is a good reason for the different phrasing of the respective penalties, and it has nothing to do with the definition of a "violation." The amount of a willful penalty may depend on the "balance" in the unreported account, *see* 31 U.S.C. § 5321(a)(5)(C)(i), (D), unlike a non-willful penalty, which is capped at $10,000, *see id.* § 5321(a)(5)(B)(i). So, Congress had no reason to refer to the "account" in the non-willful penalty provision. This different phrasing does not affect the definition of "violation," which, as already explained, means the same thing whether willful or non-willful.

We next consider the reasonable-cause exception. No penalty attaches to a non-willful violation if "such violation was due to reasonable cause" and "the amount of the transaction or the balance in the account at the time of the transaction was properly reported." *Id.* § 5321(a)(5)(B)(ii). This language equates a "violation" with failing to report the amount of the transaction or the balance in an account. *See Solomon*, 2021 WL 5001911, at *9 (noting "this exception speaks in account-specific terms—not form-specific terms"). Specifically, the definite article "the" before the singular "transaction" and "account" suggests that the "violation" excused for reasonable

cause relates to a single transaction or account.[10] If "violation" in section (a)(5)(B)(ii) is transaction- or account-based, then "violation" in section (a)(5)(A) presumably is too. *See* SCALIA & GARNER, *supra*, at 170–73. Nothing in the text suggests Congress intended otherwise.

Bittner argues that "the statutorily permissible excuse for non-compliance is completely independent from the violation itself." We disagree. Neither the statute's text nor its structure separates the excuse from the violation. To the contrary, if the exception for non-willful violations applies on a per-account basis, then logically the violations the exception forgives must arise on a per-account basis too. Framed in terms of "the transaction" and "the account," the reasonable-cause exception most naturally reads as excusing the failure to report a transaction or account, not the failure to file an FBAR. This reading supports our view that the underlying "violation" in section 5321(a)(5)(A) cannot be read on a per-form basis.

## C.

Bittner's remaining arguments lack merit. He claims that, as a penal tax statute, section 5321(a)(5)(A) should be strictly construed against the government. It is a "'longstanding canon of construction' that if 'the words of a tax statute are doubtful, the doubt must be resolved against the government and in favor of the taxpayer.'" *United States v. Marshall*, 798 F.3d 296, 318 (5th Cir. 2015) (collecting cases); *accord Comm'r v. Acker*, 361 U.S. 87, 91

---

[10] *See Evanto v. Fed. Nat'l Mortg. Ass'n*, 814 F.3d 1295, 1298 (11th Cir. 2016) ("[S]ections 1638 and 1641 connote one particular document by using a definite article ('the') and a singular noun ('disclosure statement')." (citing *Rumsfeld v. Padilla*, 542 U.S. 426, 434 (2004))); *United States v. Grimes*, 702 F.3d 460, 466 (8th Cir. 2012) ("Congress's use of the definite article 'the' followed by the singular noun 'court' suggests that the phrase 'the court' refers to a single district court, rather than all ninety-four district courts . . . ."); *Renz v. Grey Advert., Inc.*, 135 F.3d 217, 222 (2d Cir. 1997) ("Placing the article 'the' in front of a word connotes the singularity of the word modified.").

(1959). This canon, which has been amply criticized,[11] does not apply here because the text of sections 5321(a)(5) and 5314 and of the regulations leaves no doubt that each failure to report an account is a separate violation of section 5314 subject to penalty.

In a similar vein, Bittner invokes the rule of lenity. This rule "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008) (collecting cases). It applies in civil cases where a law "has both criminal and noncriminal applications." *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004); *see United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505, 517–18 & n.10 (1992) (plurality opinion). The rule does not apply here because the statute is not ambiguous and the non-willful penalty provision has no criminal application. *Cf.* 31 U.S.C. § 5322(a)–(b) (imposing criminal penalties only for willful violations).

Additionally, Bittner maintains (and the district court agreed) that a per-account reading would lead to "absurd results." *See Bittner*, 469 F. Supp. 3d at 721–23. We disagree. Statutes generally should be construed to avoid an absurd result, *Martinez v. Mukasey*, 519 F.3d 532, 544 (5th Cir. 2008)— meaning, one "no reasonable person could intend," Scalia & Garner,

---

[11] *See, e.g.*, *White v. United States*, 305 U.S. 281, 292 (1938) (noting "[i]t is the function and duty of courts to resolve doubts," and seeing "no reason why that function should be abdicated in a tax case more than in any other [case]"); *see also* Anita S. Krishnakumar, *Reconsidering Substantive Canons*, 84 U. Chi. L. Rev. 825, 826–27 (2017) (noting "popular belief" that substantive canons of statutory interpretation "act as an 'escape valve' that helps textualist judges eschew, or 'mitigate,' the rigors of textualism" and "reject statutory readings dictated by other tools of construction in favor of readings based on external policy considerations"); Antonin Scalia, A Matter of Interpretation: Federal Courts and the Law 27–29 (Amy Gutmann ed., 1997) (decrying substantive canons as "dice-loading rules" and questioning "where the courts get the authority to impose them").

*supra*, at 237. But we see no absurdity here. Congress's central goal in enacting the BSA was to crack down on the use of foreign financial accounts to evade taxes. It is not absurd—it is instead quite reasonable—to suppose that Congress would penalize each failure to report each foreign account. *See Shultz*, 416 U.S. at 27–29 (noting the "debilitating effects" of secret offshore accounts on the American economy, including hundreds of millions in lost tax revenue).[12]

As a last resort, Bittner turns to legislative history. But "mining legislative history . . . is highly disfavored in the Fifth Circuit . . . ." *Thomas v. Reeves*, 961 F.3d 800, 817 n.45 (5th Cir. 2020) (en banc) (Willett, J., concurring) (emphasis omitted) (collecting cases). In any event, the legislative history Bittner cites is unilluminating.

\*     \*     \*

The text, structure, history, and purpose of the relevant statutory and regulatory provisions show that the "violation" of section 5314 contemplated by section 5321(a)(5)(A) is the failure to report a qualifying account, not the failure to file an FBAR. The $10,000 penalty cap therefore applies on a per-account, not a per-form, basis.

---

[12] Nor is there any absurdity, as Bittner supposes, in the fact that the FBAR filing requirement is triggered not by how many foreign accounts someone has, but by whether their aggregate value exceeds $10,000. *See* 31 C.F.R. § 1010.306(c); *see also Bittner*, 469 F. Supp. 3d at 720 (agreeing with Bittner on this point). People holding less than $10,000 abroad are likely not using foreign accounts to evade taxes. Or so the government might reasonably think. And so it makes sense for the government not to require those people to file FBARs. The $10,000 aggregate threshold aims "to avoid burdening unreasonably" people holding relatively small amounts of money abroad. 31 U.S.C. § 5314(a).

No. 20-40597

# V.

We AFFIRM the summary judgment on Bittner's liability and failure to establish a reasonable-cause defense under 31 U.S.C. § 5321(a)(5)(B)(ii); REVERSE the summary judgment for Bittner on application of the $10,000 penalty cap to his non-willful violations of 31 U.S.C. § 5314; and VACATE and REMAND for further proceedings consistent with this opinion.

# *United States Court of Appeals*

### FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

January 24, 2022

Mr. David O'Toole
Eastern District of Texas, Sherman
101 E. Pecan Street
Federal Building
Room 216
Sherman, TX 75090-0000

     No. 20-40597   USA v. Bittner
               USDC No. 4:19-CV-415

Dear Mr. O'Toole,

Enclosed is a copy of the judgment issued as the mandate and a
copy of the court's opinion.

                    Sincerely,

                    LYLE W. CAYCE, Clerk

                    *Dawn Shulin*
              By: _____
              Dawn M. Shulin, Deputy Clerk
              504-310-7658

cc w/encl:
     Mr. Paul Andrew Allulis
     Mr. Arthur Thomas Catterall
     Mr. Farley P. Katz
     Ms. Rachael E. Rubenstein